## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL ACADEMY OF EDUCATION,
500 5th Street NW
Washington, DC 20001

and

NATIONAL COUNCIL ON
MEASUREMENT IN EDUCATION
19 Mantua Road
Mt. Royal, NJ 08061
                    *Plaintiffs*,

                    vs.

DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, D.C. 20202

and

LINDA MCMAHON, *in her official capacity as Secretary of Education*,
400 Maryland Avenue, SW
Washington, D.C. 20202

                    *Defendants*.

Civil Action No. 1:25-cv-01266


**COMPLAINT**


### INTRODUCTION

1.      The Education Sciences Reform Act ("ESRA") requires that the federal government maintain robust educational data collection capabilities, and that the Department of Education ("the Department") collect, maintain, analyze, and disseminate high-quality data through its research initiatives. To accomplish these goals, ESRA reorganized the existing Department research initiatives and established the Institute of Education Sciences ("IES") which includes the four National Centers of Research (collectively, "IES's Centers"): the National Center

for Education Statistics ("NCES"), National Center for Education Evaluation ("NCEE"), National Center for Education Research ("NCER"), and the National Center for Special Education Research ("NCSER").

2.      Congress has taken no action to curtail IES's and its Centers' obligations under ESRA and has instead continued to add further mandates to IES's collection duties. In support of these data collection mandates, Congress continues to appropriate hundreds of millions of dollars to ensure that IES and its Centers can meet their critical legal obligations.

3.      Despite these ongoing congressional mandates, Defendants and other officials in the Trump Administration, through Executive Orders and the Department of Government Efficiency ("DOGE") initiatives, have moved swiftly to take actions that restrict the collection and dissemination of federal education information as part of the administration's ultimate goal of dismantling the Department.

4.      The first disruptive action resulting in the restriction of Department data took place on February 10, 2025, when the Department cancelled over $900 million in Department contracts, including vendor contracts required to maintain and update data collected by IES and its Centers in accordance with congressional mandates.

5.      On March 11, 2025, the administration announced a Reduction in Force ("RIF") of nearly fifty percent of the Department's workforce. Due to the RIF and other actions by the Department, approximately 90% of IES's staff was eliminated, shrinking IES to approximately twenty employees, and NCES—one of the nation's oldest statistical centers—has shrunk from approximately 100 employees down to three. Following the Department's RIF and other agency actions related to the shuttering of the Department, IES and its Centers are no longer able to comply with congressional mandates to collect, analyze, and disseminate critical datasets related to

2

education.

6.      Where federal education data does exist, the Department has terminated academic researchers' access to this data in contravention of the congressional mandate to make IES data publicly available.

7.      Plaintiffs and their members, preeminent education scholars and measurement experts, rely on data from IES's Centers for their research on pressing educational issues, including the National Assessment of Educational Progress ("NAEP"), EDFacts, National Post Secondary Student Aid Survey ("NPSAS"), Educational Longitudinal Studies ("ELS"), Early Childhood Longitudinal Study ("ECLS"), High School Longitudinal Study ("HCLS"), and the Trends in International Mathematics and Science Study ("TIMSS").

8.      This data from IES's Centers is critical to Plaintiffs and their members' research on educational inequality in access to resources, opportunities, support, and outcomes. Without this data, Plaintiffs and their members cannot continue their study of educational inequality and the practices, programs, and policies that work to improve opportunities and outcomes for historically underserved students, including Black, Latino, and Native American students; students with disabilities; English language learner/multilingual learners; and socioeconomically disadvantaged students by: measuring national trends in education access and outcomes; ensuring that measurement data is of the highest quality, and valid and reliable for representing disparities in state and national test scores among demographic groups; and measuring changes in the distribution of financial aid.

9.      IES's data not only fuels Plaintiffs and their members' research, but also technical assistance, federal aid calculations, grants to localities, recipients' compliance efforts, and Census Bureau statistics. The impending failure of IES to collect future data will have longstanding and

far-reaching impacts on our nation's education system.

10.    Not only will Defendants' actions related to IES's and its Centers' data create long-term, irreparable harm, these actions are in violation of the Administrative Procedure Act (APA). Restricting the collection, maintenance, and analysis of IES's and its Centers' data violates the APA because it was carried out in excess of statutory authority, was arbitrary and capricious, and was not in accordance with the law under ESRA. These actions are also unlawful because they violate the constitutional Separation of Powers and constitute unlawful *ultra vires* agency action.

11.    This suit seeks declaratory and injunctive relief against Defendants' unlawful restriction of IES's and its Centers' data, and against Defendants' imminent and ongoing failure to maintain and update IES's and its Centers' data as required by Congress.

## PARTIES

12.    Plaintiff National Academy of Education (NAEd) is a nonpartisan, nonprofit organization that advances high-quality research to improve education policy and practice. Founded in 1965, the NAEd has 342 members, including those in the United States and international associates, who are elected on the basis of their leading and trusted scholarship related to education. NAEd undertakes research studies to address pressing educational issues and administers professional development fellowship programs to enhance the preparation of the next generation of education scholars. NAEd and its members rely on  data to study a wide variety of pressing educational issues, including inequities that prevent Black and other historically marginalized students from having equal access to educational opportunities. Using NAEd member research to improve education policy and practice is integral to NAEd's mission and access to the IES data is a necessary component of this work. NAEd and its members are injured by Defendants' actions restricting the collection, maintenance, analysis, and dissemination of

federal education data because Defendants' actions prevent NAEd and its members from completing ongoing research, disseminating planned research, and instructing students in their coursework. NAEd and its members are injured by this loss of information due to Defendants' actions, and Defendants' failure to comply with ESRA and other federal laws.

13.    Plaintiff National Council on Measurement in Education (NCME) is a professional organization founded in 1938 for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement. NCME has 1,870 members who are education researchers and measurement experts involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation. NCME aims to advance the science and scholarship of educational measurement and promote knowledge, understanding, and implementation of best practices in educational measurement through the publication of research and scholarly journals. NCME members include researchers; university faculty; graduate students; test developers; and other professionals with work related to education, psychology, and other testing issues and practices. Serving communities and ensuring that assessment is fair and equitable for all students are essential elements of NCME's mission and purposes. NCME and its members are injured by Defendants' actions restricting the collection, maintenance, analysis, and dissemination of federal education data because Defendants' actions prevent NCME and its members from completing ongoing research, disseminating planned research, and instructing students in their coursework. NCME and its members are injured by this loss of information due to Defendants' actions, and Defendants' failure to comply with ESRA and other federal laws.

14.    Defendant United States Department of Education is a Cabinet agency headquartered in Washington, D.C., responsible for the oversight of federal education and civil-

rights laws and programs, including the Institute for Education Sciences. Through ESRA, Congress mandates that the Department, through IES and its Centers, collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally. 20 U.S.C. §§ 9541–48. The Department's actions, including its attempted dismantling and cessation of congressionally mandated work at IES and its Centers, and effectuating mass terminations of the Department's staff or cancelling vendor contracts necessary for the statutorily required collection, maintenance, and dissemination of educational data, are not authorized by ESRA.

15.     Defendant Linda McMahon is the U.S. Secretary of Education and is sued in her official capacity. Defendant McMahon authorized and approved the Department's unlawful dismantling and cessation of congressionally mandated work at IES and its Centers.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1346(a)(2), because the matters in this controversy arise under the laws of the United States, and the defendants are United States officials. *See* 44 § U.S.C. 33501 *et seq*. and 5 U.S.C. § 702, 704.

17.     This Court has jurisdiction to grant declaratory judgment, and to provide preliminary and permanent injunctive relief under Federal Rules of Civil Procedure 57 and 65, as well as 28 U.S.C. §§ 2201 and 2202.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because defendants are agencies of the United States.

## FACTUAL BACKGROUND

### A. The Creation and Development of Federal Education Research Institutes and Centers.

19.     Since the 1860s, the federal government has dedicated significant resources

towards the collection, analysis, and dissemination of high-quality educational data for the benefit of our nation's students.[1] To that end, it has worked to improve and expand educational statistical research and provide additional resources for the evaluation of the United States educational system.[2]

20.    In 1979, Congress passed, and President Carter signed, the Department of Education Organization Act (DEOA), Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510), establishing the present-day Department under the supervision of a Secretary of Education.

21.    On November 5, 2002, President Bush signed H.R. 3801, which included ESRA, a landmark act for the improvement of federal education research, statistics, evaluation, information, and dissemination. Through ESRA, Congress recommitted to prioritizing the federal government's role in educational data collection, evaluation, and dissemination.

22.    The DEOA created a research office in the Department, which the 2002 ESRA, an act "to provide for improvement of Federal education research, statistics, evaluation, information and dissemination," reconstituted as IES, an independent research division. *See* Pub. L. 107-279; 20 U.S.C. §§ 9501–84.

23.    In creating IES, Congress established the division's mission as "expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about— (A) the condition and progress of education in the United States, including early childhood education; (B) educational practices that

---

[1] Thomas D. Snyder, 120 Years of American Education: A Statistical Portrait, Nat'l Ctr. for Educ. Stat. (1993), https://nces.ed.gov/pubs93/93442.pdf
[2] *Id.*

support learning and improve academic achievement and access to educational opportunities for all students; and (C) the effectiveness of Federal and other education programs." *See id*. § 9511.

24.     IES has a congressional mandate to "directly or through grants, contracts, or cooperative agreements . . . (1) conduct and support scientifically valid research activities, including basic research and applied research, statistics activities, scientifically valid education evaluation, development, and wide dissemination; (2) widely disseminate the findings and results of scientifically valid research in education; (3) promote the use, development, and application of knowledge gained from scientifically valid research activities; (4) strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education; (5) promote the coordination, development, and dissemination of scientifically valid research in education within the Department and the Federal Government; and (6) promote the use and application of research and development to improve practice in the classroom." *See id*. § 9512.

25.     In carrying out these mandates, Congress requires IES to establish and operate four research centers—NCES, NCEE, NCER, and NCSER—to maintain specialized federal education data and information. *See id*. §§ 9511(c), 9531–34, 9541–48, 9561–64, 9567–67b.

26.     IES is the statistics, research, and evaluation arm of the Department. IES was created "to provide scientific evidence on which to ground education practice and policy and to share this information in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public."[3]

---

[3] Inst. of Educ. Sci., *About IES*, https://ies.ed.gov/about (last visited Apr. 21, 2025).

27.     NCES is "the federal statistical agency responsible for collecting, analyzing, and reporting data on the condition of U.S. education—from early childhood to adult education—to help improve student outcomes."[4]

28.     Through IES and its Centers, Congress sought to improve both the quantity and quality of educational data collection, by increasing not only the amount of data collected but also by setting high standards and processes for review of the research that relied on this data.[5] Across IES and its Centers' data-collection programs, utilizing empirical research methods and peer review are major requirements of ESRA.

29.     Along with this improvement in the quantity and quality of educational data, Congress charged IES with ensuring that the research findings uncovered through IES data would be widely distributed to researchers, schools, educators, parents, students, and other public stakeholders.[6] An example of this required dissemination is the congressionally mandated statistical report on the conditions and progress of education in the U.S. that NCES is required to produce annually. *See* 20 U.S.C. § 9545.

30.     Congress requires NCES to create the NAEP, also known as "the Nation's Report Card." *See id.* § 9621. NCES is required to collect and report NAEP data and ensure that it is publicly available in a timely manner following official reporting, and in such a way that facilitates further research. *See id.*

31.     As stated by NCES on its official website, "[s]ince 1867, NCES has been the federal statistical agency responsible for collecting, analyzing, and reporting data on the condition of U.S.

---

[4] Nat'l Ctr. for Educ. Stat., *National Center for Education Statistics (NCES)*, https://nces.ed.gov/ (last visited Apr. 21, 2025).
[5] *Id.*
[6] *Id.*

education—from early childhood to adult education—to help improve student outcomes."[7] Though statutory provisions in ESRA, Congress mandated that the mission of NCES is "(1) to collect and analyze education information and statistics in a manner that meets the highest methodological standards; (2) to report education information and statistics in a timely manner; and (3) to collect, analyze, and report education information and statistics in a manner that— (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." *Id.* § 9541. To achieve this mission, NCES collects and produces data in many ways including "from state reports, direct student assessments, longitudinal studies, international surveys, postsecondary institutions, adult surveys, and synthesizing data from federal sources."[8]

32.     As noted on NCES's official website, NCES has a "Congressional mandate to collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally."[9] *See* 20 U.S.C. §§ 9541–48.

33.     Congress has made explicit through statutory provisions in ESRA that NCES's mandate requires NCES to collect, compile, and disseminate statistics on topics including: (A) state and local education reform activities; (B) state and local early childhood school readiness activities; (C) student achievement in, at a minimum, the core academic areas of reading, mathematics, and science at all levels of education; (D) secondary school completions, dropouts,

---

[7] *Id.*
[8] *Id.*
[9] Nat'l Ctr. for Educ. Stat., *The National Center for Education Statistics: Who We Are*, https://nces.ed.gov/national-center-education-statistics-nces/about (last visited Apr. 21, 2025).

and adult literacy and reading skills; (E) access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students; (F) teaching, including professional development opportunities for teachers and teacher qualifications; (G) instruction, the conditions of the education workplace, and the supply of, and demand for, teachers; (H) the incidence, frequency, seriousness, and nature of violence affecting students, school personnel, and other individuals participating in school activities, as well as other indices of school safety; (I) the financing and management of education, including data on revenues and expenditures; (J) the social and economic status of children, including their academic achievement; (K) the existence and use of educational technology and access to the Internet by students and teachers in elementary schools and secondary schools; (L) access to, and opportunity for, early childhood education; (M) the availability of, and access to, before-school and after-school programs; (N) student participation in and completion of secondary and postsecondary vocational and technical education programs by specific program area; and (O) the existence and use of school libraries. *See id*. § 9543.

34.     This congressional mandate also requires NCES to collect, analyze, cross-tabulate, and report "information by gender, race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, and other population characteristics, when such disaggregated information will facilitate educational and policy decisionmaking." *See id*. § 9543(a)(3). To this end, NCES collects demographic data for use in datasets like the Integrated Postsecondary Education Data System.[10]

35.     NCEE "conducts unbiased, large-scale evaluations of education programs

---

[10] Nat'l Ctr. for Educ. Stat, *The History and Origins of Survey Items for the Integrated Postsecondary Education Data System* (2023), https://nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf (last visited Apr. 21, 2025).

supported by federal funds; provides training and coaching to states, districts, and institutions of higher education to support their improvement goals; and encourages the development and use of research and evaluation in education systems throughout the United States."[11] Its primary mission is to provide technical assistance and conduct evaluations of federal education programs administered by the Secretary (and as time and resources allow, other education programs) to determine the impact of such programs. 20 U.S.C. § 9561(b).

36.    NCEE is responsible for the production of the What Works Clearinghouse and the work of the Regional Education Laboratories. It is statutorily mandated to collect, analyze, and disseminate federal education data. *Id.* § 9562(a).

37.    NCER "promotes the highest quality of and rigor in the education sciences through funding state-of-the-art research and research training programs that build the knowledge and understanding of education practice, systems, and policy needed to improve the quality of education in the United States and optimize education outcomes for all learners."[12] Its primary mission is to sponsor sustained research that will lead to the accumulation of knowledge and understanding of education to improve education outcomes and close the achievement gap. 20 U.S.C. § 9531 (b).

38.    NCER is statutorily mandated to collect, analyze and disseminate federal education data. *Id.* § 9533.

39.    NCSER "supports a comprehensive program of research to expand the knowledge and understanding of children and youth with or at risk for disabilities, from infancy through

---

[11] Nat'l Ctr. for Educ. Eval. and Regional Assistance, https://ies.ed.gov/about/national-center-education-evaluation-regional-assistance-ncee (last visited Apr. 23, 2025).
[12] Nat'l Ctr. for Educ. Research, https://ies.ed.gov/about/national-center-education-research-ncer (last visited Apr. 23, 2025).

postsecondary education."[13] Its primary mission is to sponsor research to expand knowledge and understanding of the needs of infants, toddlers, and children with disabilities in order to improve the developmental, educational, and transitional results of such individuals. 20 U.S.C. § 9567 (b).

40.     NCSER is statutorily mandated to collect, analyze, and disseminate federal education data. *Id.* § 9567b.

41.     IES datasets include those that are collected, analyzed, and reported through NAEP, EDFacts, NPSAS, ELS, TIMSS, and the What Works Clearinghouse.

42.     ESRA requires that the NAEP measure "student academic achievement and reporting of trends in such achievement in reading, mathematics" and other subjects; ensure that the measurement occurs by using a methodology that is designed to produce "valid and reliable" results, that are based on "widely accepted professional standards;" and that the results are publicly disseminated. *See id*. §§ 9622(b)(1), 9622(e)(2)(A), 9622(c)(1)(A). The next round of NAEP assessments is due to occur in January 2026.

43.     The NPSAS examines characteristics of students in postsecondary education, with a special focus on how they finance their education and was designed to fulfill the requirements of 20 U.S.C. § 1015. The NPSAS has been conducted every three to four years since 1987. Data collection has ended for the NPSAS24, and the results are due to be analyzed imminently in advance of publication in 2026.[14]

44.     Since 1972, the Department has conducted ELS to enable the study of the educational experiences, outcomes, and transitions of students throughout their lives, including

---

[13] Nat'l Ctr. for Spec. Ed. Research, https://ies.ed.gov/about/national-center-special-education-research-ncser (last visited Apr. 23, 2025).
[14] Nat'l Ctr. for Educ. Stat., *National Postsecondary Student Aid Study*, https://nces.ed.gov/surveys/npsas/ (last visited Apr. 21, 2025)

their transitions into postsecondary education and the workforce.[15] These studies involve individual assessments of thousands of students and teachers across the country and include the ECLS and HCLS.

45.     EDFacts is a Department initiative to collect, analyze, and promote the use of high-quality, pre-kindergarten through grade 12 data.[16] It is a centralized hub for data provided by school districts and state education agencies. The purpose of EDFacts is to, among other things, publicize educational data that can be used for planning, policy, and management at the federal, state, and local levels.

46.     TIMSS provides reliable and timely trend data on the mathematics and science achievement of American students compared to that of students in other countries. TIMSS data have been collected from students at grades 4 and 8 every 4 years since 1995, with the United States participating in every administration of TIMSS.[17]

47.     Furthermore, Congress mandated through ESRA that the above-mentioned datasets from IES's Centers must be available online. ESRA provides that "data collected by [IES], including any office, board, committee, or center of [IES], in carrying out the priorities and mission of [IES], shall be made available to the public, including through use of the Internet." *Id*. § 9574.

---

[15] Nat'l Ctr. for Educ. Stat., *Longitudinal Studies*, https://nces.ed.gov/surveys/lsb/#high-school-studies (last visited Apr. 21, 2025).
[16] U.S. Dep't of Educ., *The EDFacts Initiative*, https://www.ed.gov/data/edfacts-initiative (last visited Apr. 21, 2025).
[17] Nat'l Ctr. for Educ. Stat., Trends in International Mathematics and Science Study (TIMSS) https://nces.ed.gov/timss/overview.asp (last visited Apr. 21, 2025). Under 20 USC § 9543 (a), NCES must "collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including . . . (6) acquiring and disseminating data on educational activities and student achievement (such as the Third International Math and Science Study) in the United States compared with foreign nations."

**B. The Department's Termination of IES Contracts, Reduction in Force, and Limiting the Availability of Access to Data.**

48.     The Trump administration has been clear about its goal of abolishing the Department since before President Trump's election. President Trump stated in a September 2023 campaign video, "One thing I'll be doing very early in the administration is closing up the Department of Education in Washington, D.C."[18]

49.     Defendant Secretary McMahon shares President Trump's goal of shuttering the Department, stating during her confirmation process that the bureaucracy in Washington should be "abolished."[19] Once in office, Secretary McMahon described her work as part of "the Department of Education's final mission."[20]

50.     On March 20, 2025, President Trump issued an Executive Order directing the Secretary of Education to dismantle the Department.[21] According to this Order, the Secretary shall, to the maximum extent appropriate and permitted by law, "take all necessary steps to facilitate the closure of the Department of Education." The Order also directs the Secretary to ensure that entities receiving federal assistance "terminate illegal discrimination obscured under the label 'diversity, equity, and inclusion.'"

51.     The Order further states that the Department should be closed, and its main

---

[18] Graham Kates, *Can Trump Dismantle the Department of Education? It Won't Be Easy, Experts Say*, CBS News (Feb. 4, 2025), https://www.cbsnews.com/news/trump-dismantle-education-department/.
[19] Linda McMahon, *Post-Hearing Questions for the Record Submitted to Ms. Linda McMahon*, Elizabeth Warren (Feb. 14, 2025),
https://www.warren.senate.gov/imo/media/doc/kim_warren_qfrs_for_mcmahon.pdf.
[20] Press Release, U.S. Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025),
https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.
[21] Executive Order 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025),
https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/

functions "returned to the states," because the "federal education bureaucracy is not working."

52.    In carrying out this goal of dismantling the Department, the administration has focused on mass firings of agency staff and cancelling hundreds of millions of dollars in Department contracts.

**1. The Department's Contract Cancellations at IES and its Centers.**

53.    IES and its Centers' data collection, retention, and dissemination rely in large part on the work of independent contractors. Most NCES data is hosted by such independent contractors, and most IES websites that publish this data and IES Centers' data are designed and maintained by independent contractors. Without these contracts, IES and its Centers do not have the resources to collect, analyze, publish, and maintain with integrity for use the federal education data in keeping with ESRA.

54.    Despite the necessity of these contracts to the proper legal functioning of IES and its Centers, on February 10, 2025, DOGE announced the cancellation of most IES and its Centers' contracts, constituting over $900 million in contracts.[22] The X (formerly Twitter) social media account for DOGE has since posted information regarding the cancellation of about ninety IES contracts, some of which are critical to the basic functioning of IES and to the realization of many of IES's congressional mandates.[23]

55.    Notable examples of contract terminations that will obstruct IES's ability to uphold congressional mandates include: (1) two contracts for the NPSAS; (2) contracts necessary to the

---

[22] Ryan Quinn & Katherine Knott, *$900M in Institute of Education Sciences Contracts Axed*, Inside Higher Ed (Feb. 12, 2025), https://www.insidehighered.com/news/faculty-issues/research/2025/02/12/900m-institute-education-sciences-contracts-axed; Jonaki Mehta & Cory Turner, *Trump Targets Education Department Research Arm in Latest Cuts*, NPR (Feb. 10, 2025), https://www.npr.org/2025/02/10/nx-s1-5292444/trump-musk-education-department-schools-students-research-cuts.
[23] Department of Government Efficiency (@DOGE), X/Twitter (Feb. 10, 2025, 7:43 PM ET), https://x.com/DOGE/status/1889113011282907434.

Common Core of Data and the Private School Survey, surveys necessary for the completion of the congressionally required NAEP and EDFacts as well as for the distribution of roughly $16 billion in federal Title I funding for low-income children; (3) the contract for the completion of the National Assessment of Adult Education, which IES is required to conduct under section 242 of the Adult Education and Family Literacy Act (AEFLA), 29 U.S.C. § 3332(b)(3)(6); (4) contracts necessary for the creation of the Condition of Education, an annual NCES report statutorily required by ESRA, 20 U.S.C. § 9545(b); (5) contracts through which IES complies with the dissemination requirements under ERSA including contracts for the DATALAB online platform and for the What Works Clearinghouse; (6) contracts for peer review of grants and research required for compliance with the requirements of 20 U.S.C. §§ 9520 and 9576(c); (7) contracts for the TIMSS, Teaching and Learning International Survey ("TALIS"), and other international surveys and analyses through which NCES meets statutory requirements to acquire and disseminate data on educational activities and student achievement in the United States compared to foreign nations; (8) contracts through which NCES completes congressionally mandated longitudinal data collections, including the High School and Beyond Survey and the Early Childhood Longitudinal Study; and (9) contracts for statutorily required Regional Educational Laboratories to conduct their statutorily mandated work.

56.     Following the cancellation of these contracts and others necessary for IES and its Centers to fulfill statutory obligations, the Department has failed to replace these contracts or in any meaningful way mitigate the damage caused by these cancellations.

57.     The Department's policies regarding these contract terminations will not only lead to failures to uphold congressional mandates with regards to future data but may also result in the destruction of existing federal education data required of IES and its Centers.

58.    Without these contracts, IES and its Centers will not be able to hold up numerous congressional mandates, and the resulting loss of data, as well as the failure to collect future data, will cause irreparable harm to Plaintiffs NAEd and NCME, and their members.

**2.    The Department's Reduction in Force.**

59.    On March 11, 2025, the Department announced a RIF of nearly 50% of its workforce.[24]

60.    These cuts have been particularly significant at IES, reducing its workforce from around 186 employees down to twenty,[25] with NCES, drastically shrinking from approximately 100 employees down to three.[26]

61.    These terminated employees lost access to physical IES and its Centers' facilities on March 11, 2025, and had only limited IT access until March 21, 2025. This limited access did not allow IES and its Centers' employees to contact any external contractors, and so the soon-to-be terminated employees had no way to transition or protect the contractor-maintained data for which IES and its Centers are statutorily responsible.

62.    Upon information and belief, only three contracting officer representatives are left at NCES, a staff too small to oversee even the select contracts that remain in force, let alone to recontract for the cancelled contracts that IES and its Centers are statutorily required to replace or

---

[24] U.S. Dep't of Educ, *supra* note 20.

[25] Jill Barshay, *Chaos and Confusion as the Statistics Arm of the Education Department is Reduced to a Skeletal Staff of 3*, Hechinger Rep. (Mar. 14, 2025), https://hechingerreport.org/proof-points-chaos-confusion-statistics-education.

[26] Letter from IES Contracts Cancellation Coalition to U.S. Congress (Feb. 13, 2025), https://www.knowledgeall.net/wp-content/uploads/2025/02/IES-Contracts-Cancellation-Coalition-Sign-On-Letter.pdf, https://www.knowledgeall.net/wp-content/uploads/2025/02/IES-Contracts-Cancellation-Coalition-Sign-On-Letter.pdf; Jonaki Mehta, *Trump's Cuts to Education Department Threaten Money for Schools*, NPR (Mar. 21, 2025), https://www.npr.org/2025/03/21/nx-s1-5330917/trump-schools-education-department-cuts-low-income.

reinstate.

63.    Due to NCES's drastically shrunken workforce, it no longer can collect, analyze, and disseminate critical datasets, including the NAEP, EDFacts, NPSAS, ELS, and TIMSS. The collection of these datasets involves measuring hundreds of indicators across all school districts across the country. Ordinarily, they require hundreds of Department employees and contractors to complete.

64.    The significant RIF guarantees that IES and its Centers will not be able to uphold their congressional mandates to not only collect data, but also to ensure that datasets comprise valid and reliable measurements of district, state, and national achievement data and trends that meet high methodological standards. *See id.* § 9622(b)(2).[27]

65.    IES's and its Centers' RIF does not excuse them from their congressional mandates to collect, analyze, and disseminate high-quality federal education data. Failure to uphold these congressional mandates will irreparably harm Plaintiffs and their researcher members.

### 3. The Department Has Limited the Availability of and Access to Important Datasets.

66.    The Department's actions, with regards to the contract terminations and the RIF as described above, will limit the availability and access of significant datasets that are needed to identify, investigate, evaluate and improve educational outcomes.

67.    These datasets have no comparators. Currently, no alternative public or private entity has the infrastructure or resources necessary to collect, analyze, and disseminate this type of data.

68.    Furthermore, the Department has significantly limited researchers' access to and use of restricted-use data. Educational researchers, including Plaintiffs NAEd's and NCME's

---

[27] *See also* Nat'l Ctr for Educ. Stat., *supra* note 4.

members, access and rely upon two categories of IES and its Centers' data. The first is "public-use data," which is aggregated and available to the general public. The second is "restricted-use data," which contains more granular, individually identifiable information.

69.    To access restricted-use data, a researcher must be a member of a qualified organization. Qualified members may access restricted-use data through either a "physical" or a "remote" data license. Through a physical data license, the researcher will receive a CD-ROM for data that must be accessed in a secure facility called a "cold room," on a standalone desktop computer disconnected from the Internet. The remote data license provides access to restricted-use data through a secure online platform.

70.    On February 10, 2025, the Department announced that all remote restricted-use data licenses would be terminated effective June 1, 2025, and that it would no longer accept new applications. In communications with remote restricted-use data license holders about these terminations, IES acknowledged that the terminations may cause difficulties for their educational research.

71.    To share research or analysis informed by restricted data, researchers holding a restricted data license must first obtain IES permission through a disclosure risk review process, which typically takes five to ten business days. On February 14, 2025, IES informed license holders that these disclosure risk reviews may be delayed due to recent reductions in resources.

72.    NCES data users received similar communications from the National Science Foundation on March 31, 2025, stating first that license renewals and disclosure reviews would be paused, and later clarifying that disclosure reviews would continue but that all new and existing requests would likely be delayed.

73.    Without access to existing and future federal education data, both public-use and

restricted-use, Plaintiffs and their member researchers will not be able to carry out vital academic research, some of which is ongoing and, without continued access to this data, likely to result in a waste of vast institutional resources, including government grants. Moreover, without these research results, researchers and the communities they serve will not know what pedagogies are working to support student learning.

**C.  The Department's Actions Harm Plaintiffs.**

74.    The relationship between education researchers and federal education data collection is symbiotic and mutually beneficial. Education researchers cannot complete their research without access to federal education data, which is unavailable from any other sources. In turn, Congress considers these researchers' work, including their expertise on research design and methodology, when preparing education data, policymaking, and determining the continued role of IES and its Centers.

75.    The collection and analysis of data is also essential for creating and maintaining valid and reliable educational assessments. Disruptions to the collection of educational assessment data threaten the quality and dependability of the assessments themselves.[28]  Congress intends for this education research done by Plaintiffs and their members to be available, including through the What Works Clearinghouse, to inform educational practices by policymakers, state and district leaders, and educators to best support all students' learning.

76.    Policymakers, state and district leaders, teachers, students, parents, and communities also rely on education researchers and experts to facilitate their understanding of IES's vast data repository and communicate the implications of IES data to improve education

---

[28] Am. Educ. Rsch. Ass'n, Am. Psych. Ass'n, & Nat'l Council on Measurement in Educ., *Standards for Educational and Psychological Testing* (2014), https://www.testingstandards.net/uploads/7/6/6/4/76643089/standards_2014edition.pdf.

policies and practices, as well as schools' teaching and learning. This relationship is of paramount importance to the success of the U.S. educational system, a fact that Congress continues to acknowledge through legislation and appropriations.

77.    IES data is particularly vital for researchers who specialize in studying how to create fair and just educational outcomes for Black, Latino, and Native American students; students with disabilities; English language learner/multilingual learners and socioeconomically disadvantaged students and communities.

78.    For example, Plaintiffs NAEd's and NCME's members rely on EDFacts and NAEP for their work on the Educational Opportunity Project, which is a clearinghouse for national educational test score data. The Educational Opportunity Project uses NAEP and EDFacts data to create a publicly available national database of academic performance for every school district and school in the country. It allows anyone to review data on a wide range of metrics, including learning loss following the COVID-19 pandemic, the impact of neighborhood segregation on student achievement, and student performance in reading and math.

79.    There are no comparable datasets that collect and measure the same metrics as those made available through NAEP and EDFacts, or those that enable researchers to answer the same questions with the same accuracy and scope. Therefore, without the continued collection, analysis, and dissemination of NAEP and EDFacts data, Plaintiffs' members cannot continue their work on this groundbreaking project.

80.    Plaintiffs NAEd's and NCME's members also rely on the NPSAS to analyze the distribution of federal financial aid to assess whether it is reaching the most disadvantaged students. For example, one NAEd member plans to study how the distribution of financial aid shifted after the passage of the FAFSA Simplification Act, including whether there were changes

in the numbers or demographics of students applying for financial aid.

81.     There are no comparable datasets that collect and measure the same metrics as the NPSAS and that enable researchers to answer the same questions with the same accuracy and scope. Therefore, without the continued collection, analysis, and dissemination of the NPSAS, Plaintiffs' members cannot continue their work.

82.     Plaintiffs NAEd's and NCME's members rely on the ECLS for their work on tracking student performance in kindergarten and primary school. For example, NAEd's members have used the ECLS to analyze and track trends in early childhood education. One NAEd member, along with other researchers, plans to use the latest results of the ECLS, which are due to be disseminated in early 2026.

83.     There are no comparable datasets that collect and measure the same metrics as the ECLS and that enable researchers to answer the same questions with the same accuracy and scope. Therefore, without the continued collection, analysis and dissemination of the ECLS, Plaintiffs' members cannot continue their work.

84.     Plaintiffs NAEd's and NCME's members rely on NCEE's "What Works Clearinghouse" and have been contracted to improve future data collection of this dataset to ensure adherence to professional standards in educational testing and measurement and to evaluate how to improve testing standards.

85.     There are no comparable datasets that collect and measure the same metrics as the What Works Clearinghouse and that enable researchers to answer the same questions with the same accuracy and scope. Without the continued collection, analysis, and dissemination of this dataset, Plaintiffs' members cannot continue their work.

86.     Plaintiffs NAEd's and NCME's members rely on the National Household

Education Survey (NHES). This survey, produced by NCES, is the only nationally representative data on home learning environments. One NAEd member uses the NHES to support their analysis of early-learning environments and experiences for children aged 3-5.

87.    There are no comparable datasets that collect and measure the same metrics as the NHES and that enable researchers to answer the same questions with the same accuracy and scope. Without the continued collection, analysis, and dissemination of this dataset, Plaintiffs' members cannot continue their work.

88.    Plaintiffs NAEd's and NCME's members also rely on NAEP's National Indian Education Study (NIES) to analyze the academic achievement of Native American students in public, private, Department of Defense, and Bureau of Indian Education funded schools. For example, one NAEd member uses the NAEP data and the NIES survey to assess how Native America students, across different contexts, are doing on assessments in ELA and mathematics, in conjunction with other critical data gained from NIES including school environment, presence or absence of Native teachers (known in research to have a profound influence on student engagement and outcomes), and the extent to which the Native language and culture are integrated into curricula. Using this data, the NAEd member can evaluate local pedagogical interventions on test scores as well as on high school graduation, college/university matriculation, and graduation rates.

89.    There are no comparable datasets that collect and measure the same metrics as the NIES and that enable researchers to answer the same questions with the same accuracy and scope. Therefore, without the continued collection, analysis, and dissemination of the NIES, Plaintiffs' members cannot continue their work.

90.    Plaintiffs NAEd's and NCME's members rely on EDFacts for detailed school-by-grade level data on the academic performance of students of various sociodemographic groups,

including Black, Latino, and Native American students, students with disabilities, and English language learner/multilingual learners.

91.     Plaintiffs NAEd's and NCME's members also rely on NAEP data to enable comparisons of school-level and district-level academic performance across states that are accurate for students of various sociodemographic groups, including Black, Latino, and Native American students, students with disabilities, and English language learner/multilingual learners.

92.     Plaintiffs NAEd's and NCME's members rely on Department datasets, including the NAEP and NPSAS, in their instruction and coursework as education professors. Each year, these members expect to utilize the most up-to-date datasets to instruct their students on current trends in federal education and on how to ensure that data collection occurs in a methodologically sound manner. They also require their students to use these data sets to conduct analysis for their coursework.

93.     Plaintiffs NAEd and NCME also rely on Department datasets to perform educational research in service of their missions.

94.     As described above, Defendants have cancelled contracts impacting the collection, analysis and dissemination of the NAEP, EDFacts, NPSAS, ELS, TIMSS, and What Works Clearinghouse. Because of these cancellations, the Department is unable to collect, analyze, and disseminate these datasets in accordance with its statutory mandates, and Plaintiffs and their members will be unable to obtain and utilize these datasets.

95.     As described above, Defendants indefinitely delayed their processing of new restricted-use licenses. Because of this delay, the Department is not able to provide these datasets to Plaintiffs and their members.

96.     Further, because of the significant reduction in force across IES, Department

datasets, including the NAEP, NPSAS, ELS, TIMSS, and What Works Clearinghouse, cannot be collected in accordance with the highest methodological standards and in a manner that is valid and reliable.

97.    The unavailability of a wide range of IES datasets severely impairs Plaintiffs and their members' ability to perform educational research and teach courses at their academic institutions. Without updated federal education data, Plaintiffs and their members cannot continue to measure and analyze trends in education outcomes; study which pedagogies are effective, fair, and unbiased; arm policymakers, states and districts, educators, students, parents, and communities with current information about proven methods for improving student learning and education outcomes; or keep the public informed about our national education system.

98.    Without redress for Defendants' actions, Plaintiffs and their members' educational research, and their contributions towards improving our educational system, will grind to a halt.

99.    Not only will Plaintiffs and their members be harmed by their inability to complete their research, the students that make up the subject of their research will also be harmed. Without access to this unique federal data, Plaintiffs and their members will not be able to study the educational outcomes of Black, Latino, and Native American students, students with disabilities, English language learner/multilingual learners, and socioeconomically disadvantaged students. Further, Defendants are the only source of data for educational outcomes based on the demographic groups of students such as Native American students, and there are no other datasets available to researchers studying related demographic educational disparities.

100.    If researchers are not able to study educational disparities based on race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, gender, and other population characteristics, it will not be possible to create effective

policies for addressing these disparities and closing any achievement gaps.

## CLAIMS FOR RELIEF

## COUNT I

### Administrative Procedure Act, 5 U.S.C. § 706 (2)(C)

### Exceeds Statutory Authority

101.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

102.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

103.    Defendants' conduct, as described above, constitutes final agency action.

104.    Through ESRA, Congress mandates that the Department, through IES and its Centers, collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally. 20 U.S.C. §§ 9541–48. ESRA further requires that all IES data remain available to the public through online channels. *See id.* § 9574.

105.    ESRA does not authorize Defendants to gut IES and its Centers or to disrupt their data collection, maintenance, and dissemination activities. *See e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 745 (2007).

106.    Only Congress has the authority to amend or repeal this statute.

107.    Defendants lack authority to dismantle or otherwise halt congressionally mandated work at IES and its Centers, in whole or in part, including by effectuating mass terminations of the Department's staff or cancelling vendor contracts necessary for the statutorily required collection, maintenance, and dissemination of educational data, including but not limited to data collected,

analyzed, and reported by NAEP, EDFacts, NPSAS, ELS, TIMSS, and the What Works Clearinghouse.

108.    Plaintiffs have been injured by Defendants' conduct and have no adequate remedy at law.

## COUNT II

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Arbitrary and Capricious

109.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

110.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

111.    Defendants' conduct, as described above, constitutes final agency action.

112.    Defendants' actions are arbitrary and capricious in that Defendants failed to provide any explanation for the dismantling of IES and its Centers, or for the resulting restriction and abandonment of IES and its Centers' data, and in that Defendants failed to consider the significant harms flowing from the restriction of and failure to continue to collect this data.

113.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES and its Centers' data and the staff and contracts necessary to support the collection, maintenance, and analysis of that data. Defendants failed to consider the impact of mass terminations on IES and its Centers' ability to carry out congressionally mandated research collection, analysis, and dissemination. Nor did Defendants articulate a reasoned explanation for these mass terminations in light of these congressionally mandated requirements.

114.    Defendants likewise failed to provide any reasoned explanation for effectuating terminations and contract cancellations that will disrupt access to critical and statutorily mandated datasets, collected by IES and its Centers, including, but not limited, to those collected, analyzed, and reported through NAEP, EDFacts, NPSAS, ELS, and the What Works Clearinghouse.

115.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

116.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and its Centers to operate and to comply with federal laws, including civil rights laws.

117.    In failing to provide a reasoned explanation or consider alternative actions to the destruction of IES and its Centers and their ability to collect data, the Defendants' actions are arbitrary and capricious.

118.    Plaintiffs have been injured by Defendants' conduct and have no adequate remedy at law.

## COUNT III

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Not in Accordance with Law

119.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

120.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

121.    Defendants' conduct, as described above, constitutes final agency action.

122.    Defendants' actions are contrary to law as set out in ESRA. IES and its Centers are created by ESRA and cannot be abolished, dismantled, or closed by the President or Secretary. That is equally true whether this closure is accomplished by mass firings of IES and its Centers' employees or by any other means. Thus, Defendants' dismantlement of IES and its Centers is contrary to the ESRA, which created the IES, and its Centers, in order to "expand[ ] fundamental knowledge and understanding of education . . . in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information." 20 U.S.C. § 9511.

123.    Defendants' actions to debilitate IES and its Centers—including, but not limited to, those actions which obstruct the creation and dissemination of datasets created by and made available through NAEP, EDFacts, NPSAS, ELS, and the What Works Clearinghouse—are in contravention with congressional directives requiring federal collection, analysis, and public dissemination of educational data.

124.    Plaintiffs have been injured by Defendants' conduct and have no adequate remedy at law.

### COUNT IV

### U.S. Const. art. I, §§ 1, 4

### Violation of Separation-of-Powers Doctrine

125.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

126.    The Constitution authorizes private plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr.*, Inc., 575 U.S. 320, 327 (2015). The claim "is the creation of courts of equity, and reflects a long history of judicial review

of illegal executive action, tracing back to England." *Id.*

127.    "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress. *Id.* at 637 (Jackson, J., concurring).

128.    The Constitution assigns to Congress the power to dismantle federal agencies. Nowhere does ESRA or any other statute provide that Defendants, or any executive officer or agency, can engage in the dismantling of the Department or cessation of work at IES and its Centers that is mandated by Congress. Neither Defendants nor the Executive has the authority to repeal ESRA or any statutes which govern IES and its Centers' activities.

129.    Defendants' actions violate the Constitution's separation of powers because Defendants have no authority to dismantle the Department through the restriction, destruction, and abandonment of IES and its Centers' data.

130.    Defendants' actions usurp Congress's legislative authority and violate the Constitution's separation of powers.

131.    Plaintiffs have been injured by Defendants' conduct and have no adequate remedy at law.

## COUNT V

## ESRA

### *Ultra Vires* Agency Action

132.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

133.    Through ESRA, Congress mandates that the Department, through IES and its

Centers, collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally. 20 U.S.C. §§ 9541–48. ESRA further requires that all IES data remain available to the public through online channels. *See id.* § 9574.

134.    By ignoring its clear obligations under ESRA and disrupting IES's and its Centers' data collection, maintenance, and dissemination activities, Defendants have acted *ultra vires*. Defendants' actions are therefore unlawful and should be enjoined.

135.    Plaintiffs have been injured by Defendants' conduct and have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter a judgment against Defendants and award Plaintiffs the following relief:

136.    Declare that Defendants have violated the APA by:

    a.    incapacitating IES and its Centers through terminating nearly 90% of IES staff, making it impossible for IES and its Centers to uphold their statutory mandates regarding the collection and dissemination of the highest quality educational data; and

    b.    cancelling contracts necessary for IES and its Centers to gather, maintain, analyze, and disseminate educational data as mandated by Congress;

137.    Order Defendants to expeditiously, within thirty days of the Court's order, to reinstate the cancelled contracts or, where another contractor could provide equivalent services, to promptly re-bid the contracts, soliciting new contracts to carry out the research and data activities covered by the cancelled contracts;

138.   Enjoin Defendants from allowing Defendants, their employees, agents or independent contractors, from destroying datasets, including by cancelling or otherwise failing to fulfill vendor contracts, where doing so would deny the public timely access to educational data which Congress has mandated IES collect and disseminate;

139.   Require Defendants to restore sufficient employee positions at IES and its Centers to ensure Department compliance with congressional and statutory mandates, including those positions necessary to ensure that, within a timely manner, IES and its Centers can:

      a.   properly oversee all necessary independent contractors,

      b.   grant and renew restricted-use data licenses; and

      c.   complete disclosure risk reviews for license holders;

140.   An order requiring all Defendants to pay Plaintiffs' reasonable costs, expenses, and attorneys' fees; and

141.   Any and all additional relief that Plaintiffs request and this Court deems just and proper.

Dated: April 24, 2025

Amy I. Berman
DC Bar No. 480541
NATIONAL ACADEMY
OF EDUCATION
500 Fifth Street, NW
Washington, DC 20001
(202) 334-2341
aberman@naeducation.org

Respectfully submitted,

*/s/ Samuel Spital*
Samuel Spital,
DC Bar No. NY0248
Morenike Fajana*
Lily Grisafi*
Allison Scharfstein*
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
(212) 965-2259
sspital@naacpldf.org
mfajana@naacpldf.org
lgrisafi@naacpldf.org
ascharfstein@naacpldf.org
cburke@naacpldf.org

*pro hac vice* forthcoming