## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL ACADEMY OF EDUCATION,
500 5th Street NW
Washington, DC 20001

    and

NATIONAL COUNCIL ON
MEASUREMENT IN EDUCATION
19 Mantua Road
Mt. Royal, NJ 08061

    *Plaintiffs*,

    vs.

DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, D.C. 20202

    and

LINDA MCMAHON, *in her official capacity as Secretary of Education*,
400 Maryland Avenue, SW
Washington, D.C. 20202

    *Defendants*.

Civil Action No. 1:25-cv-01266-TNM

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Through the Education Sciences Reform Act ("ESRA"), Congress requires the Defendants U.S. Department of Education (the "Department") and Secretary of Education (collectively, "Defendants") to collect, maintain, analyze, and disseminate high-quality educational data through the Institute of Education Sciences ("IES"), and its research centers, including the National Center for Education Statistics ("NCES"). As recently as 2024, Congress appropriated hundreds of

millions of dollars to the Department to meet its critical legal obligations to collect and disseminate federal educational data.

Plaintiffs the National Academy of Education ("NAEd") and the National Council of Measurement in Education ("NCME") are educational nonprofit organizations whose members are researchers and experts who rely on IES data for their research on pressing educational issues. IES data is critical to Plaintiffs' and their members' research on ensuring equal access to educational resources, opportunities, and support for all students. Among other things, Plaintiffs and their members use this data to measure national trends in education outcomes and changes in the distribution of financial aid. Restrictions on the availability and quality of this data severely hinder Plaintiffs' and their members' work and the development of practices, programs, and policies stemming from this work to improve opportunities and outcomes for all students.

Despite these harms to Plaintiffs and their members, and in violation of federal mandates, Defendants have severely restricted the Department's ability to collect and disseminate federal educational data. For example, Defendants have cancelled over $900 million in contracts necessary for the maintenance and operation of data collected by IES. Defendants have also halved the Department's overall workforce and imposed even starker layoffs at IES and NCES, shrinking IES's workforce from over 175 to 20 employees, and NCES's workforce from approximately 100 employees down to three. This significant reduction in staff renders it impossible for IES to comply with its congressional mandates to collect, analyze, and disseminate critical and high-quality educational datasets. Moreover, where federal education data already exists, Defendants have terminated Plaintiffs' and their members' access to this data in contravention of federal law, which requires Defendants to make IES data publicly available. *See, e.g.*, Bastedo Decl. ¶¶ 10–14, Ex. 1.

Defendants' restrictions on the collection, maintenance, and analysis of IES data violate the Administrative Procedure Act ("APA"). Defendants' actions have been conducted in an arbitrary and capricious manner, which exceeds Defendants' statutory authority and blatantly defies federal laws like ESRA. Defendants' actions also unlawfully violate the constitutional Separation of Powers, which provides that only Congress can dismantle or significantly limit the function of federal agencies.

Defendants' failure to provide access to and maintain this statutorily-mandated federal education data irreparably harms Plaintiffs and their members. These harms cannot be remedied at some future time at the close of this litigation. Plaintiffs may never be able to recover IES data lost as a result of Defendants' contract terminations and reductions in the workforce. Without this data, Plaintiffs' and their members' work will be severely hindered and may need to be abandoned completely.

The impacts of these harms will be most deeply felt by students of color; students with disabilities; English language learners and multilingual learners; and low-income students who benefit from and rely on Plaintiffs' and their members' education work. Preliminary relief is therefore necessary and appropriate to curtail the harms Defendants have already caused and continue to cause to Plaintiffs, their members, and America's entire educational system. Plaintiffs respectfully request a preliminary injunction to prohibit Defendants from taking any further action to limit access to this crucial data and to immediately restore access to data that has already been restricted.

## FACTUAL BACKGROUND

### A. The Creation and Development of Federal Education Research Institutes and Centers.

Since the 1860s, the federal government has dedicated significant resources towards the

collection, analysis, and dissemination of high-quality educational data for the benefit of our nation's students. Thomas D. Snyder, *120 Years of American Education: A Statistical Portrait*, Nat'l Ctr. for Educ. Stat. (1993), https://nces.ed.gov/pubs93/93442.pdf, Ex. 2. To that end, it has worked to improve and expand educational statistical research and provide additional resources for the evaluation of our educational system. *Id*. In 2002, President George W. Bush signed H.R. 3801, which included ESRA, a landmark act "to provide for improvement of Federal education research, statistics, evaluation, information and dissemination." *See* Pub. L. 107-279; 20 U.S.C. §§ 9501–84. Through ESRA, Congress recommitted to prioritizing the federal government's role in educational data collection, evaluation, and dissemination, and reconstituted the Department's prior research office as IES.

IES is the statistics, research, and evaluation arm of the Department. IES was created "to provide scientific evidence on which to ground education practice and policy and to share this information in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public." *About IES*, Inst. of Educ. Sci., https://ies.ed.gov/about (last visited Apr. 21, 2025), Ex. 3.

IES has a congressional mandate to:

directly or through grants, contracts, or cooperative agreements . . . (1) conduct and support scientifically valid research activities, including basic research and applied research, statistics activities, scientifically valid education evaluation, development, and wide dissemination; (2) widely disseminate the findings and results of scientifically valid research in education; (3) promote the use, development, and application of knowledge gained from scientifically valid research activities; (4) strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education; (5) promote the coordination, development, and dissemination of scientifically valid research in education within the Department and the Federal Government; and (6) promote the use and application of research and development to improve practice in the classroom. § 9512.

Through IES, Congress sought to improve both the quantity and quality of educational data

collection by increasing not only the amount of data collected but also by setting high standards and processes for the review of the research that relies on this data. *National Center for Education Statistics (NCES)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/ (last visited Apr. 21, 2025), Ex. 4.

Along with this improvement in the quantity and quality of educational data, Congress charged IES with ensuring that the research findings uncovered through IES data would be widely distributed to researchers, schools, educators, parents, students, and other public stakeholders. *Id*. An example of this required dissemination is the congressionally mandated statistical report on the conditions and progress of education in the United States that the Department is required to produce annually. *See* 20 U.S.C. § 9545.

In carrying out these mandates, Congress requires IES to establish and operate four research centers (collectively, "IES's Centers"), *id*. § 9511(c), —National Center for Education Statistics (NCES), *id* §§ 9541–48, the National Center for Education Evaluation (NCEE), *id* §§ 9561–64, the National Center for Education Research (NCER), *id* §§ 9531-34, and the National Center for Special Education Research (NCSER), *id* §§ 9567–67b —to maintain specialized federal education data and information. Each of these research centers are statutorily required to collect, analyze, and disseminate federal education data. *See id*.

IES datasets include, among many others, those that are collected, analyzed, and reported through:

- the National Assessment of Educational Progress (NAEP), which measures student achievement in multiple subject areas, *see id*. § 9622;

- EDFacts, which is a centralized hub for high-quality data from pre-kindergarten through grade 12 provided by school districts and state education agencies; *The EDFacts Initiative*, U.S. Dep't of Educ., https://www.ed.gov/data/edfacts-initiative (last visited May 2, 2025), Ex. 5

- the National Postsecondary Student Aid Study (NPSAS), which examines characteristics of students in postsecondary education, with a special focus on how they

finance their education and was designed to fulfill the requirements of 20 U.S.C. § 1015;

- Education Longitudinal Studies (ELS), which enable the study of the educational experiences, outcomes, and transitions of students throughout their lives, including their transitions into postsecondary education and the workforce; *Longitudinal Surveys: Longitudinal Surveys Branch*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/lsb/ (last visited Apr. 29, 2025) ["*Longitudinal Surveys Branch*, NCES"], Ex. 6; and

- the What Works Clearinghouse (WWC), which is a resource hub for scientific evidence on education programs, products, practices and policies. *What Works Clearinghouse, What We Do*, Inst. of Educ. Sci., https://ies.ed.gov/ncee/wwc/WhatWeDo (last visited Apr. 29, 2025), Ex. 7.

ESRA provides that the above-mentioned datasets from IES's Centers and any other "data collected by [IES], including any office, board, committee, or center of [IES], in carrying out the priorities and mission of [IES], shall be made available to the public, including through use of the Internet." *Id*. § 9574.

**B. The Department's Termination of Contracts, Reduction in Force, and Limited Availability of Data.**

On March 20, 2025, President Trump issued an Executive Order directing the Secretary of Education to dismantle the Department. Exec. Order 14242, 90 Fed. Reg. 13,679 (Mar. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/, Ex. 8. According to this Order, the Secretary shall, to the maximum extent appropriate and permitted by law, "take all necessary steps to facilitate the closure of the Department of Education." *Id*. The Order further states that the Department should be closed, and its main functions "returned to the states," purportedly because the "federal education bureaucracy is not working." *Id*.

In carrying out this goal of dismantling the Department, the Administration fired agency staff in mass and canceled hundreds of millions of dollars in Department contracts.

i.    *The Department's Contract Cancellations at IES and its Centers.*

IES and its Centers rely on contracts with independent contractors and cannot fulfill their statutory mandates without such contracts. NCES, for example, typically employed one employee for every ten contractors. *See* Jeffrey Mervis, *Cancelling Data Collections Could Imperil Efforts to Improve U.S. Education*, Science (Feb. 12, 2025), https://www.science.org/content/article/canceling-data-collections-could-imperil-efforts-improve-u-s-education-former-trump, Ex. 9; *see also* Ho Decl. ¶ 16, Ex. 10. Contractors are involved in all aspects of NCES's work. *See* Ex. 9. As such, these contract cancellations have impacted IES's Centers' ability to collect future data, store and maintain it, and analyze it. *See id. See also* Johnson Decl. ¶¶ 11-15, Ex. 11; Briggs Decl. ¶¶ 11-12, Ex. 12; Patz Decl. ¶ 18, Ex. 13. Reardon Decl. ¶¶ 25, 27-29, Ex. 14; Dynarski Decl. ¶ 13, Ex. 15; McCarty Decl. ¶ 15, Ex. 16. Without these contracts, IES's Centers do not have the ability to collect, analyze, publish, and maintain with integrity federal education data as mandated by ESRA.

Despite the necessity of these contracts to the proper legal functioning of IES's  Centers, on February 10, 2025, the "Department of Government Efficiency" (DOGE) announced the cancellation of most of IES's Centers' contracts, constituting over $900 million in contracts. Ryan Quinn & Katherine Knott, *$900M in Institute of Education Sciences Contracts Axed*, Inside Higher Ed (Feb. 12, 2025), https://www.insidehighered.com/news/faculty-issues/research/2025/02/12/900m-institute-education-sciences-contracts-axed, Ex. 17; Jonaki Mehta & Cory Turner, *Trump Targets Education Department Research Arm in Latest Cuts*, NPR (Feb. 10, 2025), https://www.npr.org/2025/02/10/nx-s1-5292444/trump-musk-education-department-schools-students-research-cuts, Ex. 18. The X (formerly Twitter) social-media account for DOGE has since posted information regarding the cancellation of about ninety IES contracts,

some of which are critical to the basic functioning of IES and to the realization of many of IES's congressional mandates. Department of Government Efficiency (@DOGE), X/Twitter (Feb. 10, 2025, 7:43 PM ET), https://x.com/DOGE/status/1889113011282907434, Ex. 19.

For example, IES has cancelled contracts necessary for the maintenance and functioning of several datasets relied on by Plaintiffs and their members, including: (1) contracts for the National Postsecondary Student Aid Study (NPSAS); (2) contracts necessary to the Common Core of Data (CCD), which collects information from state education agencies on all public elementary and secondary schools; (3) surveys necessary for the completion of the congressionally required NAEP and EDFacts; (4) contracts supporting the analysis and quality assurance of NAEP data; (5) contracts supporting the operation and availability of the WWC; (6) contracts for the Trends in International Math and Science Study (TIMSS), which provides reliable and timely data comparing American student achievement; and (7) contracts through which NCES completes congressionally-mandated longitudinal data collections, including the High School and Beyond Survey and the Early Childhood Longitudinal Study. *See* Ho Decl. ¶¶ 16, 21, Ex. 10; Briggs Decl. ¶ 12, Ex. 12; Tipton Decl. ¶ 19, Ex. 31; Johnson Decl. ¶ 11, Ex. 11; Reardon Decl. ¶ 25, 10, Ex. 14; Dynarski Decl. ¶ 13, Ex. 15; McCarty ¶ 13, Ex. 16.

These cancellations necessarily impact and hamper IES's Centers' ability to continue data collection for these studies and to ensure that the data is valid, reliable, and properly analyzed. *See, e.g.*, Ho Decl. ¶ 16, Ex. 10; Reardon Decl.¶ 29, Ex. 14. Without these contracts, IES's Centers will not be able to uphold numerous congressional mandates, and the resulting loss of data, as well as the failure to collect future data, will cause irreparable harm to Plaintiffs and their members. *See* Reardon Decl. ¶¶ 22-23, 25, Ex. 14; Ho Decl. ¶¶ 21-22, Ex. 10; Patz Decl. ¶18, Ex. 13; Tipton Decl. ¶¶ 12-13, 21, Ex. 31; Johnson Decl. ¶¶ 10-13, Ex. 11; Briggs Decl. ¶¶ 11-13, Ex. 12; Dynarski

Decl. ¶ 12-13, Ex. 15; Lee Decl. ¶¶ 6-8, Ex. 30; McCarty Decl. ¶ 18, Ex. 16.

   *ii.  The Department's Reduction in Force.*

   On March 11, 2025, the Department announced a Reduction in Force (RIF) of nearly 50% of its workforce. Press Release, U.S. Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force, Ex. 20. These cuts have been particularly significant at IES, reducing its workforce from over 175 employees down to twenty, and with NCES drastically shrinking from approximately 100 employees down to three. Jill Barshay, *Chaos and Confusion as the Statistics Arm of the Education Department is Reduced to a Skeletal Staff of 3*, Hechinger Rep. (Mar. 14, 2025), https://hechingerreport.org/proof-points-chaos-confusion-statistics-education,. Ex. 21; Jonaki Mehta, *Trump's Cuts to Education Department Threaten Money for Schools*, NPR (Mar. 21, 2025) ["Mehta, *Education Department cuts*"], https://www.npr.org/2025/03/21/nx-s1-5330917/trump-schools-education-department-cuts-low-income, Ex. 22.

   With so few employees left at NCES and IES, the current staff is too small to collect, analyze, and disseminate critical datasets, including National Assessment of Educational Progress (NAEP), EDFacts, Education Longitudinal Studies (ELS), and Trends in International Math and Science Study (TIMSS), in a manner that will ensure that these data are valid and reliable. Ho Decl. ¶¶ 16-17, Ex. 10; Patz Decl. ¶¶ 18-20, Ex. 13; Briggs Decl. ¶¶ 11-13; 16, Ex. 12; Bastedo Decl. ¶ 16, Ex. 1; Reardon Decl. ¶ 28-29, Ex. 14; McCarty Decl. ¶ 15, Ex. 16; Barnett Decl. ¶¶ 8, 12, Ex. 23. The reduction in force will compound the harm caused by the loss of independent contractors, therefore making it virtually impossible for IES's Centers to perform their data collection work as legally required. Additionally, many of the impacted datasets  are not readily

available from any other source. Ho Decl. ¶ 16, Ex. 10; Johnson Decl. ¶ 12, Ex. 11; Bastedo Decl. ¶ 15, Ex. 1; Reardon Decl. ¶¶ 15, 26, Ex. 14; Worell Decl. ¶¶ 9,13, Ex. 24; McCarty Decl. ¶ 9, 17, Ex. 16; Barnett Decl. ¶¶ 7, 10, Ex. 23.

### iii. The Department Disrupted Access to Data

Furthermore, the Department has significantly limited researchers' access to and use of restricted-use data, which is data that requires special permission from the Department in order to access, and other public-use data. For example, in March 2025, the Department issued a stop work order on Professor Derek Briggs' research that relied on restricted-use NAEP data. Briggs Decl. ¶ 10, 13, Ex. 12. In February 2025, Professor Michael Bastedo applied for a restricted-use data license for the High School Longitudinal Study (HSLS) data. Bastedo Decl. ¶ 13, Ex. 1. In April 2025, the Department notified Professor Bastedo that it had paused all applications for restricted-use data, and that there was no timeframe for when the application would be reviewed. *Id.* ¶ 14. As a result, Professor Bastedo has no way of legally accessing this data or continuing this work. *Id.* ¶¶ 15-16.

## ARGUMENT

To prevail on a request for a preliminary injunction, Plaintiffs with standing must show that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in Plaintiffs' favor, and (4) the requested relief is in the public interest. *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008). Because all factors weigh in Plaintiffs' favor, this court should grant a preliminary injunction.

I.    **Plaintiffs have Standing.**

Article III standing requires that a plaintiff demonstrate (1) an "injury in fact," (2) fairly traceable to the defendant's challenged action, (3) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Plaintiffs NAEd and NCME can demonstrate both associational standing—"a cognizable injury to one or more of its members,'" *Kingman v. Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016)—and organizational standing, showing injury to their organizations.

A.    **Associational Standing.**

To establish associational standing, Plaintiffs must show that "(1) [their] members would otherwise have standing to sue in their own right; (2) the interests [they] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quotation marks omitted).

*1.  Plaintiffs' Members Have Standing to Sue in Their Own Right.*

Plaintiffs' members have standing to sue because they have suffered informational injuries based on Defendants' curtailment of IES data collection, analysis, and dissemination. To plead an informational-injury claim, a plaintiff must establish that (1) Congress created a legally enforceable right to receive information; and (2) the plaintiff suffered concrete harm due to the failure to receive this information. *See Spokeo v. Robins*, 578 U.S. 330, 348 (2016); *Federal Election Comm'n v. Akins,* 524 U.S. 11, 12 (1998); *Rise for Animals v. Vilsack*, No. 8:22-CV-00810-JRR, 2024 WL 1243847, at *8 (D. Md. Mar. 21, 2024).

Regarding the first factor, IES's Centers have a clear Congressional mandate to conduct "scientifically valid" research, "widely disseminate the findings and results" of this research, and

"promote the coordination, development, and dissemination of scientifically valid research in education within the Department" and across the federal government. *See* 20 U.S.C. §§ 9512, 9541–48. (establishing NCES's obligation to disseminate federal education data); *id*. § 9562 (establishing same for NCEE); *id*. § 9533 (establishing same for NCER); *id*. § 9567b (establishing same for NCSER).

As such, Congress has clearly mandated that IES collect and publish federal educational data, and Congress has established a corresponding right for the public to receive this data. Similar federal laws requiring the collection and dissemination of data have been interpreted to create a corresponding right to information. *See, e.g.*, *Spokeo*, 578 U.S. at 335, 342 (holding that the Fair Credit Reporting Act (FCRA) created a statutory right to information by requiring consumer reporting agencies to revise credit reports to assure their "maximum possible accuracy" and to notify consumers of their responsibilities under FCRA); *Akins,* 524 U.S. at 14-15, 20-28 (finding that the Federal Election Campaign Act created a statutory right to information by "impos[ing] extensive recordkeeping and disclosure requirements"); *Campaign Legal Ctr. v. Fed. Election Comm'n*, 31 F.4th 781, 790 (D.C. Cir. 2022); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) ("Under the language of Section 10(c), the Secretary of the Interior must disclose information it receives in connection with any Section 10 permit. . . .Thus, Section 10(c) clearly creates a right to information upon which a claim of informational standing may be predicated.").

Regarding the second factor, the inability to receive this information poses concrete harms to Plaintiffs' members. Many of Plaintiffs' members rely on Defendants' datasets to complete their research, scholarship, and instruction.

For example, Plaintiffs' members rely on EDFacts and the National Assessment of Educational Progress (NAEP) for their work on the Educational Opportunity Project, which is a

clearinghouse for data on educational achievement across the country. Reardon Decl. ¶ 12-14, Ex. 14; Ho Decl. ¶ 12, Ex. 10. EDFacts and NAEP enable Professors Sean Reardon and Andrew Ho to compare school and district scores to each other by stitching various datasets together for a comprehensive perspective on academic opportunity. Reardon Decl. ¶¶ 16-17, Ex. 14; Ho Decl. ¶ 12, Ex. 10. They learned through public reporting in February and March 2025 that contracts necessary for the collection of these datasets had been cut. Reardon Decl. ¶ 27, Ex. 14; Ho Decl. ¶ 16, Ex. 10. As a result, they will be unable to continue their work on the Educational Opportunity Project due to the Department's failure to continue to collect, maintain and analyze EdFacts and NAEP data. Ho Decl ¶ 19, Ex. 10.

Professor Reardon also relies on the Early Childhood Longitudinal Study, Kindergarten (ECLS-K) in his research on patterns of kindergarten readiness and the effectiveness of early childhood education programs and elementary schools. Reardon Decl. ¶¶ 22-23, Ex. 14. Collecting data for the ECLS-K is resource intensive, involving 1-on-1 assessments from a trained specialist of a random sample of 15,000-25,000 Kindergarten students at multiple points throughout their early childhood education. *Id.* Reardon learned through public reporting in March 2025 that contracts associated with the collection, analysis, and dissemination of ELCS-K data were cancelled. *Id.* ¶ 25. Without access to the new ECLS-K data, Reardon cannot complete research examining school readiness and the factors that lead to improvements in readiness. *Id.* ¶ 30.

Professor Susan Dynarski's research relies on the National Postsecondary Student Aid Study (NPSAS) to study the distribution of federal financial aid. Dynarski Decl. ¶¶ 6, 10, Ex. 15. Dynarski plans to study the impact of the recent FAFSA Simplification Act on the number and demographics of students applying for and receiving financial aid, which requires student-level data only collected through NPSAS surveys. *Id.* ¶ 12. Around February 11, 2025, Dynarski was

informed by education researchers and news reports that contracts necessary for the collection of NPSAS data were cancelled. *Id*. ¶ 13. Without those contracts, existing NPSAS surveys will not be updated, and new NPSAS surveys will not be launched. *Id*. Consequently, Dynarski's research on the impact of the FAFSA Simplification Act will be impossible. *Id*.

Professor Teresa McCarty relies on the National Indian Education Survey (NIES) survey for her research on improving education practice and policy for Native American students. McCarty Decl. ¶¶ 5, 8, 16, 17, Ex. 16. On April 22, 2025, Professor McCarty was made aware through news sources that access to the NIES would be curtailed or eliminated. *Id*. ¶ 13. There are no comparable datasets to the NIES, *id*. ¶ 9, so without access to it, her research will be significantly negatively impacted, undermining the ability to ameliorate longstanding academic disparities experienced by underserved Native American students. *Id*. ¶ 18.

Plaintiffs' members also rely on IES data in their instruction and coursework as education professors. For example, Professor Elizabeth Tipton and her students rely on the What Works Clearinghouse (WWC) to identify problems and develop new methods to improve the quality of education research. Tipton Decl. ¶ 18, Ex. 31. As of February 10, 2025, at least six contracts supporting the operation and availability of WWC were canceled, threatening Tipton's ability to continue this instruction. *Id*. ¶ 19. Professor Worell relies on NCES datasets and reports to teach his course on "Psychosocial Development." Worell Decl. ¶¶ 9-10, Ex. 24 On February 11, Worell learned through public reporting that contracts necessary to collect and maintain these data sets had been canceled. *Id*. ¶ 12. Without continued collection and maintenance of this data, his research and the research of his students will be substantially hindered. *Id*. ¶ 14.

In sum, there are no other comparable datasets that collect and measure the same metrics as those made available through the Department. *See* Ho Decl. ¶¶ 14-15, Ex. 10; Johnson Decl. ¶

12, Ex. 11; Bastedo Decl. ¶ 15, Ex. 1; Reardon Decl. ¶ 15, Ex. 14; Worell Decl. ¶ 13, Ex. 24;
McCarty Decl. ¶ 9, 17, Ex. 16; Dynarski Decl. ¶ 13, Ex. 15; Barnett Decl. ¶¶ 7, 10, 14, Ex. 23. The
inability of IES to continue to collect this data in a valid and reliable manner impairs Plaintiffs'
members' ability to perform educational research and teach courses at their academic institutions.
*See* Ho Decl. ¶¶ 20-21, Ex. 10; Tipton Decl. ¶ 13, Ex. 31; Johnson Decl. ¶ 12-13, Ex. 11; Briggs
Decl. ¶ 11-14, Ex. 12; Bastedo Decl. ¶ 14-15, Ex. 1; Reardon Decl. ¶ 26, Ex. 14; Worell Decl. ¶
14, Ex. 24; Dynarski Decl. ¶ 13, Ex. 15; Barnett Decl. ¶¶ 11-15, Ex. 23. Without updated federal
education data, Plaintiffs' members cannot continue to measure and analyze trends in education
outcomes, arm policymakers with current information about proven methods for improving
education outcomes and keep the public informed about our national education system. *See* Ho
Decl. ¶ 22, Ex. 10; Tipton Decl. ¶ 13, Ex. 31; Johnson Decl. ¶ 12-13, 15, Ex. 11; Briggs Decl. ¶
11-14, 17, Ex. 12; Bastedo Decl. ¶ 14-15, 17, Ex. 1; Reardon Decl. ¶ 32, Ex. 14; Worell Decl. ¶
14-15, Ex. 24; Dynarski Decl. ¶¶ 15-16, Ex. 15; McCarty Decl. ¶ 9, 18-20, Ex. 16; Barnett Decl.
¶¶ 15-17, Ex. 23.

These harms constitute a concrete injury. *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Just.*, 491
U.S. 440, 449 (1989); *Jewell*, 824 F.3d at 1041 (finding that an animal-rights group would be
harmed by the failure to obtain information under the Endangered Species Act because the group
would have used the information to "meaningfully participate in the Act's permitting process, as
well as engage in related advocacy efforts to protect the three antelope species."); *Doctors for
America v. OPM*, CV 25-322 (JDB), 2025 WL 452707 at *4 (D.D.C. Feb. 11, 2025 (finding that
plaintiff organization had associational standing based on allegations from several doctor-members
that the "denial of information these doctors wish to use in their routine activities has inhibited

their daily operations and thereby caused an injury both concrete and specific to the work in which they are engaged").

This concrete injury is directly traceable to Defendants' actions in gutting IES. Defendants' institution of the RIF, their cancellation of vital contracts, and their restrictions on data licenses are creating Plaintiffs' members' informational injuries. As set forth above, Defendants' refusal to review restricted-use data licenses, *see supra* pp. 10, has limited Plaintiffs' members' access to data, and Defendants' cancellation of contracts, *see supra* pp. 8–10, 13–14 has halted the collection, maintenance, and analysis of IES data.

Even where data collection lapses or data is lost or destroyed by a third-party contractor, there is a clear causal link between any such lost data and the Defendants' actions. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 24 (D.D.C. 2020) (noting that this Circuit has "routinely found causation established in cases where the relevant 'third-party conduct is voluntary but reasonably predictable.'"). Plaintiffs' members' injuries are thus traceable to Defendants. *Id.* at 29.

Plaintiffs' members' injuries are clearly redressable by the relief sought. Plaintiffs' members will be able to carry out their research and teaching if: (1) Defendants are required to promptly reinstate or otherwise provide for new contracts necessary to fulfill IES's congressionally-mandated data-collection obligations; (2) Defendants are enjoined from cancelling any additional necessary contracts or otherwise destroying IES data; and (3) Defendants restore IES employee positions at least to an amount sufficient to ensure compliance with congressional mandates.

### 2. *This Suit Is Germane to Plaintiffs' Organizational Purposes.*

The members' interests this suit aims to protect are plainly germane to the missions of both

Plaintiffs NAEd and NCME.

NAEd's mission is to advance high-quality research to improve education policy and practice. Lee Decl. ¶ 5,Ex. 30. To carry out this mission, NAEd undertakes research studies to address pressing educational issues. *Id*. ¶ 9. Protecting members' interests in access to federal education data, critical to member's research, is clearly germane to NAEd's mission to advance high-quality research to improve education policy and practice. *Id*. ¶ 12.

Protecting this access to federal education data is equally critical to NCME's mission of advancing the science and scholarship of educational measurement. Patz Decl. ¶ 13, Ex. 13. In particular, the interests this suit aims to protect are paramount to NCME's goals of promoting knowledge, understanding, and implementation of best practices in educational measurement. *Id*

       *3. Neither the Claims Asserted nor the Relief Requested Requires the Participation of Individual Members in the Lawsuit.*

"This third element 'focus[es] on matters of administrative convenience and efficiency, not on elements of a case or controversy.'" *United Food & Com. Workers Union, Loc. No. 227 v. United States Dep't of Agric.*, No. CV 20-2045 (TJK), 2021 WL 12312897, at *2 (D.D.C. Aug. 20, 2021) (quoting *United Food & Commercial Workers Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). "Individual [Plaintiff] members are unnecessary parties here because...the merits of the APA claims asserted turn only on the administrative record, and not their particular circumstances." *Id.* Furthermore, the participation of individual members of Plaintiffs NAEd and NCME is not necessary to this suit given that Plaintiffs "seek[s] prospective and injunctive relief, not damages for its members." *Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024); *see also NRDC v. Raimondo*, No. CV 23-982 (BAH), 2024 WL 4056653, at *15 (D.D.C. Sept. 5, 2024).

B. **Organizational Standing**

Plaintiffs NAEd and NCME have organizational standing because Defendants have deprived them of information they are legally entitled to in a manner that directly affects and interferes with their core activities. *See Coalition for Humane Immigrant Rights v. DHS*, No. 1:25-cv-00943 (TNM), 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)); *see also Akins*, 524 U.S. at 21. "The law is settled that 'a denial of access to information' qualifies as an injury in fact 'where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (quoting *Jewell*, 824 F.3d at 1040–41; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 441–42 (2021) (plaintiff suffered a concrete injury when denied legally-required information and that denial had "downstream consequences"). Plaintiffs also suffer an injury where, as here, a federal agency delays their access to data. *See, e.g.*, *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 39–45 (D.D.C 2019); *Am. Hist. Ass'n v. NARA*, 516 F. Supp. 2d 90, 106 (D.D.C. 2007) (recognizing that "denial of 'timely access'" to documents is a cognizable informational injury).

As explained above, IES is required to provide Plaintiffs NAEd and NCME with a variety of data under ESRA. *See* 20 U.S.C. §§ 9512, 9574-75; *supra*. These provisions require IES "to provide robust public information," and "create a right to information sufficient for [Plaintiffs'] injury." *Ctr. for Bio. Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023).

Plaintiffs utilize this statutorily-required data to carry out their core activities. NAEd's research arm regularly identifies, develops, and publishes various research projects. For example, a recent NAEd project titled "Evaluating and Improving Teacher Preparation Programs" highlights

the critical context surrounding teacher education and provides research-informed recommendations for evaluating and improving both teacher-preparation programs and the larger educational and policy contexts in which these programs are situated. Lee Decl. ¶ 9, Ex. 30. Like other NAEd research projects, this project relied on IES data to support its findings and recommendations.

NCME regularly publishes three journals: Journal of Educational Measurement (JEM), Educational Measurement: Issues and Practice (EM:IP), and Chinese/English Journal of Educational Measurement and Evaluation (CEJEME). These journals publish peer-reviewed scientific articles that are highly respected and widely cited by scholars. Patz Decl. ¶ 14, Ex. 13. A significant number of articles in these journals use data collected and disseminated by IES and, therefore, could not be published without IES' continued work. *Id.* ¶ 15.

Plaintiffs are already harmed by Defendants' conduct because it hampers their ability to use IES data for their research publications. Patz ¶¶ 14-15, Ex. 13. These harms are traceable to Defendants' dismantling of IES and would be redressed by an order requiring the restoration of IES through promptly reinstating or otherwise providing for new contracts necessary to fulfill IES's congressionally-mandated data-collection obligations, preventing any further vital contract cancelations, ensuring no IES data is otherwise destroyed, and restoring IES employee positions at least to an amount sufficient to ensure compliance with congressional mandates. This type of redress is available to the court in this case. *See Nat'l Treas. Emps. Union v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772, at *46 (D.D.C. Mar. 28, 2025), *stay denied in relevant part*, No. 25-5091 (D.C. Cir. Apr. 11, 2025) (ordering executive agency to rescind notices of contract termination and reinstate employees).

19

II.    **Plaintiffs Are Likely to Succeed on the Merits of Their Claims**.

A.    <u>Administrative Procedure Act</u>

Under the Administrative Procedure Act (APA), a court may set aside any final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

1.    *Final Agency Action*

Under the APA, an "action" constitutes "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking* Ass'ns, 531 U.S. 457, 478 (2001). An agency's action is final if it "'marks the consummation of the agency's decisionmaking process' and determines 'rights or obligations . . . from which legal consequences will flow." *Nat'l Council of Nonprofits v. OMB*, No. 25-239 (LLA), 2025 WL 368852 at *10 (D.D.C. Feb. 3, 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). An action marks the consummation of the agency's decisionmaking if the action "is properly attributable to the agency itself" and is not "informal, or only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted).

The following actions constitute final agency actions reviewable by this court under the APA: (1) the February 10, 2025 announced cancellation of over $900 million in IES contracts, some of which are critical to the basic functioning of IES and to the realization of many IES congressional mandates; (2) the March 11, 2025 announced RIF of 90% of IES staff including 97% of NCES staff; and (3) the February 2025 termination of all remote restricted-use data licenses and the end of accepting new applications for these licenses.

In announcing and carrying out these actions, the agency has made clear that the actions are "properly attributable to the agency itself." *Soundboard Ass'n*, 888 F.3d at 1267. These actions

cannot be said to be informal and are instead clearly final as "[t]here is nothing abstract about firing employees, cutting off the funding stream, terminating contracts, or stopping all work." *Nat'l Treas. Emps. Union v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772, at \*13 (D.D.C. Mar. 28, 2025); *see* 5 U.S.C. §§ 702, 704.

## 2. *Excess of Statutory Authority*

The APA requires courts to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). In determining whether agency action exceeds statutory authority, "the question . . . is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington v. F.C.C.*, 569 U.S. 290, 297–98 (2013).

Congress mandates IES's Centers to collect and disseminate federal education data and to ensure that it remains publicly available. *See* 20 U.S.C. §§ 9541–48 (establishing NCES's obligation to disseminate federal education data); § 9562 (establishing same for NCEE); § 9533 (establishing same for NCER); *id*. § 9567b (establishing same for NCSER); *supra*; *see also* Pub. L. 110–336, 122 Stat. 3726 (2008) (H.R. 5893) (allocating $807 million to IES and its Centers); H.R. 5894, 118th Cong. (2023) (same). IES's Centers are further required to carry out these mandates to a high standard of quality to ensure the accuracy and validity of the data that is collected, maintained, and analyzed. *See id*. §§ 9512, 9533, 9534, 9541, 6562, 9563, 9567. Furthermore, this data must be kept up-to-date and disseminated to the public in a timely manner. *See id*. §§ 9541, 9562. By acting contrary to these mandates set forth in ESRA; reducing staff at IES to such a degree that it renders it virtually impossible to collect, maintain, analyze, and disseminate data; cancelling contracts necessary for the maintenance, analysis, and dissemination of data; and restricting Plaintiffs' and their members' use of data, Defendants have clearly violated

21

their statutory authority. *See id.*; *see also New York v. EPA*, 413 F.3d 3, 41 (D.C. Cir. 2005); *Bowen*, 488 U.S. at 208. The provisions of ESRA that require data to be high quality, up-to-date, and timely negate any potential argument that the current barebones staff at IES's Centers could uphold the rigorous statutory mandates in ESRA. Ho Decl. ¶ 16, 17, Ex. 10.

Furthermore, nowhere under ESRA or any other relevant statute has Congress granted Defendants the power to dismantle IES or to remove public access to IES data in the manner described above. Without clear statutory authority to act, agency action is in excess of statutory authority. *See Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001); *see Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

### 3.  Arbitrary and Capricious

Under the APA, courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ["*State Farm*"].

Here, Defendants' actions, namely, by reducing staff at IES to such a degree that renders it virtually impossible to collect and maintain, analyze and disseminate data; cancelling contracts necessary for the maintenance, analysis, and dissemination of data; and restricting Plaintiffs' and their members' use of data, are arbitrary and capricious for at least two reasons: (1) the Department failed to explain this decision in any matter; and (2) the Department failed to consider the harms

22

flowing from the loss of access to up-to-date, reliable educational data of the highest scientific standards.

When an agency drastically changes its position, the APA requires that "it display awareness that it *is* changing position." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). Therefore, when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide "a reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16. The agency must also assess whether its prior policy has "engendered serious reliance interests," and if so, consider whether the agency's other interests and policy concerns outweigh those reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1913–15 (2020).

Here, Defendants' only public statements about their course of conduct fail to offer any meaningful explanation for their decision-making. DOGE's February 2025 announcement of cutting nearly $900 million in contracts is two sentences long and contains no explanation. *See* Ex. 19.  Similarly, the Department's March 2025 announcement of a nearly 50% reduction in force references only a "commitment to efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents and teachers," with no explanation of how halving the staff would achieve this or why it is warranted. Ex. 10. [cite] Nor did the Department provide any explanation of how it anticipated continuing to comply with ERISA, nor of its plan to maintain the quality and availability of the federally-mandated education data in light of these significant cuts to the workforce. *See id.* Similarly, the President's March 2025 Executive Order directing the Secretary to dismantle the Department describes that the Department has "entrenched the education bureaucracy and sought to convince America that federal control over education is

beneficial" as its central rationale for the dismantling. Ex. 8.. But none of these announcements engage in a cost-benefit analysis, acknowledge the reliance interests at stake, or meaningfully account for this drastic change in position that runs counter to the very aim of the Department, and its ongoing congressional mandates. These are all hallmarks of arbitrary, ill-reasoned agency action under the APA. *See Regents of the Univ. of Cal.,* 140 S. Ct. at 1913–15 (setting aside agency action as arbitrary based on *inter alia* the failure to consider serious reliance interests); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222–24 (2016) (same); *State Farm*, 463 U.S. at 51 (same).

This lack of explanation also means that the Department did not grapple with less harmful alternatives. These public announcements make clear that the Department did not consider why any benefits associated with decimating the IES workforce, cancelling contracts, and restricting the availability of data outweigh the significant costs, including the significant reliance interests identified by Plaintiffs, their members, and the communities who rely on the work of Plaintiffs and their members to better understand IES data. For example, as described above, Professor McCarty relies on the National Indian Education Survey (NIES) throughout her research  on improving education practice and policy for Native American students. *See supra*; McCarty Decl. ¶¶ 5, 8, 16, 17, Ex. 16. Professor McCarty has no other way to access this vital data, as it is only collected and maintained by Defendants. *Id.* ¶ 18. Professors Ho and Readon are similarly negatively impacted. Professors Ho and Reardon rely on EDFacts and the National Assessment of Educational Progress (NAEP) for their work on the Educational Opportunity Project, a clearinghouse for data on educational achievement across the country. Reardon Decl. ¶ 12-14, Ex. 14; Ho Decl. ¶ 12, Ex. 10. Now that the contracts necessary for the collection of these datasets have been cut, Reardon Decl. ¶ 27, Ex. 14; Ho Decl. ¶ 16, Ex. 10, they will not be able to continue the Educational Opportunity

Project, which cannot be maintained without EdFacts and NAEP data. Ho Decl. ¶ 19, Ex. 10.

Not only will Plaintiffs and their members be harmed by their inability to complete their research, the students who make up the subject of their research will also be harmed. Without access to this unique federal data, Plaintiffs' members will not be able to study the educational outcomes of all students, including Black, Latino, and Native American students; students with disabilities; English language learners/multilingual learners; and socioeconomically disadvantaged students. *See supra.* Further, Defendants are the only source of data for educational outcomes based on certain demographic characteristics, including Native American identity, and there are no other datasets available to researchers studying related demographic educational disparities. *See, e.g.*, McCarty Decl. ¶ 9, 17, Ex. 16. If Plaintiffs and their members are not able to study educational disparities based on race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, gender, and other population characteristics, it will become impossible to create effective policy addressing these disparities and closing any achievement gaps. *See, e.g.*, *id.* For example, Professor Johnson relies on NAEP data for his research into how to ensure that federal and state funds supplement and not supplant local effort to raise funds for Title I schools. *See* Johnson Decl. ¶ 14, Ex. 11. Lack of access to NAEP data to support this research "may therefore affect the distribution of Title I funding, undermine the effectiveness of the agency's anti-discrimination enforcement arm that protects students' civil rights, and leave economically disadvantaged students more vulnerable." *Id.* These harms were clearly not considered by Defendants before they took action to dismantle IES and its research centers.

Defendants' explanations and decision-making here, *see* Exs. 8, 10, 19, was "not so much a balance of conflicting policy goals as the acceptance of one without any real consideration of the

other." *Nat'l Ass'n of Regul. Util. Comm'rs v. Interstate Com. Comm'n*, 41 F.3d 721, 728 (D.C. Cir. 1994); *see also Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 825–26 (D.C. Cir. 1983); *Heartland Hosp. v. Shalala*, No. 95–951, slip op. (D.D.C. Jun. 15, 1998); *Forelaws on Bd. v. Johnson*, 643 F.2d 677, 685 (9th Cir. 1984). The Defendants' failure to consider the "broader, real-world impact[s]" of the incapacitation of IES and its data collection and research functions was, therefore, arbitrary and capricious. *American Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017).

### 4. Not in Accordance with Law

For all the reasons why the removal of data exceeds the Department's statutory authority, it is also not in accordance with law under the APA. *See F.C.C. v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law' which means, of course, *any* law . . ." (citation omitted)); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (holding that an agency acts "not in accordance with law" when it "violates a federal statute"); *see supra* pp. 21–22.

## B. Separation of Powers

"[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Boumediene v. Bush*, 553 U.S. 723, 743 (2008) (private plaintiffs may "enforce separation-of-powers principles"); *INS v. Chadha*, 462 U.S. 919, 958–59 (1983). And "where one branch has impaired or sought to assume a power central to another branch, the Court has not hesitated to enforce the doctrine." *Chadha*,

462 U.S. at 962–63. Because Plaintiffs have Article III standing, *supra*, they may bring a separation-of-powers claim.

Defendants have failed to faithfully execute constitutional statutes and actively impeded their implementation. Defendants have reduced staff at IES to such a degree that renders it virtually impossible to collect and maintain, analyze and disseminate data. Defendants have cancelled the contracts necessary for the maintenance, analysis, and dissemination of data, as well as, restricted Plaintiffs' and their members' use of data. In doing so, Defendants, an executive agency and executive branch official, have usurped Congress's lawmaking authority. "But the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013). Article I of the Constitution vests Congress with "[a]ll legislative powers[,]" U.S. Const. art. I, § 1, including the power to enact, amend, and repeal statutes, *Chadha*, 462 U.S. at 954. Concurrently, the Constitution mandates the Executive Branch "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 1.

In hamstringing IES's ability to fulfill its congressional mandates, Defendants have violated their constitutional duty under the Take Care Clause and dramatically infringed on Congress's legislative power by refusing to enforce a duly enacted statute and actively impeding its operation. The Constitution instructs that the President and executive agencies, including Defendants, "shall take Care that the Laws be faithfully executed." *Id*. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). In violating and otherwise declining to enforce valid federal laws, Defendants are overstepping their constitutional limits and duties. *See Wudajyswara v. Lake*, 2025 WL 1166400 at *15 (D.D.C. 2025) (citing *Wudajyswara v. Lake*, 2025 WL 945869 at *7 (S.D.N.Y. 2025)) ("Withholding

congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause]").

Defendants have conducted mass firings and cancelled hundreds of millions of dollars in contracts that IES needs to fulfill its congressional mandates, including cancelling the contract for the completion of the NAEP, which Plaintiffs' members rely on in their research. *See supra* pp. 8–10, 13–14. Additionally, Defendants have taken steps to restrict the availability of accessible data in direct contravention of Congress's mandate to make the datasets publicly accessible. For example, NCES informed Professor Bastedo, that all applications for restricted-use data, including his own application, were on pause until further notice. Bastedo Decl. ¶ 13, Ex. 1. Without the restricted-use license, he has no other way of continuing his research project. *Id*. ¶ 14.

Through these actions, Defendants have unjustifiably failed to enforce several congressional mandates and actively impeded their implementation. *See In re Aiken Cnty.*, 725 F.3d at 259; *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730 at *37 (D.D.C. Apr. 24, 2025) ("[T]he President's power is at its lowest ebb because his unilateral instruction . . . is contrary to the manifest will of Congress, as expressed in the text, structure, and context [of the agency statute]") (cleaned up)). These mandates include those set forth in the Further Consolidated Appropriations Act, 2024, which provided $793.1 million in funds for "necessary expense for the Institute of Education Sciences" to "remain available through September 30, 2025," which was then extended by continuing resolution on March 15, 2025. *See* Pub. L. 118-47, 138 Stat. 693 (Mar. 23, 2024); *see also* Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025). "Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative

statutes. . . ." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals. Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers.").

### III.    The Balance of the Equities Tip Towards Plaintiffs Because Plaintiffs Face Irreparable Harm, the Public Interest Will Be Served by the Injunction, and the Injunction Would not Harm Defendants.

Where, as here, the government is the party opposing a motion for a preliminary injunction, the balance of equities and public-interest factors merge. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Considering the irreparable harm posed by Defendants' conduct to both Plaintiffs, their members and to the public interest, the balance of the equities favor Plaintiffs.

An injury constitutes irreparable harm when it is "both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission ... provide injury for purposes ... [of] irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Plaintiffs and their members suffer significant irreparable harm from Defendants' actions, and, absent preliminary relief, will continue to face this harm due to their inability to continue their research that relies on access to the Department's databases. *See supra*. Lack of timely access to information to which plaintiffs are entitled may constitute irreparable harm. *See, e.g., Am. Immigr.*

*Council v. DHS*, 470 F. Supp. 3d 32, 37–38 (D.D.C. 2020); *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 58 (D.D.C. 2020). This is particularly true where, like Plaintiffs and their members, organizations and their members are deprived of access to statutorily required information that they rely on to conduct routine business activities, such as research and teaching. *See, e.g.*, *Doctors for Am. v. OPM*, CV 25-322 (JDB), 2025 WL 452707 at *8–9 (D.D.C. Feb. 11, 2025) (finding that plaintiff organization's members suffered irreparable harm by "defendants' removal of the webpages and datasets," which the members relied upon for their research and work); *cf. Jewell*, 824 F.3d at 1041 (finding that an animal-rights group suffered harm by the Secretary of the Interior's failure to disclose information under the Endangered Species Act because the group would have used the information to "meaningfully participate in the Act's permitting process, as well as engage in related advocacy efforts.").

Here, Plaintiffs and their members rely on Department data to conduct research, publish articles, and develop curriculum. *See supra* pp. 11–19; Tipton Decl. ¶¶ 12, 17, 18-20, Ex. 31; Johnson Decl. ¶¶ 10, 12, Ex. 11; Briggs Decl. ¶ 9, Ex. 12; Bastedo Decl. ¶ 10, Ex. 1; McCarty Decl. ¶¶ 8, 9, 11, 12, 18, Ex. 16; Worell Decl. ¶¶ 9, 11, Ex. 24; Barnett Decl. ¶¶ 5-6, Ex. 23. As described above, restricted access to this data, or compromises to the integrity of this data, will significantly hinder Plaintiffs' and their members' research, publishing, and teaching, resulting in irreparable harm, *cf. Wis. Gas. Co.*, 758 F.2d at 674 (finding that economic harm can "constitute irreparable harm ... where the loss threatens the very existence of the movant's business").

While Plaintiffs suffer certain and irreparable injury due to Defendants' unlawful actions, Defendants would suffer no cognizable harm if required to restore IES's research and data-collection processes to comply with federal law. Defendants "cannot suffer harm from an

injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)).

Not only can there be no harm to Defendants in ending unlawful government action, but neither can there be any public interest in the perpetuation of unlawful agency action. *Open Communities All.*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* Beyond the general public interest in requiring the Department to comply with congressional mandates, there is a particularly strong public interest in requiring the Department to comply with congressional mandates to provide public access to up-to-date federal education data. IES data fuels not only Plaintiffs' research, but also the research of professors and other academics around the country. This data is also necessary for determining federal-aid calculations, grants to localities, recipients' compliance efforts, and Census Bureau statistics.

Key examples of how IES data is used to benefit the public include maintaining: (1) the WWC, which provides evidence-based recommendations, including practice guides for educators to improve student outcomes. Ex. 7; (2) the CCD, a comprehensive, annual, national database of all public elementary and secondary schools and school districts.  Ex. 25 ; (3) the Private School Universe Survey, the primary database on all private elementary and secondary education in the US, *Private School Universe Survey (PSS)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/pss/#:~:text=This%20is%20the%20Private%20School%20Universe %20Survey%20site%2C,download%20questionnaires%2C%20and%20search%20the%20privat e%20school%20locator (last visited Apr. 29, 2025), Ex. 26; (4) NAEP, the nation's report card on student achievement in the US, at the national and state levels as well as trends over time. Ex. 27; (5) the TIMSS, which provides reliable and timely trend data on U.S. students' mathematics and

science achievement as compared with students in other countries. , Ex. 28; (6) the Program for International Student Assessment, along with the Organization for Economic Cooperation and Development, administers international assessments that measure 15-year-old students' reading, mathematics, and science literacy, *Program for International Student Assessment (PISA)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/pisa/ (last visited Apr. 29, 2025), Ex. 29; and (6) the ELS, which include different surveys over time of early childhood and elementary grades, middle grades, high schools, and postsecondary. Ex. 6. The above examples are only a few of the numerous ways IES datasets are used. Plaintiffs, their members, and many other education researchers, rely on these and other Department particularly in their research and teaching. *See supra* pp. 12–14.

IES data also plays a critical role in ensuring that federal funding is equitably allocated to high-need schools through, among other grants, the Rural Education Achievement Program (REAP) and Title I grants. Ex. 22. For these and other grants, NCES works with the U.S. Census Bureau to analyze school-district boundaries, income levels, and other characteristics that help the Department determine grant eligibility. *Id*. Not only are these datasets necessary for determining grant spending, but they also provide invaluable information into federal spending, more generally ensuring that federal funds are being employed effectively to achieve educational success nationwide.

Losing access to these datasets will create irreparable and growing harm to our country for years to come. Without IES data, the U.S. educational system will be without information necessary to guide policy or test educational system efficacy. There will be no way to make sure that whole states or other subgroups of students, such as those based on race, do not fall behind. Black, Latino, and Native American students, students with disabilities, English language

learners/multilingual learners, and socioeconomically disadvantaged students will be at greatest risk of harm from lack of informational oversight into an educational system where these marginalized students are already disadvantaged. Federal data on educational disparities is crucial to creating policies that can effectively close achievement gaps. Without this data, our nation's children will risk receiving an ineffective education that would place our country at a competitive disadvantage globally and create serious national security risks. These deleterious impacts make clear that Defendants' actions are extreme and without regard to the public benefit.

The balance of equities thus weighs decisively in favor of granting a preliminary injunction. The requested relief is vital to prevent irreparable harm to Plaintiffs, the national education system, and the future of our country's workforce and national security.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask this court to issue a preliminary injunction against Defendants.


Dated: May 2, 2025

Amy I. Berman
DC Bar No. 480541
NATIONAL ACADEMY
OF EDUCATION
500 Fifth Street, NW
Washington, DC 20001
(202) 334-2341
aberman@naeducation.org

*Counsel for NAEd*

Respectfully submitted,

*/s/ Samuel Spital*
Samuel Spital
DC Bar No. NY0248
Morenike Fajana*
Lily Grisafi*
Allison Scharfstein*
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
(212) 965-2259
sspital@naacpldf.org
mfajana@naacpldf.org
lgrisafi@naacpldf.org
ascharfstein@naacpldf.org

cburke@naacpldf.org

*Awaiting *pro hac vice* admission

*Counsel for NAEd and NCME*