UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF EDUCATION, et al.,<br><br>Defendants. | Civil Action No. 25-1266 (TNM) |

**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................... i

Table of Authorities ......................................................................................................... ii

Background ........................................................................................................................ 1

    I.    Statutory Background ...................................................................................... 1

    II.   Factual Background ......................................................................................... 2

    III.  Procedural Background .................................................................................. 6

Legal Standards ................................................................................................................ 6

Argument .......................................................................................................................... 7

    I.    Plaintiffs Are Unlikely To Succeed On The Merits .................................... 7

        A.    The Court Lacks Subject-Matter Jurisdiction. ............................. 7

        B.    Plaintiffs' Claims Fail on the Merits. ........................................... 21

    II.   Plaintiffs Have Not Shown that They Will Face Irreparable Harm Absent a Preliminary Injunction. ........................................................................... 33

    III.  The Equities and Public Interest Weigh Against Relief. ...................... 36

    IV.  Any Preliminary Injunction Should Be Limited. ................................... 37

    V.   Any Preliminary Injunction Should Be Accompanied by Security and Stayed. .. 38

Conclusion ...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (5th Cir. 2014) ................................................................. 22

*Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) .................................................................. 14

*\*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  ("AFGE"), 929 F.3d 748 (D.C. Cir. 2019) ................................. 16, 17, 21

*Am. Foreign Serv. Ass'n v. Trump*,
  Civ. A. No. 25-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025).................................... 21

*\*Architects & Eng'rs for 9/11 Truth v. Raimondo*, Civ. A.,
  No. 21-2365 (TNM), 2022 WL 3042181 (D.D.C. Aug. 2, 2022)........................................... 10

Axon Enterprise, Inc. v. FTC,
  598 U.S. 175 (2023)................................................................................. 17

*\*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................. 23

*Benoit v. Dist. of Columbia*,
  Civ. A. No. 18-1104 (RC), 2018 WL 5281908 (D.D.C. Oct. 24, 2018) ............................. 32

*Biovail Corp. v. FDA*,
  448 F. Supp. 2d 154 (D.D.C. 2006) ........................................................ 35

*\*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984)........................................................................... 19, 20

*Bowen v. Massachusetts*,
  487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).................................... 13, 24

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ................................................................ 33

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948)................................................................................. 24

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ........................................................ 36

*City of Olmsted Falls v. Fed. Aviation Admin.*,
  292 F.3d 261 (D.C. Cir. 2002) ........................................................................... 27

*Clapper v. Amnesty Intern. USA*,
  568 U.S. 398 (2013) ............................................................................................ 12

*Clinton v. Jones*,
  520 U.S. 681 (1997) ............................................................................................ 32

*Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*,
  Civ. A. No. 25-0943 (TNM), 2025 WL 1078776 (D.D.C. Apr. 10, 2025) ...................... 7, 8, 10

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ........................................................................... 22

*Ctr. for Biological Diversity v. Trump*,
  453 F. Supp. 3d 11 (D.D.C. 2020) ..................................................................... 31

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................................................................ 31

*Davis v. FEC*,
  554 U.S. 724 (2008) ......................................................................................... 7, 8

*Dep't of Educ. v. California*,
  145 S. Ct. 966 (2025) .................................................................................. 13, 15

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ......................................................................................... 38

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ............................................................................. 28

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ............................................................................. 38

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ........................................................................ 17, 18, 19, 21

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ........................................................................................... 26

*FEC v. Akins*,
  524 U.S. 11 (1998) ......................................................................................... 8, 10

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
  423 U.S. 326 (1976) ........................................................................... 27

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................... 29

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................. 7

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .......................................................... 8, 9

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ................................................... 17, 18, 20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................................... 32

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) ........................................................ 7, 10

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) .......................................................... 35

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) .......................................................... 24

*Gill v. Whitford*,
  585 U.S. 48 (2018) ............................................................................. 38

*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) .......................................................... 16

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ......................... 13

*Grosdidier v. Chairman, Broad. Bd. of Govs.*,
  560 F.3d 495 (D.C. Cir. 2009) ...................................................... 18, 19

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................... 28, 29, 37

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................................. 8

*Indigenous People of Biafra v. Blinken*,
  639 F. Supp.3d 79 (D.D.C. 2022) ........................................................... 12

*Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ................................................................ 8

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ................................................................ 15

*Kansas v. United States*,
  124 F.4th 529 (8th Cir. 2024) .............................................................. 36

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023) ..................................................... 37

*Lacson v. Dep't of Homeland Sec.*,
  726 F.3d 170 (D.C. Cir. 2013) .............................................................. 20

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ............................................................................. 33

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................... 15, 26, 28, 29

*Littlefield v. Dep't of the Interior*,
  85 F.4th 635 (1st Cir. 2023) ................................................................. 26

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) .................................................. 23

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................... 7

*Lujan v. Nat'l Wildlife Fed.*,
  497 U.S. 871 (1990) .................................................................. 11, 21, 22

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ............................................................................. 38

*Mahoney v. Donovan*,
  721 F.3d 633 (D.C. Cir. 2013) ............................................................. 18

*Mahorner v. Bush*,
  224 F. Supp. 2d 48 (D.D.C. 2002) ....................................................... 12

*Markland v. OPM*,
    140 F.3d 1031 (Fed. Cir. 1998) ............................................................................................. 27

*McKenna v. Dep't of Interior*,
    996 F.2d 1235 (Fed. Cir. 1993) ............................................................................................. 11

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ............................................................................................... 14

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ............................................................................................... 34

*\*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ............................................................................................... 30

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................................................... 32

*\*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................................................. 6

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................................... 35

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ............................................................................................... 37

*New York Times Co., v. Def. Health Agency*,
    Civ. A. No. 21-0566 (BAH), 2021 WL 1614817 n.6 (D.D.C. Apr. 25, 2021) ...................... 32

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ....................................................................................... 34

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................................... 7, 36

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................... 11, 21, 22, 23

*Nyunt v. Chairman, Broad. Bd. of Govs.*,
    589 F.3d 445 (D.C. Cir. 2009) ......................................................................................... 18, 20

*Open Top Sightseeing USA v. Mr. Sightseeing, LCC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) ........................................................................................... 34

*Payne v. Biden,*
    62 F.4th 598 (D.C. Cir. 2023) ................................................................................... 21

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................................ 8, 9

*Perry Cap. LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ................................................................................. 24

*Printz v. United States,*
    521 U.S. 898 (1997) ................................................................................................. 32

*\*Pub. Citizen Health Rsch. Grp. v. Acosta,*
    363 F. Supp. 3d 1 (D.D.C. 2018) .............................................................. 34, 35, 36

*Sai v. Transp. Sec. Admin.,*
    54 F. Supp. 3d 5 (D.D.C. 2014) ............................................................................... 34

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ................................................................................... 6

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) ................................................................................. 25

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002) ................................................................................. 11

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ........................................................................... 14, 15

*Steadman v. Gov., U.S. Soldiers & Airmen's Home,*
    918 F.2d 963 (D.C. Cir. 1990) ................................................................................. 18

*State v. Musk,*
    --- F. Supp. 3d ---, 2025 WL 520583 (D.D.C. Feb. 18, 2025) ................................. 36

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................................. 12

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ........................................................................................... 17, 20

*Turlock Irrigation Dist. v. FERC,*
    786 F.3d 18 (D.C. Cir. 2015) ..................................................................................... 9

*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) ..................................................................... 19

*\*U.S. Conf. of Catholic Bishops v. Dep't of State*,
    Civ. A. No. 25-465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..................... 13, 14, 15

*United States v. Fausto*,
    484 U.S. 439 (1988) .................................................................................. passim

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................................................... 7

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
    259 F.2d 921 (D.C. Cir. 1958) ........................................................................ 34

*Versata Dev. Corp. v. Rea*,
    959 F. Supp. 2d 912 (E.D. Va. 2013) ................................................................. 24

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ......................................................................... 22

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................................ 27, 28

*Weaver v. Info. Agency*,
    87 F.3d 1429 (D.C. Cir. 1996) ...................................................................... 17, 18

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ..................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 6

*Wis. Gas Co. v. Fed. Regul. Comm'n*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 33

**Statutes**

5 U.S.C. § 701(a)(2) ................................................................................... 27, 29

5 U.S.C. § 702 ........................................................................................... 13

5 U.S.C. § 704 ........................................................................................ 23, 24

5 U.S.C. § 706(2)(A) ..................................................................................... 6

5 U.S.C. § 706(2)(C) ..................................................................................... 6

5 U.S.C. § 7703(b) ........................................................................................................ 16

7 U.S.C. § 608c ...................................................................................................... 19, 20

20 U.S.C. § 3402 ............................................................................................................ 1

20 U.S.C. § 9511(b)(2) .................................................................................................. 2

20 U.S.C. § 9512 .......................................................................................................... 14

20 U.S.C. §§ 9501-9584 ............................................................................................... 1

28 U.S.C. § 1331 .......................................................................................................... 16

28 U.S.C. § 1491(a)(1) ................................................................................................. 13

Department of Education Organization Act,
    Pub. Law 96-88, 93 Stat. 668 (1979) ............................................................... 29, 30

Further Consolidated Appropriations Act, 2024,
    Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024) ............................................. 29, 30

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. Law 119-4 (Mar. 15, 2025) ...................................................................... 29, 30

**Executive Orders**

Exec. Order 14,222: Implementing the President's 'Department of Government Efficiency' Cost
    Efficiency Initiative,
    90 Fed. Reg. 11,095 (Feb. 26, 2025) .................................................................. 3, 25

Exec. Order 14,242: Improving Education Outcomes by Empowering Parents, States, and
    Communities,
    90 Fed. Reg. 13,679 (Mar. 20, 2025) ............................................................ 3, 25, 37

**Rules**

Federal Rule of Civil Procedure 65 .............................................................................. 38

**Other Authorities**

John Roberts, Article III Limits on Statutory Standing,
    42 Duke L. J. 1219 (1993) ................................................................................... 7

Defendants the Department of Education (the "Department") and Linda McMahon, in her official capacity as Secretary of Education (the "Secretary"), oppose Plaintiffs' motion for a preliminary injunction ("Pls.' Mot.," ECF No. 14).  Plaintiffs are unable to demonstrate that they are likely to succeed on the merits, that they have suffered irreparable harm, and that the balance of the equities or the public interest tip in their favor.  The Court should deny Plaintiffs' motion for preliminary injunction.

## BACKGROUND

### I.    <u>Statutory Background</u>

The Department of Education was established as part of the Department of Education Organization Act.  Pub. L. No. 96-88, 93 Stat. 668 (1979).  The purpose of the Department is principally

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

Under the Education Sciences Reform Act, 20 U.S.C. §§ 9501-9584 (the "Act"), Congress established an Institute of Education Sciences (the "Institute") within the Department to:

> compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in

technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities-- (A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). The Act also established within the Institute four centers: the National Center for Education Research, the National Center for Education Statistics, the National Center for Education Evaluation and Regional Assistance, and the National Center for Special Education Research and delineated the duties for each center. *Id.* §§ 9511-9567.

Additionally, the Act states that the Institute shall "[d]isseminat[e] information in a timely fashion and in formats that are easily accessible and usable by researchers, practitioners, and the general public" and **"**[u]tiliz[e] the most modern technology and other methods available, including arrangements to use data collected electronically by States and local educational agencies, to ensure the efficient collection and timely distribution of information, including data and reports," and "[m]ak[e] information available to the public in an expeditious fashion." *Id.* § 9575(2), (3), (6). Additionally, "data collected by the Institute, including any office, board, committee, or center of the Institute, in carrying out the priorities and mission of the Institute, shall be made available to the public, including through use of the Internet." *Id.* § 9574.

## II.    <u>Factual Background</u>

On February 26, 2025, the President signed the "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative" Executive Order. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) (the "Contract Executive Order"). The purpose of this order was to "commence[] a transformation in Federal spending on contracts, grants, and loans to ensure Government spending is transparent and Government employees are accountable to the American public." Id. § 1. Accordingly, this Executive Order instructed "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead, [to] review all existing covered contracts and

grants and, where appropriate and consistent with applicable law," "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the President's] Administration." *Id*. § 3(b).  Covered contracts are defined as among other things, "discretionary spending through Federal contracts," but excludes "direct assistance to individuals; expenditures related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id*. § 2(d).  The Executive Order instructed the process to "commence immediately" and to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions . . . for waste, fraud, and abuse." *Id*.

On March 20, 2025, the President signed the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order.  Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) (the "Department Executive Order").  The Department Executive Order found that the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id*. § 1.  For example, the Order identified the Department of Education's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id*.  Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id*.

Under the Department Executive Order, the Secretary of Education was ordered "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education."  Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.  The "Secretary of Education shall ensure that the allocation of any Federal Department of Education

funds is subject to rigorous compliance with Federal law." *Id.* § 2(b).  And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

The Secretary has stated she intends to do "an overhaul" of the Department.  U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.  As part of the overhaul, the Department is implementing a reduction in force, which impacts "[a]ll divisions within the Department," and some divisions will require "significant reorganization to better serve students, parents, educators, and taxpayers."  U.S. Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://www.ed.gov/about/news/pressrelease/us-department-of-education-initiates-reduction-force ("RIF Press Release").  The purpose of the reduction in force is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers."  *Id.*  It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-lindamcmahon-education-department-mass-layoffs/ ("Hill Article").  The Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come from Congress, all of that are being met, and none of that's going to fall through the cracks."  *Id.*  As part of the reduction in force, any staff that may be separated will first be put on administrative leave. RIF Press Release.

After the overhaul, the Department has stated that it "will continue to deliver on all statutory programs that fall under the agency's purview."  RIF Press Release.  The Secretary stated

that she planned to keep fifty percent of the Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

Longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. The Secretary plans to partner with Congress and other federal agencies to determine the best path forward to fulfill the expectations of the President and the American people. Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-lindamcmahon-education-department-trump-musk/.

Plaintiffs in this case, the National Academy of Education (the "Academy") and the National Council on Measurement in Education (the "Council"), are membership organizations whose members they allege "rely on data to study a wide variety of pressing education issues." Compl. (ECF No. 1) ¶ 12; *see also id*. ¶ 13. Plaintiffs allege that their members rely on unique Department data for numerous research projects. *Id*. ¶¶ 78-93. They allege that "Defendants have cancelled contracts impacting the collection, analysis and dissemination" of the data Plaintiffs' members need for their research and that as a result "of these cancellations, the Department is unable to collect, analyze, and disseminate these datasets in accordance with its statutory mandates, and Plaintiffs and their members will be unable to obtain and utilize these datasets." *Id*. ¶ 94. According to Plaintiffs, their members' ability to access accurate data is also impacted because "Defendants indefinitely delayed their processing of new restricted-use licenses" and "because of the significant reduction in force[.]" *Id*. ¶¶ 95-96. Without access to that data, they allege, they suffer irreparable harm. *Id*. ¶ 97.

III.    **Procedural Background**

On April 24, 2025, Plaintiffs brought a five-count Complaint, alleging that: (1) Defendants have exceeded their statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C) ("APA"), *id*. ¶¶ 101-08 (Count 1); (2) Defendants' actions are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A), *id*. ¶¶ 109-18 (Count 2); (3) Defendants' actions are not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A), *id*. ¶¶ 119-24; (4) a separation-of-powers claim, U.S. Const. art. I §§ 1, 4, *id*. ¶¶ 125-31 (Count 4), and (5) an ultra vires agency action claim, *id*. ¶¶ 132-35 (Count 5), *id*. ¶¶ 132-35.  Plaintiffs ask the Court for a declaration that Defendants have violated the APA; an injunction ordering Defendants "to reinstate cancelled contracts" or to "re-bid the contracts," refrain from "destroying datasets," reinstate employees, pay attorney's fees, and other relief the Court deems just and proper.  *Id*. ¶¶ 136-41.

On May 2, 2025, Plaintiffs moved for a preliminary injunction.  They ask the Court to order Defendants to "maintain" and not to "destroy" any "datasets, including by cancelling or otherwise failing to fulfill vendor contracts," reinstate and maintain" the Institute's "data collection, analysis, and dissemination activities," and reinstate the canceled contracts and employees.  Proposed Order (ECF No. 14-34) at 1-2.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C.

Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest—

"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.  Plaintiffs Are Unlikely To Succeed On The Merits.

#### A.   The Court Lacks Subject-Matter Jurisdiction.

##### 1.   Plaintiff's Lack Article III Standing.

Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670,

675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps

ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food &*

*Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus

"serves to protect the 'autonomy' of those who are most directly affected so that they can decide

whether and how to challenge the defendant's action." *Id.* at 379–80. The standing doctrine

further ensures that "'the Framers' concept of the proper—and properly limited—role of the courts

in a democratic society' is vindicated, by ensuring decisions meant for the political process are left

to the political process." *Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*, Civ. A.

No. 25-0943 (TNM), 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (quoting John Roberts,

Article III Limits on Statutory Standing, 42 Duke L. J. 1219, 1220 (1993)).

Under any theory of standing, "the irreducible constitutional minimum" requires that, (1)

the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the

injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision." *Friends of Animals v. Jewell*, 828 F.3d

989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Importantly, standing is "not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008)

(quotation marks omitted). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quotation marks omitted).

Membership-based associations like Plaintiffs can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA")*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Plaintiffs can also demonstrate informational standing. *FEC v. Akins*, 524 U.S. 11, 25 (1998). Plaintiffs here fail to demonstrate any kind of standing.

(a) <u>Plaintiffs Fail to Demonstrate Organization Standing.</u>

To establish organizational standing, a plaintiff must demonstrate "that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (cleaned up). "For an organizational plaintiff to demonstrate that it has suffered an injury in fact, it must show 'more than a frustration of its purpose,' since mere hindrance to a nonprofit's mission 'is the type of abstract concern that does not impart standing.'" *Coal. for Humane Immigrant Rts*, 2025 WL 1078776, at *4 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (cleaned up)). Thus, to determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm." *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (quoting *PETA*, 797 F.3d at 1094).

Critically, here, the Complaint contains no allegations that either plaintiff "used its resources to counteract the harm" of which Plaintiffs complain. *See generally* Compl. (ECF No.

1).  Plaintiffs' brief likewise is silent on the second prong.  Pls.' Br. (ECF No. 14-1) at 18-19.  Nor

do they acknowledge the second prong.  *Id*.  At best, Plaintiffs offer a single statement, that the

Council has "committed over $50,000 in funds to support [its] members facing these challenges."

Mot. Ex. 13, Patz Decl. (ECF No. 14-15) ¶ 22.

If the second prong were not already fatal to Plaintiffs' organizational standing, Plaintiffs

also fail the first prong.  "To allege an injury to its interest, an organization must allege that the

defendant's conduct perceptibly impaired the organization's ability to provide services in order to

establish injury in fact."  *Food & Water Watch*, 808 F.3d at 919 (quoting *Turlock Irrigation Dist.

v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)) (cleaned up).  "An organization's ability to provide

services has been perceptibly impaired when the defendant's conduct causes an inhibition of [the

organization's] daily operations."  *Id*. (cleaned up).

Plaintiffs here assert that they "utilize [the] statutorily-required data to carry out their core

activities," which for the Council consists of "regularly publishing three journals" and holding an

annual conference to discuss research, both of which Plaintiff claims have been affected by the

Institute's status.  Pls.' Br. (ECF No. 14-1) at 18, 19; Ex. 13, Patz. Decl. (ECF No. 14-15) ¶¶ 14,

17.  As for the Academy, Carole Lee, President of the Academy, states it carries out its missions

by pointing to three examples of research projects that rely on Institute data and have been affected

by the Institute's status. Mot. Ex. 30, Lee Decl. (ECF No. 14-32) ¶¶ 9-11.

But pointing to these purported difficulties with research and publication does not satisfy

either the Council's or the Academy's burden to show its mission has been "perceptibly impaired"

by the Institute's status.  *PETA*, 797 F.3d at 1094.  None of the offered declarants state that their

publication or research have been eliminated or no longer published or performed because of the

status of the Institute's programs.  The Council Executive Director Richard Patz declares, for

- 9 -

example, that without the Institute's data collections and research, the Council "will publish less research in its journals." Mot. Ex. 11, Patz Decl. (ECF No. 14-15) ¶ 15. He concludes that the unavailability of data "diminish[es]" the Council's "ability to produce, publish and disseminate scholarship" or that there will otherwise be "substantial risks" to the programs on which the Council relies. *Id.* ¶¶ 19, 20. Lee similarly states that without access to the data the Academy "will be limited in its ability to advance the high-quality research relied upon by scholars, educators, advocates and the general public to improve education policy and practice." *Id.* ¶ 12.

In this way, the mere fact that the Institute's status may make it more difficult for their operations does not meet either Plaintiff's burden to establish organizational standing. *See Coal. For Humane Immigrant Rts.*, 2025 WL 1078776, at *6 (organizational standing not satisfied where challenged government action merely "has made [] advocacy efforts more difficult to achieve" (cleaned up)). Nor do Plaintiffs explain any limiting principle under which standing would not arise for every entity and individual as to every downstream ripple effect of every fluctuation in a government agency's operations.

(b) <u>Plaintiffs and their Members Fail to Demonstrate Information Standing.</u>

To show informational standing, Plaintiffs have the burden of proving two elements: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." Friends of Animals, 828 F.3d at 992 (cleaned up). Nonetheless, "[a]ny informational injury still must meet the traceability and redressability prongs of the traditional standing analysis." *Architects & Eng'rs for 9/11 Truth v. Raimondo*, Civ. A. No. 21-2365 (TNM), 2022 WL 3042181, at *3 (D.D.C. Aug. 2, 2022) (citing Akins, 524 U.S. at 25), aff'd, No. 22-5267, 2023 WL 6439491 (D.C. Cir. Oct. 3, 2023).

Even if Plaintiffs or their members could show an informational injury—only one part of the chain they must show for standing—in many cases they cannot connect it to a statutory violation rather than a permissible exercise of discretion. "The decision to undertake a reorganization necessitating a [reduction in force] is within the discretion of the agency," *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993). And any other programmatic decisions regarding the Institute's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Yet Plaintiffs ask this Court to insert itself into this process, and, in the name of equity, issue a programmatic injunction freezing in place the Department's programmatic structure, personnel, and organization. And Plaintiffs ask this Court to do so notwithstanding the Secretary's differing judgment about how the Institute should operate. Having crossed—in Plaintiffs' mind—some threshold for organization and programmatic change that is as unarticulated as it is inarticulable, Plaintiffs ask this Court to step in and manage the Department's day-to-day operations. That is not the law.

(c) Plaintiffs Lack Associational Standing.

To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

First, as noted above, the individual members are unable to establish informational standing, and therefore Plaintiffs' claim to associational standing on this basis fails for the same reasons noted above.

Second, other harms articulated by the declarants, such as their purported inability to provide relevant research and information to policymakers and legislators, is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499-500 (2009); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990). Declarants discuss alleged risks to "sound policy decisions by state elected and appointed officials." Mot. Ex. 23, Barnett Decl. (ECF No. 14-25) ¶ 17; *see also* Mot. Ex. 10, Ho Decl. (ECF No. 14-12) ¶ 20; Mot. Ex. 11, Johnson Decl. (ECF No. 14-13) ¶ 14; Mot. Ex. 15, Dynarski Decl. (ECF No. 14-17) ¶ 16; Mot. Ex. 31, Tipton (ECF No. 14-33) ¶ 21. Their speculation about the members' inability to provide research and information to the relevant community "amounts to nothing more than speculation about future events that may or may not occur." *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd* 2003 WL 349713 (D.C. Cir. 2003); *Indigenous People of Biafra v. Blinken*, 639 F. Supp.3d 79, 85 (D.D.C. 2022) (concluding the John Does who "reasonably fear[] injury at the hands of the Nigerian government"—after the United States's sale of aircrafts to the Nigerian government—failed to plead a sufficient injury-in-fact).

Thus, without injury, Plaintiffs fail to demonstrate associational standing to bring this action and seek any relief.

      2.   <u>The Court Lacks Jurisdiction Over Any Cancellation of the Institute's Contracts.</u>

Insofar as Plaintiffs seek reinstatement of any Institute contracts, the proper course would be for the parties to those contracts to seek appropriate recourse under the terms of the contracts—

not for Plaintiffs, as nonparties to the contracts, to seek such relief through this suit. Any challenges to the cancellation of the Institute's contracts are not subject to this Court's jurisdiction. Under the Tucker Act, any claim based on "an express or implied contract with the United States" must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). The Supreme Court recently reaffirmed this jurisdictional line in *California*:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." Ibid. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. Bowen v. Massachusetts, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

*Dep't of Educ. v. California*, 145 S. Ct. 966, 967 (2025); *see also U.S. Conf. of Catholic Bishops v. Dep't of State*, Civ. A. No. 25-465 (TNM), 2025 WL 763738, at *4 (D.D.C. Mar. 11, 2025) (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government" (cleaned up)), appeal docketed No. 25-5066 (D.C. Cir.).  Since *California*, courts have been reacting by withholding or staying orders that would have required the types of remedies sought here.  *See, e.g., Am. Ass'n of Colleges for Teacher Ed., et al. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction because of *California*); *Mass. Fair Housing Cent. et al v. HUD*, Civ. A. No. 25-30041 (D. Mass Apr. 14, 2025) (dissolving temporary restraining order considering the Supreme Court's decision in California).

- 13 -

To determine whether an action is "at its essence a contract action," this Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (cleaned up). In this case, both of those considerations make clear that this Court lacks jurisdiction over any claims challenging the cancellation of the Institute's contracts, particularly as here, brought by entities lacking privity with contracting parties.

Plaintiffs improperly point to the Act and the APA as sources of the rights to the continuation of the contracts cancelled by the Institute. *See* Pls.' Br. (ECF No. 14-1) at 21, 22; Compl. ¶¶ (ECF No. 1) 101-35. The Act permits the Institute to perform its delineated functions "directly or through grants, contracts, or cooperative agreements." 20 U.S.C. § 9512 (emphasis added). To the extent that the Act requires any of the Institute's centers to enter contracts to perform their duties, Plaintiffs provide no suggestion that the Act required the centers to maintain the particular contracts being challenged. Given that Plaintiffs seek the reinstatement of those specific contracts that had been cancelled the source of Plaintiffs' challenge then lies within those specific contracts themselves. Compl. (ECF No. 1) ¶ 137. Moreover, citation to the APA is irrelevant, as the APA itself will not grant jurisdiction where another statutory scheme, here the Tucker Act, applies. *See Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) ("the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA (cleaned up)).

In any event, the latter *Megapulse*, 672 F.2d at 968, factor is dispositive here. The nature of the relief Plaintiffs seek sounds in contract. *See Conf. of Catholic Bishops*, 2025 WL 763738, at *7-8. It asks the Court to "to reinstate the canceled contracts." Compl. at (ECF No. 1) ¶ 137. Thus, Plaintiffs "seek[] the classic contractual remedy of specific performance." *Spectrum*

*Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).  But this Court cannot order the Government to continue to specifically perform a contract.  *Id.*  Such a request for an order that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also California*, 145 S. Ct. at 967 (the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'") (cleaned up).  Indeed, this Court has already found that there was no jurisdiction to hear a claim by a federal grantee seeking specific performance on a federal grant agreement.  As to the D.C. Circuit precedent, *Ingersoll-Rand Co.*, this Court has written: "[t]he Court squints in vain to see any daylight.  Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts.  That is something this Court lacks the power to do."  *Conf. of Catholic Bishops*, 2025 WL 763738, at *6. The same is true here.

The Court likewise lacks the power to grant Plaintiff's request to require the Government "to re-bid the contracts" and "solicit[] new contracts"  Compl. (ECF No. 1) ¶ 137.  Plaintiffs in their brief point to no authority that requires any party, let alone the Government, to contract. Moreover, as explained further below, "the allocation of funds from a lumpsum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  This is particularly clear here where Plaintiffs do not claim that the Institute has to perform all of its duties through contracts, let alone through specific contracts.  In short, the Court cannot require the Executive to enter into new contracts or direct funds that Congress has specifically committed to Executive discretion.

In sum, this Court lacks jurisdiction over the claims challenging the Departments' cancellation of the contracts.

        3.      <u>The Court Lacks Jurisdiction Over Plaintiffs' Employment Action Claims.</u>

Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE")*, 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's reductions in force.

The Civil Service Reform Act ("CSRA") and Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth within the CSRA, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see also Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel for certain "prohibited personnel practices." Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *United States v. Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Personnel actions" that fall within the Office of Special Counsel's purview include "any. . . significant change[s] in duties, responsibilities, or working conditions." 5 U.S.C.

§ 2302(a)(2)(A)(xii).   The CSRA enumerates thirteen circumstances under which personnel actions become "prohibited personnel practices," which must be brought before the Office of Special Counsel in the first instance.  *Id*. § 2302(b).  One of those thirteen "prohibited personnel practices" occurs when a "personnel action" violates "any law, rule, or regulation implementing, or directly concerning, the merit system principles" listed in the statute.  *Id*. § 2302(b)(12).  These principles require, in relevant part, "proper regard for [employees'] constitutional rights."  *Id*. § 2301(b)(2).  Consequently, personnel actions that implicate violations of constitutional rights are prohibited personnel practices that generally fall within the CSRA's exclusive remedial scheme. *See*, *e.g.*, *Weaver v. Info. Agency*, 87 F.3d 1429, 1432 (D.C. Cir. 1996).

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment.  *AFGE*, 929 F.3d at 754.  Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  *See id*. at 755 (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees.  *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *Fausto*, 484 U.S. at 455.  Likewise, the D.C. Circuit repeatedly has recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework.  *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005); *but see* Axon Enterprise, Inc. v. FTC, 598 U.S. 175 (2023).  In other

words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide'. . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67–69), or its decision to engage in "'a type of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013) (emphasis in original); *see generally Grosdidier v. Chairman, Broad. Bd. of Govs.*, 560 F.3d 495, 497 (D.C. Cir. 2009) (holding that federal employees "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions"). As the D.C. Circuit put it bluntly: "what you get under the CSRA is what you get," even if what you get is nothing at all. *Fornaro*, 416 F.3d at 67.

With respect to any constitutional claims, even in cases centering on CSRA–covered actions, the Supreme Court has considered the availability of "meaningful review" in an Article III judicial forum when evaluating the scope of the CSRA's exclusive remedial scheme. *Elgin*, 567 U.S. at 10. The D.C. Circuit has similarly consistently determined that federal employees have "a right to federal court review of their constitutional claims." *Weaver*, 87 F.3d at 1433. Although there exists a narrow exception to the exhaustion rule for employees covered under the CSRA when their "constitutional claim raises issues totally unrelated to the CSRA procedures," *Steadman v. Gov., U.S. Soldiers & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990), this exception is a narrow one, and does not excuse exhaustion requirement for claims, that, while framed as constitutional challenges, are in truth a disguised "vehicle" to challenge CSRA–covered personnel

actions or practices.  *Elgin*, 567 U.S. at 22; *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 366 (D.D.C. 2020).

Here, Plaintiffs seek among other things, "to restore sufficient employee positions." Compl. (ECF No. 1) ¶ 139.  But allowing a stranger to the federal-employment relationship such as Plaintiffs to raise claims in this Court that the affected federal employees themselves cannot raise would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes.  The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions.  *Fausto*, 484 U.S. at 455; *see also Grosdidier*, 560 F.3d at 497 ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail[.]").

When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims. For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984) considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else.  *See id.* at 346 (citing 7 U.S.C. § 608c).  When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process."  *Id.* at 347.  Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized."  *Id.*  And the "restriction of the administrative remedy to handlers strongly suggests that

Congress intended a similar restriction of judicial review of market orders."  *Id*.  Any other holding would facilitate circumvention of the comprehensive statutory scheme.  *See id*. at 348.

The principles described in *Block* fully apply to the CSRA and other employment statutory schemes.  *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"); *see also Thunder Basin*, 510 U.S. at 207 (citing *Block* for governing standards in determining if review is precluded).  Because Congress intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, certainly cannot challenge the Department's employment actions either.

Furthermore, even setting aside Plaintiffs' lack of any role in the federal employment relationship, Plaintiff still cannot bypass Congress's statutory procedures by artfully labeling their claims as a broad challenge to the March 11, 2025, announced reductions in force.  Pls.' Br. (ECF No. 14-1) at 20.  Even where challengers "frame their suit as a systemwide challenge to" agency "policy" rather than individual benefits determinations, the exclusive review procedures for federal employees remain mandatory.  *Fornaro*, 416 F.3d at 67–68 (Roberts, J., for the Court); *accord Nyunt*, 589 F.3d at 448–49 (rule that federal employees may not use APA challenge to "circumvent" CSRA process "applies to a 'systemwide challenge' to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case") (Kavanaugh, J., for the Court); *see also Lacson v. Dep't of Homeland Sec.*, 726 F.3d 170, 175 (D.C. Cir. 2013) (describing *Elgin* as having "echoed and amplified the approach taken" in D.C. Circuit cases such as *Fornaro* and *Nyunt*).  So should this Court accept Plaintiffs' characterization of their suit, that

would not allow them to "bypass" the FSL-MRS and CSRA. *See Am. Foreign Serv. Ass'n v. Trump*, Civ. A. No. 25-352 (CJN), 2025 WL 573762, at *11 (D.D.C. Feb. 21, 2025).

Plaintiffs' challenges to the reductions in force also cannot be understood as collateral to the statutory review provisions at issue. "This consideration is related to whether meaningful judicial review is available," but focuses on "whether the plaintiffs aim[] to seek the same relief they could obtain in the agency proceeding." *AFGE*, 929 F.3d at 759–60 (quotation marks omitted). Surely they do—based on the relief the Complaint seeks, Plaintiffs at this point seek to "restore sufficient employee positions." Compl. (ECF No. 1) ¶ 139. Proceedings before the administrative agencies could culminate in that relief. *See, e.g.*, *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir. 2023), judgment vacated as moot, 144 S. Ct. 480 (2023) (MSPB can resolve "challenges to adverse employment actions").

Ultimately, allowing separate litigation by the instant Plaintiffs would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development . . . of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449. Thus, the Court does not have jurisdiction to review any of Plaintiffs' claims challenging the Department's reductions in force.

### B.    Plaintiffs' Claims Fail on the Merits.

#### 1.    Plaintiffs' APA Claims (Counts I-III) Fail.

##### (a) Plaintiffs Have Not Identified A Discrete Agency Action.

As a threshold matter, Plaintiffs do not identify a discrete and circumscribed agency action that the Department has taken and that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891, 899; *see also S. Utah*, 542 U.S. at 62 (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency

actions must be "circumscribed [and] discrete." *S. Utah*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of the Department's management of the Institute. Instead of presenting the Court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge a host of individual actions—the cancellation of Institute contracts, a reduction in Institute staff, and the end of the Institute's remote access program, *see, e.g.*, Compl. (ECF No. 1) ¶¶ 4-6; Pls.' Br. at 22-23 ("Defendants' actions, namely, by reducing staff . . .; cancelling contracts necessary for the maintenance, analysis, and dissemination of data; and restricting Plaintiffs' and their members' use of data, are arbitrary and capricious . . . .").

Addressing this type of claim would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function— an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497

U.S. at 892-93.  Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *S. Utah*, 542 U.S. at 66-67.

Although Plaintiffs attempt to cloak this action as an "administrative" challenge or a Constitutional challenge, at bottom, their challenge is to the executive orders directing the termination of contracts and reorganization of the Department.  Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to any executive order under the APA are not reviewable.  *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (holding that a challenge to EO 14008 "cannot be reviewed under the APA because the President is not an agency").  Plaintiffs' claims that the Contract Executive Order or Department Executive Order was adopted without "hallmarks" of agency actions are all non-cognizable under the APA. *See id.*; Pls.' Br. (ECF No. 14-1) at 24.

(b) Plaintiffs Do Not Identify Any Final Agency Action.

Even assuming Plaintiffs have identified discrete agency actions, they have not shown that these programmatic actions are final.  "Final agency action" has two components.  First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).  It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704.  Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs' motion claims that the Department's actions reflect a decision to terminate the Institute is a final agency action. Pls.' Br. (ECF No. 14-1) at 20.  It is telling that Plaintiffs are unable to identify any concrete, final decision by the Department to shut down the Institute.  To

the extent that Plaintiffs are relying on any of the individual actions taken with respect to the Institute as the final agency action with respect to the reorganization of the Department, Secretary McMahon in her public statements has indicated those programmatic decisions mark the initiation, not the consummation, of the agency's decision-making process regarding the reorganization of the Department.

The actions taken so far reflect a decision by Department leadership that agency functions need to be streamlined and reorganized. Those decisions are thus "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the individual programmatic actions themselves the "consummation of the administrative process" reevaluating the agency's priorities to reorganize the Department. *Id*. at 113.

### (c) There Are Adequate Alternative Remedies Available.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id*., reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903. As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the

Federal Circuit). As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies. To the extent this case rests on contract claims, then the Court of Federal Claims provides an adequate alternative under the Tucker Act.

>    (d) <u>Because the Contract Executive Order and Department Executive Order Expressly Direct the Department to Continue All Actions Required by Law, the Executive Orders Do Not Infringe on the Department's Statutory Obligations.</u>

Plaintiffs are unlikely to succeed on the substantive merits of their claim that the Department's statutes foreclosed the actions that the Department has taken pursuant to the Contract Executive Order or Department Executive Order. Insofar as they are challenging the President's executive orders, the claims fail because they rely on characterizations of those orders that are inconsistent with their terms. The Contract Executive Order instructs for the termination of contracts "where appropriate and consistent with applicable law." Exec. Order. No. 14,222 § 3(b), 90 Fed. Reg. at 11,096. Moreover, the Department Executive Order does not require the immediate shutdown of the Department. To the contrary, the Department Executive Order requires the Secretary of Education only to discontinue activities "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.

Definitionally, directing the Secretary to end contracts or functions consistent with law cannot be interpreted to violate the law. It is plainly lawful for the President to direct the Secretary to act within the agency's discretion to implement the Act and related statutes consistent with the law. *See*, *e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). Plaintiffs argue that Defendants violate the Act by terminating contracts and reducing the Institute's staff. Pls.' Br. (ECF No. 14-1) at 26. But that argument proceeds from a premise that the Contract Executive Order and Department Executive Order expressly reject. Again, the notion that the agency has eliminated any of the Institute's statutorily mandated

programs is inconsistent with Secretary McMahon's statement that the Department "will continue to deliver on all statutory programs that fall under the agency's purview."  RIF Press Release. Plaintiffs point to no authority permitting them to act as the equivalent to a board of directors overseeing and vetoing managerial and operational actions entrusted to Agency discretion.

(e) <u>The Department's Staffing and Other Programmatic Implementation<br>Decisions Are Committed to Agency Discretion.</u>

Plaintiffs are likewise unlikely to succeed on the merits of their arbitrary and capricious claim, which, as briefed, involves actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]"  *Id.*  "[T]he standard of review is highly deferential" in determining whether an action is arbitrary and capricious, *Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), cert. denied, 144 S. Ct. 1117 (2024), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln*, 508 U.S. at 192 (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department.  This waste impacted the ability of the Department to perform its underlying mission, which is to support the States and localities in providing education to their citizens.  Based on these findings, the Secretary has taken the first

- 26 -

steps in right-sizing the Department through a reduction in force and other programmatic decisions, such as the end of the remote access program.

Plaintiffs bear the burden of showing that these actions are arbitrary and capricious. *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quotations omitted). They come nowhere close to meeting their burden. Their arguments contesting whether the reductions in force, the contract cancelations, or ending the remote access program will bring savings, efficiency, or its policy objectives reflects a fundamental "lack of understanding" of "the nature" of the Department's actions, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). Plaintiffs have not pointed to any Department decision to terminate the Institute. Indeed, Plaintiff states that employees still remain at the Institute, Pls.' Br (ECF No. 14-1) at 2, and Plaintiffs do not claim that all of the Institute's contracts have been terminated.

Moreover, the Department has stated its commitment to performing its statutory obligations. Ultimately, courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staffing would be an extraordinary violation of the separation of powers.

Indeed, the reduction in force and end of the remote access program incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a reduction in force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision.") (cleaned up). "In determining whether a matter has been committed solely to agency

discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, staffing decisions and other decisions on how to implement a program (such as the end of the remote access program) fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (citation omitted). After all, the point of the Department's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id*. at 192. Similarly, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The reduction in force and other decisions on program implementation (such as the end of the access of the remote access program) reflect the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

Second, Plaintiffs cannot point to a particular statute limiting the agency's inherent discretion to reduce headcount or any requirement to have the exact remote access program that was previously in place. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee*, 435 U.S. at 543.

But even if this Court were to conclude that the Department's explanation for the reductions in force or the end of the remote access program is insufficient to withstand judicial

review, that would in no way justify a preliminary injunction.  Rather, "the proper course" would be "to remand to the [Department] for additional . . . explanation," not any type of injunction.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

    (f)  <u>The Department's Funding Decisions Are Committed to the Agency's Discretion by Law.</u>

Additionally, Plaintiffs' challenge to funding decisions by the Department are committed to the agency's discretion by law.  *See* 5 U.S.C. § 701(a)(2).  In appropriating funds for the Institute, Congress gave the agency broad discretion to decide when and how to spend funds consistent with the various purposes specified in the appropriations laws.  Here, in 2024, Congress appropriated funds "[f]or necessary expenses for the Institute of Education Sciences."  Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024); S. Rept. 118-84 at 247 (incorporated into statute by Pub. Law 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024).  Congress continued funding at this level for 2025.  Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15, 2025).

Those appropriations provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds.  *See Heckler*, 470 U.S. at 830.  The agency has unreviewable discretion to make choices on how the appropriations are spent.  *Lincoln*, 508 U.S. at 192 ("the allocation of funds from a lumpsum appropriation is another administrative decision traditionally regarded as committed to agency discretion.").  The Department's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831–32).

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), supports the Government's position regarding the Executive's discretion over appropriated funds.  There, the D.C. Circuit considered a challenge to the Secretary of Agriculture's implementation of a subsidy program for milk producers, where the agency received an appropriation "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary" "to compensate dairy producers for economic losses incurred during 1999."  *Id*. at 750, 751.  Plaintiffs challenged the agency's method for calculating how much money a milk producer should receive, but the court held that the statutory appropriations language "left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed," and that decision was unreviewable. *Id*. at 751–52.  The court also ruled that plaintiffs could challenge the Secretary's calculation insofar as it compensated dairy producers for the wrong year.  But that was because Congress had specified that compensation must be for "economic losses incurred during 1999."  *Id*. at 752.  In that limited regard, "Congress limited the Secretary's authority to disburse funds."  *Id*.

No similar limitation exists here: Congress merely appropriated funds for broad purposes, including for the expenses of Institute operations, and the further delineation of broad purposes does not require that the Government provide specific amount funds to particular contracts or employee salaries.  *See* Further Consolidated Appropriations Act, 2024, Pub. Law 118-47, 138 Stat. 690 (Mar. 23, 2024) (appropriating funds "[f]or necessary expenses for the Institute of Education Sciences"); S. Rept. 118-84 at 247 (incorporated into statute by Pub. Law 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024); Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. Law 119-4 (Mar. 15, 2025).  How those funds "could best be distributed" is not, as in *Milk Train*, a judicially reviewable question, but instead is left to agency discretion.

2.    <u>Plaintiffs Are Unlikely to Succeed On their Constitutional Claims (Count IV).</u>

Plaintiffs' separation of powers claim is barred at the outset because it is purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review[.]" *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id.* at 473, n.5. Neither of those situations applies here. Thus, Plaintiffs cannot bring independent constitutional claim. *See, e.g.*, *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).

Contending that the challenged actions violate the separation of powers, Plaintiffs are advancing the similar arguments the Supreme Court rejected in *Dalton*. Plaintiffs' alleged separation-of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with statutory obligations. *See* Compl. (ECF No. 1) ¶¶ 125-31; Pls.' Br. (ECF No. 14-1) at 26-29. The outcome of the issues Plaintiffs raise depends on resolution of statutory claims rather than any unique separation-of-powers principles. If Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a statutory provision could also for the same reason be alleged to violate the constitutional separation of powers. "Under *Dalton*, [Plaintiffs] cannot recast these types of claims as constitutional." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 53; *see also Dalton*, 511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and

claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration."). Thus, Plaintiffs' ultra vires claim fails. Plaintiffs also assert in their motion that "Defendants have violated their constitutional duty under the Take Care Clause[.]" Pls.' Br. (ECF No. 14-1) at 27. Plaintiffs cannot obtain a preliminary injunction based on a claim they have not asserted in the complaint. *Benoit v. Dist. of Columbia*, Civ. A. No. 18-1104 (RC), 2018 WL 5281908, *5 (D.D.C. Oct. 24, 2018); *see also New York Times Co., v. Def. Health Agency*, Civ. A. No. 21-0566 (BAH), 2021 WL 1614817, at *4 n.6 (D.D.C. Apr. 25, 2021) (collecting cases). Plaintiffs here have not alleged in their Complaint a violation of the Take Care Clause; their sole constitutional claim is a separations-of-power claim. Compl. (ECF No. 1) ¶¶ 125-31. Plaintiffs as a result are unlikely to succeed on the merits of such claim, and the Court cannot grant a preliminary injunction based on that non-pleaded claim.

Nonetheless, the Take Care Clause does not provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is his responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the actions of the Secretary, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which as explained above, presents separate insurmountable obstacles for Plaintiffs.

3.    Plaintiffs Are Unlikely To Succeed On Their Ultra Vires Claim (Count V).

Plaintiffs also repackage their APA claims as an ultra vires claim; but that claim will also likely fail.  "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity.  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949).  The exception to sovereign immunity is based on the principle that such ultra vires action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign."  *Id.* at 690.  Here, Plaintiffs set forth no ultra vires claim that is distinct from their APA claims.  Compl. (ECF No. 1) ¶¶ 132-35. Count V of the Complaint alleges that Defendants acted ultra vires "[b]y ignoring its clear obligations under [the Act] and disrupting [the Institute's] and its Centers' data collection, maintenance, and dissemination activities."  *Id.* ¶ 135.  This count is merely duplicative of the APA claims in Counts I and III, which allege violations of statutory requirements under the Act. *Id.* ¶¶ 101-08, 119-24.  Thus, Plaintiffs' ultra vires claim fails for the same reasons as do the APA claims.

## II.    Plaintiffs Have Not Shown that They Will Face Irreparable Harm Absent a Preliminary Injunction.

The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  First, the moving party must demonstrate an injury that is "'both certain and great'" and "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Id.* (emphasis in original) (quoting *Wis. Gas Co. v. Fed. Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Second, the injury must "be beyond remediation," meaning the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm."  *Id.* at 297–98 (quoting *Wis. Gas*, 758 F.2d at 674).  Plaintiffs' various attempts to identify such an injury fail.

First, Plaintiffs point to the fact that they and their members are unable "to continue their research that relies on access to the Department's databases."  Pls.' Br. (ECF No. 14-1) at 29.  But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a" preliminary injunction, such as locating alternative sources of information alternative, methods of accessing the Institute's data, or different research projects, "are not enough" to show irreparable harm. *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).  Moreover, Plaintiffs fail to show that this injury is "beyond remediation" at the preliminary injunction phase.  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).  In the Freedom of Information Act context, a plaintiff's ability "to obtain all responsive and non-exempt documents at the conclusion of the litigation" makes it "difficult for a plaintiff to demonstrate 'irreparable harm' that is in fact 'beyond remediation.'" *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 10 (D.D.C. 2014).  Likewise, if Plaintiffs prevail at a later stage of this litigation, the Court could order restoration of the Institute's research and information, which will ameliorate the harm.  *See Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 22–23 (D.D.C. 2018).

The irreparable harm from the lack of data is indeed diminished here by the length of time since Plaintiffs and their members learned of the contract cancellations or other issues with retrieving Institute data. "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).  "The D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Open Top Sightseeing USA*

*v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury").

Plaintiffs claim that the many of the Institute's contracts were terminated as early as February 10, 2025, that their members were notified on February 10, 2025, and that their restricted use licenses for the remote access program would be terminated. *See* Pls.' Br. (ECF No. 14-1) at 7, 20. The fact that Plaintiffs then have waited nearly than three months to seek injunctive relief calls into doubt their claims that they and their members are suffering irreparable harm from the Institute's status.

Plaintiffs also cannot demonstrate irreparable harm by pointing to "[l]ack of timely access to information." Pls.' Br. (ECF No. 14-1) at 29. Plaintiffs point to no requirement that the Institute provide the data or research on a particular timeline. And while "in general, data is more valuable the more timely it is, [] plaintiffs seeking access to information are not by default entitled to preliminary injunctive relief." *Pub. Citizen*, 363 F. Supp. 3d at 22–23. Moreover, Plaintiffs only speculate that the quality of data will erode without having the same number of staffing and the same exact contracts that were in place prior to February 2025. *See, e.g.*, Pls.' Br. (ECF No. 14-1) at 30; Ex. 10, Ho Decl. (ECF No. 14-12) ¶ 17 ("With such a significant reduction in staff across [the Institute], I do not believe that it is possible to ensure that data I need such as NAEP and EDFacts are valid and reliable and meet high methodological standards as statute requires."); Ex. 12, Briggs Decl. (ECF No. 14-14) ¶ 16 ("I do not believe that NAEP data can continue to be collected to the highest methodological standards as required by law if there are hardly any staff

or contractors available to perform this work"); Ex. 14, Reardon Decl. (ECF No. 14-16) ¶ 29 ("I do not believe that this data can continue to be collected to the highest methodological standards as required by law if there are few staff or contractors available to perform this work."); Ex. 13, Patts Decl. (ECF No. 14-15) ¶ 20 (pointing to "experience"); Ex. 16, McCarty Decl. (ECF No. 14-18) 15; Ex. 23, Barnett Decl. (ECF No. 14-25) ¶ 12. Such "speculation" based on nothing other than the declarants' beliefs or experience does not satisfy Plaintiffs' burden for making a "credible showing of a likelihood of irreparable harm." *Pub. Citizen*, 363 F. Supp. 3d at 23.

Second, Plaintiffs point to the harm to the purported data or research should the Institute's staffing and contracts not be reinstated as they were prior to February 2025. *See* Pls.' Br. (ECF No. 14-1) at 31-33. But that assertion is misplaced because "harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *State v. Musk*. --- F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)); *see also Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) ("The irreparable-harm analysis focuses on the moving party, not the nonmoving party or some third party.") (citation omitted). By focusing on the any purported damage to the data or research, Plaintiffs here essentially point to the harm that non-parties, those in the community who rely on their research and publications, would suffer from the purported diminished quality in the research that Plaintiffs and their members produce or publish. Thus, Plaintiffs fail to demonstrate irreparable harm.

## III.     **The Equities and Public Interest Weigh Against Relief.**

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against

granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), appeal dismissed, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). Granting a preliminary injunction would disrupt the Department's efforts to perform the overhaul of the Department as the Secretary envisioned or comply with the Contract Executive Order to "terminate . . . such covered contracts . . . to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the] Administration," Exec. Order. No. 14,222 § 3(b), 90 Fed. Reg. at 11,096, as well as the Department Executive Order's directive to "the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely," Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Institute. Entering any sort of preliminary relief would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831–32. As discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief, because Plaintiffs have not shown that their harm could not otherwise be mediated later, or they have asserted harms on behalf of parties not before this Court.

## IV.    Any Preliminary Injunction Should Be Limited.

For the reasons explained above, Plaintiffs are not entitled to a preliminary injunction. But if the Court concludes otherwise, the relief granted "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,

435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  The expansive relief that Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all.

As such, any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is either broader in substance or scope (i.e., wholesale reinstatement of staffing at or any contracts for programs that Plaintiffs do not even utilize) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Id*. at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

## V.    <u>Any Preliminary Injunction Should Be Accompanied by Security and Stayed.</u>

Any preliminary injunction should also require Plaintiffs to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").  Particularly given that the relief requested by Plaintiffs could hinder

Defendants' ability to conduct the reorganization of the Department in a manner consistent with the President's policies, the Court should consider the implications of any order prohibiting the President from implementing his policy objectives.

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for preliminary injunction.

 Dated: May 9, 2025                     Respectfully submitted,

                                        EDWARD R. MARTIN, JR., D.C. Bar #481866
                                        United States Attorney


                                        By: _____*/s/Dimitar P. Georgiev*_____
                                            DIMITAR P. GEORGIEV, D.C. BAR #1735756
                                            ERIKA OBLEA, D.C. BAR #1034393
                                            Assistant United States Attorneys
                                            601 D Street, NW
                                            Washington, DC 20530
                                            (202) 252-2500 (main)

                                            *Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-1266 (TNM) |
| DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Plaintiffs' motion for a preliminary injunction, Defendants' opposition, and the entire record herein, it is hereby

ORDERED that Plaintiffs' motion for preliminary injunction is DENIED.

SO ORDERED:

_____                    _____
Date                                 TREVOR N. MCFADDEN
                                     United States District Judge