UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ACADEMY OF EDUCATION,
500 5th Street NW
Washington, DC 20001

and

NATIONAL COUNCIL ON
MEASUREMENT IN EDUCATION
19 Mantua Road
Mt. Royal, NJ 08061

Plaintiffs,

vs.

DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, D.C. 20202

and

LINDA MCMAHON, *in her official capacity
as Secretary of Education,*
400 Maryland Avenue, SW
Washington, D.C. 20202

Defendants.

Civil Action No. 1:25-cv-01266-TNM

| Deleted: _____ |

FIRST AMENDED COMPLAINT

INTRODUCTION

1.    The Education Sciences Reform Act ("ESRA") requires that the federal government maintain robust educational data collection capabilities, and that the Department of

| Deleted: |

Education ("the Department") collect, maintain, analyze, and disseminate high-quality data through its research initiatives. To accomplish these goals, ESRA reorganized the existing Department research initiatives and established the Institute of Education Sciences ("IES") which includes the four National Centers of Research: the National Center for Education Statistics

| Deleted: (collectively, "IES's Centers") |

("NCES"), National Center for Education Evaluation ("NCEE"), National Center for Education Research ("NCER"), and the National Center for Special Education Research ("NCSER").

2.    Beginning in February 2025, the Department has taken numerous actions which curtail its ability to comply with congressional mandates to collect, analyze, and disseminate ten critical datasets related to education.

3.    Plaintiffs and their members, preeminent education scholars and measurement experts, rely on ten datasets from IES for their research on pressing educational issues, including the National Assessment of Educational Progress, Common Core of Data, National Post Secondary Student Aid Survey, Integrated Postsecondary Education Data System ("IPEDS"), Early Childhood Longitudinal Study, High School Longitudinal Study, Baccalaureate and Beyond Longitudinal Study ("B&B"), Beginning Postsecondary Students Longitudinal Study ("BPS"), National Household Education Survey ("NHES"), and the Trends in International Mathematics and Science Study.

4.    This data is critical to Plaintiffs' and their members' research on educational inequality in access to resources, opportunities, support, and outcomes. Without this data, Plaintiffs and their members cannot continue their study of the practices, programs, and policies that work to improve opportunities and outcomes for all students as well as students with disabilities; English language learners/multilingual learners; Black, Latino, and Native American students; and socioeconomically disadvantaged students. Plaintiffs and their members rely on this data to measure national trends in education access and outcomes; ensure that measurement data is of the highest quality, and is valid and reliable for representing disparities in state and national test scores among demographic groups; and measure changes in the distribution of financial aid.

5.    IES's data not only fuels Plaintiffs' and their members' research, but also technical

2

---

**Deleted:** <#>Congress has taken no action to curtail IES and its Centers' obligations under ESRA and has instead continued to add further mandates to IES's collection duties. In support of these data collection mandates, Congress continues to appropriate hundreds of millions of dollars to ensure that IES and its Centers can meet their critical legal obligations. ¶

**Deleted:** <#>Despite these ongoing congressional mandates, Defendants and other officials in the Trump Administration, through Executive Orders and the Department of Government Efficiency ("DOGE") initiatives, have moved swiftly to take actions that restrict the collection and dissemination of federal education information as part of the administration's ultimate goal of dismantling the Department.

**Deleted:** <#>¶
The first disruptive action resulting in the restriction of Department data took place on February 10, 2025, when the Department cancelled over $900 million in Department contracts, including vendor contracts required to maintain and update data collected by IES and its Centers in accordance with congressional mandates. ¶
2025, the administration announced a Reduction in Force ("RIF") of nearly fifty percent of the Department's workforce. Due to the RIF and other actions by the Department, approximately 90% of IES's staff was eliminated, shrinking IES to approximately twenty ... [1]

**Deleted:** <#>Where federal education data does exist ... [2]

**Deleted:** <#>'s Centers

**Deleted:** <#> ("NAEP")

**Deleted:** <#>EDFacts,

**Deleted:** <#> ("NPSAS")

**Deleted:** <#>Educational Longitudinal Studies ("ELS"),

**Deleted:** <#> ("ECLS")

**Deleted:** <#> ("HCLS")

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**Deleted:** <#> ("TIMSS")

**Deleted:** from IES's Centers

**Deleted:** educational inequality and

**Deleted:**

**Deleted:** historically underserved students, including Black, Latino, and Native American students;

**Deleted:**  by

**Deleted:** :

**Deleted:** ing

**Deleted:** to

**Deleted:** ing

**Deleted:** ing

assistance, federal aid calculations, grants to localities, recipients' compliance efforts, and Census Bureau statistics. The failure of IES to collect, analyze, maintain, and collect these ten datasets will have longstanding and far-reaching impacts on every student and our nation's entire education system.

6.    Defendants' actions restricting access to these ten datasets create long-term, irreparable harm to Plaintiffs and their members in violation of congressional mandates on educational data collection. Defendants actions violate the Administrative Procedure Act because they are arbitrary and capricious, and not in accordance with federal law under ESRA.

7.    This suit seeks declaratory and injunctive relief against Defendants' unlawful restriction of IES's ten datasets, and against Defendants' imminent and ongoing failure to maintain and this data as required by Congress.

## PARTIES

8.    Plaintiff National Academy of Education (NAEd) is a nonpartisan, nonprofit organization that advances high-quality research to improve education policy and practice. Founded in 1965, the NAEd has 342 members, including those in the United States and international associates, who are elected on the basis of their leading and trusted scholarship related to education. NAEd undertakes research studies to address pressing educational issues and administers professional development fellowship programs to enhance the preparation of the next generation of education scholars. NAEd and its members rely on data to study a wide variety of pressing educational issues, including inequities that prevent historically marginalized students from having equal access to educational opportunities. Using NAEd member research to improve education policy and practice is integral to NAEd's mission and access to the IES data is a necessary component of this work. NAEd and its members are injured by Defendants' actions

3

restricting the collection, maintenance, analysis, and dissemination of federal education data. Defendants' actions prevent NAEd and its members from completing ongoing research, disseminating planned research, and instructing students in their coursework. NAEd and its members are injured by this loss of information due to Defendants' actions, and Defendants' failure to comply with ESRA and other federal laws.

9.      Plaintiff National Council on Measurement in Education (NCME) is a professional organization founded in 1938 for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement. NCME has 1,372 members who are education researchers and measurement experts involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation. NCME aims to advance the science and scholarship of educational measurement and promote knowledge, understanding, and implementation of best practices in educational measurement through the publication of research and scholarly journals. NCME publishes the Standards for Educational and Psychological Testing which are widely accepted professional testing standards of the kind that statute requires national tests to adhere. NCME members include researchers; university faculty; graduate students; test developers; and other professionals with work related to education, psychology, and other testing issues and practices. Serving all students and communities and ensuring that assessment is fair and equitable are essential elements of NCME's mission and purposes. NCME and its members are injured by Defendants' actions restricting the collection, maintenance, analysis, and dissemination of federal education data. Defendants' actions prevent NCME and its members from completing ongoing research, disseminating planned research, and instructing students in their coursework. NCME and its members are injured by this loss of information due to Defendants' actions, and Defendants' failure to comply with ESRA and other

4

---

**Deleted:** because

**Deleted:** 1,870

**Deleted:** for all students

**Deleted:** because

federal laws.

10.     Defendant United States Department of Education is a Cabinet agency headquartered in Washington, D.C., responsible for the oversight of federal education and civil-rights laws and programs, including the Institute for Education Sciences. Through ESRA, Congress mandates that the Department, through IES and its Centers, collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally. 20 U.S.C. §§ 9541–48. The Department's actions disrupting the statutorily required collection, maintenance, and dissemination of educational data are not authorized by ESRA.

11.     Defendant Linda McMahon is the U.S. Secretary of Education and is sued in her official capacity. Defendant McMahon authorized and approved the Department's unlawful cessation of congressionally mandated work at IES.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1346(a)(2), because the matters in this controversy arise under the laws of the United States, and the Defendants are United States officials. *See* 44 § U.S.C. 33501 *et seq.* and 5 U.S.C. §§ 702, 704.

13.     This Court has jurisdiction to grant declaratory judgment, and to provide permanent injunctive relief under Federal Rules of Civil Procedure 57 and 65, as well as 28 U.S.C. §§ 2201, 2202.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants are agencies of the United States.

5

## FACTUAL BACKGROUND

**A. The Creation and Development of Federal Education Research Institutes and Centers.**

15.    Since the 1860s, the federal government has dedicated significant resources towards the collection, analysis, and dissemination of high-quality educational data for the benefit of our nation's students.[1] To that end, it has worked to improve and expand educational statistical research and provide additional resources for the evaluation of the United States educational system.[2]

16.    In 1979, Congress passed, and President Carter signed, the Department of Education Organization Act (DEOA), Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510), establishing the present-day Department under the supervision of a Secretary of Education.

17.    On November 5, 2002, President Bush signed H.R. 3801, which included ESRA, a landmark act for the improvement of federal education research, statistics, evaluation, information, and dissemination. Through ESRA, Congress recommitted to prioritizing the federal government's role in educational data collection, evaluation, and dissemination.

18.    The DEOA created a research office in the Department, which the 2002 ESRA reconstituted as IES, an independent research division. *See* Pub. L. 107-279; 20 U.S.C. §§ 9501–84.

19.    In creating IES, Congress established the division's mission as "expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers,

| Deleted: which the 2002 ESRA, an act "to provide for improvement of Federal education research, statistics, evaluation, information and dissemination," |

---

[1] Thomas D. Snyder, 120 Years of American Education: A Statistical Portrait, Nat'l Ctr. for Educ. Stat. (1993), https://nces.ed.gov/pubs93/93442.pdf
[2] *Id.*

and the general public with reliable information about— (A) the condition and progress of education in the United States, including early childhood education; (B) educational practices that support learning and improve academic achievement and access to educational opportunities for all students; and (C) the effectiveness of Federal and other education programs." *See* 20 U.S.C. § 9511.

20.    IES has a congressional mandate to "directly or through grants, contracts, or cooperative agreements . . . (1) conduct and support scientifically valid research activities, including basic research and applied research, statistics activities, scientifically valid education evaluation, development, and wide dissemination; (2) widely disseminate the findings and results of scientifically valid research in education; (3) promote the use, development, and application of knowledge gained from scientifically valid research activities; (4) strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education; (5) promote the coordination, development, and dissemination of scientifically valid research in education within the Department and the Federal Government; and (6) promote the use and application of research and development to improve practice in the classroom." *See* 20 U.S.C. § 9512.

21.    IES is the statistics, research, and evaluation arm of the Department. IES was created "to provide scientific evidence on which to ground education practice and policy and to share this information in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public."[3]

22.    In carrying out these mandates, Congress requires IES to establish and operate four research centers—NCES, NCEE, NCER, and NCSER—to maintain specialized federal education data and information. *See* 20 U.S.C. §§ 9511(c), 9531–34, 9541–48, 9561–64, 9567–67b.

---

[3] Inst. of Educ. Sci., *About IES*, https://ies.ed.gov/about (last visited July 16, 2025).

23.    NCES is "the federal statistical agency responsible for collecting, analyzing, and reporting data on the condition of U.S. education—from early childhood to adult education—to help improve student outcomes."[4]

24.    Through IES and its research centers, Congress sought to improve both the quantity and quality of educational data collection, by increasing not only the amount of data collected but also by setting high standards and processes for review of the research that relied on this data.[5] Across IES' data-collection programs, utilizing empirical research methods and peer review are major requirements of ESRA.

25.    Along with this improvement in the quantity and quality of educational data, Congress charged IES with ensuring that the research findings uncovered through IES data would be widely distributed to researchers, schools, educators, parents, students, and other public stakeholders.[6]

26.    Though statutory provisions in ESRA, Congress mandated that the mission of NCES is:

"(1) to collect and analyze education information and statistics in a manner that meets the highest methodological standards; (2) to report education information and statistics in a timely manner; and (3) to collect, analyze, and report education information and statistics in a manner that— (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." To achieve this mission, NCES collects and produces data in many ways including "from state reports, direct student assessments, longitudinal studies, international surveys, postsecondary institutions, adult surveys, and synthesizing data from federal sources."[8]

27.    As noted on NCES's official website, NCES has a "Congressional mandate to

---

[4] Nat'l Ctr. for Educ. Stat., *National Center for Education Statistics (NCES)*, https://nces.ed.gov/ (last visited July 16, 2025).
[5] *Id.*
[6] *Id.*
[8] *Id.*

8

Deleted: C

Deleted: and its Centers'

Deleted: An example of this required dissemination is the congressionally mandated statistical report on the conditions and progress of education in the U.S. that NCES is required to produce annually. *See* 20 U.S.C. § 9545.

Deleted: <#>Congress requires NCES to create the NAEP, also known as "the Nation's Report Card." *See id.* § 9621. NCES is required to collect and report NAEP data and ensure that it is publicly available in a timely manner following official reporting, and in such a way that facilitates further research. *See id.* ¶
website, "[s]ince 1867, NCES has been the federal statistical agency responsible for collecting, analyzing, and reporting data on the condition of U.S. education—from early childhood to adult education—to help improve student outcomes."[7]

Deleted:

Deleted: "

Formatted: Indent: Left:  0.5", Right:  0.5", Line spacing: single,  No bullets or numbering

Deleted: *Id.*

Deleted: 20 U.S.C. § 9541.

Formatted: Space Before:  12 pt

Deleted: Apr. 21

collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally."[9] *See* 20 U.S.C. §§ 9541–48.

28.    Congress has made explicit through statutory provisions in ESRA that NCES's mandate requires NCES to collect, compile, and disseminate statistics on topics including (*See* 20 U.S.C. § 9543):

a.  state and local education reform activities;

b.  state and local early childhood school readiness activities;

c.  student achievement in, at a minimum, the core academic areas of reading, mathematics, and science at all levels of education;

d.  secondary school completions, dropouts, and adult literacy and reading skills;

e.  access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students;

f.  teaching, including professional development opportunities for teachers and teacher qualifications;

g.  instruction, the conditions of the education workplace, and the supply of, and demand for, teachers;

h.  the incidence, frequency, seriousness, and nature of violence affecting students, school personnel, and other individuals participating in school activities, as well as other indices of school safety;

i.  the financing and management of education, including data on revenues and

---

[9] Nat'l Ctr. for Educ. Stat., *The National Center for Education Statistics: Who We Are*, https://nces.ed.gov/national-center-education-statistics-nces/about (last visited July 16, 2025).

expenditures;

j.  the social and economic status of children, including their academic achievement;

k.  the existence and use of educational technology and access to the Internet by students and teachers in elementary schools and secondary schools;

l.  access to, and opportunity for, early childhood education;

m.  the availability of, and access to, before-school and after-school programs;

n.  student participation in and completion of secondary and postsecondary vocational and technical education programs by specific program area; and

o.  the existence and use of school libraries.

29.    This congressional mandate also requires NCES to collect, analyze, cross-tabulate, and report "information by gender, race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, and other population characteristics, when such disaggregated information will facilitate educational and policy decisionmaking." 20 U.S.C. § 9543(a)(3). To this end, NCES collects demographic data for use in datasets like the Integrated Postsecondary Education Data System.[10]

**B.  The Department's Decision to End Data Collection Activities for Ten Datasets.**

30.    Beginning in February 2025, and continuing through the present, the Department has disrupted, hindered, and in some instances, completely ceased to fulfill its statutory mandates to collect, analyze, maintain, and disseminate ten datasets.

31.    Plaintiffs and their members rely on the ten datasets described below for their

---

[10] Nat'l Ctr. for Educ. Stat., *The History and Origins of Survey Items for the Integrated Postsecondary Education Data System* (2023), https://nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf (last visited July 16, 2025).

10

educational research, teaching, and scholarship. Defendants' actions restricting the collection, maintenance, analysis, and dissemination of these datasets severely impair Plaintiffs' and their members' ability to perform educational research and teach courses at their academic institutions.

32.    Without updated federal education data, Plaintiffs and their members cannot continue to measure and analyze trends in education outcomes; study which pedagogies are effective, fair, and unbiased; arm policymakers, states and districts, educators, students, parents, and communities with current information about proven methods for improving student learning and education outcomes; or keep the public informed about our national education system.

33.    The relationship between education researchers and federal education data collection is symbiotic and mutually beneficial. Plaintiffs and their members cannot complete their research without access to federal education data, which is unavailable from any other sources. In turn, Congress considers these researchers' work, including their expertise on research design and methodology, when preparing education data, engaging in policymaking, and determining the continued role of IES.

*1.   The National Assessment of Educational Progress*

34.    Title III of ESRA ("NAEP Law") requires that the Department carry out a "National Assessment of Educational Progress" ("NAEP"), which measures "student academic achievement and reporting of trends in such achievement in reading, mathematics, and other subject[s]. . . ." *See* 20 U.S.C. § 9622(b)(1).

35.    NAEP, sometimes referred to as the Nation's Report Card, began in 1969 and "is the largest continuing and nationally representative assessment of what our nation's students know and can do in subjects such as mathematics, reading, science, and writing."[19] In 2024, 116,200

---

[19] The Nation's Report Card, *About the Nation's Report Card*, https://www.nationsreportcard.gov/about.aspx (last visited July 8, 2025).

students were included in the NAEP assessment.[20]

36.    NAEP measurement must occur by using a methodology that is designed to produce "valid and reliable" results; based on "widely accepted professional standards;" and be publicly disseminated. 20 U.S.C. §§ 9622(e)(2)(A), 9622(c)(1)(A).

37.    The Department is required to collect and report NAEP measurement data and ensure that it is made publicly available in a timely manner, and in such a way that facilitates further educational research and includes trend lines. 20 U.S.C. § 9622(b)(2)(H).

38.    The Secretary shall provide for the continuing review of all NAEP assessments by a professional assessment evaluation organization. 20 U.S.C. § 9622(f)(1)(A). This continuing review shall address various issues concerning the validity and reliability of NAEP assessments, including whether they produce high-quality data consistent with relevant widely accepted professional assessment standards; whether the student achievement levels are reasonable, valid, reliable and informative to the public; whether any of the test questions are biased; and whether the assessments used are appropriately measuring reading ability and mathematical knowledge. 20 U.S.C. §§ 9622(f)(1)(B)(i)–(v).

39.    The Commissioner for Education Statistics and the NAEP Assessment Board shall consider the findings and recommendations of such ongoing reviews when determining how to carry out NAEP. 20 U.S.C. § 9622(f)(3).

40.    Since 1995, the Department has contracted with the American Institutes for Research ("AIR") to maintain the NAEP Validity Studies Panel ("NVS Panel"), which is an

---

[20] The Nation's Report Card, *Technical appendix tables for 2024 mathematics report card*, https://www.nationsreportcard.gov/reports/mathematics/2024/g4_8/supporting-files/2024_technical_appendix_math_national.pdf.

independent panel of experts that perform the continuing review of NAEP.[21] This panel reviews NAEP plans and data disseminations, and "identifies technical concerns and promising techniques worthy of further study."[22] For three decades, the Department has relied on the NVS Panel to help ensure that NAEP products are valid and reliable.

41.    Various NAEP assessments are due to be published each year for the next seven years. The next NAEP assessment will occur in January 2026.[23]

42.    The Department has taken several actions to disrupt the collection, maintenance analysis, and dissemination of NAEP data, in violation of the NAEP Law.

43.    For example, on March 3, 2025, the Department issued a "stop order" to AIR and the members of the NVS Panel, who perform the statutorily required continuing review of NAEP assessments. *See* 20 U.S.C. § 9622(f).

44.    Upon information and belief, the Department did not undertake the following implementation activities necessary for the preparation of the 2026 NAEP assessment: releasing prior assessment results for Grades 4 & 8; releasing prior assessment results for Grades 8 & 12; collecting data for the Ages 9 & 17 Long-term Trend Administration; processing data from the NAEP 2025 assessments; and selecting which schools to sample from for the NAEP 2026 assessment.[24]

---

[21] Am. Inst. for Research, *NAEP Validity Studies Panel*, https://air.org/project/naep-validity-studies-nvs-panel (last visited June 4, 2025).
[22] Nat'l Ctr. for Educ. Stat., *About NAEP*, Advancements in Design & Technology, https://nces.ed.gov/nationsreportcard/about/advancements.aspx (last visited June 4, 2025).
[23] Nat'l Ctr. for Educ. Stat., *About NAEP*, Assessment Calendar, https://nces.ed.gov/nationsreportcard/about/calendar.aspx (last visited July 8, 2025).
[24] *See* Nat'l Ctr. for Educ. Stat., *National Assessment of Educational Progress* 2026, Part A Supporting Statement at A22-23, A31-32.

13

45.     Although the Department has represented that it "will ensure that NAEP continues to provide invaluable data on learning across the U.S." and is "on track for administration in January 2026,"[25] the Department's failure to perform the above-mentioned implementation activities hinders its ability to administer the NAEP "on track," and to perform the January 2026 assessment in a manner that is valid and reliable and publish reading and math data for Grades 4, 8 and 12 at statutorily required intervals, pursuant to the NAEP Law.

### 2.   Common Core of Data

46.     As part of NAEP's collection and reporting process, Congress mandated that NCES "use a random sampling process which is consistent with relevant, widely accepted professional assessment standards and that produces data that are representative on a national and regional basis[.]" 20 U.S.C. § 9622(b)(2)(A).

47.     To fulfill this mandate, NCES has historically produced the Common Core of Data ("CCD").

48.     NAEP relies on the CCD database as the population by which it conducts its congressionally-mandated random sampling because the CCD is the only comprehensive national database on public elementary and secondary schools that collects the data that NAEP requires. Upon information and belief, there is no valid and reliable alternative data set upon which the NAEP could rely.

---

[25] U.S. Dep't of Ed., *U.S. Department of Education Releases Statement on 2026 NAEP Schedule*, Apr. 17, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-releases-statement-2026-naep-schedule.

49.     CCD collects data on public elementary and secondary districts, including data on enrollment, minority populations, poverty levels, local education agency finance data, and teacher compensation.[26]

50.     The Department describes CCD as "the Department of Education's primary database on public elementary and secondary education in the United States. CCD is a comprehensive, annual, national database of all public elementary and secondary schools and school districts."[27]

51.     On February 10, 2025, the Department cancelled contract 91990023D0008/91990024F0331, which supported the operation of CCD. The Department has not secured alternate funding to support the operation of the CCD.

52.     Upon information and belief, the Department's actions have impeded its ability to perform the collection, maintenance, analysis, and dissemination of the CCD. Specifically, from February 2025 to the present, the Department would have otherwise taken the following actions: edited data, reviewed reports, and produced data for Fiscal Year 2023; collected, reviewed and edited data for Fiscal Year 2024; trained state coordinators; made expenditure data available; and disseminated multiple data files and reports.[28]

### 3.   National Postsecondary Student Aid Study

53.     NCES is required to "collect[], acquir[e], compil[e] . . . and disseminat[e] full and complete statistics" on "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students[.]" 20 U.S.C. §§ 9543(a)(1), (a)(1)(E).

---

[26] American Institutes for Research, *Common Core of Data,* https://www.air.org/project/common-core-data (last visited July 16, 2025).
[27] Nat'l Ctr. for Educ. Stat., *About CCD,* https://nces.ed.gov/ccd/aboutccd.asp (last visited July 16, 2025).
[28] *See* Nat'l Ctr. for Educ. Stat., National Public Education Financial Survey 2022-2024; Common Core of Data, Supporting Statement Part A at 11.

54.    Congress separately requires the NCES to "conduct, on a State-by-State basis, a survey of recipients of Federal student financial aid[.]" 20 U.S.C. § 1015a(k)(1).

55.    Since 1987, NCES has chosen to fulfill these mandates by collecting the National Postsecondary Student Aid Study ("NPSAS").[29]

56.    According to the Department, "NPSAS is the primary source of information used by the federal government (and others, such as researchers and higher education associations) to analyze student financial aid and to inform public policy on such programs as the Pell grants and Direct/Stafford loans."[30]

57.    NPSAS is "based on student-level records, on financial aid provided by the federal government, the states, postsecondary institutions, and private agencies, along with student demographic and enrollment data."[31]

58.    Since 1996, NPSAS has been published every four years.

59.    The Department has taken steps to inhibit its ability to continue collecting NPSAS and fulfill its statutory mandates.

60.    On February 10, 2025, the Department cancelled Contracts 91990018C0039, 91990022C0017, and 91990023D0005/91990024F033 which supported the operation of the NPSAS. The Department has not secured alternate funding to support the operation of the NPSAS.

61.    On information and belief, the Department's cancellation of these contracts has inhibited NCES from "collecting, acquiring, compiling . . . and disseminating" statistics on access to financial aid in postsecondary education.

---

[29] Nat'l Ctr. for Educ. Stat., *National Postsecondary Student Aid Study,* https://nces.ed.gov/surveys/npsas/, (last visited July 16, 2025).
[30] Nat'l Ctr. for Educ. Stat., *National Postsecondary Student Aid Study, About NPSAS,* https://nces.ed.gov/surveys/npsas/about.asp (last visited July 16, 2025).
[31] *See id.*

62.    Without the Department's actions, NCES would have been preparing data-file documentation beginning in May 2024 and lasting throughout March 2026 as part of NPSAS operations.

63.    Upon information and belief, the Department's actions have impeded its ability to perform the collection, maintenance, analysis, and dissemination of the NPSAS.

*4.    Integrated Postsecondary Education Data System*

64.    NCES "shall continue to update and improve the Integrated Postsecondary Education Data System ("IPEDS"), including the reporting of information by institutions and the timeliness of the data collected." 20 U.S.C. § 1015a(i)(4).

65.    IPEDS is a web-based data-collection system designed to collect basic data from all postsecondary institutions in the United States and the other jurisdictions. The IPEDS data collection enables NCES to report on key dimensions of postsecondary education such as enrollments, degrees and other awards earned, tuition and fees, average net price, student financial aid, graduation rates, student outcomes, revenues and expenditures, faculty salaries, and staff employed.[32]

66.    IPEDS was first implemented in the 2000-01 school year. NCES sought approval under the Paperwork Reduction Act to continue to collect this data for the 2024-25, 2025-26, and 2026-27 data collections because the current approval expires on August 31, 2025.[33]

67.    Upon information and belief, IPEDS should have been carrying out several data-related activities since February 2025 to the present, including: complete Winter data collection by mid-February, 2025; complete Spring data collection closed for both keyholders and coordinators

---

[32] Integrated Postsecondary Education Data System 2024-25 through 2026-27, Supporting Statement Part A at 1.
[33] *See id.*

by April 2025; and ongoing communications regarding these data collections and their deadline between keyholders and staff in the weeks before the data completion deadlines.[34]

68.    Upon information and belief, the Department cancelled at least one contract that supported the operation of IPEDS. The Department has not secured alternate funding to support the operation of the IPEDS.

69.    Upon information and belief, the Department's actions have impeded its ability to perform the collection, maintenance, analysis and dissemination of the IPEDS.

*5.    Early Childhood Longitudinal Studies-Kindergarten*

70.    NCES is required to collect, acquire, and disseminate complete statistics on "[s]tate and local early childhood school readiness activities" and "access to, and opportunity for, early childhood education[.]" 20 U.S.C. §§ 9543(a)(1)(B), (L).

71.    The Department fulfills this mandate, in part, by administering the Early Childhood Longitudinal Studies ("ECLS") program. According to the Department, this program "provides important information about children's knowledge, skills, and development from birth through elementary school," and "has helped educators, families, researchers, and policymakers improve children's educational experiences."[35]

72.    One study within the ECLS program is the ECLS-K, which "focuses on children's early school experiences beginning with kindergarten and following children through middle school."[36]

---

[34] *See id.* at 24–25.

[35] Nat'l Ctr. for Educ. Stat., ECLS Program, Overview, https://nces.ed.gov/ecls/ (last visited July 8, 2025).

[36] Nat'l Ctr. for Educ. Stat., ECLS Program, *ECLS-K*, https://nces.ed.gov/ecls/kindergarten.asp (last visited July 8, 2025).

18

73.    Before the creation of this study in 1998, "[n]o large national study focused on education had followed a cohort of children from kindergarten entry to middle school."[37]

74.    As the Department recognizes, the ECLS-K study is "exceptionally broad in its scope and coverage."[38] It is designed to "advance research in child development and early learning by providing a detailed and comprehensive source of current information on children's early learning and development, transitions into kindergarten and beyond, and progress through school."[39]

75.    For the past three decades, the Department has used a random sample of 15,000-25,000 Kindergarten students from 800 to 1000 public and private schools in the United States. As part of the study, each student receives a one-on-one assessment from a trained early childhood education specialist in the fall and spring of Kindergarten, and then again in First, Third, and Fifth grade. The Department also collects information from parents and teachers as part of the survey.

76.    As the Department acknowledges, this study has been enormously fruitful in understanding patterns of kindergarten readiness and evaluating the effectiveness of early childhood education programs and elementary schools.[40]

77.    The next dissemination of the ECLS-K data is due to be published in 2026. According to the Department, the study results will be especially significant because it will "provide important information about the experiences of children whose early lives were shaped by the COVID-19 pandemic."[41]

---

[37] *See id.*

[38] Early Childhood Longitudinal Study, *Kindergarten Class of 2023-24*, Supporting Statement Part A at A-1.

[39] *See id.*

[40] *See id.*

[41] Nat'l Ctr. for Educ. Stat., ECLS Program, *Comparisons to Other ECLS Studies*, https://nces.ed.gov/ecls/comparisons2024.asp (last visited July 16, 2025).

78.    There is no comparable dataset to the ECLS-K.

79.    On February 10, 2025, the Department cancelled Contract 91990019C0002, which supported the operation of the ECLS-K. The Department has not secured alternate funding to support the operation of the ECLS-K.

80.    Since that time, the Department has taken several actions to hinder the collection, maintenance, analysis, and dissemination of the ECLS-K. Specifically, the Department has failed to conduct language screeners for students, issue school administrator surveys, and collect data through parent and teacher surveys relating to the program participants for the spring of 2025.

### 6.    High School Longitudinal Study

81.    NCES is required to "collect, report, analyze, and disseminate statistical data related to . . ." ". . . the condition and progress of education, at the . . . secondary, postsecondary, and adult levels in the United States[.]" 20 U.S.C. § 9543(a)(1).

82.    Congress also requires NCES to "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education[.]" 20 U.S.C. § 9543(a)(7).

83.    NCES fulfills these mandates by collecting the High School Longitudinal Study ("HSLS").

84.    The HSLS is a set of five nationally representative longitudinal studies of high-school aged students. The most recent HSLS is the HSLS of 2009. The HSLS of 2009 "follows a nationally representative cohort of Fall 2009 9th-graders as they progress through high school and transition into postsecondary education and/or the labor force."[42] To follow this cohort, NCES

---

[42] Nat'l Ctr. for Educ. Stat., *High School Longitudinal Study of 2009,* https://nces.ed.gov/surveys/hsls09/ (last visited July 16, 2025).

conducts follow-up data collections on the same set of people at the same time. For example, the HSLS of 2009 had follow-up data collections in 2012 and 2016 and a planned third follow-up in 2025.[43]

85.    According to NCES, "there [was] a third follow-up being planned for 2025, to collect data on civic participation, family formation, and labor market outcomes of Fall 2009 9th-graders[.]"[44]

86.    On February 10, 2025, the Department cancelled the 91990023D0042/91990024F0321 contract which supported the operation of the HSLS. The Department has not secured alternate funding to support the operation of the HSLS.

87.    On information and belief, the Department has taken several additional actions to disrupt the collection, maintenance, analysis, and dissemination of the HSLS. Specifically, the Department has failed to complete its administrative data matching, collect self-administered web-based survey data, process and impute the data and assign weights, and finalize data products for the 2025 HSLS follow-up.[45]

### 7.    Baccalaureate and Beyond Longitudinal Study

88.    NCES "shall collect, report, analyze, and disseminate statistical data related to . . . access to, and opportunity for, postsecondary education[.]" 20 U.S.C. § 9543(a)(1)(E).

89.    The Department fulfills this mandate, in part, by administering the Baccalaureate and Beyond Longitudinal Study ("B&B") program.

---

[43] *See id.*
[44] *See id.*
[45] *See* High School Longitudinal Study of 2009 – Third Follow-Up, Supporting Statement Part A at 13.

21

90. A component dataset of NPSAS, B&B is a "longitudinal study of students who completed the requirements for a bachelor's degree in a given academic year and follows graduating seniors 1, 4, and 10 years after completing their bachelor's degree."[46]

91. On February 10, 2025, the Department cancelled Contracts 91990022C0017 and 91990023D0005/91990024F0330, which supported the operation of the B&B. The Department has not secured alternate funding to support the operation of the B&B.

92. On information and belief, the Department's actions have hindered its ability to perform the collection, maintenance, analysis, and dissemination of the B&B.

8. *Beginning Postsecondary Students (BPS)*

93. NCES "shall collect, report, analyze, and disseminate statistical data related to . . . access to, and opportunity for, postsecondary education[.]" 20 U.S.C. § 9543(a)(1)(E).

94. The Department fulfills this mandate, in part, by administering the Beginning Postsecondary Students ("BPS") longitudinal study. According to the Department, BPS "tracks first-time students' pathways through postsecondary education over the course of six years, focusing on persistence and degree attainment, transition to employment, and school and work experiences."[47]

95. BPS is a component study of NPSAS. BPS provides the only nationally representative study of all beginning college students (those who go straight through from high school to college and those who take a break in-between) and includes all students (not just those seeking bachelor's degrees but also certificates, associate's degrees, and those taking

Deleted: study

Formatted: Font: Italic

Formatted: Level 3, Numbered + Level: 3 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 1.38" + Indent at: 1.63"

Formatted: Justified

Deleted:

Deleted: it

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Default Paragraph Font, Font: 12 pt

Formatted: Font: 12 pt

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Default Paragraph Font, Font:

Formatted: Font: (Default) Times New Roman, 12 pt

---

[46] Nat'l Ctr. for Educ. Stat., Baccalaureate and Beyond Longitudinal Study, https://nces.ed.gov/surveys/b&b/ (last visited July 8, 2025).

[47] Nat'l Ctr. for Educ. Stat., CES, Beginning Postsecondary Students, https://nces.ed.gov/surveys/bps/ (last visited July 16, 2025).

postsecondary classes outside of degree).[48] "With the first BPS cohort starting in 1990 (BPS:90), the BPS:20 cohort is the fifth study of beginning postsecondary students. Beginning with the BPS:96 cohort, first time beginning students are surveyed at three points in time for up to 6 years: in the base year (through the NPSAS student interview) and 3 and 6 years later in the BPS follow-up interviews."[49]

96.    The most recent survey, the BPS:20/25 full-scale study, will be a nationally representative sample of approximately 34,240 students who were first-time beginning students during the 2019-20 academic year.[50]

97.    BPS:20 (base NPSAS year 2020) had its first follow-up in 2022, and its second follow-up should have occurred in 2025.

98.    On February 10, 2025, the Department cancelled contracts 91990018C0039, 91990022C0017, and 91990023D0005/91990024F0330 which supported the operation of the BPS. The Department has not secured alternate funding to support the operation of the BPS.

99.    On information and belief, the Department has taken several additional actions to disrupt the collection, maintenance, analysis, and dissemination of the BPS. Specifically, from February 2025 to present it should have taken the following actions: created a First Look Report; documented all aspects of the full-scale study design and data-collection procedures, including an appendix summarizing the methodological findings from the field test; complete data files and documentation for research data users in the form of both a restricted-use file and PowerStats; and

_____

[48] *See* 2020/25 Beginning Postsecondary Students Field Test, Supporting Statement Part A at 3.
[49] *See id.* at 2.
[50] *Id.*

created special tabulations of issues of interest to the higher education community, as determined by NCES.[51]

*9.   National Household Education Survey*

100.    NCES is required to collect, acquire, and disseminate complete statistics on "[s]tate and local early childhood school readiness activities" and "access to, and opportunity for, early childhood education[.]" 20 U.S.C. §§ 9543(a)(1)(B), (L).

101.    The Department fulfills this mandate, in part, by conducting the National Household Education Survey ("NHES"), which is specifically designed to support NCES's mission. According to the Department, NHES is "the flagship household survey program" of NCES. The survey "collects nationally representative, descriptive data on the educational activities of children and families in the United States."[52]

102.    The topics covered are wide-ranging, including early childhood care and education, children's readiness for school, parents' perceptions of school safety and discipline, before- and after-school activities of school-age children, participation in adult and career education, parents' involvement in their children's education, school choice, homeschooling, and civic involvement.

103.    NHES was specifically designed to help NCES fulfill its statutory mandates by providing a means to investigate education issues that cannot be adequately studied through NCES's other data-collection efforts.[53] For example, NHES is the only nationally representative data on home-learning environments. No comparable datasets collect and measure the same metrics as NHES.

---

[51] *See id.* at 16.
[52] Nat'l Ctr. for Educ. Stat., National Household Education Surveys Program, https://nces.ed.gov/nhes/ (last visited July 16, 2025).
[53] National Household Education Survey 2023, Full-scale Data Collection, Part A at 1.

24

104.    As the Department acknowledges, NHES provides data to policymakers and researchers that are not available elsewhere.[54]

105.    NHES has been conducted roughly every two years since it began in 1991, "typically field[ing] 2 to 3 topical surveys at a time." NHES:2023 for example, provided "data on early childhood education, parent and family involvement in education, and homeschooling that are not available elsewhere."[55]

106.    NHES:2023 adhered to the following schedule: formatting and printing of questionnaires was due to take place July-December 2022, data collection via mailed questionnaires was due to be conducted January-August 2023, preliminary reports released by August 2024, and data released by December 2024.[56] NHES:2019 followed a similar timeline.[57]

107.    On February 10, 2025, the Department cancelled contracts 91990020F0309 and 91990021F0343. These contracts supported the maintenance, functioning, and operation of NHES. The Department has not secured alternate funding to support the operation of the NHES.

108.    Absent Defendants' disruptions to the data-collection process of NHES, the Department would have begun questionnaire formatting and printing beginning in July 2026. Upon information and belief, from February 2025 to the present, a risk disclosure review of the data should have been conducted but was not.

109.    Upon information and belief, the Department's actions have hindered its ability to undertake the activities necessary for the collection, maintenance, analysis, and dissemination of the NHES.

---

[54] See id.
[55] Id.
[56] Id. at 15.
[57] Id. at 14.

### *10. Trends in International Mathematics and Science Study*

110.    NCES "shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including . . . acquiring and disseminating data on educational activities and student achievement (such as the Third International Math and Science Study)[.]" 20 U.S.C. § 9543(a)(6).

111.    The Department fulfills this mandate, in part, by conducting the Trends in International Mathematics and Science Study ("TIMSS").

112.    TIMSS is an international assessment of Fourth and Eighth grade students' achievement in math and science. TIMSS is a "cornerstone assessment for measuring U.S. student achievement internationally," and seeing where U.S. students stand in comparison to their counterparts in other countries, especially as to STEM preparedness.[58]

113.    As recognized by the Department, "[t]he continuation of U.S. participation allows for the study of past and current education policies that have shaped science and mathematics achievement over the past 28 years." Further, "TIMSS data are paramount for our educational system."[59]

114.    TIMSS is led by the International Association for the Evaluation of Educational Achievement ("IEA"). IEA is an international collective of research organizations and government agencies. IEA creates the framework for developing the assessment, the survey instruments, the study timeline, and a common set of standards, procedures, and timelines for collecting and reporting data.[60]

---

[58] *Trends in International Mathematics and Science Study, Field Test Data Collection and Main Study Sampling, Recruitment and Data Collection, Supporting Statement Part A* at 1-2.
[59] *See id.*
[60] *Id.*

115.    Since its creation in 1995, TIMSS has been conducted every four years and "provides reliable and timely trend data on the mathematics and science achievement of U.S. students compared to that of students in other countries."[61] https://nces.ed.gov/timss/.

116.    TIMSS:2023 has been completed and is publicly available as of December 2024.[62]

117.    On February 10, 11, and 12, 2025, the Department cancelled contracts 91990023C0002, GS00Q14OADU217/91990021F0001, and 91990023D0005/91990024F0348, respectively, which supported the operation of TIMSS. The Department has not secured alternate funding to support the operation of the TIMSS.

118.    Because TIMSS is a collaborative effort among many parties, the United States must adhere to the international schedule set forth by the IEA.[63]

119.    Upon information and belief, NCES should be taking steps to prepare for TIMSS:2027 including preparing assessment materials and selecting a school sample. The Department's actions have hindered its ability to undertake the activities necessary for the collection, maintenance, analysis, and dissemination of the TIMSS.

**C.  The Department's Actions Irreparably Harm Plaintiffs and their Members.**

120.    Plaintiffs and their members rely on the 10 datasets described above for their educational research, scholarship and teaching. Plaintiffs and their members are harmed by the Department's failure to collect, maintain, analyze, and disseminate the data contained in these datasets.

121.    For example, Plaintiffs NAEd's and NCME's members rely on NAEP, the National Assessment of Educational Progress, for their work on the Educational Opportunity Project, which

---

[61] Nat'l Ctr. for Educ. Stat., TIMSS, https://nces.ed.gov/timss/ (last visited July 8, 2025).
[62] Id.
[63] See supra note [58] at 1.

is a clearinghouse for national educational test-score data. The Educational Opportunity Project uses NAEP data to create a publicly available national database of academic performance for every school district and school in the country. It allows anyone to review data on a wide range of metrics, including learning loss following the COVID-19 pandemic, the impact of residential segregation on student achievement, and student performance in reading and math. Plaintiffs' members also rely on the NAEP and its constituent studies, including the BPS, B&B, and CCD to enable comparisons of school-level and district-level academic performance across states that are accurate for students of various sociodemographic groups, including Black, Latino, and Native American students, students with disabilities, and English language learner/multilingual learners.

122.    Plaintiffs NAEd's and NCME's members rely on NPSAS, the National Postsecondary Student Aid Survey, to analyze the distribution of federal financial aid to assess whether it is reaching the most disadvantaged students. One NAEd member plans to study how the distribution of financial aid shifted after the passage of the FAFSA Simplification Act, including whether there were changes in the numbers or demographics of students applying for financial aid.

123.    Plaintiffs NAEd's and NCME's members rely on IPEDS, the Integrated Postsecondary Education Data System. One NAEd member uses IPEDS data in their ongoing analysis of which interventions are most successful for improving student achievement.

124.    Plaintiffs NAEd's and NCME's members rely on ECLS-K, the Early Childhood Longitudinal Study-Kindergarten, for their work on tracking student performance in kindergarten and primary school. One member of NAEd and NCME has used the ECLS-K to analyze and track trends in early childhood education. This member, along with other researchers, plans to use the latest results of the ECLS-K, which are due to be disseminated in early 2026.

28

125.    Plaintiffs NAEd's and NCME's members rely on HSLS, the High School Longitudinal Study. One member plans to use HSLS data to evaluate how taking Advanced Placement courses impacts student admissions and achievement in Science, Technology, Engineering and Medicine programs.

126.    Plaintiffs NAEd's and NCME's members rely on NHES, the National Education Household Survey. One NAEd member uses the NHES to support their analysis of early-learning environments and experiences for children aged 3-5.

127.    Plaintiffs NAEd's and NCME's members rely on TIMSS, the Trends in International Mathematics and Science Study. One of Plaintiff's members intends to use TIMSS to measure academic achievement across different countries.

128.    Plaintiffs NAEd's and NCME's members rely on the 10 datasets described above in their instruction and coursework as education professors. Each year, these members expect to utilize the most up-to-date datasets to instruct their students on current trends in federal education and on how to ensure that data collection occurs in a methodologically sound manner. They also require their students to use these datasets to conduct analysis for their coursework.

129.    Plaintiffs NAEd and NCME also rely on the ten datasets described above to perform educational research in service of their missions.

130.    As described above, Defendants have cancelled contracts and failed to fund the operation of the 10 datasets described above. Defendants' actions have hindered the collection, analysis, maintenance, quality, and dissemination of NAEP, CCD, NPSAS, IPEDS, ECLS-K, HSLS, B&B, BPS, NHES and TIMSS. Because of Defendants' actions, the Department is unable to collect, analyze, and disseminate these datasets in accordance with its statutory mandates, and Plaintiffs and their members are unable to obtain and utilize these datasets.

29

131.    There are no comparable datasets that collect and measure the same metrics as those made available through these 10 datasets, or those that enable researchers to answer the same questions with the same accuracy and scope. Therefore, without the continued collection, analysis, and dissemination of these 10 datasets, Plaintiffs' members cannot continue their work.

132.    Without redress for Defendants' actions, Plaintiffs' and their members' educational research, and their contributions towards improving our educational system, will grind to a halt.

133.    Not only will Plaintiffs and their members be harmed by their inability to complete their research, the students that make up the subject of their research will also be harmed. Without access to this unique federal data, Plaintiffs and their members will not be able to study the educational outcomes of Black, Latino, and Native American students, students with disabilities, English language learner/multilingual learners, and socioeconomically disadvantaged students. Further, Defendants are the only source of data for educational outcomes based on the demographic groups of students such as Native American students, and there are no other datasets available to researchers studying related demographic-educational disparities.

134.    If researchers are not able to study educational disparities based on race, ethnicity, socioeconomic status, limited English proficiency, mobility, disability, urban, rural, suburban districts, gender, and other population characteristics, it will not be possible to create effective policies for addressing these disparities and closing achievement gaps.

135.    The collection and analysis of data is also essential for creating and maintaining valid and reliable datasets, including the ten datasets described above. Disruptions to the collection of these datasets threaten the quality and dependability of the assessments themselves.[74] Congress

---

[74] Am. Educ. Rsch. Ass'n, Am. Psych. Ass'n, & Nat'l Council on Measurement in Educ., *Standards for Educational and Psychological Testing* (2014), https://www.testingstandards.net/uploads/7/6/6/4/76643089/standards_2014edition.pdf.

intends for this education research done by Plaintiffs and their members to be available to inform educational practices by policymakers, state and district leaders, and educators to best support all students' learning.

136.    Policymakers, state and district leaders, teachers, students, parents, and communities also rely on education researchers and experts to facilitate their understanding of IES's vast data repository and communicate the implications of IES data to improve education policies and practices, as well as schools' teaching and learning. This relationship is of paramount importance to the success of the U.S. educational system.

## CLAIMS FOR RELIEF

## COUNT I

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Cessation of NAEP Collection Activities: Arbitrary and Capricious

137.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 136 as if fully set forth herein.

138.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

139.    Defendants' decision not to fund the operation of NAEP, through the cancellation of contracts and failure to allocate other operational funding, is arbitrary and capricious in that Defendants failed to provide any explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating of NAEP, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

140.    Defendants' decision to cease NAEP collection activities constitutes final agency action.

31

---

**Deleted:** <#>¶

**Deleted:** COUNT I ¶
Administrative Procedure Act, 5 U.S.C. § 706 (2)(C)¶
Exceeds Statutory Authority ¶
Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.¶
Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C)¶
Defendants' conduct, as described above, constitutes final agency action. ¶
Through ESRA, Congress mandates that the Department, through IES and its Centers, collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally. 20 U.S.C. §§ 9541–48. ESRA further requires that all IES data remain available to the public through online channels. *See id.* § 9574.¶
its Centers or to disrupt their data collection, maintenance, and dissemination activities. *See e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745 (2007).¶
this statute.¶
Defendants lack authority to dismantle or otherwise halt congressionally mandated work at IES and its Centers, in whole or in part, including by effectuating mass terminations of the Department's staff or cancelling vendor contracts necessary for the statutorily required collection, maintenance, and dissemination of educational data, including but not limited to data collected, analyzed, and reported by NAEP, EDFacts, NPSAS, ELS, TIMSS, and the What Works Clearinghouse.¶
Defendants' conduct and have no adequate remedy at law. ¶

**Deleted:** I

**Deleted:** the prior

**Deleted:** <#>Defendants' conduct, as described above, constitutes final agency action. ¶

**Deleted:**

**Formatted:** Normal

**Formatted:** Font: (Default) Times New Roman

141.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

142.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

143.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil rights laws.

144.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

145.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

## COUNT II

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Cessation of CCD Collection Activities: Arbitrary and Capricious

146.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 145 as if fully set forth herein.

147.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

148.    Defendants' decision not to fund the operation of the CCD, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that

Defendants failed to provide any explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating the CCD, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

149.   Defendants' decision to cease CCD collection activities constitutes final agency action.

150.   Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

151.   Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

152.   Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil-rights laws.

153.   In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

154.   Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

**COUNT III**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

**Cessation of NPSAS Collection Activities: Arbitrary and Capricious**

155.   Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 154

as if fully set forth herein.

156.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

157.    Defendants' decision not to fund the operation of the NPSAS, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating of the NPSAS, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

158.    Defendants' decision to cease NPSAS collection activities constitutes final agency action.

159.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

160.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

161.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil rights laws.

162.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

163.    Plaintiffs and their members have been injured by Defendants' conduct and have

34

no adequate remedy at law.

<u>**COUNT IV**</u>

<u>**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**</u>

<u>**Cessation of IPEDS Collection Activities: Arbitrary and Capricious**</u>

164.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 163 as if fully set forth herein.

165.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

166.    Defendants' decision not to fund the operation of the IPEDS, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any reasoned explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating of IPEDS, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze and disseminate this data.

167.    Defendants' decision to cease IPEDS collection activities constitutes final agency action.

168.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

169.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

170.    Defendants have also failed to consider the reliance interests of students, families,

35

schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil rights laws.

171.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

172.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

### COUNT V

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Cessation of ECLS-K Collection Activities: Arbitrary and Capricious

173.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 172 as if fully set forth herein.

174.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

175.    Defendants' decision not to fund the operation of ECLS-K, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any reasoned explanation for the decisions to cease collecting, maintaining, analyzing and disseminating of ECLS-K, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

176.    Defendants' decision to cease ECLS-K collection activities constitutes final agency action.

177.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

178.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

179.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil-rights laws.

180.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

181.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

<div align="center">COUNT VI

Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

Cessation of HSLS Collection Activities: Arbitrary and Capricious</div>

182.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 181 as if fully set forth herein.

183.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

184.    Defendants' decision not to fund the operation of HSLS, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any reasoned explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating each of HSLS, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

<div align="center">37</div>

185.    Defendants' decision to cease HSLS collection activities constitutes final agency action.

186.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

187.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

188.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil-rights laws.

189.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

190.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

### COUNT VII

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

**Cessation of B&B Collection Activities: Arbitrary and Capricious**

191.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 190 as if fully set forth herein.

192.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

193.    Defendants' decision not to fund the operation of the B&B, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating each of B&B and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

194.    Defendants' decision to cease B&B collection activities constitutes final agency action.

195.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

196.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

197.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil rights laws.

198.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

199.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

## COUNT VIII

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

**Cessation of BPS Collection Activities: Arbitrary and Capricious**

200.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 199 as if fully set forth herein.

201.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

202.    Defendants' decision not to fund the operation of B&B, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating of B&B, and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

203.    Defendants' decision to cease B&B collection activities constitutes final agency action.

204.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

205.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

206.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil-rights laws.

207.    In failing to provide a reasoned explanation or consider alternative actions to the

disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

208.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

### COUNT IX

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Cessation of NHES Collection Activities: Arbitrary and Capricious

209.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 208 as if fully set forth herein.

210.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

211.    Defendants' decision not to fund the operation of NHES, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any reasoned explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating of NHES and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze, and disseminate this data.

212.    Defendants' decision to cease NHES collection activities constitutes final agency action.

213.    Defendants failed to provide any reasoned explanation for their departure from the Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

214.    Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen

41

course of action.

215.    Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil-rights laws.

216.    In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

217.    Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

### COUNT X

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

### Cessation of TIMSS Collection Activities: Arbitrary and Capricious

218.    Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 217 as if fully set forth herein.

219.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

220.    Defendants' decision not to fund the operation of TIMSS, through the cancellation of contracts and failure to allocate other operational funding is arbitrary and capricious in that Defendants failed to provide any explanation for the decisions to cease collecting, maintaining, analyzing, and disseminating of TIMSS and failed to consider the significant harms flowing from the failure to continue to collect, maintain, analyze and disseminate this data.

221.    Defendants' decision to cease TIMSS collection activities constitutes final agency action.

222.    Defendants failed to provide any reasoned explanation for their departure from the

Department's past practice of maintaining IES data and the staff and contracts necessary to support the collection, maintenance, analysis, and dissemination of that data.

223.  Despite congressional mandates and risk of irreparable informational injury to Plaintiffs and their members, and others who rely on these statutorily mandated datasets, Defendants did not consider alternative action or offer a reasoned explanation for their chosen course of action.

224.  Defendants have also failed to consider the reliance interests of students, families, schools, states, colleges and universities, and other entities that depend on the effective operations of IES and to comply with federal laws, including civil-rights laws.

225.  In failing to provide a reasoned explanation or consider alternative actions to the disruption of IES's ability to collect data, the Defendants' actions are arbitrary and capricious.

226.  Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

## COUNT XI

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

#### Cessation of NAEP Collection Activities: Not in Accordance with Law

227.  Plaintiffs repeat and incorporate by reference each allegation of paragraphs 1 to 226, as if fully set forth herein.

228.  Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

229.  Defendants' decision to cease NAEP collection activities is contrary to law as set out in ESRA, which requires the Department to perform the NAEP to measure "student academic achievement and reporting of trends in such achievement in reading, mathematics" and other

43

subjects by using a methodology that is designed to produce "valid and reliable" results, and based on "widely accepted professional assessment standards." Furthermore, the NAEP must be publicly disseminated at specific timeframes. *See* 20 U.S.C. §§ 9622(b)(1), (2)(A), (2)(B).

230. Plaintiffs and their members have been injured by Defendants' conduct and have no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter a judgment against Defendants and award Plaintiffs the following relief:

231. Declare that Defendants have violated the APA by hindering the ability of IES to collect, maintain, analyze, and disseminate the NAEP, CCD, NPSAS, IPEDS, ECLS-K, HSLS, B&B, BPS, NHES and TIMSS as mandated by Congress;

232. Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of NAEP, and order Defendants to resume this study;

233. Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of CCD, and order Defendants to resume this study;

234. Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of NPSAS, and order Defendants to resume this study;

235. Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of IPEDS, and order Defendants to resume this study;

236. Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of ECLS-K, and order Defendants to resume this study;

237. Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of HSLS, and order Defendants to resume this study;

44

238.    Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of B&B, and order Defendants to resume this study;

239.    Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of BPS, and order Defendants to resume this study;

240.    Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of NHES, and order Defendants to resume this study;

241.    Enjoin Defendants from hindering the collection, maintenance, analysis, and dissemination of TIMSS, and order Defendants to resume this study;

242.    An order requiring all Defendants to pay Plaintiffs' reasonable costs, expenses, and attorneys' fees; and

243.    Any and all additional relief that Plaintiffs request and this Court deems just and proper.

**Deleted:** <#>Require Defendants to restore sufficient employee positions at IES and its Centers to ensure Department compliance with congressional and statutory mandates, including those positions necessary to ensure that, within a timely manner, IES and its Centers can:¶ properly oversee all necessary independent contractors,¶ grant and renew restricted-use data licenses; and ¶ complete disclosure risk reviews for license holders; ¶

Dated: July 21, 2025

Respectfully submitted,

Amy I. Berman
DC Bar No. 480541
NATIONAL ACADEMY
OF EDUCATION
500 Fifth Street, NW
Washington, DC 20001
(202) 334-2341
aberman@naeducation.org

/s/ Morenike Fajana
Samuel Spital
DC Bar No. NY0248
Morenike Fajana*
Colin Burke*
Kameron Johnston**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
(212) 965-2259
sspital@naacpldf.org
mfajana@naacpldf.org
cburke@naacpldf.org
kjohnston@naacpldf.org

*Admitted *pro hac vice*
**DC bar admission pending

46

| Page 2: [1] Deleted | Morenike Fajana | 7/10/2025 1:41:00 PM |
|---|---|---|

1.

| Page 2: [2] Deleted | Morenike Fajana | 7/10/2025 10:28:00 AM |
|---|---|---|

| Page 10: [3] Deleted | Morenike Fajana | 7/10/2025 10:42:00 AM |
|---|---|---|

| Page 27: [4] Deleted | Morenike Fajana | 7/10/2025 11:02:00 AM |
|---|---|---|

| Page 27: [5] Deleted | Morenike Fajana | 7/16/2025 4:11:00 PM |
|---|---|---|

| Page 27: [6] Deleted | Morenike Fajana | 7/16/2025 11:36:00 AM |
|---|---|---|

| Page 28: [7] Deleted | Morenike Fajana | 7/16/2025 11:52:00 AM |
|---|---|---|

2.

| Page 28: [8] Deleted | Morenike Fajana | 7/15/2025 11:43:00 AM |
|---|---|---|

3.

| Page 28: [9] Deleted | Morenike Fajana | 7/16/2025 4:14:00 PM |
|---|---|---|

4.

| Page 28: [10] Deleted | Morenike Fajana | 7/15/2025 11:43:00 AM |
|---|---|---|

5.

| Page 29: [11] Deleted | Morenike Fajana | 7/16/2025 11:55:00 AM |
|---|---|---|

| Page 29: [12] Deleted | Morenike Fajana | 7/16/2025 11:57:00 AM |
|---|---|---|

| Page 44: [13] Deleted | Morenike Fajana | 7/10/2025 11:55:00 AM |
|---|---|---|

6.

| Page 44: [14] Deleted | Morenike Fajana | 7/16/2025 12:16:00 PM |
|---|---|---|

| Page 44: [15] Deleted | Morenike Fajana | 7/10/2025 11:56:00 AM |
|---|---|---|

| Page 44: [16] Formatted | Morenike Fajana | 7/10/2025 11:58:00 AM |
|---|---|---|

Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

| Page 44: [17] Deleted | Morenike Fajana | 7/10/2025 11:58:00 AM |
|---|---|---|

7.

| Page 44: [18] Deleted | Morenike Fajana | 7/10/2025 11:59:00 AM |
|---|---|---|

| Page 44: [19] Deleted | Morenike Fajana | 7/10/2025 12:00:00 PM |
|---|---|---|

8.

| Page 46: [20] Deleted | Morenike Fajana | 7/10/2025 12:00:00 PM |
|---|---|---|