**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION, *et al.*,<br>*Plaintiffs*,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, *et al.*,<br>Washington, D.C. 20202<br><br>*Defendants*. | Civil Action No. 1:25-cv-01266 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR RELIEF FROM LOCAL RULE 7(N)**

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

I. Procedural History ..... 2

II. Factual Background ..... 3

A. The Creation and Development of Federal Education Research Institutes and Centers. 3

B. The Department's Decision to End Data Collection Activities for Ten Datasets. ..... 4

1. The National Assessment of Educational Progress ..... 5

2. Common Core of Data ..... 6

3. National Postsecondary Student Aid Study ..... 6

4. Integrated Postsecondary Education Data System ..... 7

5. Early Childhood Longitudinal Studies-Kindergarten ..... 7

6. High School Longitudinal Study ..... 7

7. Baccalaureate and Beyond Longitudinal Study ..... 8

8. Beginning Postsecondary Students ..... 8

9. National Household Education Survey ..... 9

10. Trends in Mathematics and Science Study ..... 9

LEGAL STANDARDS ..... 10

I. Rule 12(b)(1) ..... 10

II. Rule 12(b)(6) ..... 11

ARGUMENT ..... 11

I. This Court Has Jurisdiction. ..... 11

A. Plaintiffs' Claims Are Not Moot. ..... 12

1. Defendants do not meet their heavy burden to establish mootness. ..... 12

2. The "voluntary cessation" exception to the mootness doctrine applies. ..... 15

a. There is a reasonable expectation that the alleged violations will recur. ..... 15

b. Interim relief or events have not completely and irrevocably eradicated the effects of the alleged violations. ..... 17

B. Plaintiffs Have Both Informational and Associational Standing. ..... 18

1. Plaintiffs have adequately alleged informational standing. ..... 18

2. Plaintiffs have plausibly alleged that they have associational standing.................... 22

C. Plaintiffs' Claims Are Reviewable Under the APA..................................................... 25

1. The APA abrogates sovereign immunity................................................................ 25

2. The Tucker Act does not apply.................................................................................. 25

3. The actions Plaintiffs challenge are not solely committed to agency discretion. ..... 30

II. Plaintiffs Adequately Allege APA Claims......................................................................... 34

A. The Challenged Actions Are Discrete............................................................................ 34

B. Defendants Do Not Dispute They Violated Federal Law. ............................................ 35

C. Defendants' Actions were Not the Result of Reasoned Decision-Making. .................. 36

D. Plaintiffs Have No Adequate Remedies at Law. ......................................................... 37

III. This Court Should Deny Defendants' Request To Be Relieved of The Obligation To File a Certified List of the Administrative Record.......................................................................... 37

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
No. 25-CV-400, 2025 WL 2537200 (D.D.C. Sept. 3, 2025) ....35

*Alaska v. U.S. Dep't of Agric.*,
17 F.4th 1224 (D.C. Cir. 2021) ....16

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) ....35

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*,
No. 25-1281 (4th Cir. Apr. 10, 2025) ....29

*Am. Ass'n of Cosmetology Schs. v. Devos*,
258 F. Supp. 3d 50 (D.D.C. 2017) ....23, 24, 33

*Am. Chemistry Council v. U.S. Dep't of Transp*.
468 F.3d 810 (D.C. Cir. 2006) ....24

*Am. Library Ass'n v. Sonderling*,
783 F. Supp. 3d 57 (D.D.C. 2025) ....28

*Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*,
642 F.3d 1137 (D.C. Cir. 2011) ....11, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....11

*Ashtari v. Pompeo*,
496 F. Supp. 3d 462 (D.D.C. 2020) ....11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
901 F. Supp. 2d 19 (D.D.C. 2012) ....23

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ....19

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ....28, 30

*Bldg. & Constr. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006) ....23

*Ctr. for Biological Diversity v. Nishida*,
No. 21-CV-119 (RDM), 2021 WL 827189 (D.D.C. Mar. 4, 2021) ....................................24

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ....................................22

*Chamber of Commerce of U.S. v. Env't Protection Agency*,
642 F.3d 192 (D.C. Cir. 2011) ....................................24

*Cierco v. Lew*,
190 F. Supp. 3d 16 (D.D.C. 2016) ....................................17

*Citizens for Responsibility & Ethics in Wash. v. Off. of Mgmt. & Budget*,
No. 25-CV-1051, 2025 WL 2025114 (D.D.C. July 21, 2025) ....................................28

*Citizens for Resp. & Ethics in Wash. v. Wheeler*,
352 F. Supp. 3d 1 (D.D.C. 2019) ....................................15

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................................19

*Conf. of State Bank Supervisors v. Off. of the Comptroller of the Currency*,
313 F. Supp. 3d 285 (D.D.C. 2018) ....................................24

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025) ....................................27, 31, 33

*Cnty. of L.A. v. Davis*,
440 U.S. 625 (1979) ....................................15

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ....................................25–27

*Doctors for Am. v. Off. of Personnel Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ....................................21

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
396 F.3d 1265 (D.C. Cir. 2005) ....................................37

*Env't Def. Fund v. Env't Protection Agency*,
922 F.3d 446 (D.C. Cir. 2019) ....................................18

*Env't Def. Fund v. Regan*,
No. 20-CV-762, 2024 WL 3887383 (D.D.C. Aug. 20, 2024) ....................................35

*Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ....................................11

*Fed. Bureau of Investigations v. Fikre*,
601 U.S. 234 (2024) ....................16

*Glob. Tel*Link v. Fed. Commc'ns Comm'n*,
866 F.3d 397 (D.C. Cir. 2017) ....................14

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ....................11

*Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*,
628 F.3d 568 (D.C. Cir. 2010) ....................12

*Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*,
402 F.3d 1249 (D.C. Cir. 2005) ....................11, 15

*Lackey v. Stinnie*,
604 U.S. 192 (2025) ....................15

*Lewis v. Becerra*,
No. 18-CV-2929, 2023 WL 3884595 (D.D.C. June 8, 2023) ....................17

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ....................33, 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................24

*Mach Mining, LLC v. Equal Emp. Opportunity Comm'n*,
575 U.S. 480 (2015) ....................30, 34

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ....................25

*Maldonado v. District of Columbia*,
61 F.4th 1004 (D.C. Cir. 2023) ....................12

*Mass. Fair Housing Ctr. v. U.S. Dep't of Hous. & Urban Dev.*,
No. 25-CV-30041 (D. Mass. Apr. 14, 2025) Dkt. 42 ....................29

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ....................26, 28

*Michigan v. Env't Protection Agency*,
576 U.S. 743 (2020) ....................37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................36, 37

*Nat'l Treasury Emps. Union v. Vought*,
___ F.4th ___, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ....................35

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ....................35

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) ....................16

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) ....................31

*Ramirez v. U.S. Immigr. & Customs Enf't*,
310 F. Supp. 3d 7 (D.D.C. 2018) ....................35

*Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*,
573 F. Supp. 3d 324 (D.D.C. 2021) ....................24, 25, 33

*Ransom v. United States*,
900 F.2d 242 (Fed. Cir. 1990) ....................27

*Reid v. Hurwitz*,
920 F.3d 828 (D.C. Cir. 2019) ....................12

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ....................32

*Scolaro v. D.C. Bd. of Elections & Ethics*,
104 F. Supp. 2d 18 (D.D.C. 2000) ....................10

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) ....................30

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ....................19

*Union for Concerned Scientists v. U.S. Dep't of Educ.*,
998 F.3d 926 (D.C. Cir. 2021) ....................19

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
770 F. Supp. 3d 155, 158, 161–66 (D.D.C. 2025) ....................29

*U.S. Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................30

*U.S. Dep't of Educ. v. California*,
145 S. Ct. 966 (2025) ....................29

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................37

*Vargus v. McHugh*,
87 F. Supp. 3d 298 (D.D.C. 2015) ....................38

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) ....................30

*Zukerman v. U.S. Postal Serv.*,
961 F.3d 431 (D.C. Cir. 2020) ....................13, 15, 17

**Statutes**

5 U.S.C. § 701 ....................30

5 U.S.C. § 702 ....................25

Dep't of Educ. Org. Act,
Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510) ......3

Educ. Scis. Reform Act,
Pub. L. 107-279, 116 Stat 1940 (2002) (codified at 20 U.S.C. §§ 9501–84) ........... *passim*

Tucker Act,
28 U.S.C. § 1491 ....................26

**Other Authorities**

Exec. Order No. 14242, 90 Fed. Reg. 13679 ....................16

Inst. of Educ. Sci., *About IES*, https://ies.ed.gov/about (last visited Oct. 7, 2025) ....................4

Jennifer Teefy, Cong. Rsch. Serv., Tracking Federal Awards: USAspending.gov and Other Data Sources (2025) ....................13

Nat'l Ctr. for Educ. Stat., *Baccalaureate and Beyond Longitudinal Study*,
https://nces.ed.gov/surveys/b&b/ (last visited Oct. 8, 2025) ....................8

Nat'l Ctr. for Educ. Stat., *The National Center for Education Statistics: Who We Are*,
https://nces.ed.gov/national-center-education-statistics-nces/about (last visited Oct. 8, 2025) ....................4

Thomas D. Snyder, 120 Years of American Education: A Statistical Portrait, Nat'l Ctr. for Educ. Stat. (1993), https://nces.ed.gov/pubs93/93442.pdf. ....................3

U.S. Gov't Accountability Off., GAO-24-106214, Federal Spending Transparency: Opportunities to Improve USAspending.gov Data (2023) ....................13

USAspending.gov, Contract PIID 91990025C0003 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0003_9100_-NONE-_-NONE- .................... 14

USAspending.gov, Contract PIID 91990025C0003 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0003_9100_-NONE-_-NONE- ....................14

USAspending.gov, Contract PIID 91990025C0005 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0005_9100_-NONE-_-NONE- ....................14

USAspending.gov, Contract PIID 91990025C0008 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0008_9100_-NONE-_-NONE- ....................14

## INTRODUCTION

The Department of Education ("the Department") is the preeminent source for federal educational data. Pursuant to the Education Sciences Reform Act ("ESRA"), the Department is required to collect, maintain, analyze, and disseminate high-quality data through its research initiatives. Plaintiffs, the National Academy of Education ("NAEd") and the National Council on Measurement in Education ("NCME") (collectively "Plaintiffs"), and their members, preeminent education scholars and measurement experts, have relied on the Department's data for their research on pressing educational issues for decades.

This all changed in February 2025, when the Department began running afoul of its congressional mandates to collect, analyze, and disseminate critical datasets related to education. Despite its clear legal obligations, the Department has failed to perform these mandated activities. As Plaintiffs allege in their First Amended Complaint ("Amended Complaint" or "Am. Compl."), Defendants disrupted the operation of ten critical educational datasets by failing to fund their operation, conduct research and data collection, analyze data, ensure that data is collected in a reliable and methodologically sound manner, and publish data.

Defendants now move to dismiss these allegations and be relieved of their obligation to file the administrative record, arguing that this court lacks jurisdiction to hear Plaintiffs' claims, that Plaintiffs fail to state a claim under the Administrative Procedure Act ("APA"), and that this Court does not need the administrative record to rule on their pending motion to dismiss. When Plaintiffs' well-pled allegations are properly construed, Defendants' motion must be denied for several reasons. First, Plaintiffs' claims are not moot because there is a live factual dispute in which this Court can provide Plaintiffs with meaningful relief, and Plaintiffs have sufficiently alleged informational injuries on behalf of themselves and their members caused by Defendants' failure to

provide statutorily required information. Defendants' mootness arguments—which turn on factual questions regarding the status of various contracts—only prove that there are ongoing, factual disputes at issue in this action supporting the Court's jurisdiction. Second, because Plaintiffs' claims do not sound in contract, but instead arise under ESRA and seek equitable and injunctive relief under the APA, the Tucker Act does not bar this Court's jurisdiction. Third, Plaintiffs have adequately pled their APA claims, as Defendants have no answer to Plaintiffs' allegations of Defendants' repeated failures to follow ESRA with no reasoned explanation. Finally, this Court should evaluate Defendants' factual claims regarding mootness against the relevant contents of the administrative record. For these reasons, Plaintiffs respectfully ask this Court to deny Defendants' motions in their entirety.

## I. Procedural History

Plaintiffs filed this action on April 24, 2025, to challenge Defendants' failure to comply with ESRA's data collection, analysis, maintenance and dissemination requirements. Compl., Dkt. No. 1. On May 2, 2025, Plaintiffs filed a motion for a preliminary injunction enjoining Defendants from taking any further action limiting the availability of federal educational data mandated by ESRA. Mot. for Prelim. Inj., Dkt. No. 14. This Court heard argument on that motion on May 16, 2025. On June 3, 2025, the Court denied the motion for a preliminary injunction on the grounds that Plaintiffs' claims were impermissible "programmatic challenges" under the APA. Mem. Op. at 8, Dkt. No. 27. Plaintiffs filed their First Amended Complaint on July 21, 2025 to more specifically explain how Defendants' conduct with respect to ten datasets violates the APA because it is arbitrary and capricious and not in accordance with law. Am. Compl., Dkt. No. 31. On September 18, 2025, Defendants filed a motion to dismiss and motion to be relieved of the obligation to file a certified list of the administrative record. Mot. to Dismiss, Dkt. No. 32 ("Defs.'

Br.”).

## II. Factual Background

### A. The Creation and Development of Federal Education Research Institutes and Centers.

Since the 1860s, the federal government has dedicated significant resources to collecting, analyzing, and disseminating high-quality educational data for the benefit of our nation’s students.[1] To that end, the government has worked to improve and expand educational statistical research and provide additional resources for the evaluation of the United States educational system.[2] In 1979, Congress passed the Department of Education Organization Act (“DEOA”), Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510), establishing the present-day Department under the supervision of a Secretary of Education.

On November 5, 2002, President Bush signed H.R. 3801 into law, which included ESRA, a landmark act for the improvement of federal education research, statistics, evaluation, information, and dissemination. Through ESRA, Congress recommitted to prioritizing the federal government’s role in educational data collection, evaluation, and dissemination. The DEOA created a research office in the Department “to provide for improvement of Federal education research, statistics, evaluation, information, and dissemination,” which the 2002 ESRA reconstituted as the Institute of Education Sciences (“IES”), an independent research division. *See* Pub. L. 107-279; 20 U.S.C. §§ 9501–84.

IES has a congressional mandate under ESRA to:

> directly or through grants, contracts, or cooperative agreements . . . (1) conduct and support scientifically valid research activities, including basic research and applied research, statistics activities, scientifically valid education evaluation, development, and wide dissemination; (2) widely disseminate the findings and

---

[1] Thomas D. Snyder, 120 Years of American Education: A Statistical Portrait, Nat’l Ctr. for Educ. Stat. (1993), https://nces.ed.gov/pubs93/93442.pdf.
[2] *Id.*

> results of scientifically valid research in education; (3) promote the use, development, and application of knowledge gained from scientifically valid research activities; (4) strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education; (5) promote the coordination, development, and dissemination of scientifically valid research in education within the Department and the Federal Government; and (6) promote the use and application of research and development to improve practice in the classroom.

20 U.S.C. § 9512.

As the statistics, research, and evaluation arm of the Department, IES was created "to provide scientific evidence on which to ground education practice and policy and to share this information in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public."[3] In carrying out these mandates, Congress requires IES to establish and operate four research centers that maintain specialized federal education data and information. *See id.* § 9511.

Along with ensuring improvement in the quantity and quality of educational data, Congress charged IES with widely disseminating the research findings uncovered through IES data to researchers, schools, educators, parents, students, and other public stakeholders.[4] As noted on the official website for the National Center for Education Statistics ("NCES"), one of the four research centers within IES, NCES has a "Congressional mandate to collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally."[5] *See* 20 U.S.C. §§ 9541–48.

**B. The Department's Decision to End Data Collection Activities for Ten Datasets.**

Beginning in February 2025, and continuing through the present, the Department has

---

[3] Inst. of Educ. Sci., *About IES*, https://ies.ed.gov/about (last visited Oct. 8, 2025).
[4] *Id*.
[5] Nat'l Ctr. for Educ. Stat., *The National Center for Education Statistics: Who We Are*, https://nces.ed.gov/national-center-education-statistics-nces/about (last visited Oct. 8, 2025).

disrupted, hindered, and in some instances, completely ceased to fulfill its statutory mandates to collect, analyze, maintain and disseminate the ten datasets described below. Am. Compl. ¶ 2. Plaintiffs' suit challenges the Department's actions with respect to these datasets, on which Plaintiffs and their members rely for their educational research, teaching and scholarship. Defendants' actions restricting the collection, maintenance, analysis and dissemination of these datasets severely impair Plaintiffs and their members' ability to perform educational research and teach courses at their academic institutions.

*1. The National Assessment of Educational Progress*

Title III of ESRA requires that the Department carry out a "National Assessment of Educational Progress" ("NAEP"), which measures "student academic achievement and reporting of trends in such achievement in reading, mathematics" and other subjects. *See* 20 U.S.C. § 9622(b)(1). The Department is required to use a method designed to produce "valid and reliable" results based on "widely accepted professional assessment standards" and to make this data publicly available in a timely manner and in a way that facilitates further educational research and includes trend lines. *See* 20 U.S.C. §§ 9622(b)(2), 9622(c)(1)(A), 9622(e)(2)(A). But the Department disrupted the operation of NAEP by issuing a "stop order" to the panel that reviews NAEP assessments, and by failing to undertake the following implementation activities necessary for the preparation of the 2026 NAEP assessment: releasing prior assessment results for Grades 4 & 8; releasing prior assessment results for Grades 8 & 12; collecting data for the Ages 9 & 17 Long-term Trend Administration; processing data from the NAEP 2025 assessments; and selecting which schools to sample from for the NAEP 2026 assessment. Am. Compl. ¶¶ 42–44.

*2. Common Core of Data*

The Department produces the Common Core of Data ("CCD") to fulfill its congressional mandate to use a random sampling process as part of NAEP's collection and reporting process. *See* 20 U.S.C. § 9622(b)(2)(A). On February 10, 2025, the Department cancelled Contract 91990023D0008/91990024F0331, which supported the operation of CCD, and has not secured alternate funding to support the operation of the CCD. Am. Compl. ¶ 51. The Department has also failed to: edit data, review reports, and produce data for Fiscal Year 2023; collect, review and edit data for Fiscal Year 2024; train state coordinators; make expenditure data available; and disseminate multiple data files and reports necessary for the operation of the CCD. *Id.* ¶ 52.

*3. National Postsecondary Student Aid Study*

The Department collects the National Postsecondary Student Aid Study ("NPSAS") to fulfill congressional mandates to "collect[], acquir[e], compil[e], and disseminat[e] full and complete statistics" on "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students," and to "conduct, on a State-by-State basis, a survey of recipients of Federal student financial aid." *See* 20 U.S.C. §§ 9543(a)(1), (a)(1)(E); 20 U.S.C. § 1015a(k). On February 10, 2025, the Department cancelled Contracts 91990018C0039, 91990022C0017, and 91990023D0005/91990024F033, which supported the operation of the NPSAS, and has not secured alternate funding to support the operation of the NPSAS. Am. Compl. ¶ 60. The Department has failed to prepare data-file documentation that it began preparing in May 2024 and would otherwise have continued to prepare throughout March 2026 as part of NPSAS operations. *Id.* ¶ 62.

4. *Integrated Postsecondary Education Data System*

The Department is required to "update and improve the Integrated Postsecondary Education Data System ("IPEDS"), which is a web-based data collection system designed to gather basic data from all postsecondary institutions in the United States and other jurisdictions. 20 U.S.C. § 1015a(i)(4). The Department cancelled at least one contract that supported the operation of IPEDS and has otherwise stopped all IPEDS data collection and analysis activities, including by failing to: complete Winter data collection by mid-February, 2025; complete Spring data collection closed for both keyholders and coordinators by April 2025; and facilitate ongoing communications regarding these data collections and their deadline between keyholders and staff in the weeks before the data completion deadlines. Am. Compl. ¶¶ 67–68.

5. *Early Childhood Longitudinal Studies-Kindergarten*

The Department administers the Early Childhood Longitudinal Studies ("ECLS") program to fulfill its mandate to collect data on "[s]tate and local early childhood school readiness activities" and "access to, and opportunity for, early childhood education." 20 U.S.C. §§ 9543(a)(1)(B), (L). On February 10, 2025, the Department cancelled Contract 91990019C0002, which supported the operation of the ECLS-Kindergarten ("ECLS-K"), and has not secured alternate funding to support the operation of the ECLS-K. Am. Compl. ¶ 79. As a result, the Department failed to conduct language screeners for students, issue school administrator surveys, and collect parent-and-teacher survey data relating to the program participants for the spring of 2025 as necessary for the operation of the ECLS-K. *Id.* ¶ 80.

6. *High School Longitudinal Study*

The Department collects the High School Longitudinal Study ("HSLS") to fulfill its mandate to "collect, report, analyze, and disseminate statistical data related to . . . the condition

and progress of education, at the . . . secondary, postsecondary, and adult levels." *See* 20 U.S.C. § 9543(a)(7). On February 10, 2025, the Department cancelled Contract 91990023D0042/91990024F0321, which supported the operation of the HSLS. Am. Compl. ¶ 86. The Department failed to secure alternate funding to support the operation of the HSLS and failed to perform necessary data collection and preparation activities. *Id.* ¶¶ 86–87. As a result, the Department failed to complete its administrative data matching, collect self-administered web-based survey data, process and impute the data and assign weights, and finalize data products necessary for the 2025 HSLS follow-up. *Id.* ¶ 87.

*7. Baccalaureate and Beyond Longitudinal Study*

A component dataset of NPSAS, the Baccalaureate and Beyond Longitudinal Study ("B&B") is a "longitudinal study of students who completed the requirements for a bachelor's degree in a given academic year and follows graduating seniors 1, 4, and 10 years after completing their bachelor's degree."[6] On February 10, 2025, the Department cancelled Contracts 91990022C0017 and 91990023D0005/91990024F0330, which supported the operation of the B&B. Am. Compl. ¶ 91. The Department has failed to secure alternate funding to support B&B operations. *Id.*

*8. Beginning Postsecondary Students*

The Department administers the Beginning Postsecondary Students ("BPS") longitudinal study to help fulfill its statutory mandate to collect, report, analyze, and disseminate statistical data regarding postsecondary education. BPS is a component study of NPSAS. On February 10, 2025, the Department cancelled Contracts 91990018C0039, 91990022C0017, and

[6] Nat'l Ctr. for Educ. Stat., Baccalaureate and Beyond Longitudinal Study, https://nces.ed.gov/surveys/b&b/ (last visited Oct. 8, 2025).

91990023D0005/91990024F0330, which supported the operation of the BPS. Am. Compl. ¶ 98. The Department has not secured alternate funding to support BPS operations. *Id.* As a consequence, the Department failed to: create a First Look Report; document all aspects of the full-scale study design and data-collection procedures, including an appendix summarizing the methodological findings from the field test; complete data files and documentation for research data users in the form of both a restricted-use file and PowerStats; and create special tabulations of issues of interest to the higher education community, as required for the operations of the BPS. *Id.* ¶ 99.

*9. National Household Education Survey*

The Department conducts the National Household Education Survey ("NHES") to fulfill its mandate to collect, acquire, and disseminate complete statistics on "[s]tate and local early childhood school readiness activities" and "access to, and opportunity for, early childhood education." 20 U.S.C. §§ 9543(a)(1)(B), (L). On February 10, 2025, the Department cancelled Contracts 91990020F0309 and 91990021F0343, which supported the maintenance, functioning, and operation of NHES. Am. Compl. ¶ 107. The Department has also failed to perform other data collection activities necessary for the operation of the NHES, including beginning questionnaire formatting and printing. *Id.* ¶¶ 107-08.

*10. Trends in Mathematics and Science Study*

The Department collects the Trends in International Mathematics and Science Study ("TIMSS") to fulfill its mandate to collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations. 20 U.S.C. § 9543(a)(6). On February 10, 11, and 12, 2025, the Department cancelled Contracts 91990023C0002, GS00Q14OADU217/91990021F0001, and 91990023D0005/91990024F0348, respectively, which

supported the operation of TIMSS. Am. Compl. ¶ 117. The Department has not secured alternate funding to support the operation of the TIMSS and has also failed to perform data collection activities related to TIMSS. *Id.* As a consequence, the Department failed to take steps to prepare for TIMSS:2027 including by preparing assessment materials and selecting a school sample. *Id.* ¶ 119.

Plaintiffs and their members rely on the ten datasets described above for their educational research, teaching, and scholarship. Defendants' actions restricting the collection, maintenance, analysis, and dissemination of these datasets severely impair Plaintiffs' and their members' ability to perform educational research and teach courses at their academic institutions. Without updated federal education data, Plaintiffs and their members cannot continue to measure and analyze trends in education outcomes; study which pedagogies are effective, fair, and unbiased; arm policymakers, states and districts, educators, students, parents, and communities with current information about proven methods for improving student learning and education outcomes; or keep the public informed about our national education system.

## LEGAL STANDARDS

### I. Rule 12(b)(1)

A court is required to dismiss a claim if it "lack[s] . . . subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). In ruling on a motion to dismiss brought under Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotations omitted). A "court may consider materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C.*

*Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) determines whether a complaint has properly "state[d] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court evaluating a Rule 12(b)(6) motion to dismiss "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotations omitted). A court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." *Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

# ARGUMENT

## III. This Court Has Jurisdiction.

Defendants contend that this Court lacks jurisdiction to consider Plaintiffs' claims for three reasons: 1) Plaintiffs' claims are moot; 2) Plaintiffs lack standing; and 3) Plaintiffs' claims are subject to the Tucker Act and otherwise unreviewable under the APA. None of these arguments are persuasive.

### A. Plaintiffs' Claims Are Not Moot.

Defendants' conclusory argument that the mere existence of certain contracts renders Plaintiffs' claims moot does not meet the heavy burden required to establish mootness. Even if it did, the voluntary cessation doctrine makes dismissal inappropriate.

*1. Defendants do not meet their heavy burden to establish mootness.*

A case becomes moot "only when it is *impossible* for a court to grant any effectual relief." *Maldonado v. District of Columbia*, 61 F.4th 1004, 1006 (D.C. Cir. 2023) (cleaned up). Making this determination requires that a court "first 'defin[e] the wrong that the defendant is alleged to have inflicted.'" *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020) (quoting *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990) (en banc)). In conducting this inquiry, the party seeking dismissal bears the "initial heavy burden" of proving mootness, *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (cleaned up), and, once established, "the opposing party has the burden to prove that a mootness exception applies." *Reid v. Hurwitz*, 920 F.3d 828, 832 (D.C. Cir. 2019) (citing *Honeywell*, 628 F.3d at 576).

Here, Defendants say nothing to dispute Plaintiffs' well-pled factual allegations that Defendants have "disrupted, hindered, and in some instances, completely ceased to fulfill [their] statutory mandates to collect, analyze, maintain and disseminate" certain datasets. Am. Compl. ¶ 30. Instead, Defendants argue that some of Plaintiffs' claims are moot and therefore unreviewable simply because the *contracts* for five studies—NAEP, CCD, NPSAS, IPEDS and BPS—have been "rescoped, recompeted, renegotiated, or otherwise remain in effect," and the work on those studies allegedly "continues." Defs.' Br. at 9. This argument fails on multiple grounds and does not meet the heavy burden required to establish mootness. *See Honeywell*, 628 F.3d at 576.

First, Defendants misconstrue the wrongdoing alleged, which is the starting point for any mootness inquiry. This Court should properly understand Plaintiffs' claims as challenges to Defendants' failure to collect and disseminate certain statutorily required data, not—as Defendants contend—challenges to their cancellation of contracts. Defendants' assurances that the contracts for five studies have been "rescoped, recompeted, renegotiated, or otherwise remain in effect" are beside the point. Defs.' Br. at 9. Those assurances do not explain how Defendants have complied, or will comply, with their obligations to produce educational data under ESRA. Nor do they establish that it is impossible for this Court to grant meaningful relief related to the persistent effects of Defendants' failure to produce such data.

Even ignoring Defendants' fundamental misunderstanding of Plaintiffs' allegations, their mootness arguments fail for other reasons. Defendants' conclusory statements about the status of various contracts rely on USAspending.gov data, data that by the Government's own account is unreliable and incomplete. *See* U.S. Gov't Accountability Off., GAO-24-106214, Federal Spending Transparency: Opportunities to Improve USAspending.gov Data 10 (2023) ("Lack of transparency and completeness of data [on USAspending.gov] undermines the usefulness of the information and could lead users to inadvertently draw incorrect conclusions based on this information."); *see also* Jennifer Teefy, Cong. Rsch. Serv., Tracking Federal Awards: USAspending.gov and Other Data Sources i (2025) ("Using USAspending.gov to locate and compile accurate data on federal awards can be challenging due, in part, to continuing data quality issues that have been identified by the U.S. Government Accountability Office (GAO). Users of USAspending.gov need to be aware that while search results may be useful for informing consideration of certain questions, these results may be incomplete or contain inaccuracies."). Defendants link to several USAspending.gov contracts to suggest that the NAEP was "never

terminated and work on the National Assessment is ongoing." Defs.' Br. at 9. However, Plaintiffs alleged in their Amended Complaint that the Department "has taken several actions to disrupt the collection, analysis, dissemination and maintenance of NAEP data, in violation of NAEP Law," Am. Compl. at ¶ 42, including "issu[ing] a 'stop order' to [entities] who perform the statutorily required continuing review of NAEP assessments," and halting "implementation activities necessary for the preparation of the 2026 NAEP assessment," *id.* ¶¶ 43–44. Plaintiffs did not claim that the NAEP was terminated in its entirety, but that Defendants' actions effectively eviscerated their ability to carry out this statutorily required work. Defendants provide no insight into whether or how the cited contracts are being implemented to advance compliance with their statutory obligations, and they offer no indication that the stop order has been withdrawn or that other actions have been taken to comply with NAEP law.

Far from establishing mootness, Defendants' reliance on purportedly open contracts, Defs.' Br. at 9–11, underscores the existence of a live controversy. The existence of an open contract does not conclusively establish Defendant's ongoing compliance with its statutory duties, particularly given that at least four of the contract pages appear to be set to expire by the end of 2025.[7] Because Plaintiffs' allegations must be accepted as true at the pleading stage, Defendants' representations here present an ongoing dispute regarding the effect of the rescoping of contracts on Defendants' ability to comply with ESRA. *E.g., Am. Nat'l Ins. Co*, 642 F.3d at 1139 (in deciding a 12(b)(1)

---

[7] *See* USAspending.gov, Contract PIID 91990025C0003 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0003_9100_-NONE-_-NONE-; USAspending.gov, Contract PIID 91990025C0003 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0003_9100_-NONE-_-NONE-; USAspending.gov, Contract PIID 91990025C0005 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0005_9100_-NONE-_-NONE-; USAspending.gov, Contract PIID 91990025C0008 (last visited Oct. 8, 2025), https://www.usaspending.gov/award/CONT_AWD_91990025C0008_9100_-NONE-_-NONE-.

motion a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]") (internal quotations omitted); *Jerome Stevens Pharms., Inc.*, 402 F.3d at 1253.

In sum, Defendants fail to meaningfully engage with Plaintiffs' factual allegations as pled and rely only on thinly argued assertions that some semblance of their statutorily required work continues. This does not meet the heavy burden for establishing mootness. Without more, "it is clearly not *impossible* for the court to provide any effectual relief whatever." *Zukerman*, 961 F.3d at 444 (internal quotations omitted) (emphasis in original).

*2. The "voluntary cessation" exception to the mootness doctrine applies.*

Even if this Court were to find that Defendants have met the heavy burden required to establish that Plaintiffs' claims as to the NAEP, CCD, NPSAS, IPEDS, and BPS studies are moot, the "voluntary cessation" exception to the mootness doctrine counsels against dismissal. Under this exception, "[a] defendant's voluntary decision to cease the activities that gave rise to the suit extinguishes the live controversy[ ] 'only if (i) there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Citizens for Resp. & Ethics in Wash. v. Wheeler*, 352 F. Supp. 3d 1, 13 (D.D.C. 2019) (quoting *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016)); *accord Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979).

*a. There is a reasonable expectation that the alleged violations will recur.*

The "voluntary cessation of the challenged conduct does not moot an action unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Lackey v. Stinnie*, 604 U.S. 192, 204 (2025) (internal quotations omitted). The Defendants bear a heavy burden to demonstrate that there is no reasonable expectation of such recurrence. *See Payne*

*Enters., Inc. v. United States*, 837 F.2d 486, 491–92 (D.C. Cir. 1988); *see also Fed. Bureau of Investigations v. Fikre*, 601 U.S. 234, 241 (2024) (characterizing the burden as "formidable"). They have not met that burden.

The contracts Defendants point to provide "weak assurance" that their allegedly wrongful behavior will not recur given that the contracts can be cancelled at any time, and the Department has a stated goal to "overhaul" the Department pursuant to Exec. Order No. 14242 § 2(a), 90 Fed. Reg. at 13679. That Order directs that the Secretary, "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." *Id.* Simply put, Defendants seek to facilitate the wholesale closure of the Department of Education. While this Court has expressed some skepticism about applying the voluntary cessation exception to agency action,[8] an agency that has voiced an explicit aim to self-destruct should not be accorded a presumption of regularity. *See Glob. Tel*Link v. Fed. Commc'ns Comm'n*, 866 F.3d 397, 407 (D.C. Cir. 2017) (concluding that there was "absolutely no basis" for concluding that the FCC's voluntary actions mooted the case where the challenged Order was "still in force"). The Department has not "acted to revoke, withdraw, or suspend" pronouncements designed to facilitate its own closure. *Id*. Thus, there is a reasonable expectation that the Department will continue to disrupt, hinder, and in some instances, completely cease to fulfill its statutory mandates to collect, analyze, maintain and disseminate the datasets at issue. This is particularly true for contracts which are due to expire by the end of October 2025, and where the Defendants have provided no

[8] *See Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1227 (D.C. Cir. 2021) (stating that the D.C. Circuit has expressed "serious doubts about whether the voluntary cessation rationale applie[s] to cases [involving agency action] . . . : it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose.") (internal quotations omitted).

indication that they have taken other steps to ensure the data-related activities covered by those contracts will continue to be performed. *See*, *e.g.*, *Zukerman*, 961 F.3d at 446 (finding that USPS's announced plans that a Customized Postage program should be terminated and the fact that USPS had taken steps to effectuate that decision provided only weak assurance that the wrongful behavior could not reasonably be expected to recur). Under these circumstances, there has been no voluntary cessation by the Department that warrants dismissal of Plaintiffs' challenges.

*b. Interim relief or events have not completely and irrevocably eradicated the effects of the alleged violations.*

The second prong of the voluntary cessation test requires a determination of "whether sufficient effects [of the alleged violation] remain . . . [and] will turn on the availability of meaningful relief." *Cierco v. Lew*, 190 F. Supp. 3d 16, 24 (D.D.C. 2016). Accordingly, "[a] case is not moot if a court can provide an effective remedy." *Lewis v. Becerra*, No. 18-CV-2929, 2023 WL 3884595, at *13 (D.D.C. June 8, 2023) (Walton, J.). Despite Defendants' assertion that five purportedly open contracts render Plaintiffs' claims moot, the mere existence of those contracts does not cure Defendants' actions restricting the collection, maintenance, analysis and dissemination of the datasets or redress the resulting harm to Plaintiffs and their members who rely on the datasets for educational research, teaching and scholarship. *See* Am. Compl. ¶¶ 31–33. This is particularly true for the five other datasets which are apparently unaffected by Defendants' purported new contracts.

As to NAEP, the "nation's report card," Plaintiffs allege that: the Department has issued a stop work order to individuals who perform the statutorily required continuing review of NAEP assessments and the Department has failed to perform crucial implementation activities, *id.* ¶ 44; the Department has similarly failed to edit data, review reports, collect, review and edit data, train state coordinators, make expenditure data available, and disseminate multiple data files and reports

required for the dissemination of CCD, *id*. ¶¶ 51–52; the Department's actions have impeded preparing data-file documentation in the NPSAS study, *id.* ¶¶ 60–62; the Department has failed to complete data collections required for the operation of IPEDS, *id.* ¶¶ 67–68; and the Department failed to take several actions, including creating reports and complete data files and documentation, related to BPS operations, *id.* ¶¶ 98–99. These actions harm Plaintiffs and their members by hindering their timely access to these datasets and eroding the quality of the data collected, thereby frustrating Plaintiffs' and their members' ability to rely on and utilize the datasets for their educational work. Because the mere purported existence of contracts does not completely and irrevocably eradicate that harm, this Court can provide meaningful injunctive relief addressing Plaintiffs' harm. Plaintiffs therefore satisfy the second prong of the voluntary cessation exception test.

**B. Plaintiffs Have Both Informational and Associational Standing.**

Contrary to Defendants' arguments, Plaintiffs have adequately alleged facts establishing that they have both informational and associational standing. This Court should therefore deny Defendants' motion to dismiss on standing grounds.

*1. Plaintiffs have adequately alleged informational standing.*

Plaintiffs have alleged facts showing that they have suffered an informational harm sufficient for purposes of standing. "The law is settled that 'a denial of access to information' qualifies as an injury in fact 'where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Env't Def. Fund v. Env't Protection Agency*, 922 F.3d 446, 452 (D.C. Cir. 2019) (quoting *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040–41 (D.C. Cir. 2016)).

Additionally, a plaintiff can demonstrate standing by showing that there is a substantial risk that the harm will occur. *See, e.g., Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 432 (2013). Courts in this Circuit "frequently uph[o]ld claims of standing based on allegations of a 'substantial risk' of future injury." *Attias v. Carefirst, Inc*., 865 F.3d 620, 627 (D.C. Cir. 2017) (collecting cases). And "absolute certainty is not required; it is enough that the increased risk of harm is substantial." *See Union for Concerned Scientists v. U.S. Dep't of Educ.*, 998 F.3d 926, 930 (D.C. Cir. 2021) (citing *Clapper*, 568 U.S. at 414). In this Circuit, courts analyze increased-risk-of-harm claims by (1) "consider[ing] the ultimate alleged harm . . . as the concrete and particularized injury" and (2) "determin[ing] whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Attias*, 865 F.3d at 627 (cleaned up). Here, Plaintiffs have standing under either inquiry: they are currently harmed by Defendants' actions, and they will undoubtedly face future harm.

In their Amended Complaint, Plaintiffs identify numerous statutory provisions requiring Defendants to publicly disclose data. *See* Am. Compl. at ¶¶ 34–39 (requiring the collection of NAEP); *id*. at ¶ 46 (requiring the collection and reporting of the CCD); *id* at ¶¶ 53–54 (requiring collection and dissemination of the NPSAS); *id*. at ¶ 64 (requiring the updating and improvement of the IPEDS); *id*. at ¶ 70 (requiring the collection and dissemination of the ECLS); *id*. at ¶¶ 81–82 (same for the HSLS); *id*. at 88 (same for the B&B); *id*. at ¶ 93 (same for the BPS); *id*. at ¶ 100 (same for the NHES); *id*. at ¶ 110 (same for the TIMSS). Plaintiffs and their members also sufficiently allege that they rely on this data to conduct their research and that they have suffered as a result of Defendants' failure to adequately collect and disseminate the data. *Id*. at ¶¶ 122–29 (summarizing the various ways Plaintiffs' members use statutorily required data in their research and instruction); *id.* ¶¶ 42–45, 51–52, 59–63, 67–69, 79–80, 86–87, 91–92, 98–99, 107–09, 117–

19 (detailing how Defendants' actions have disrupted data collection for the ten challenged datasets).

Specifically, Plaintiffs and their members explain how they cannot continue their research that relies on the maintenance of updated, scientifically valid and reliable federal educational datasets. *See id.* For instance, Plaintiffs allege that their members working on the Educational Opportunity Project, which aims to create a publicly available database on the most recent academic performance of every school district in the country, cannot continue that work without access to current, valid, NAEP data. *See id*. at ¶¶ 121, 131. Plaintiffs make similar allegations concerning a member who uses the IPEDS in their ongoing work analyzing the effectiveness of different interventions on student academic performance. *See id*. at ¶ 123.

In addition to disrupting the operation of particular datasets, Defendants have taken steps that will prevent the future dissemination of other datasets, thereby exposing Plaintiffs and their members to a substantial risk of harm. For example, by cancelling the contracts supporting the operation of the ECLS-K and failing to conduct language screeners for students, issue school-administrator surveys, or collect data through parent-and-teacher surveys, Am. Compl. at ¶¶ 79–80, Defendants guarantee that the ECLS-K cannot be released in a suitable format as the governing statutes require, *see* 20 U.S.C. §§ 9543(a)(1)(B), (L); *see also* Am. Compl. at ¶ 135 (explaining that "[d]isruptions to the collection of these datasets threaten the quality and dependability of the assessments themselves"). Defendants have similarly taken steps that guarantee that the other nine datasets challenged in the First Amended Complaint will no longer be able to be released in a valid and reliable format. *See, e.g*., Am. Compl. ¶ 130; *id*. at 117, 119 (detailing contracts cancelled and steps Defendants failed to take required to maintain the TIMSS); *id*. at 107–08 (same for NHES).

Taken together as true, Plaintiffs' allegations establish that Plaintiffs and their members suffer informational harms as a result of Defendants' failure to collect, maintain, analyze, and disseminate the ten datasets. *See, e.g.*, Am. Compl. at ¶¶ 121–31. Defendants mischaracterize these concrete harms to Plaintiffs and their members as "speculative." Defs.' Br. at 12. As described above, however, the harms to Plaintiffs flow from Defendants' actions restricting the availability of datasets, which—absent relief—prevents Plaintiffs and their members from carrying on their research and teaching. These harms are cognizable for purposes of standing. *See Doctors for Am. v. Off. of Personnel Mgmt.*, 766 F. Supp. 3d 39, 48 (D.D.C. 2025) (finding an injury in fact when "denial of information these [members] wish to use in their routine activities has inhibited their daily operations and thereby caused an injury both concrete and specific to the work in which they are engaged.") (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

Finally, Defendants contend that Plaintiffs and their members lack standing because they cannot connect their injuries to a statutory violation rather than the exercise of proper discretion. Defs.' Br. at 13. This argument belies the fact that Plaintiffs have identified half a dozen statutory commands that Defendants have broken. For example, Congress provides that IES "shall" "collect[], acquir[e], compil[e] . . . and disseminat[e] full and complete statistics on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels in the United States, including data on . . . access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students[.]" 20 U.S.C. §§ 9543(a)(1), (a)(1)(E); *see also* Am. Compl. at ¶ 53. Nowhere in the statute does Congress grant Defendants the discretion to stop "collecting, acquiring, compiling, and disseminating" this postsecondary and financial aid data, 20 U.S.C. §§ 9543(a)(1), (a)(1)(E). Failing to collect that data in the form of NPSAS—

without any replacement—falls squarely outside any discretion granted by the statute, and the harms flowing from that failure arise solely from Defendants' unlawful action.

Plaintiffs and their members have thus sufficiently alleged facts showing informational standing, and none of Defendants' arguments defeat those facts.

2. *Plaintiffs have plausibly alleged that they have associational standing.*

Plaintiffs have also adequately alleged that they have associational standing. To show associational standing, Plaintiffs must prove that "(1) [their] members would otherwise have standing to sue in their own right; (2) the interests [they] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). There is no dispute—nor have Defendants disputed—that, when taken as true, the facts alleged in Plaintiffs' Amended Complaint show that "the interests [they] seek[] to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*; *see* Defs.' Br. at 13–14 (failing to dispute these elements of associational standing). Defendants argue only that Plaintiffs have failed to identify members who have been harmed, thus failing the first prong of associational standing. *Id.*

Despite Defendants' citationless assertions to the contrary, Plaintiffs repeatedly identify members who have been harmed by Defendants' actions. *See, e.g.*, Am. Compl. at ¶ 121 (identifying members who rely on NAEP "for their work on the Educational Opportunity Project"), ¶ 122 (identifying a member who uses NPSAS "to study how the distribution of financial aid shifted after the passage of the FAFSA Simplification Act, including whether there were changes

in the numbers or demographics of students applying for financial aid"), ¶ 123 (identifying a member who "uses IPEDS data in their ongoing analysis of which interventions are most successful for improving student achievement"), ¶ 124 (identifying a member who relies on ECLS-K data in "analyz[ing] and track[ing] trends in early childhood education" and "plans to use the latest results of the ECLS-K, which are due to be disseminated in early 2026"), ¶ 125 (identifying a member who "plans to use HSLS data to evaluate how taking Advanced Placement courses impacts student admissions and achievement in Science, Technology, Engineering and Medicine programs"), ¶ 126 (identifying a member who "uses the NHES to support their analysis of early-learning environments and experiences for children aged 3-5"), ¶ 127 (identifying a member who "intends to use TIMSS to measure academic achievement across different countries").

Defendants argue that Plaintiffs are required to identify members by name in their Amended Complaint. Defs.' Br. at 14. That is not the law. Federal courts "have found that, although an association must identify members, it need not identify members by name at the pleading stage to fulfill the first prong of the test for associational standing." *Am. Ass'n of Cosmetology Schs. v. Devos*, 258 F. Supp. 3d 50, 67 (D.D.C. 2017); *accord Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012); *see also Bldg. & Constr. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006).

Requiring particularity without a naming requirement makes sense at this stage of litigation. Standing is evaluated "with the manner and degree of evidence required at the successive stages of the litigation," and "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). When considering a facial challenge to standing, "courts generally operate in a manner similar to a motion to dismiss under Rule 12(b)(6) and so do not consider material outside the

allegations in the pleadings." *Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 335 (D.D.C. 2021). Courts likewise "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561, making a naming requirement unnecessary at this stage in the litigation.

The cases Defendants cite are not to the contrary. With one exception, none were decided at the motion-to-dismiss phase. *See Chamber of Commerce of U.S. v. Env't Protection Agency*, 642 F.3d 192 (D.C. Cir. 2011) (on petition for review of an agency order); *Am. Chemistry Council v. U.S. Dep't of Transp*. 468 F.3d 810 (D.C. Cir. 2006) (on petition for review of an agency rule); *Ctr. for Biological Diversity v. Nishida*, No. 21-CV-119 (RDM), 2021 WL 827189, at *2 (D.D.C. Mar. 4, 2021) (reviewing a motion to intervene).[9] In the only case decided at the motion-to-dismiss stage, the court dismissed the action because plaintiffs failed to identify the particular members of the organization generally, not because they failed to identify members by name. *See Conf. of State Bank Supervisors v. Off. of the Comptroller of the Currency*, 313 F. Supp. 3d 285, 299 (D.D.C. 2018).[10] Plaintiffs here have plainly identified specific members suffering harms from Defendants' actions, and those members need not be identified by name in the complaint.

---

[9] "[W]hen the D.C. Circuit considers standing . . . in the context of direct petitions for review of agency action, . . . [it] requires the petitioner to 'supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review,' unless 'the petitioner's standing is ... self-evident.'" *Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324 (D.D.C. 2021) (quoting *Sierra Club v. Env't Protection Agency*, 292 F.3d 895, 896 (D.C. Cir. 2002)).

[10] Another court in this district has rejected the assertion in *Conference of State Bank Supervisors*, cited by Defendants, *see* Defs. Br. at 14, that three district courts have required the naming of an associational plaintiff's injured member at the motion to dismiss stage. *See Am. Ass'n of Cosmetology Schs. v. Devos*, 258 F. Supp. 3d 50, 68 (D.D.C. 2017). Other courts in this district have cast doubt on the conclusion in *Conf. of State Bank Supervisors* that a naming requirement at the motion-to-dismiss stage is appropriate. *See Ranchers-Cattlemen Action Legal Fund*, 573 F. Supp. 3d at 334–36.

**C. Plaintiffs' Claims Are Reviewable Under the APA.**

The APA provides this Court jurisdiction to review Plaintiffs' claims. Properly read, those claims challenge IES's failure to perform certain statutorily required duties, not—as Defendants contend—IES's cancellation of contracts. Because Plaintiffs' claims arise from statute, not contract, the Tucker Act does not deprive this Court of jurisdiction. Further, although courts recognize an exception to judicial review under the APA for actions committed to agency discretion, that exception does not apply here. Plaintiffs' APA claims are thus properly before this Court.

*1. The APA abrogates sovereign immunity.*

Although the "United States is immune from suit unless it unequivocally consents," *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020), Section 702 of the APA provides "a limited waiver of sovereign immunity" for claims by "persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin. ("Crowley")*, 38 F.4th 1099, 1105-06 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702). That waiver applies to claimants "seeking relief other than money damages," 5 U.S.C. § 702, so long as no "'other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Crowley*, 38 F.4th at 1106 (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) and 5 U.S.C. § 702). Because Plaintiffs seek declaratory and injunctive relief, and as discussed below, the Tucker Act does not impliedly forbid that relief, the APA validly abrogates sovereign immunity with respect to Plaintiffs' claims.

*2. The Tucker Act does not apply.*

Seeking to defeat this Court's jurisdiction, Defendants argue that "Plaintiffs' claims are exactly those traditional contract claims that this Court is precluded from reviewing" on account

of the Tucker Act. Defs.' Br. at 15. This argument—which fundamentally misreads Plaintiffs' First Amended Complaint—lacks merit.

The Tucker Act waives the government's sovereign immunity from actions "founded . . . upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), and has been interpreted to grant the Court of Federal Claims exclusive jurisdiction over any such action seeking more than $10,000 in damages. *See Crowley*, 38 F.4th at 1106; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The D.C. Circuit has cautioned that the Tucker Act should not be construed "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Id*. at 968.

Accordingly, to determine whether it has jurisdiction over Plaintiffs' claims, this Court must assess whether the claims are "at [their] essence" contract claims. *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 967–68) (internal quotation marks omitted). That assessment depends on (1) "the source of the rights upon which [Plaintiffs] base[ their] claims," and (2) "the type of relief sought." *Crowley*, 38 F.4th at 1106–07 (quoting *Megapulse*, 672 F.2d at 968) (internal quotation marks omitted).

Here, the source of the rights Plaintiffs assert is statutory, not contractual. Plaintiffs do not—as Defendants suggest—challenge the cancellation or "seek reinstatement of any Institute contracts." Defs.' Br. at 14. Rather, they challenge Defendants' failure to comply (by whatever means) with statutory mandates requiring IES to collect and make public ten education-related datasets. *See*, *e.g.*, Am. Compl. ¶ 1 (noting that ESRA "requires that the federal government maintain robust educational data-collection capabilities, and that the Department . . . collect, maintain, analyze, and disseminate high-quality data"), ¶ 2 (alleging that the Department has "curtail[ed] its ability to comply with congressional mandates to collect, analyze, and disseminate

ten critical datasets related to education”), ¶ 6 (alleging that “restricting access to these ten datasets” violates ESRA and the APA).

Because Plaintiffs are not party to any IES-related contract with the government giving rise to a duty, their rights necessarily “exist[ed] prior to and apart from any rights created under [a] contract.” *Crowley*, 38 F.4th at 1107 (quoting *Spectrum Leasing Corp. v. U.S.*, 764 F.2d 891, 894 (D.C. Cir. 1985)) (internal quotation marks omitted). In these circumstances, the Tucker Act does not apply. *See id.* at 1108–10 (citing the lack of a contractual relationship between the parties in determining that “the right [plaintiff] seeks to vindicate is not a contract right” and that the Tucker Act therefore does not deprive the district court of jurisdiction); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep’t of Health & Hum. Servs.*, 137 F.4th 932, 937–39 (9th Cir. 2025) (finding no Tucker Act jurisdiction where statutory claims were brought by subcontractors with no contractual relationship with the government); *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) (“To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government . . . .”).

The remedies Plaintiffs seek—declaratory and injunctive relief sufficient to redress unlawful agency action—reinforce this conclusion. While Defendants assert that “what [Plaintiffs] want is a judicial decree directing the Institute to pay on the contracts,” Defs.’ Br. at 17 (cleaned up), their assertion plainly misconstrues the First Amended Complaint. Plaintiffs seek injunctive relief requiring Defendants to finish collecting the data that ESRA requires them to disseminate, but nowhere do Plaintiffs ask this Court to require that Defendants do so by reinstating cancelled contracts. In any event, it would be immaterial if the actions Plaintiffs seek to enjoin also amounted to a breach of contract. *See Megapulse*, 672 F.2d at 971 (rejecting the view that “an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action

might also amount to a breach of contract"); Am. Compl. ¶¶ 231–43 (enumerating Plaintiffs' requested declaratory and injunctive relief). Plaintiffs' requested relief is precisely the sort routinely granted under the APA. *See also*, *e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Off. of Mgmt. & Budget*, No. 25-CV-1051, 2025 WL 2025114 at *15–19 (D.D.C. July 21, 2025) (awarding summary judgment with respect to plaintiffs' APA claims challenging the removal of information contained in a public apportionments database, vacating and setting aside the unlawful removal, and permanently enjoining the government from removing the database and the apportionment information required to be disclosed by statute); *Am. Library Ass'n v. Sonderling*, 783 F. Supp. 3d 57, 60–61 (D.D.C. 2025) (granting preliminary injunctive relief prohibiting further actions to dissolve the operations of the Institute of Museum and Library Services where plaintiffs were likely to succeed on an APA claim challenging the violation of statutory mandates requiring the government to "support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services" and plaintiffs demonstrated irreparable harm as a result of their loss of access to statutorily required data, among other things). More importantly, it is relief Plaintiffs cannot obtain in the Court of Federal Claims. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief.").

The Supreme Court's recent opinion in *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966 (2025), and its progeny do not compel a different conclusion regarding jurisdiction. Unlike the Plaintiffs here, all of the plaintiffs in *California* and the related lower court cases Defendants cite were federal grantees challenging the termination of grants previously awarded to them. *See id*. at 968–69, 971 (citing the Tucker Act in granting a stay pending appeal of a temporary restraining

order entered at the request of eight States suing on behalf of public universities, schools, and other institutions that were federal grantees whose teacher training grants were cancelled by the Department of Education); Order Granting Motion for Stay Pending Appeal, *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025), Dkt. 30 (citing *California* in granting a stay of a preliminary injunction entered at the request of organizations acting on behalf of members who were federal grantees challenging the Department of Education's termination of their teacher training grants); Order Granting Mot. to Dissolve TRO, *Mass. Fair Housing Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, No. 25-CV-30041 (D. Mass. Apr. 14, 2025) Dkt. 42 (citing *California* in dissolving a temporary restraining order entered at the request of federal grantees after the Department of Housing and Urban Development cancelled their fair housing grants); *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 158, 161–66 (D.D.C. 2025) (McFadden, J.) (citing the Tucker Act in denying a motion for preliminary injunction brought by plaintiffs—federal grantees seeking to challenge the State Department's cancellation of their refugee aid grants).

That distinction matters. As this Court acknowledged in *U.S. Conf. of Catholic Bishops*, a remedy can "neither be construed as damages nor specific performance" where, as here, "the plaintiff ha[s] no contractual relationship with [the government]." *Id.* at 164. Although an injunction requiring IES to release the data and information that it is statutorily required to disseminate might indirectly lead Defendants to continue funding contracts to which Plaintiffs are not a party, that continuation would be "a mere by-product of [the] court's primary function of reviewing the Secretary's interpretation of federal law." *Bowen*, 487 U.S. at 910.

For the reasons discussed, this Court should reject Defendants' assertion that the Tucker Act deprives it of jurisdiction to hear Plaintiffs' APA claims.

*3. The actions Plaintiffs challenge are not solely committed to agency discretion.*

In their final bid to foreclose review, Defendants contend that this Court has limited, if any, authority to review their challenged actions under the APA and provide injunctive relief because those actions are committed to agency discretion. *See* Defs.' Br. at 22–24. Not so.

To the extent Defendants assert that their decisions regarding IES operations are insulated from judicial review because those decisions are committed to agency discretion, their position is legally unsound. Although courts recognize an exception to judicial review under the APA for actions committed to agency discretion, *see* 5 U.S.C. § 701(a)(2), the scope of this exception must be read "quite narrowly." *U.S. Dep't of Com. v. New York*, 588 U.S. 752, 771–72 (2019) (internal quotation omitted). As the Supreme Court has made clear, there is a "strong presumption favoring judicial review of administrative action," *Mach Mining, LLC v. Equal Emp. Opportunity Comm'n*, 575 U.S. 480, 486 (2015) (cleaned up), and "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). Courts therefore apply the exception to judicial review for actions committed to agency discretion only in two limited circumstances: 1) when the law provides no standard by which to judge agency action and 2) when the challenged action is the type that courts have typically viewed as committed to agency discretion. *See, e.g.*, *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (explaining that § 701(a) "imposes two related, but distinct, barriers to judicial review").

Neither circumstance is present here. ESRA establishes the IES and NCES by name, specifies the mission of each, and mandates that each perform specific duties. *See* 20 U.S.C. §§ 9511, 9541–48. Indeed, the operative statutory language—which is replete with the word "shall"—

provides a detailed recitation of IES and NCES's obligations in these areas.[11] *See Cmty. Legal Servs.*, 137 F.4th at 941 ("[T]he use of 'shall' plainly imposes a mandatory duty . . . .") (citing

[11] *See*, *e.g.*, 20 U.S.C. §§ 9511(a) ("There shall be in the Department the Institute of Education Sciences, to be administered by a Director . . . ."), § 9511(b)(2) ("In carrying out [its] mission . . . [IES] shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need."), § 9511(c) ("The Institute shall consist of the following: (1) The Office of the Director . . . . (2) The National Board for Education Sciences . . . (3) The National Education Centers, which include—(A) the National Center for Education Research . . . ; (B) the National Center for Education Statistics . . . ; (C) the National Center for Education Evaluation and Regional Assistance . . . ; and (D) the National Center for Special Education Research . . . ."), § 9512 (noting that "the Institute . . . shall—(1) conduct and support scientifically valid research activities, including basic research and applied research, statistics activities, scientifically valid education evaluation, development, and wide dissemination; [and] (2) widely disseminate the findings and results of scientifically valid research in education"), § 9541(b) ("The mission of [NCES] shall be—(1) to collect and analyze education information and statistics in a manner that meets the highest methodological standards; (2) to report education information and statistics in a timely manner; and (3) to collect, analyze, and report education information and statistics in a manner that— (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public."), § 9543(a) (noting that NCES "shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations" and enumerating the specific topics that data must cover), § 9545(b) (noting the NCES Commissioner "shall submit to the President and the appropriate congressional committees a statistical report on the condition and progress of education in the United States" each year on June 1), § 9546(e)(2) (NCES "shall . . . provide all interested parties, including public and private agencies, parents, and other individuals, direct access, in the most appropriate form (including, where possible, electronically), to data collected by [NCES] for the purposes of research and acquiring statistical information."), § 9622(b)(2) (noting that the NCES Commissioner "shall . . . carry out . . . a National Assessment of Educational Progress" and "shall . . . use a random sampling process which is consistent with relevant, widely accepted professional assessment standards and that produces data that are representative on a national and regional basis[,] conduct a national assessment and collect and report assessment data . . . at least once every 2 years, in grades 4 and 8 in reading and mathematics[,] conduct a national assessment and collect and report assessment data, including achievement data trends, in a valid and reliable manner on student academic achievement in public and private schools in reading and mathematics in grade 12 in regularly scheduled intervals, but at least as often as such assessments were conducted prior to January 8, 2002[, and] ensure that achievement data are made available on a timely basis following official reporting, in a manner that facilitates further analysis and that includes trend lines"), § 9622(b)(5) ("In carrying out any assessment authorized under this section, the [NCES] Commissioner . . . shall . . . use widely accepted professional testing standards, objectively measure academic achievement, knowledge, and skills, and ensure that any academic assessment authorized under this section be tests that do not evaluate or assess personal or family beliefs and attitudes or publicly disclose personally identifiable information[,] and collect

*Alabama v. Bozeman*, 533 U.S. 146, 153 (2001)). The statute not only directs IES and NCES to collect and analyze education-related data, but it also specifies the topics that education-related data should cover, the standards that IES and NCES should use in collecting and analyzing that data, and the schedule on which NCES must collect and disseminate certain subsets of the data (including the NAEP and financial aid survey). *See* 20 U.S.C. §§ 1015a(k), 9511–12, 9541, 9543, 9545–46, 9622. Thus, while Defendants may have discretion to make some decisions regarding the data and information that ESRA requires them to disseminate, the statutory scheme plainly provides detailed, mandatory guidelines for how that discretion must be used. Because those guidelines provide standards against which this Court can measure Defendants' conduct, Plaintiffs' APA claims are reviewable. *See Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.").

Nothing in *Lincoln v. Vigil*, 508 U.S. 182 (1993), alters this conclusion. Defendants cite *Lincoln* to support their assertion that "an agency has unreviewable 'capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.'" Defs.' Br. at 22 (quoting *Lincoln*, 508 U.S. at 192). But *Lincoln* makes clear that

---

information on race, ethnicity, socioeconomic status, disability, limited English proficiency, and gender."), § 1015a(k) (noting that the "Secretary, acting through the [NCES] Commissioner . . . shall conduct, on a State-by-State basis, a survey of recipients of Federal student financial aid under subchapter IV," that "[t]he survey shall be conducted on a regular cycle and not less often than once every four years," that "[t]he survey shall be representative of students from all types of institutions, including full-time and part-time students, undergraduate, graduate, and professional students, and current and former students," and that "[t]he [NCES] Commissioner . . . shall disseminate to the public, in printed and electronic form, the information resulting from the survey").

"an agency is not free simply to disregard statutory responsibilities." 508 U.S. at 193; *see also Shawnee Tribe*, 984 F.3d at 100 (explaining that there is no presumption of non-reviewability where "Congress has circumscribed agency discretion to allocate resources by putting restrictions in the operative statute") (cleaned up); *Cmty. Legal Servs.*, 137 F.4th at 940 ("Where Congress establishes a mandatory program, in the sense that Congress directs (rather than merely authorizes) the agency to conduct certain activities, the rule in *Lincoln* has no application.") (cleaned up). That is what this case is about: Defendants' disregard of their statutory obligation to make specific data and information available to the public.

No one disputes that Defendants may identify eliminating inefficiency and waste as policy objectives. But they may not ignore statutory directives in order to pursue those objectives. By imposing a detailed scheme of affirmative obligations, *see supra* n.11, the relevant statutory provisions limit Defendants' discretion[12] and "stand in stark contrast with those at issue in *Lincoln*, where no statute or regulation even mentioned the Program that was cancelled, let alone required that the Executive carry out the program." *Cmty. Legal Servs.*, 137 F.4th at 941 (cleaned up); *see also id.* at 936, 940, 943 (upholding preliminary injunction preventing agency from withdrawing funding for "a program that is *required* by statute") (emphasis in original). In short, whatever *Lincoln* says about agency discretion regarding the type of lump-sum appropriations at issue in that case, *see* 508 U.S. at 192–93, it does not save Defendants from complying with the statutory requirements at issue in this case. *See generally Mach Mining, LLC*, 575 U.S. at 486 ("Congress rarely intends to prevent courts from enforcing its directives to federal agencies.").

---

[12] In arguing that "Plaintiffs cannot point to a particular statute limiting the Department's inherent discretion to maintain the same contracts as before," Defs.' Br. at 23, Defendants miss the point. Plaintiffs do not seek to compel Defendants to maintain any particular contracts but instead to deliver—by whatever means—the data and information that ESRA requires Defendants to make publicly available.

## IV. Plaintiffs Adequately Allege APA Claims.

Defendants make no attempt to show that their challenged conduct was the result of reasoned decision making or that it complied with the law. Instead, Defendants argue that Plaintiffs' claims amount to an impermissible programmatic challenge. Defs.' Br. at 18–19. Defendants' reasoning lacks merit. When Plaintiffs' well-pled allegations are accepted as true, which they must be at the motion to dismiss stage, they plainly identify numerous discrete agency actions taken by Defendants in violation of the APA.

### A. The Challenged Actions Are Discrete.

Nowhere do Defendants actually contend, let alone meaningfully explain, that their decisions to suspend the collection and release of statutorily mandated datasets do not constitute discrete agency actions. Defendants' brief merely restates the law on programmatic challenges, and in one sentence, argues that Plaintiffs' claims ask this court to "supervise all agency activities." Defs.' Br. at 20. But this argument misstates the nature of Plaintiffs' claims. Plaintiffs do not seek to overhaul a program or the day-to-day operations at the Department. Plaintiffs simply request this court to order Defendants to comply with ESRA.

ESRA's mandate is clear: the Department must maintain federal educational data on a variety of specified topics, gather and analyze this data in a timely manner that is scientifically valid, and publicly disseminate its findings. *See supra* pp 32-34. Plaintiffs do not seek an order dictating how Defendants collect and disseminate these datasets, only an order that they do so. *See* Am. Compl. ¶¶ 231–43. At their essence, Plaintiffs' core claims—that Defendants' "failed to take a *discrete* agency action that [they are] *required to take*,"—are precisely the types of claims courts review under the APA. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

This Court should reject Defendants' invitation to "confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018). Courts have repeatedly sustained APA challenges based on allegations that the government failed to perform a statutorily required task, even if the government has discretion in *how* the task is performed. *See e.g., AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,* No. 25-CV-400, 2025 WL 2537200, at *13 (D.D.C. Sept. 3, 2025); *Env't Def. Fund v. Regan*, No. 20-CV-762, 2024 WL 3887383, at *10 (D.D.C. Aug. 20, 2024); *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 620 (D.C. Cir. 2020).

Nor should the Court credit Defendants' misplaced reliance on *Nat'l Treasury Emps. Union v. Vough*t, ___ F.4th ___, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ("*NTEU*"). Contrary to Defendants' explanation, the *NTEU* court found that the plaintiffs there challenged a discrete agency action, but that the action could not be challenged under the APA because it did not mark the consummation of the agency decision-making. *NTEU* at *13. As for the other actions challenged by the plaintiffs, the court determined that they were too widespread and unrelated to constitute discrete agency actions. *See id.* at 11–13. By contrast, Plaintiffs here have identified a circumscribed set of actions Defendants have taken with respect to specific datasets. *See* Am. Compl. ¶¶ 34–119.

**B. Defendants Do Not Dispute They Violated Federal Law.**

Plaintiffs' First Amended Complaint alleges that Defendants' decision to suspend the operations of NAEP violates ESRA, which requires Defendants to perform the NAEP to measure "student academic achievement and reporting of trends in such achievement in reading, mathematics" and other subjects using a methodology designed to produce "valid and reliable"

results based on "widely accepted professional assessment standards." Am. Compl. ¶¶ 34–45. In response, Defendants offer absolutely no argument that their actions to disrupt the collection of NAEP were legal under ESRA. Defendants' response that some NAEP contracts are operational now, Defs.' Br. at 8, does not make Defendants' NAEP disruption activities lawful. Nor does it answer the question of whether the contracts to which they point prove that NAEP is producing valid and reliable results, as required by law. Therefore, Plaintiffs' allegations, which must be accepted as true at this stage, sufficiently establish that Defendants' failure to perform certain implementation activities required for the operation of the NAEP is contrary to law.

**C. Defendants' Actions Were Not the Result of Reasoned Decision-Making.**

Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, Plaintiffs' well-pleaded allegations show that Defendants took extreme action in contravention of decades of agency practice and public reliance without meaningfully explaining their decisions or considering any harms flowing from these actions. Am. Compl. ¶¶ 137-226. Defendants still offer no reasoned justification for their decision-making. Instead, they simply assert, without any evidence, that their actions are designed to address "inefficiency" at the Department. Defs.' Br. at 23. Imagined inefficiency does not obviate the requirement that Defendants uphold their statutory mandates. Indeed, without any evidence to prove that "inefficiency" is the actual reasoning behind the challenged actions, this is precisely the type of post-hoc rationalization by counsel that "courts may not accept." *State Farm*, 463 U.S. at 50; *see*

*also U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020); *Michigan v. Env't Protection Agency*, 576 U.S. 743, 758 (2020).

**D. Plaintiffs Have No Adequate Remedies at Law.**

Plaintiffs have no other adequate alternative remedies at law. For the reasons described above, *see supra* pp. 25-29*,* the Tucker Act does not apply to Plaintiffs' claims as Plaintiffs have no contracts with IES or NCES. Even if they did, these contracts would not allow Plaintiffs to obtain the injunctive and declaratory remedies they seek. Plaintiffs do not seek contract-related remedies like damages or specific performance but instead Defendants' restoration of critical dataset operations. For the same reasons Plaintiffs' claims are not precluded by the Tucker Act, the Act does not provide Plaintiffs with an adequate alternative to pursue their requested relief. *See, e.g., El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1275 (D.C. Cir. 2005).

**V. This Court Should Deny Defendants' Request To Be Relieved of The Obligation To File a Certified List of the Administrative Record.**

Local Civil Rule 7(n)(1) requires Defendants to file a certified list of the contents of the administrative record with any dispositive motion. Defendants request that the Court relieve them of this obligation. Defs.' Br. at 24–25. Because this Court's resolution of Defendants' Motion depends, at least in part, on facts properly provided as part of the administrative record, Defendant's request should be denied.

Defendants press this Court to dismiss some of Plaintiffs' claims as moot because several contracts that Plaintiffs allege were cancelled purportedly remain in force. Defs.' Br. at 8–11. Instead of supplying relevant information from the certified administrative record, Defendants rest their claims regarding the status of these contracts on data appearing on the USAspending.gov website. As discussed above, the data appearing on USAspending.gov is—by the government's

own admission—often inaccurate and incomplete. Rather than base a finding of mootness on such unreliable data, this Court should require Defendants to produce a certified list of the contents of the administrative record and any portions of the record that Defendants contend establish mootness.[13] *See Vargus v. McHugh*, 87 F. Supp. 3d 298, 301–03 (D.D.C. 2015) (granting motion to compel production of administrative record prior to ruling on the government's mootness claims where the occurrence of changes cited by the government "c[ould] only be assessed with reference to the [Administrative] Record itself").

## CONCLUSION

Based on all the foregoing reasons, Defendants' motions should be denied in their entirety.

Dated: October 9, 2025

Respectfully submitted,

Amy I. Berman, DC Bar No. 480541
NATIONAL ACADEMY
OF EDUCATION
500 Fifth Street NW
Washington, DC 20001
(202) 334-2341
aberman@naeducation.org

/s/ Morenike Fajana
Samuel Spital, DC Bar No. NY0248
Morenike Fajana*
Kelly Gardner***
Colin Burke*
Kameron Johnston**
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2259
sspital@naacpldf.org
mfajana@naacpldf.org
kgardner@naacpldf.org
cburke@naacpldf.org
kjohnston@naacpldf.org

*Admitted *pro hac vice*
**DC bar admission pending
***Admission *pro hac vice* forthcoming

[13] To the extent Defendants produce a certified list of the administrative record or portions of that record, Plaintiffs request the right to supplement their response to Defendants' motion to dismiss on mootness grounds, as appropriate.