**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF EDUCATION and <br><br> LINDA MCMAHON, *in her official capacity as Secretary of Education*, <br><br> *Defendants*. | Civil Action No. 1:25-cv-1266 (TNM) |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.    Congress Established a Comprehensive Framework for Federal Education Research to Which the Department of Education's Institute of Education Sciences Is Integral.......... 2

    II.    The Department's Abrupt Termination of Scores of Contracts Supporting Statutorily Mandated Research Disrupted the Underlying Studies and Harmed Plaintiffs and Their Members. ............................................................................................................... 5

        A.    The Department Issues a Termination Directive........................................................ 5

        B.    The Termination Directive Triggers Contract Cancellations that Have Immediate Consequences, Including Disruption of Statutorily-Mandated Research Studies. .... 6

        C.    Plaintiffs' Research, Teaching, and Scholarship Suffer on Account of Defendants' Failure to Continue Collecting and Disseminating High Quality Data from the Challenged Studies............................................................................................. 20

    III.    Plaintiffs' Lawsuit.................................................................................................. 20

ARGUMENT...................................................................................................................... 21

    I.    Plaintiffs Have Standing to Challenge the Defendants' Actions. .................................. 21

        A.    Plaintiffs and Their Members Suffer Concrete and Particularized Informational Injuries. ................................................................................................................ 22

            1.    ESRA Unambiguously Requires the Department to Collect, Analyze, and Publicly Disseminate the Information at Issue. .................................................. 22

            2.    The Department Deprived Plaintiffs and their Members of Information ESRA Mandates Defendants Make Public. ................................................................. 24

            3.    Plaintiffs and Their Members Suffer the Very Harm Congress Sought to Prevent............................................................................................. 28

        B.    The Harms that Plaintiffs and Their Members Assert Are Traceable to Defendants and Redressable by This Court. ........................................................................... 34

    II.    There Are No Jurisdictional Bars Preventing this Court from Reviewing Plaintiffs' Claims Under the APA. .......................................................................................... 35

A.    The APA Affords Plaintiffs Judicial Review of the Challenged Agency Action. .... 35

B.    The Tucker Act Does Not Apply. ............................................................................. 36

III.  Plaintiffs Challenge Discrete and Final Agency Action Subject to APA Review. .......... 37

A.    The Challenged Actions Are Discrete. ..................................................................... 38

B.    The Challenged Actions Are Final. .......................................................................... 38

IV.  The Department's Termination of the Challenged Studies Was Arbitrary
and Capricious. ................................................................................................................. 40

A.    Defendants Did Not Engage in Reasoned Decision-Making. ................................... 41

1.    The Administrative Record Does Not Adequately Explain Defendants' Actions. 41

2.    The Department Did Not Consider Important Aspects of the Problem. ............... 42

3.    The Department Relied on Factors Congress Did Not Intend for It to Consider.. 43

4.    The Department Ignored Important Reliance Interests. ....................................... 44

V.    Vacatur Is Appropriate. .................................................................................................... 45

CONCLUSION ............................................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Abramowitz v. Lake*,
824 F. Supp. 3d 1 (D.D.C. 2026) .................................................................. 38, 40, 45

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) ................................................................................ 30

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
770 F. Supp. 3d 822 (D. Md. 2025) ......................................................................... 40

*Am. Libr. Ass'n v. Sonderling*,
783 F. Supp. 3d 57 (D.D.C. 2025) ........................................................................... 37

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................ 38

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)................................................................................................ 37

*Citizens for Responsibility & Ethics in Wash. v. Off. of Mgmt. & Budget*,
No. 25-CV-1051, 2025 WL 2025114 (D.D.C. July 21, 2025) ................................. 36

*City of Dania Beach v. FAA*,
485 F.3d 1181 (D.C. Cir. 2007)............................................................................... 39

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)................................................................................................ 45

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ......................................................................... 35, 36

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ........................................................................... 24, 28

*Doc Soc'y v. Rubio*,
141 F.4th 1273 (D.C. Cir. 2025) ............................................................................. 29

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017).. 24

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ................................................................................ 22

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)................................................................................................ 44

*Env't Def. Fund v. EPA*,
   922 F.3d 446 (D.C. Cir. 2019) .............................................................................. 22

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................................................. 29

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) ........................................................................... 40, 41

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) .............................................................................. 21

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ................................................................................ 38

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .............................................................................................. 21

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .............................................................................................. 22

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .............................................................................................. 37

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) .............................................................................. 36

*Michigan v. EPA*,
   576 U.S. 743 (2015) .............................................................................................. 42

*Mid-Atlantic Equity Assistance Consortium v. U.S. Dep't of Educ.*,
   793 F. Supp. 3d 166 (2025) ................................................................................... 40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 40, 41, 42, 43

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   763 F. Supp. 3d 36 (D.D.C. 2025) ........................................................................ 39

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................................................................ 37

*Ramaprakash v. Fed. Aviation Admin.*,
   346 F.3d 1121 (D.C. Cir. 2003) ............................................................................ 42

*S. Educ. Found. v. U.S. Dep't of Educ.*,
   784 F. Supp. 3d 50 (D.D.C. 2025) ........................................................................ 40

*Sierra Club v. EPA*,
  754 F.3d 995 (D.C. Cir. 2014) ........................................................................... 22

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ............................................................................. 38

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  437 F.3d 75 (D.C. Cir. 2006) ............................................................................. 41

*United Food & Com. Workers Union, Loc. No. 227 v. U.S. Dep't of Agric.*,
  No. CV 20-2045 (TJK), 2021 WL 12312897 (D.D.C. Aug. 20, 2021) ................................... 30

**Statutes**

20 U.S.C. § 1015a(i)(4) .............................................................................. 4, 23, 26

20 U.S.C. § 9622(b)(1) ..................................................................................... 4

20 U.S.C. § 9622(b)(2) ................................................................................ 17, 23

20 U.S.C. § 9622(c)(1)(A) ............................................................................... 17

20 U.S.C. § 9622(e)(2)(A) ............................................................................... 17

20 U.S.C. §§ 1015a(k) .................................................................................... 13

20 U.S.C. §§ 9501–84 ............................................................................... *passim*

28 U.S.C. § 1491(a)(1) ................................................................................... 36

5 U.S.C. § 551(13) ........................................................................................ 37

5 U.S.C. § 702 ............................................................................................ 35

5 U.S.C. § 706(2)(A) ..................................................................................... 45

Pub. L. 107-279 ............................................................................................ 2

U.S.C. § 1094(a)(17) ....................................................................................... 4

**Other Authorities**

*About IES*, Inst. Educ. Scis., https://ies.ed.gov/about (last visited July 10, 2026) ........................ 23

*Baccalaureate and Beyond Longitudinal Study (B&B)*, Nat'l Ctr. for Educ. Stat.,
  https://nces.ed.gov/surveys/b&b/ (last visited July 5, 2026) ............................................ 11, 12

*Beginning Postsecondary Students Longitudinal Study (BPS)*, Nat'l Ctr. for Educ. Stat.,
  https://nces.ed.gov/surveys/bps/index.asp (last visited July 10, 2026) .................................... 12

*Early Childhood Longitudinal Studies (ECLS) Program*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/ecls/ (last visited July 5, 2026) ............................................................. 9, 10

*High School Longitudinal Study of 2009*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/hsls09/ (last visited July 10, 2026) ............................................. 11

*National Household Education Surveys Program*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/nhes/ (last visited July 10, 2026) ................................................. 8

*National Postsecondary Student Aid Study (NPSAS)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/npsas/ (last visited July 10, 2026) ................................................ 13

*NCES Handbook of Survey Methods*, Inst. Educ. Scis., https://nces.ed.gov/statprog/handbook/ipeds.asp (last visited July 10, 2026) ........................... 4

*NCME Mission*, NCME, https://ncme.org/about/#mission (last visited July 10, 2026) ................ 1

*Our Mission*, NAEd, https://naeducation.org/mission/ (last visited July 10, 2026) ....................... 1

*Private School Universe Survey*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/pss/ (last visited July10, 2026)................................................................................................................... 29

*Trends in International Mathematics and Science Study (TIMSS)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/timss/ (last visited July 10, 2026) ....................................................... 14, 15

**INTRODUCTION**

For decades, the Department of Education has collected, analyzed, and disseminated educational data on which policymakers, researchers, and the public rely to understand how American students are learning, whether federal investments in education are working, and where the nation's schools are falling short. Congress did not leave this work to chance. Through the Education Sciences Reform Act of 2002 ("ESRA"), it mandated specific studies and data, and directed the Department of Education to fulfill these obligations continuously and rigorously.

Plaintiffs National Academy of Education ("NAEd") and National Council on Measurement in Education ("NCME") are the nation's leading organizations of education researchers and measurement experts. NAEd seeks to "advance[] high-quality research to improve education policy and practice" and "undertake[] research studies to address pressing educational issues," among other things."[1] NCME seeks "to advance theory and applications of educational measurement to benefit society."[2] Plaintiffs and their members, preeminent education scholars and measurement experts, have long relied on the Department's educational data. That data is both foundational to the advancement of Plaintiffs' missions and indispensable to their members' work.

On February 10, 2025, the Department disregarded ESRA's statutory mandate in sweeping fashion. Acting on the approval of a single employee and, without any meaningful input from its own experts on ESRA's research mandates, the Department ordered, en masse, the termination of 166 contracts supporting major federal education research. The Department offered no reasoned explanation for its sweeping decision or the departure from agency precedent the decision represented. And the terminations that followed were executed without regard to the statutory

---

[1] *Our Mission*, NAEd, https://naeducation.org/mission/ (last visited July 10, 2026).
[2] *NCME Mission*, NCME, https://ncme.org/about/#mission (last visited July 10, 2026).

obligations the contracts fulfilled, the effects of termination on the Department's ability to complete ongoing or planned data collection and dissemination, or the amount of federal funds already expended toward completing the contract's underlying research activities.

The damage was immediate and, for many of the Department's research studies, permanent. Data from completed studies were not processed in accordance with quality control procedures and were therefore never released. Longitudinal studies that had tracked cohorts of children and young adults for years were cut off mid-collection, creating gaps in the data that can never be filled. And studies that remained ongoing in some fashion were modified in ways that threaten their methodological soundness. These disruptions deprived Plaintiffs of access to critical, high-quality datasets that do not exist elsewhere, and to which they are legally entitled. Because Defendants' mass terminations and the resulting disruptions to federal research studies were not the product of reasoned decision-making, Plaintiffs respectfully request that this Court grant them summary judgment, vacate Defendants' unlawful actions, and restore the disrupted studies.

## BACKGROUND

**I.    Congress Established a Comprehensive Framework for Federal Education Research to Which the Department of Education's Institute of Education Sciences Is Integral.**

The Institute of Education Sciences ("IES"), established through the Education Sciences Reform Act of 2002, is the preeminent source of federal education data. In passing ESRA, Congress sought to "improve[] Federal education research, statistics, evaluation, information and dissemination." Pub. L. 107-279; 20 U.S.C. §§ 9501–84. IES's mission, as defined by ESRA, is "to provide national leadership in expanding fundamental knowledge and understanding of education . . . in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about . . . the condition and progress of education in the United States," successful educational practices, and "the effectiveness of Federal and other

2

education programs." 20 U.S.C. § 9511(b)(1). ESRA requires that IES advance this mission by "compil[ing] statistics, develop[ing] products, and conduct[ing] research, evaluations, and wide dissemination activities in areas of demonstrated national need." *Id.* § 9511(b)(2).

Congressionally-appropriated funds support IES's mission-driven activity. With those funds, IES must:

> directly or through grants, contracts, or cooperative agreements . . . conduct and support scientifically valid research activities, . . . widely disseminate the findings and results of scientifically valid research in education; . . . promote the use, development, and application of knowledge gained from scientifically valid research activities; . . . strengthen the national capacity to conduct, develop, and widely disseminate scientifically valid research in education; . . . [and] promote the use and application of research and development to improve practice in the classroom.

*Id.* § 9512. In conducting these activities, IES is obligated to "conform to high standards of quality, integrity, and accuracy." *Id.*

IES's research and data activities are distributed across four research centers established by ESRA: the National Center for Education Statistics, the National Center for Education Evaluation, the National Center for Education Research, and the National Center for Special Education Research. The National Center for Education Statistics ("NCES") is specifically charged with collecting and analyzing education data "in a manner that meets the highest methodological standards." *Id.* § 9541(b)(1). NCES must disseminate that data in a "timely," "objective" manner that "is relevant and useful to practitioners, researchers, policymakers, and the public." *Id.* § 9541(b)(3). ESRA further mandates NCES to collect, compile, and disseminate "full and complete statistics" on a broad range of topics that illuminate the condition and progress of education from preschool through adult levels. *Id.* § 9543(a)(1). These topics include student achievement in core academic subjects, postsecondary educational access and financial aid, education financing, the social and economic status of children, access to early childhood

3

education, and secondary and postsecondary completion and dropout rates, among others. *Id.* § 9543(a)(1)(A)-(O).

In many instances, ESRA goes beyond mandating the topics on which NCES must collect and disseminate data and actually directs NCES to conduct specific studies. *See, e.g.*, 20 U.S.C. § 9622(b)(1) (National Assessment of Educational Progress); *id.* § 1015a(i)(4) (Integrated Postsecondary Education Data System); *id.* § 9543(a)(6) (Third International Math and Science Study); *id.* § 9543(a)(7) (longitudinal studies). Most prominently, ESRA directs NCES to administer the National Assessment of Educational Progress ("NAEP"), which must be conducted using widely accepted professional standards to produce "valid and reliable" results on student achievement at the national and regional level. *Id.* § 9622(b)(1). NCES also has a statutory obligation to "continue to update and improve" the Integrated Postsecondary Education Data System ("IPEDS"). *Id.* § 1015a(i)(4). By statute, all U.S. postsecondary institutions that participate in certain federal student financial aid programs must report data to IPEDS, which provides a single, comprehensive method of collecting institution-level data in such areas as enrollment, admissions, program completions, graduation rates, student financial aid, tuition and fees, faculty, staff, library data, and finances.[3] *See id.* § 1094(a)(17). Finally, ESRA requires participation in the Trends in International Mathematics and Science Study ("TIMSS"), as necessary to collect and disseminate data comparing U.S. student achievement with that of other nations. *Id.* § 9543(a)(6).

For years, the Department has fulfilled these and various other statutory research obligations by administering a comprehensive suite of education research programs. Although ESRA permits IES to discharge its research obligations "directly *or* through grants, contracts, or

---

[3] *NCES Handbook of Survey Methods*, Inst. Educ. Scis., https://nces.ed.gov/statprog/handbook/ipeds.asp (last visited July 10, 2026).

cooperative agreements," 20 U.S.C. § 9512 (emphasis added), IES has historically done so by engaging contractors to conduct research, compile data, and ensure the validity and reliability of that data before IES promotes its dissemination. Dep. of Matthew Soldner 14:20–15:9, 27:6–28:14, 60:2–13, 61:9–11, 61:16–19, 62:1–10.

Plaintiffs, who rely on IES data for their educational research, teaching, and scholarship, challenge the Department's resulting failure to fulfill its statutory mandates to collect, analyze, maintain and disseminate ten datasets: (1) the National Household Education Survey ("NHES"), (2) the Early Childhood Longitudinal Studies-Kindergarten ("ECLS-K"), (3) the High School Longitudinal Study ("HSLS"), (4) the Baccalaureate and Beyond Longitudinal Study ("B&B), (5) the Beginning Postsecondary Students Study ("BPS"), (6) the National Postsecondary Student Aid Study ("NPSAS"), (7) the Trends in Mathematics and Science Study (TIMSS), (8) the Common Core of Data ("CCD"), (9) NAEP, and (10) IPEDS (collectively, "Challenged Studies").

## II.    The Department's Abrupt Termination of Scores of Contracts Supporting Statutorily Mandated Research Disrupted the Underlying Studies and Harmed Plaintiffs and Their Members.

In February 2025, the Department ordered the termination of hundreds of contracts through which it had previously satisfied its statutory research obligations under ESRA. The Department made no alternative provision for continued fulfillment of those obligations.

### A.    The Department Issues a Termination Directive.

At 4:04 p.m. on Friday February 7, 2025, Richard J. Lucas, an employee in the Department's Office of Finance and Operations, emailed Conor Fennessy at the Office of the Secretary, seeking approval to terminate or descope approximately four hundred government contracts listed on an attached spreadsheet. EDAERA_AR_00003; EDAERA_AR_00004–26. In making this request, Lucas wrote: "Here is the summary of IES contracts we reviewed today and the associated actions. If you are in agreement, I can forward to Chris Rosier and Jonathan Bettis

5

for action." EDAERA_AR_00003. At 4:15 p.m., Fennessy responded: "Can simply send to Chris for termination to begin." *Id*.

In his reply, Lucas informed Fennessy that he would "send immediately," *id*., and, at 4:25 p.m., directed Chris Rosier, Anil Nayak, and Jennifer Sokolower to "proceed with the actions (listed in column H) and provide a confirmation when the actions are complete." EDAERA_AR_00004. Lucas emphasized that "the terminations should happen immediately, followed by the de-scoping and then ULO [unliquidated obligation] review and de-obligations." *Id.*

At 11:27 a.m. the following business day, Lucas reinforced his orders by e-mailing a spreadsheet of 166 government contracts to Rosier, Nayak, and Calvin Mitchell and directing them to "[m]ove out on terminating the contracts in the attachment." VA000001; *see also* VA000002–9 (spreadsheet). Lucas's email ("Termination Directive") provided specific instruction regarding the timing and order of terminations: "The expectation is that these will be terminated today. I recommend starting with those with the highest dollar value of implied savings." VA000001.

**B.    The Termination Directive Triggers Contract Cancellations that Have Immediate Consequences, Including Disruption of Statutorily-Mandated Research Studies.**

The consequences of the Termination Directive were swift. After receiving the Termination Directive, the Department's contracting officers began outreach that same day. *See, e.g.*, VA000589 (termination dated Feb. 10, 2025). The officers notified affected contractors of the government's decision to terminate their contracts and requested that the contractors submit termination settlement proposals focusing exclusively on wind-down activities by a date certain. In most instances, the contracting officers gave the contractors just 48 to 72 hours to submit such a proposal. *See, e.g.*, VA000408 (requesting that contractor "send a termination settlement proposal no later than 12 February 2025").

6

By the time the contracting officers fully processed the terminations ordered, contracts supporting nearly all of the Challenged Studies had been canceled. *See* VA000001–09 at lines 1 (CCD), 26 (IPEDS), 27 (TIMSS), 35 (HSLS), 46 (NHES), 49 (NPSAS, B&B, BPS), 53 (NPSAS:20), 55 (ECLS-K), 73 (TIMSS), 76 (NHES), 82 (NPSAS:24), 91 (TIMSS). The government's termination notices for these contracts offered no justification for termination other than the government's "convenience" and directed that all work on the underlying study cease "immediately." *See* VA000752 (NHES) (further noting "[t]he contractor will not be paid for work performed beyond the termination effective date noted above."); *accord* VA002810 (NHES); VA000396 (HSLS); VA000589 (ECLS-K); VA000179 (B&B and BPS); VA002875, VA003019, VA003241 (TIMSS); VA001516 (CCD); VA000179, VA002436 (NPSAS). The termination settlement agreements required contractors to focus exclusively on wind-down activities: archiving existing data in secure storage, documenting sample member status and data processing stages, notifying stakeholders of the termination, delivering outstanding project artifacts to NCES, and developing a termination settlement proposal. *See, e.g.*, VA000409. In most cases, vendors were provided very little time to fully assess the tasks needed to close out each study because, as one contracting officer noted, "we have been directed that all settlements must be completed within 72 hours. We were not given options to extend anything beyond that." VA000407.

Confirming that no IES employee had final decision-making authority, that same contracting officer stated, "[p]lease know this is coming from higher than our agency directors and if I had any say, I would but I don't." *Id*. In an e-mail to a different vendor, that same contracting officer left no doubt that the sole consideration was "maximizing efficiencies" and that the goal was to "reduc[e] the level of effort to a level that will meet the Government's minimum needs ONLY." VA000607.

As outlined below, the contract cancellations that the Termination Directive prompted immediately affected the Challenged Studies and the researchers who rely on them. Those effects were compounded by a reduction in force that decimated IES's workforce. Soldner Dep. 151:15–17, 161:3–13, 170:10–13, 192:22–193:12.

**NHES.** The National Household Education Survey is "the flagship household survey program of [NCES], [which] collects nationally representative, descriptive data on the educational activities of children and families in the United States."[4] The Department conducts NHES in fulfillment of NCES's mandate "to collect, acquire, and disseminate complete statistics" on "[s]tate and local early childhood school readiness activities" and "access to, and opportunity for, early childhood education[.]" 20 U.S.C. §§ 9543(a)(1)(B), (L). The Department terminated, in their entirety, two contracts critical to continuation of NHES. The first contract, *see* VA000623–753 (contract 91990021F0343), "involve[d] assisting NCES with review of materials produced by the third-party contractors who conduct the [NHES] study data collections." VA000698. As the contract itself acknowledges, that "review is critical to the production of high-quality materials that adhere to standards and best practices for survey research, data dissemination and reporting." *Id.* The contract's assessment comports with the Department's own pre-termination identification of the contract as "Statutory, Mandated, or Critical." EDAERA_AR_00009 at line 145.

At the time the Department terminated the contract, there were less than five months remaining in the four-year performance period and the majority of the contract funds had already been expended. *See* VA000625 (showing performance period end date of June 30, 2025); VA000005 at line 76 (showing $4,122,501 of the $6,057,648 total contract amount, or 68%,

---

[4] *National Household Education Surveys Program*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/nhes/ (last visited July 10, 2026).

expended as of February 10, 2025). More importantly, the Department was days away from receiving a qualitative memo due under the contract. VA000680 (showing memo due Feb. 15, 2025). The contract's uncompleted tasks were "needed to complete the work" of "provid[ing] final datafiles and documentation for the 2023 NHES[.]" VA000633.

The second NHES contract (91990020F0309) provided the "necess[ary] . . . services of a contractor to support mailout operations[.]" VA000003 at line 46. That contract was also terminated on February 10, 2025. VA002810.

To date, IES still has not released the final NHES 2023 report. The only publication that has been released is a 2024 First Look report on early childhood program participation. Ex. A, Barnett Decl. ¶ 21. That report provides only a few top-level findings, and—three years after the initial data collection—the full data set still has not been released. *Id*. Moreover, serious errors contained in the First Look report call into question the validity of the entire dataset should it ever be released. *Id*. ¶¶ 22–24 (stating he would not utilize the 2023 NHS data because a glaring error in the First Look Report went uncorrected, suggesting further errors in the remaining data). Moreover, although contract 91990021F0343 identifies "the next NHES administration [as occurring] in 2026 or 2027," VA000663, nothing in the administrative record indicates that the Department has taken any concrete steps to continue the study.

**ECLS-K.** The Early Childhood Longitudinal Studies Program "provides important information about children's knowledge, skills, and development from birth through elementary school," and "has helped educators, families, researchers, and policymakers improve children's educational experiences."[5] ECLS is comprised of four longitudinal studies, the most recent of

---

[5] *Early Childhood Longitudinal Studies (ECLS) Program*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/ecls/ (last visited July 5, 2026).

which, "ECLS-K:2024, plan[ned] to follow the kindergarten class of 2023–24 through the third grade."[6] The Department conducts ECLS to help meet its obligation to collect, acquire, and disseminate complete statistics on "[s]tate and local early childhood school readiness activities" and "access to, and opportunity for, early childhood education," 20 U.S.C. §§ 9543(a)(1)(B), (L), as well as its obligation to conduct "longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). On February 10, 2025, the Department terminated the contract supporting ECLS-K. *See* VA000589 (contract 91990019C0002). Prior to termination, the Department had categorized the contract as "Statutory, Mandated, or Critic[al]" and acknowledged that it pertained to a "Mandated Early Child Longitudinal Study." EDAERA_AR_00005 at line 10. Although the Department indicated that the contract should be "[r]eview[ed] for descope for non-critical tasks[,]" *id.*, the contract was simply canceled. *See* VA000589.

In the rush to cancel the contract, the Department gave no consideration to how far along the studies were or how much had already been paid for completed work. Instead, it terminated the underlying contract, awarded in 2019, in the seventh year of a ten-year performance period. VA000615. At the time of termination, multiple rounds of data collection had already been completed for the cohort of students from preschool through third grade, and the next round was scheduled to begin in April and May 2025. VA000615–16. Preparations were also already underway for a March 2025 training meeting for field testers and schools. *Id*. Rather than completing the scheduled data collection, the Department canceled the contract, and an attempt to reinstate it for the purpose of completing the already-scheduled spring 2025 round was explicitly rejected by the Secretary's office. *Id*. The loss of current ECLS-K data represents the loss of "our

---

[6] *Id.*

best window" into whether the country is meeting its goals for school readiness and the data loses value for policymakers with each month and year of delay. Ex. A, Barnett Decl. ¶ 16.

**HSLS.** The High School Longitudinal Study is a "series of school-based longitudinal studies" that "follows a nationally representative cohort of . . . 9th-graders as they progress through high school and transition into postsecondary education and/or the labor force."[7] In part through this study, the Department has satisfied its statutory obligation to "collect, report, analyze, and disseminate statistical data related to . . . the condition and progress of education, at the . . . secondary, postsecondary, and adult levels in the United States," 20 U.S.C. § 9543(a)(1), as well as its obligation to conduct "longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). In accordance with the Termination Directive, the Department canceled the contract supporting HSLS just days before receiving a draft survey from the contractor for testing under the contract. *See* VA000396–97 (termination of contract 91990024F0321); VA000395 (showing draft survey due to NCES on Feb. 14, 2025).

**B&B and BPS.** The Baccalaureate and Beyond Longitudinal Study is a nationally representative study that "examines students' education and work experiences after they complete a bachelor's degree, with a special emphasis on the experiences of new elementary and secondary teachers."[8] B&B follows cohorts of "graduating seniors 1, 4, and 10 years after completing their

---

[7] *High School Longitudinal Study of 2009*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/hsls09/ (last visited July 10, 2026); *see also* VA000350 (describing HSLS 2009 as designed to "track the critical transitions experienced by young adults, as they progress through high school to postsecondary education and into the world of work").
[8] *Baccalaureate and Beyond Longitudinal Study (B&B)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/b&b/ (last visited July 5, 2026).

bachelor's degree."[9] The most recent cohort of graduating seniors completed their bachelor's degrees in 2015-16 and were scheduled for their 10-year follow up in 2026.[10]

The Beginning Postsecondary Students Longitudinal Study "surveys cohorts of first-time, beginning students at three points in time: at the end of their first year, and then three and six years after first starting in postsecondary education."[11] BPS 20/22, the current cohort, "began postsecondary education in the 2019-20 academic year" and was scheduled for invitation to complete the next survey in 2025.[12]

The Department conducts B&B and BPS, both of which are component datasets of the National Postsecondary Student Aid Study, not only to help fulfill its statutory mandate to "collect, report, analyze, and disseminate statistical data related to . . . access to, and opportunity for, postsecondary education," 20 U.S.C. § 9543(a)(1)(E), but also to comply with its obligation to conduct "longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). The Department terminated the contract supporting B&B and BPS. *See* VA000179–180 (contract 91990022C0017). Although the Department reinstated the contract more than four months later, the reinstated contract is significantly narrower in scope and identifies the 10-year B&B follow-up and data collection for future B&B cohorts as optional, not required, tasks. *See* VA000189; VA000194–97. Moreover, the reinstated contract does not provide for continued activity related to BPS. *See* VA000189–190. Testimony from IES's acting director has since confirmed that IES is no longer conducting any longitudinal studies. Soldner Dep.

---

[9] *Id.*
[10] *See id.*
[11] *Beginning Postsecondary Students Longitudinal Study (BPS)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/bps/index.asp (last visited July 10, 2026).
[12] *Id.*

12

131:19–22. Without these data, the public cannot understand whether our colleges are producing graduates who match the needs of our economy. Ex. B, Dynarski Decl. ¶ 24.

*NPSAS*. The National Postsecondary Student Aid Study "examines the characteristics of students in postsecondary education, with a special focus on how they finance their education."[13] A nationally representative cross-sectional study, NPSAS has been "conducted every 3 to 4 years since 1987."[14] NPSAS helps satisfy the Department's statutory obligation to collect and disseminate "full and complete statistics" on "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students," as well as its obligation to "conduct, on a State-by-State basis, a survey of recipients of Federal student financial aid." *See* 20 U.S.C. §§ 9543(a)(1), (a)(1)(E); *id.* § 1015a(k).

Despite these statutory obligations and the Department's long-running administration of NPSAS, in February 2025 the Department canceled the contracts supporting the operation of NPSAS:20 and NPSAS:24. *See* VA002227–435 (contract 91990018C0039); VA002436–37 (termination); VA000010–178 (contract 91990022C0017); VA000179–81 (termination). The Department also canceled a third contract supporting publication of data from NPSAS, B&B, and BPS. *See* VA003248–313 (contract 91990024F0330); *see also id.* at VA003268 (providing that "[c]ontractor shall write the ordered reports using data from NCES postsecondary sample studies (i.e., NPSAS, BPS, and B&B) on topics identified from the publication planning process"); VA003314–15 (termination). NPSAS:20 was executed on July 25, 2018, and was designed to track students through the 2024-25 school year, with the last data collection scheduled for 2026. VA002227; VA002269–70. At the time the Department decided to terminate, it had already paid

---

[13] *National Postsecondary Student Aid Study (NPSAS)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/npsas/ (last visited July 10, 2026).
[14] *Id.*

13

$42,045,006, or nearly 87% of the contract value, for services performed. VA000004 at line 53 (showing $6,391,935 in unspent funds against a contract value of $48,496,941). Similarly, when the Department terminated the NPSAS:24 contract, the only work remaining was completing the data file and data file documentation report. VA000189.

Nearly five months after the Department discontinued NPSAS:24, it reversed course, resuming NPSAS:24 without putting mechanisms in place to ensure timely and accurate public data releases, and without any of the tasks covering longitudinal follow-up studies, including B&B and BPS follow-up interviews. VA000203, VA000214, VA000191. The Department also eliminated administrative follow-up activities, which are inexpensive and require only a data pull to keep information current so that policymakers can make decisions in real time. VA000191; Ex. B, Dynarski Decl. ¶¶ 21–22. As the Department conceded when resuming the NPSAS:24 contract, however, each of the "tasks in th[e] contract as originally awarded were necessary for the efficient implementation and fulfillment of NCES's statutory requirements." VA000188–VA000189.

Because the contract supporting publication of reports using data from NPSAS remained canceled, dissemination of those reports—which was set to begin in July 2025—was permanently disrupted. VA003269; VA003314–15 (termination).

**TIMSS.** According to NCES, the "Trends in International Mathematics and Science Study (TIMSS) provides reliable and timely trend data on the mathematics and science achievement of U.S. students compared to that of students in other countries."[15] The Department administers TIMSS to fulfill its mandate to "collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations, including . . . acquiring and disseminating data

---

[15] *Trends in International Mathematics and Science Study (TIMSS)*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/timss/ (last visited July 10, 2026).

on educational activities and student achievement (such as the Third International Math and Science Study)[.]" 20 U.S.C. § 9543(a)(6). The study relies on the collection of data from students in grades 4 and 8 and has been conducted "every 4 years since 1995, with the United States participating in every administration."[16] But the Department terminated, in their entirety, three contracts supporting the operation of TIMSS in February 2025. *See* VA002875, VA003019, VA003241–42. The first contract (91990023C0002) was executed on June 29, 2023, and scheduled to continue through May 31, 2026. VA002813, VA002815. Based on the contract's data-collection schedule, cancellation of the contract disrupted TIMSS data reporting and its database and technical report release, which were scheduled to occur in Year 2 (2024-25) and Year 3 (2025-26) of the contract. *See* VA002849. When the Department ordered cancellation, its own assessment revealed that doing so would not result in any implied cost savings. *See* VA000005 at line 91.

The second contract (GS00Q14OADU217/91990021F0001) was executed by the contracting officer on October 22, 2020, and was scheduled to continue through November 15, 2025. VA002876, VA002879. Cancellation of this contract led to an implied savings of only $1,910,574 on a contract valued at $15,684,003. *See* VA000005 at line 73. ($13,773,429, or nearly 88% of contract value, expended at time of cancellation). It also effectively ended preparation for TIMSS 2027, including the development of sampling plans and selection of samples, preparation and production of instruments, assessment recruitment, and recruitment, training, and management of data collectors—all of which were scheduled to begin in 2025. *See* VA002891–2892. The canceled contract was reinstated nine months after termination. VA003020.

The third contract (91990023D0005/9199002F0348) was executed on July 24, 2024, and was scheduled to continue through July 23, 2025, with options to extend the timeline further. *See*

---

[16] *Id.*

VA003139, VA003147. At the time it was canceled, the Department had identified the contract as "Statutory, Mandated, or Critic[al]" and instructed that it be reviewed for descoping. EDAERA_AR_00010 at line 185. The contract provided quality control support for NCES's International Activities Branch in an effort "to ensure their data and findings are valid and reliable." VA003146; *see also* VA003153–3154. To facilitate this goal, the contract provided for the contractor to "conduct[] a Branch-level technical review of U.S. national restricted-use (RUF) and public-use (PUF) data files, codebooks, and technical documentation for up to six studies[,]" including TIMSS. VA003166. "The objective of th[at] data file review [wa]s to identify deviations and errors in the products in order to ensure that [the] final products me[t] the . . . standards" specifically outlined in the contract. VA003168–69. The contract also provided for the contractor to assist "in preparing the data products for publication," including working with NCES personnel "to take data files through all stages of technical [and quality] review." VA003169. Completing that review and obtaining final approval of the data products "would take from 6 months to 1 ½ year to complete." *Id.* Because the TIMSS data subject to this review was not anticipated to be available until October 2024—at the earliest—and the target date for release of the data files was sometime in May 2025, the Department's termination of this contract effectively ended the quality control review process required before the Department could finalize and approve TIMSS 2023 U.S. national data files for public release. VA003167; *see also* VA003170. To date, neither the TIMSS 2023 U.S. public-use data files nor the 2023 restricted-use data files are available.[17]

---

[17] *See TIMSS Data Files*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/timss/datafiles.asp (last visited July 10, 2026); *TIMSS Publications and Products*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/timss/publications.asp (last visited July 10, 2026).

***CCD***. The Common Core of Data is the Department's "comprehensive, annual, national database of all public elementary and secondary schools and school districts."[18] The Department produces CCD to fulfill its congressional mandate to use a random sampling process as part of NAEP collection and reporting. *See* 20 U.S.C. § 9622(b)(2)(A). On February 10, 2025, in response to the Termination Directive, the Department canceled the contract supporting the operation of CCD. *See* VA001329–515 (contract 91990023D0008/91990024F0331); VA001516–17 (termination). Although the Department eventually reinstated the contract, it slashed the original contract's value and eliminated numerous components critical to data quality and stakeholder support. VA001518–19 (reducing contract by $16,615,583.02, or 42%); *see* VA001600.

***NAEP***. ESRA mandates that the Department carry out a "National Assessment of Educational Progress" that measures "student academic achievement and reporting of trends in such achievement in reading, mathematics" and other subjects. 20 U.S.C. § 9622(b)(1). In conducting NAEP, the Department must use a methodology designed to produce "valid and reliable" results based on "widely accepted professional assessment standards" and must make this data publicly available in a timely manner that facilitates further educational research and includes trend lines. *See* 20 U.S.C. § 9622(b)(2), (c)(1)(A), (e)(2)(A). NAEP is governed by ten separate contracts, though the Administrative Record contains only three. *See* VA000808; *see also* VA000816–19. Each of the three contracts in the record was executed just months before the Department issued the Termination Directive and were later re-scoped with significant reductions in the research activities embedded within the contract.

---

[18] *Common Core of Data: America's Public Schools*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/ccd/ (last visited July 10, 2026).

17

The Programs and Operations contract, executed on November 1, 2024, and awarded to Educational Testing Service, serves as the backbone of NAEP administration, providing study direction, day-to-day program coordination, research and development, and strategic planning across multiple subcontractors. VA000754. Just six months after its execution, *see* VA000992, the Department descoped core work and optional tasks in the amount of $29,745,237.88, reducing the overall contract value from $46,245,026.94 to $16,499,789.06. VA001019.

The Sampling and Weighting contract, executed on November 11, 2024, covers the design and selection of samples for national and regional NAEP assessments and the generation of sampling weights sufficient to detect errors that could compromise valid inferences about student groups. VA001021; VA001120. The Department descoped the contract several times, first on March 21, 2025, by $2,177,771, VA001228–242, and then again on May 13, 2025, by an additional $5,743,965. VA001243.

The Program Support Management ("PSM") contract, executed on October 30, 2024, provides project management support including scheduling, quality control, risk management, and coordination across NAEP contractors. VA001282. On June 3, 2025, the Department descoped the PSM contract in the amount of $236,295.55. VA001320–28. The specific tasks eliminated through the descoping are not discernible from the Administrative Record due to redactions.

*IPEDS*. In connection with the Termination Directive, the Department ordered the cancellation of contract 91990024F0329, which "provide[d] assistance with [IPEDS] Data Collection and Data Operation activities." VA003331; *see also* VA000003 at line 26. The contract had an initial performance period through February 12, 2025, with options to extend the period.

VA003323.[19] It specifically provided for the contractor to "review new and existing IPEDS Survey Components for standards compliance, content relevance, cognitive design, assist in the development of instrumentation and data collection mechanisms, user interface requirements and instructions, answer user questions, provide quality control, [and] review summary data," among other things. VA003332. The contractor's work proposing new survey components was to be completed "[w]ithin 15 days of [the] close of Spring collection." VA003345. The contractor was also obligated to "review and audit data products to ensure 100% accuracy prior to release." VA003335. The contract notes that, for purposes of this data review, "[t]here will be up to 20 reports to review a year" and such "work is ongoing from late Spring kick-off through release in late Fall/early Winter." VA003346. By the contract's own terms, the "help provided by the contractors will allow NCES to improve their efficiency with the data dissemination process, which in turn will enable the Department to provide data to the public in a timelier manner." VA003385. The contract was inoperative from February 2025 through January 2026, when it was reinstated to exercise one of the option years. VA003430. During that time, neither the Department nor the public benefitted from the contract's promotion of timely data dissemination.

The Department took additional action with respect to IPEDS. On June 18, 2025, it descoped contracts supporting IPEDS. VA001973. As part of that descope, IPEDS stopped using its Technical Review Panel, which was previously convened to obtain peer review of plans for improvement to IPEDS data collection and products and to foster communications with data providers and users. VA001980. The descoped contract also removed respondent training and dissemination activities, conference outreach, and travel and logistics support. VA001980. These

---

[19] Because the contract was set to end on February 12, 2025, just days after the Termination Directive was issued, it appears from the Administrative Record that the Department simply allowed the contract to lapse.

actions undermine the quality of the data that colleges submit and reduce the data's reliability for researchers and policymakers. Ex. B, Dynarski Decl. ¶ 17.

        **C.**        **Plaintiffs' Research, Teaching, and Scholarship Suffer on Account of Defendants' Failure to Continue Collecting and Disseminating High Quality Data from the Challenged Studies.**

As outlined more specifically below, *see infra* Section I.A.2, Plaintiffs and their members lost access to important data meeting the content and quality standards established by ESRA in the wake of the Department's Termination Directive. Plaintiffs and their members cannot access NHES 2023 data; longitudinal data from ECLS, HSLS, B&B, and BPS; or TIMSS 2023 U.S. public-use and restricted-use data files. *See id.* For other datasets, Plaintiffs and their members can no longer confirm that the data Defendants produce is suitable for their research purposes given Defendants' elimination of key quality-control measures. *See id.* Faced with these barriers to obtaining high-quality, statutorily mandated information, Plaintiffs research, teaching, and scholarship have suffered. *See infra* Section II.A.3.

**III.**    **Plaintiffs' Lawsuit.**

Plaintiffs filed this action on April 24, 2025, challenging Defendants' failure to comply with ESRA's data collection, analysis, maintenance and dissemination requirements under the Administrative Procedure Act ("APA"). ECF No. 1. On May 2, 2025, Plaintiffs sought a preliminary injunction enjoining Defendants from taking any further action limiting the availability of federal educational data mandated by ESRA. ECF No. 14. This Court heard argument on Plaintiffs' motion on May 16, 2025. On June 3, 2025, the Court denied the motion for a preliminary injunction on the grounds that Plaintiffs' claims constituted impermissible "programmatic challenges" under the APA. ECF No. 27 at 8. Plaintiffs subsequently filed a First Amended Complaint to more specifically explain how Defendants' conduct with respect to ten datasets violates the APA. ECF No. 31.

On September 18, 2025, Defendants moved to dismiss. ECF No. 33. This Court denied that motion on February 26, 2026, concluding that Plaintiffs had standing to bring their claims, that the Court did not lack jurisdiction to review those claims, and that Plaintiffs had adequately stated claims to relief under the APA.

Defendants produced an initial administrative record and a supplemental administrative record on April 30, 2026, and June 1, 2026, respectively (collectively, "Administrative Record"). ECF Nos. 45, 49. Plaintiffs now move for summary judgment.

<strong>ARGUMENT</strong>

**I.      Plaintiffs Have Standing to Challenge the Defendants' Actions.**

This Court correctly found that Plaintiffs established standing to challenge the termination of the Challenged Studies at the motion-to-dismiss stage. ECF No. 40 at 9. The contents of the Administrative Record only reinforce that conclusion.

To establish Article III standing, Plaintiffs must show (1) they "have suffered an injury in fact that is concrete and particularized and actual or imminent"; (2) there is "a causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (citation modified).

As organizations, NAEd and NCME may establish standing in one of two ways. First, they may establish organizational standing "on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). In addition, they may establish associational standing on behalf of their members if "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

21

participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014) (same).

Here, Defendants' disruption of the Challenged Studies deprived NCME and NAEd, as well as their members, of information Defendants are statutorily required to collect and make public. Plaintiffs have therefore suffered cognizable informational injuries that, for the reasons set forth below, give rise to both organizational and associational standing.

### A.  Plaintiffs and Their Members Suffer Concrete and Particularized Informational Injuries.

There is no genuine dispute that Plaintiffs and their members have suffered informational injuries sufficient to confer standing. "The law is settled that 'a denial of access to information' qualifies as an injury in fact 'where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (quoting *Friends of Animals*, 824 F.3d at 1040–41). Accordingly, Plaintiffs can establish cognizable harm for purposes of standing by showing that (1) they have "been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to [them]," and (2) they "suffer, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (citation modified). Plaintiffs meet this burden.

### 1.  ESRA Unambiguously Requires the Department to Collect, Analyze, and Publicly Disseminate the Information at Issue.

As this Court has already recognized, ESRA unambiguously requires Defendants to collect, compile, and publicly disseminate educational data covering a range of topics. *See* ECF No. 40 at 10. Because these statutory mandates govern Defendants' collection and release of information

22

produced by the Challenged Studies, Plaintiffs and their members satisfy the first prong of the test for informational standing.

In passing ESRA, Congress sought to promote the creation and dissemination of "scientific evidence on which to ground education practice and policy . . . in formats that are useful and accessible to educators, parents, policymakers, researchers, and the public."[20]As noted above, for years, Defendants have conducted the Challenged Studies to satisfy ESRA's broad purpose and the specific statutory mandates it imposes. ESRA expressly directs the Department to: (1) administer NAEP, 20 U.S.C. § 9622(b)(1); (2) collect and disseminate "full and complete statistics" on postsecondary education and financial aid through studies like NPSAS, 20 U.S.C. § 9543(a)(1)(E); (3) "continue to update and improve" IPEDS, 20 U.S.C. § 1015a(i)(4); (4) collect and disseminate data comparing U.S. student achievement with that of other nations through studies like TIMSS, 20 U.S.C. § 9543(a)(6); and (5) "conduct longitudinal and special data collections necessary to report on the condition and progress of education" through studies like NHES, ECLS-K, HSLS, B&B, and BPS, 20 U.S.C. § 9543(a)(7). By mandating that NAEP use a random sampling process that meets widely accepted professional standards and produces nationally and regionally representative data, ESRA also requires Defendants to maintain CCD, the sampling framework supporting proper administration of NAEP. 20 U.S.C. § 9622(b)(2)(A).

Not only does ESRA require the Department to collect and disseminate information from the Challenged Studies, but it also mandates that the Department ensure the information "conform[s] to high standards of quality, integrity, and accuracy." 20 U.S.C. § 9511(b)(2)(A). These provisions, each of which is specific and binding, establish a "clear command" that Defendants "provide robust public information," *Ctr. for Biological Diversity v. U.S. Int'l Dev.*

---

[20] *About IES*, Inst. Educ. Scis., https://ies.ed.gov/about (last visited July 10, 2026).

*Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023), including information from the Challenged Studies. For this reason, Plaintiffs have established an entitlement to information sufficient to support the injuries they claim. *See id.*; *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 309 (D.D.C.), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017) (finding that Plaintiff satisfies the first prong of the informational standing test by espousing a view of the law that entitled it to information).

> 2.   *The Department Deprived Plaintiffs and their Members of Information ESRA Mandates Defendants Make Public.*

As a result of disruptions to the Challenged Studies, Defendants have deprived Plaintiffs and their members of information to which they are statutorily entitled.

The Department has entirely failed to release data for several of the Challenged Studies. Because the Department canceled the contract supporting NHES less than five months before the end of its performance period and days before receiving a contract deliverable necessary to complete study data, Plaintiffs are unable to access the final NHES 2023 data files. *See* VA000625; VA000680l; Ex. A, Barnett Decl. ¶ 21. Plaintiffs and their members also lack access to the TIMSS 2023 U.S. public-use and restricted-use data files, *see supra* note 19, as well as information from four longitudinal studies: ECLS-K, HSLS, B&B, and BPS. Because Defendants' cancellation of the contracts supporting these longitudinal studies led to missed data collections, *see* VA000615–16; VA000395; VA000179; VA000189, Plaintiffs have been permanently deprived of critical information that cannot be recovered.[21]  *See* Ex. A, Barnett Decl. ¶ 8 (stating that "[i]f a planned data collection wave is missed, that data is permanently lost.").

---

[21] Acting Director Soldner's declaration offers little more than the prospect of future studies. He states that IES "anticipates" that discontinued studies, including BPS, HSLS, ECLS, and NHES, "will be discussed" as part of an unspecified process, and that IES "continues to evaluate" whether "specific aspects" of some studies "might be resumed." VA003433 ¶ 8.

Defendants' deprivation of information to which Plaintiffs are entitled is not limited to the datasets themselves; Defendants have also deprived Plaintiffs of data that (1) "conform[s] to high standards of quality, integrity, and accuracy," 20 U.S.C. § 9511(b)(2), and (2) is disseminated in a "timely," "objective" manner that "is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b)(3)(B). As described below, the Department has dismantled critical safeguards that ensure IES data is valid, reliable, and useful to researchers and policymakers, thus undermining the very statutory purpose the data is meant to serve.

**NPSAS**. In descoping NPSAS, the Department stripped away the mechanisms previously used to ensure the survey was methodologically sound and that its findings were released to the public in a timely manner, effectively depriving Plaintiffs of the full and complete data ESRA requires. For example, the NPSAS:24 contract was reinstated without the mini technical review meetings previously required for focused discussion of survey methodology. VA000203. Yet these convenings "are critical for maintaining the quality of the data so that it can be used by researchers and policy makers to help make decisions that affect financial aid policy." Ex. B, Dynarski Decl. ¶ 18.

The descoping process also weakened the utility of NPSAS by removing First Look reports, which ensure timely public release of initial findings. VA000214. First Look Reports serve a critical function, releasing preliminary findings in real time and allowing policymakers to respond quickly to developments in college student enrollment and financial aid. *Id*. ¶ 20. Without them, researchers and policymakers are left waiting years for a fully processed dataset before they can act, in direct contravention of the statutory requirement that data be disseminated in a timely and useful manner. *Id*.

**IPEDS**. Similarly, the Department has left Plaintiffs with a degraded version of the IPEDS data. The IPEDS dataset is a census of the nation's colleges and contains critical information about what they do, whether their students succeed, and how they spend government money. *Id*. ¶ 15. These data are gathered directly from the colleges, which fill out lengthy and complicated surveys. *Id*. The quality of these data depends on the surveys being completed correctly. *Id*.  But the reinstated IPEDS contract eliminated technical support and training for the college staff who must complete the surveys, undermining the quality of the data that colleges submit and reducing its reliability for researchers and policymakers alike. VA001980; *Id*. ¶ 17. Notably, even as the Department eliminated these tasks on purported cost-saving grounds, it simultaneously added more than $3 million to the same contract for data collection tied to the administration's priorities, sharply increasing the burden of the IPEDS surveys while cutting the support services for colleges completing them. *Id*. ¶ 16.

The IPEDS contract was also reinstated without its Technical Review Panel, which had previously provided independent expert review of plans for improvement to IPEDS data collection and products through two annual meetings of approximately sixty higher education experts. VA001926; VA001980; *see* 20 U.S.C. § 1015a(i)(4) (requiring the continuous improvement of IPEDS). Such convenings are critical to maintaining data quality. Ex. B, Dynarski Decl. ¶ 18.

**CCD**. The Department also eliminated the data quality checks and stakeholder support previously considered essential to ensuring the accuracy and reliability of CCD data, depriving Plaintiffs of a dataset that meets the statutory standard of being valid, reliable, and useful. *Compare* VA001603, VA001880 (revised performance work statement), *with* VA001430 (original performance work statement). Data are now taken directly from state-provided inputs without editing, and the Partner Support Center no longer follows up with states during collections.

VA001750–54. Strikingly, the revised CCD contract acknowledged it would no longer mitigate the risk of "lack of quality data." VA001603. Ad hoc requests must now be fulfilled by the Department directly, although the decimation of IES's workforce renders such an approach highly impractical. *See* VA001423; VA001560; VA001752–53; Soldner Dep. 161:3–6, 170:10–13, 192:22–193:12.

As Professor Tipton explains, CCD's value depends entirely on it being widely accepted as valid and reliable. Ex. C, Tipton Decl. ¶ 17. Because states collect data differently, robust data editing and quality control are essential to producing a coherent, nationally representative dataset. *Id*. ¶ 16. Without those quality checks, the data is effectively crowdsourced, rather than rigorously validated, and loses the scientific credibility that makes it useful for research and policy purposes. *Id*. ¶ 17. When word spreads that this kind of data is inaccurate, researchers stop using it and the Department runs afoul of ESRA's requirement that its data be useful to researchers and policymakers. *Id*.; *see* 20 U.S.C. § 9541(b)(3). Professor Andrew Ho further explains that the cuts to CCD risk errors in data reporting, particularly because state agency representatives, who sometimes lack experience due to frequent personnel turnover, need opportunities to ask contractors how to interpret data fields and upload data accurately. Ex. D, Ho Decl. ¶ 20. Eliminating expert data editing and follow-up with states to resolve anomalies creates exactly the conditions for those errors to go undetected and uncorrected. *Id*.

**NAEP**. The degradation of CCD has direct upstream consequences for NAEP, compounding the informational injury Plaintiffs suffer with respect to that study as well. Because CCD serves as the sampling framework for NAEP, a weakened CCD means that NAEP's sample may no longer meet widely accepted professional standards, as ESRA requires. *Id*. ¶ 22. Professor Ho cautions that even if NAEP data collection proceeded, he cannot verify from the available

27

information that the Department has maintained the quality controls necessary to produce a valid, representative sample or comparable trend data, and that these failures may not become apparent until the 2026 NAEP results are released in 2027. *Id.*

**TIMSS**. Finally, as detailed above, the Department revived participation in TIMSS, but canceled the contract that provided quality control support "to ensure the[] data and findings are valid and reliable." VA003146; *see also* VA003153–54.

In sum, Defendants continue to deprive Plaintiffs of access to the complete, high-quality, and timely data that ESRA requires.

> 3. *Plaintiffs and Their Members Suffer the Very Harm Congress Sought to Prevent.*

Because Plaintiffs rely on data from the Challenged Studies to conduct educational research, Defendants' failure to provide that data causes precisely the type of harm that Congress sought to prevent. *See* ECF No. 40 at 12; *see also Ctr. for Biological Diversity*, 77 F.4th at 686.

> i. <u>Organizational Harm</u>

The Department's failure to collect and disseminate quality information from the Challenged Studies directly harms NAEd and NCME's organizational activities.

NAEd is injured by the cancellation of the longitudinal studies because "NAEd itself also relies on IES data to conduct its research initiatives." Ex. E, Lee Decl. ¶ 9. As former NAEd President Carol Lee explains, "[u]sing NAEd research projects . . . to improve education policy and practice is integral to NAEd's mission and access to the IES data is a necessary component." *Id.* ¶ 12. For example, NAEd's "Addressing Educational Inequities in the Wake of the COVID-19 Pandemic" project relied on IES data, including NAEP. *Id*. ¶ 10. Without reliable IES data, "NAEd will be limited in its ability to advance the high-quality research relied upon by scholars, educators, advocates, and the general public to improve education policy and practice." *Id*. ¶ 12.

As a result of the Department's cancellations and the resulting disruption to the Challenged Studies, NAEd has therefore suffered a "concrete and demonstrable injury to the organization's activities." *Doc Soc'y v. Rubio*, 141 F.4th 1273, 1276 (D.C. Cir. 2025); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (finding organizational harm where the cancellations "directly affected and interfered" with the organizations' "core business activities.").

Similarly, NCME publishes three journals to advance its organizational goals, and the articles published in those journals rely on data collected and disseminated by IES, particularly the Common Core of Data (CCD), Private School Universe Survey (PSS),[22] High School and Beyond (HS&B), Integrated Postsecondary Education Data System (IPEDS), What Works Clearinghouse, National Assessment of Educational Progress (NAEP), Early Childhood Longitudinal Study (ECLS), Trends in International Mathematics and Science Study (TIMSS), and others. *See* Ex. F, Patz Decl. ¶ 15. For example, a "a keyword search for 'TIMSS' revealed 9 records of papers, posters or sessions in the 2025 NCME Annual Meeting related to this IES-supported international assessment program." *Id*. ¶ 17. "Without new IES data collections and research, NCME will publish less research in its journals, which according to [its] bylaws, is a 'principal means by which the Council accomplishes its purposes.'"[23] *Id*. ¶ 15. Accordingly, Defendants' termination of the Challenged Studies compromises NCME's "core" activities by depriving NCME of critical data

---

[22] The Private School Survey produces data similar to that of CCD for private schools. The data are useful for a variety of policy- and research-relevant issues, such as the growth of religiously-affiliated schools, the length of the school year, the number of private high-school graduates, and the number of private-school students and teachers. *Private School Universe Survey*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/surveys/pss/ (last visited July10, 2026).

[23] In addition to suffering harm to its organizational activities, NCME has also been forced to expend additional resources as a result of Defendants' mass termination of educational research contracts. More than fifty individuals required financial support to attend NCME's Annual Meeting due to impacts from the cancellation of IES contracts and support for education research. *See* Ex. F, Patz Decl. ¶ 22. To support members facing these challenges, NCME had to redirect certain funds. *Id*.

sources that fuel the research and scholarship it publishes, as well as the knowledge and understanding it contributes to the field of educational measurement. *See id.* ¶¶ 13, 19.

The harms that NAEd and NCME suffer organizationally are precisely the sort of harms Congress intended to thwart by requiring IES to "timely," 20 U.S.C. § 9541(b), and "widely disseminate the findings and results of scientifically valid research in education," including the Challenged Studies, *id.* § 9512; *see also Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (finding that the agency's inaction "perceptibly impaired the [plaintiffs'] organizational interests by depriving it of key information that it relies on to fulfill its mission.") (citation modified).

## ii.  Associational Harm

NAEd and NCME also suffer associational harm arising from their members' informational injuries. While each of those members would have standing to sue in their own right, their participation is not required here because "the merits of the APA claims asserted turn only on the administrative record, and not [the members'] particular circumstances." *United Food & Com. Workers Union, Loc. No. 227 v. U.S. Dep't of Agric.*, No. CV 20-2045 (TJK), 2021 WL 12312897, at *2 (D.D.C. Aug. 20, 2021). In addition, the interests Plaintiffs seek to protect, namely assurance of the Department's continued collection and release of statutorily mandated research, are germane to NAEd and NCME's organizational purposes—both of which strive to address pressing educational issues using data-driven research. *See* Ex. F, Patz Decl. ¶ 19; Ex. E, Lee Decl. ¶ 12.

Numerous NAEd and NCME members rely on access to data from the Challenged Studies for their research and scholarship and have thus been harmed by Defendants' failure to provide that data. NAEP data serves as the foundation for a broad range of education research that could not otherwise be conducted. *See* Ex. D, Ho Decl. ¶ 14 (noting "[w]ithout reliable NAEP and EdFacts data, we cannot make valid distinctions among districts and schools, which is the core

30

purpose of SEDA."); Ex. G, Johnson Decl. ¶ 12 (noting "NAEP is necessary to address the issue of comparability when states have different state learning assessment instruments."). Members of NAEd and NCME use NAEP data to study the causes and consequences of social and educational inequality; to analyze patterns of school and neighborhood segregation by race, ethnicity, and income across states, counties, and school districts over time; and to assess academic achievement among historically underserved student populations, including Black, Latinx, and Native students and socioeconomically disadvantaged students. Ex. D, Ho Decl. ¶ 15; Ex. G, Johnson Decl. ¶¶ 10, 12; Ex. H, Worrell Decl. ¶ 14.

For example, Professor Andrew Ho, a member of both NAEd and NCME, relies extensively on NAEP data. *See generally* Ex. D, Ho Decl. He is a founding collaborator of the Stanford Education Data Archive—a national database of academic performance built upon various IES datasets, including NAEP. *Id*. ¶¶ 11, 14. His work "requires not only continued collection and access for these data but also data quality and reliability." *Id*. ¶ 17. And even though the contract has been reinstated, key support activities that help ensure timely and complete data have been eliminated. *Id*. ¶ 19. "Without these supports," even the data that is collected "is at greater risk of incompleteness and error, further undermining [his] ability to use NAEP data accurately." *Id*. NAEd member Teresa McCarty also relies on NAEP because it is the primary data source for research on Native students' educational experiences, including the role of Native teachers and the integration of Native language and culture into curriculum and instruction. Ex. I, McCarty Decl. ¶ 8. Derek Briggs, a member of NCME whose work "involves evaluating the technical quality and validity of [NAEP]," also relies on NAEP. Ex. J, Briggs Decl. ¶ 6. However, Defendants' disruption of NAEP has deprived these members of confidence that NAEP is conducted to the highest methodological standards and that its data continues to be worthy of

reliance. *See, e.g.*, Ex. D, Ho Decl. ¶¶ 21–22; Ex. I, McCarty Decl. ¶¶ 15–16; Ex. J, Briggs Decl. ¶¶ 11–12, 14–17. Professor Briggs has been harmed further by Defendants' failure to disseminate his research regarding the use of NAEP scores. *Id.* at. ¶¶ 9–11, 13.

NAEd members also rely on IPEDS for a wide range of post-secondary education research. For example, NAEd member Susan Dynarski uses IPEDS to study the distribution of federal financial aid and whether it is reaching the most disadvantaged students. Ex. B, Dynarski Decl. ¶¶ 9–10. NAEd member Elizabeth Tipton uses IPEDS to develop new research designs and statistical methods for large randomized experiments, with a focus on understanding for whom, and under what conditions, educational interventions are effective. Ex. C, Tipton Decl. ¶¶ 6, 12. As with NAEP, however, NAEd members have been harmed by Defendants' elimination of measures designed to ensure the quality and integrity of IPEDS data. Ex. B, Dynarski Decl. ¶¶ 17–18.

NAEd members rely on CCD as the definitive source of national data on the universe of public schools and districts and have used CCD to develop tools that help ensure research findings are representative and generalizable across school types and populations. Ex. G, Johnson Decl. ¶ 10, Ex. C, Tipton Decl. ¶ 12. For example, NAEd member Professor Elizabeth Tipton created and maintains "the Generalizer," an online resource used by hundreds of education researchers to ensure their findings are representative and generalizable across school types and populations. *Id.* ¶ 8. The Generalizer relies upon both CCD and IPEDS and is routinely updated with data from these sources. *Id.* ¶ 12. Professor's Tipton work relies not only on the dissemination of CCD and IPEDS data, but also on the reliability and validity of that data. *Id.* ¶ 14 (noting that education data changes have been particularly volatile since the COVID-19 pandemic). Because Defendants' disruption to CCD has resulted in the removal of data quality editing and other practices that ensure the quality and credibility of CCD data, Professor Tipton has been harmed. *Id.* ¶¶ 16–17.

32

NAEd member Susan Dynarski relies upon NAEP, NPSAS, IPEDS, and the BPS surveys to study the distribution of federal financial aid to understand whether it is reaching the most disadvantaged students. Ex. B, Dynarski Decl. ¶¶ 9, 10. NPSAS-based research has had direct policy impact, as research using NPSAS data formed the basis for the FAFSA Simplification Act, which reduced the FAFSA from over 100 questions to just 30. *Id*. ¶ 10. Defendants' disruption of NPSAS by cancelling the state representative samples in NPSAS:24 results in researchers, including Professor Dynarski, and policymakers being unable to understand how aid policy affects students at the state level. *Id*. ¶¶ 12, 22. Defendants' decision to cancel the administrative collection of NPSAS 25-26 deprives researchers of up-to-date surveys and reduces the critical information available to researchers and policymakers, resulting in harm to Professor Dynarski. *Id*. ¶¶ 12, 21.

NAEd members rely on longitudinal studies to explain the "why" behind educational trends in ways that cross-sectional studies, which capture only a single snapshot in time, cannot uncover. For example, NAEd member Michael Bastedo's research relies on various IES's datasets, including HSLS. Ex. K, Bastedo Decl. ¶ 11. He is presently evaluating whether, and how, taking Advanced Placement Calculus later impacts admissions & student success in Science, Technology, Engineering, and Medicine program, which requires HSLS data. *Id*. NAEd member Steven Barnett has relied upon NHES and ECLS data for more than a decade to conduct research that addresses the educational needs of all children but has particular relevance for Black and Hispanic/Latino children, those with disabilities, dual language learners, and children who are socioeconomically disadvantaged. Ex. A, Barnett Decl. ¶ 30. His work requires that he can trust the validity and reliability of the NHES and the ECLS. *Id*. ¶ 17.

Ultimately, NAEd members have used longitudinal data to track the long-term educational and economic outcomes of students from disadvantaged backgrounds, Ex. B, Dynarski Decl. ¶¶ 9,

10, to understand patterns of kindergarten readiness and evaluate the effectiveness of early childhood education programs and elementary schools, Ex. L, Reardon Decl. ¶¶ 21, 22, to evaluate whether and how taking Advanced Placement Calculus impacts admissions and student success in STEM programs, Ex. K, Bastedo Decl. ¶ 19, and to assess national and state trends in early learning opportunities to inform state early childhood education policy. Ex. A, Barnett Decl. ¶ 16. These members all suffer harm from Defendants' decision to discontinue the longitudinal studies on which they rely. Ex. K, Bastedo Decl. ¶¶ 17–22; Ex. A, Barnett Decl. ¶¶ 10, 14–17; Ex. B, Dynarski Decl. ¶¶ 19, 23, 24; Ex. L, Reardon Decl. ¶¶ 24, 27–30.

Similarly, a number of NCME members rely upon IES data for their research. NCME member Sean Reardon also relies on ECLS-K to complete his research examining the trends and patterns in school readiness and the factors that lead to improvements in readiness. Ex. L, Reardon Decl. ¶¶ 21, 22. Andrew Ho is an NCME member and relies upon NAEP, as described above, *supra* Section I.A.2. As does NCME member, Derek Briggs whose work "involves evaluating the technical quality and validity of [NAEP]." Ex. J, Briggs Decl. ¶ 6.

## B.    The Harms that Plaintiffs and Their Members Assert Are Traceable to Defendants and Redressable by This Court.

The Administrative Record confirms what this Court has already found Plaintiffs to have plausibly alleged: Because "*the Department* stopped the programs that previously produced the data to which Plaintiffs are entitled," it is "*the Department* [that] curbed Plaintiffs' research and policy abilities." ECF No. 40. at 13 (emphasis in original); *see supra* Section II.A–B. The Department wrought this harm by cancelling contracts facilitating the production, analysis, and dissemination of data from the Challenged Studies without making alternative provision for those studies to continue. Thus, Plaintiffs' injuries "'follow[] inexorably from the decision' to cancel various agency functions." ECF No. 40 at 13 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d

34

298, 306 (D.C. Cir. 2013)). This Court may redress those injuries by declaring Defendants' disruption of the Challenged Studies arbitrary and capricious and ordering Defendants to not only resume the studies, but to do so in a manner that ensures the data meets the highest standards of "quality, integrity, and accuracy." *See* 20 U.S.C. § 9511.

For the reasons discussed, Plaintiffs have established both organizational and associational standing to bring the claims at issue.

## II.    There Are No Jurisdictional Bars Preventing this Court from Reviewing Plaintiffs' Claims Under the APA.

The APA provides this Court jurisdiction to review Plaintiffs' claims. Properly construed, those claims challenge IES's failure to perform certain statutorily required duties and not the mere cancellation of contracts. As this Court has already concluded, Plaintiffs' claims arise from statute. ECF No. 40 at 18. Because nothing in the Administrative Record alters that conclusion, the Tucker Act does not apply and jurisdiction to review Plaintiffs' APA claims properly lies in this Court.

### A.    The APA Affords Plaintiffs Judicial Review of the Challenged Agency Action.

Section 702 of the APA permits persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to sue the government, provided those persons "seek[] relief other than money damages," and no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin. ("Crowley")*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citation modified). Plaintiffs' claims fall squarely within the scope of judicial review under the APA. To redress this harm, Plaintiffs seek declaratory and injunctive—not monetary—relief. Accordingly, any claim by Defendants that the Tucker Act impliedly forbids the relief that Plaintiffs seek is— as this Court has already found—meritless.

### B.     The Tucker Act Does Not Apply.

The Tucker Act waives the government's sovereign immunity from actions "founded . . . upon any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), and has been interpreted to grant the Court of Federal Claims exclusive jurisdiction over any such action seeking more than $10,000 in damages. *See Crowley*, 38 F.4th at 1106; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The D.C. Circuit has cautioned that the Tucker Act should not be construed "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968. Accordingly, to determine whether it has jurisdiction over Plaintiffs' claims, this Court must assess whether the claims are "at [their] essence" contract claims. *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 967–68) (internal quotation marks omitted). That assessment depends on (1) "the source of the rights upon which [Plaintiffs] base[ their] claims," and (2) "the type of relief sought." *Id.* at 1106–07 (quoting *Megapulse*, 672 F.2d at 968) (internal quotation marks omitted).

Plaintiffs challenge the Department's failure to meet its statutory obligations to perform studies and produce data. ECF No. 40 at 18 (citing ECF No. 31 at 44). These circumstances compel the conclusion that "this dispute concerns statutory constraints, not contracts." ECF No. 40 at 18. *See, e.g.*, *Crowley*, 38 F.4th at 1108–10 (citing the lack of a contractual relationship between the parties in determining that "the right [plaintiff] seeks to vindicate is not a contract right" and that the Tucker Act therefore does not deprive the district court of jurisdiction).

Plaintiffs request that this Court order Defendants to finish collecting and disseminating the high-quality data that ESRA statutorily mandates. Plaintiffs' requested relief is precisely the sort routinely granted under the APA. *See also, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Off. of Mgmt. & Budget*, No. 25-CV-1051, 2025 WL 2025114, at *15–19 (D.D.C. July 21, 2025) (awarding summary judgment with respect to plaintiffs' APA claims challenging the removal of

36

information contained in a public-apportionments database, vacating and setting aside the unlawful removal, and permanently enjoining the government from removing the database and the apportionment information required to be disclosed by statute); *Am. Libr. Ass'n v. Sonderling*, 783 F. Supp. 3d 57, 60–61 (D.D.C. 2025) (granting preliminary injunctive relief prohibiting further actions to dissolve the operations of the Institute of Museum and Library Services where plaintiffs were likely to succeed on an APA claim challenging the violation of statutory mandates requiring the government to "support and conduct, as appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services" and plaintiffs demonstrated irreparable harm as a result of their loss of access to statutorily required data, among other things). Moreover, it is relief Plaintiffs cannot obtain in the Court of Federal Claims. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief.").

For the reasons discussed, the Tucker Act does not apply, and this Court has jurisdiction to review Plaintiffs' APA claims.

### III.    Plaintiffs Challenge Discrete and Final Agency Action Subject to APA Review.

The termination of the Challenged Studies constitutes discrete and final agency action, as required to successfully pursue a claim under the APA.

A "person claiming a right to sue" under the APA "must identify some 'agency action' that affects him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (quoting 5 U.S.C. § 702). The APA defines "agency action" to mean "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). To challenge agency action under the APA, the challenged action must be discrete and final. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004). The actions Plaintiffs challenge

37

indisputably fall within the definition of "agency action," which is "'meant to cover comprehensively every manner in which an agency may exercise its power.'" *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001)). This is particularly so where, as here, the challenged actions are discrete and final.

### A.    The Challenged Actions Are Discrete.

As this Court has already found, each of the 10 canceled studies "is an 'identifiable action.'" ECF No. 40 at 20 (quoting *Lujan*, 497 U.S. at 899); *see also Abramowitz v. Lake*, 824 F. Supp. 3d 1, 21–22 (D.D.C. 2026) (terminating a contractor is a discrete agency action). Because Plaintiffs challenge "specific erroneous decisions" related to those identifiable actions, and not "large-scale alterations in day-to-day agency operations," they satisfy the requirement that the challenged agency action be discrete. ECF No. 40 at 20 (quoting *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 25 (D.D.C. 2025)).

### B.    The Challenged Actions Are Final.

The disruptions Plaintiffs challenge also constitute final agency action. An agency's action is final when it marks "the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Determining whether agency action determines rights or obligations or gives rise to legal consequences "is a 'pragmatic' inquiry." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016)).

Here, the Termination Directive marked the consummation of Defendants' decision-making process. The Directive and the terminations that it ordered were not conditioned upon further approval or consideration of additional facts or circumstances. *See* VA000001 ("Please

38

move out on terminating the contracts in the attachment. The expectation is that these will be terminated today."); VA000002–VA000009 (identifying contracts for the performance of studies slated for cancellation); EDAERA_AR00003–00004 (obtaining final approval to execute decision to terminate studies prior to issuing February 10, 2025 directive). Instead, the Directive provided the contracting officers with "marching orders" that, once executed, effectively terminated the Challenged Studies. *City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007) (concluding that a letter represented the consummation of agency decision making where it was not "tentative, open to further consideration, or conditional on future agency action" but instead provided "marching orders"). The Directive and resulting terminations were therefore final, not preliminary, decisions. *See id.* at 188–89.

The Termination Directive also determined rights and obligations and gave rise to legal consequences. The practical effect of the Directive was to halt all research activities for the Challenged Studies performed through the contracts identified and frustrate Plaintiffs' rights to access data produced in connection with the Challenged Studies. Defendants' contract terminations included language making clear that "[t]he contractor must stop all work immediately on the effective date," including work by "suppliers and subcontractors," and that "[t]he contractor will not be paid for work performed beyond the termination effective date . . . or for incurred costs which could reasonably have been avoided." VA00752, VA002810 (NHES); VA000589 (ECLS); VA000396 (HSLS); VA000179 (B&B and BPS); VA002875, VA003019, VA003241 (TIMSS); VA002436 (NPSAS); VA001516 (CCD). Under these circumstances, the Directive and related terminations determined rights and "immediately produced legal consequences" such that they constitute final agency action. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 53–54 (D.D.C. 2025) (concluding that a memorandum that "commanded agencies to pause

39

all funding obligations within twenty-four hours" and prompted the closure of open awards constituted final agency action). This consequence alone demonstrates that the Directive and related terminations constitute final agency action. *Abramowitz*, 824 F. Supp. 3d at 21–22 (reaffirming the court's prior holding that terminating contractors is final agency action reviewable under the APA); *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 73 (D.D.C. 2025) (concluding that the Department of Education's termination of a grant award constituted final agency action where the termination "immediately produced legal consequences for the [grant recipient] because [the recipient] could no longer access previously awarded funds"); *Mid-Atlantic Equity Assistance Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 190 (2025) (similar); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 845–46 (D. Md. 2025) (similar).

## IV.    The Department's Termination of the Challenged Studies Was Arbitrary and Capricious.

The Administrative Record is entirely bereft of evidence showing that the Department's termination of the Challenged Studies was the product of reasoned decision-making. Nor does the Administrative Record contain any reasoned explanation of Defendants' departure from years of agency precedent regarding compliance with ESRA's statutory research mandates. For these reasons, Defendants actions were arbitrary and capricious.

The APA requires that agency action "be the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012). Accordingly, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("State Farm")*, 463 U.S. 29, 43 (1983) (cleaned up). The agency's "decreed result" must not only fall "within the scope of its lawful authority, but the process by which it reaches that result must

40

be logical and rational." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006) (cleaned up). An agency acts arbitrarily and capriciously when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [its decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

A court will not uphold an agency action where the agency's judgment "was neither adequately explained in its decision nor supported by agency precedent." *Fox*, 684 F.3d at 75. And "no deference" is owed where an agency's explanation for its action "lacks any coherence." *Tripoli Rocketry Ass'n*, 437 F.3d at 77.

### A.       Defendants Did Not Engage in Reasoned Decision-Making.

#### 1.   The Administrative Record Does Not Adequately Explain Defendants' Actions.

Far from establishing a rational connection between the facts found and the choices made, the Administrative Record reflects Defendants' complete failure to "cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48. The Record shows that a single Department employee authorized the mass termination of hundreds of contracts supporting the Department's research programs. EDAERA_AR_00003; VA000001. Nothing in the Administrative Record establishes how the Department decided which studies to cancel or why, let alone that those decisions were reasoned. In fact, none of the IES employees who were "experts" on the Department's performance of its statutory research obligations appear to have wielded any decision-making power. *See, e.g.*, Soldner Dep. 98:5–13, 99:6–9 (Acting Director of IES had "no input prior to an initial decision to terminate").

41

The explanations the Department offered contractors who had spent years collecting, analyzing, and disseminating critical educational research are no more illuminating. The contract terminations do not contain any information showing that the Department reviewed or considered the contractor's performance in reaching its decision.[24] The termination notices state only that the contracts were being terminated "for the government's convenience." VA000179; *see also supra* Background II.B. On this Administrative Record, "[t]here are no findings and no analysis . . . to justify the choice made, [and] no indication of the basis on which the [agency] exercised its expert discretion." *State Farm*, 463 U.S. at 48 (citing *Burlington Truck Lines*, 371 U.S. at 167–68).

The Department's failure to justify its choice is especially problematic given the unprecedented nature of its terminations and descoping of contracts, as well as the related disruption to research. Although "[a]gencies are free to change course as their expertise and experience may suggest or require, . . . when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Ramaprakash v. Fed. Aviation Admin.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (cleaned up). Because Defendants provided no such analysis here, they acted arbitrarily and capriciously. *See id.*

> 2.    *The Department Did Not Consider Important Aspects of the Problem.*

The Department failed to consider the "relevant factors" when deciding to terminate contracts supporting the Challenged Studies without making alternative provision for the studies to continue. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015). For example, the Administrative Record contains no evidence that the Department considered the need to continue performing its

---

[24] The Department has a "formal mechanism" typically used to evaluate a contractor's performance—the Contractor Performance Assessment Report ("CPARS")—which considers factors such as timeliness and adherence to scope. Solder Dep. 64:11–65:11.

statutory research obligations in taking the challenged actions.[25] Indeed, in numerous cases, the Department canceled contracts that—by the Department's own assessment—supported "Statutory, Mandated, or Critical" research. *See, e.g.*, EDAERA_AR_00009 at line 145 (NHES); EDAERA_AR_00005 at line 10 (ECLS-K); EDAERA_AR_00010 at line 185 (TIMSS).

The Department's failure to consider the status and progress of the contracts it terminated is equally troubling. The Directive prompted the termination of contracts that were mid-study and on the cusp of providing important deliverables or nearly complete, effectively wasting the millions of dollars in federal funds that had already been obligated and spent on the studies without actually obtaining the benefit of the studies' full measure of data. *See, e.g.*, VA000005 at line 73 (TIMSS); VA000680 (NHES); VA000615-16 (ECLS-K); VA000004 at line 53, VA000189 (NPSAS). Yet, as IES's own Acting Director admitted, "the relative value of completing the project, given its current status, as opposed to cancellation," was a factor that warranted consideration prior to termination. Solder Dep. 99:10–100:9.

Finally, as noted in further detail below, the Department wholly ignored the interests of the public and researchers and policymakers who routinely anchor their work in IES data.

### 3. The Department Relied on Factors Congress Did Not Intend for It to Consider.

Not only did the Department fail to consider relevant factors in terminating contracts and disrupting the Challenged Studies, but it also "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Contemporaneous correspondence suggests that Defendants were motivated by realizing cost efficiencies. *See, e.g.*, VA000001 (directing termination in order of "highest dollar value of implied savings"); VA000607 (suggesting the

---

[25] Testimony from Acting Director Soldner confirms the importance of considering whether a given contract "supported a mission critical function" or "was required specifically by statute." Soldner Dep. 101:5–9.

motivation for severely descoping some contracts was "maximizing efficiencies, reducing the level of effort to a level that will meet the Government's minimum needs ONLY"). Congress, however, never authorized the Department to subordinate its statutory research mandates to budgetary efficiency. To the contrary, IES's mission is supported by "[f]ederal funds appropriated to the Institute [to] ensure [its] activities conform to high standards of quality, integrity, and accuracy." 20 U.S.C. § 9511(b)(2)(A). By elevating cost savings over compliance with ESRA's statutory research mandates, Defendants failed to adhere to the congressional purpose embodied in ESRA.

Even if cost savings were a factor that Congress intended Defendants to consider (and it is not), the Administrative Record shows that this explanation still does not supply a rational connection between the facts found and the choices made. Nothing in the record suggests the Department achieved any significant cost savings in comparison to the millions of dollars wasted in terminating or disrupting studies that were already in effect. Indeed, in numerous instances, the cancellations resulted in no implied savings, as the vast majority of the contract amount had already been expended and cancellation sacrificed statutorily required data in exchange for only minimal cost savings. *See, e.g.*, VA000005 at line 91; VA000004 at line 53; VA000005 at line 73.

### 4. *The Department Ignored Important Reliance Interests.*

The Department has offered no reasoned explanation for its actions. But even if it had, the APA requires more than bare explanation alone. When "explaining its changed position, an agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (cleaned up). As shown, researchers, policymakers, and other stakeholders across the country have built their work around the continued availability of the data the Challenged Studies produce. *See supra* Section I.A.3. This is no surprise. ESRA specifically contemplates that researchers will be among the primary beneficiaries of IES's data collection. *See* 20 U.S.C. § 9541(b)(3) (directing

44

NCES to collect data that "is relevant and useful to practitioners, *researchers*, policymakers, and the public.") (emphasis added).

Given these facts, the Department's terminations did not merely inconvenience researchers; they removed a statutorily grounded foundation for work that had been years in the making and which Congress specifically sought to encourage. Because the Administrative Record demonstrates that the Department took this action without considering the interests of the public and the researchers and policymakers across the country who routinely anchor their work in data produced by the Challenged Studies,[26] its actions were arbitrary and capricious.

## V.    Vacatur Is Appropriate.

The APA directs federal courts to "hold unlawful and set aside agency action" deemed arbitrary and capricious. 5 U.S.C. § 706(2)(A); *see also Abramowitz*, 824 F. Supp. 3d at 26 ("Vacatur is the 'normal remedy' for 'unsustainable agency action.'") (cleaned up). "The Federal Government and the federal courts have long understood [the APA] to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). Because Defendants' Termination Directive and the resulting disruptions to the Challenged Studies were arbitrary and capricious, this Court should vacate Defendants' disruption of the Challenged Studies. Such a remedy would restore the Challenged Studies, ensure that Defendants meet their statutory obligations, and redress the harms that Plaintiffs continue to suffer as a result of Defendants' unlawful actions.

### CONCLUSION

For these reasons, the Court should award summary judgment in favor of Plaintiffs.

---

[26] Acting Director Solder confirmed that he never received any requests for information on stakeholders, such as education researchers, prior to the terminations. Soldner Dep. 113:18–24.

Dated: July 10, 2026

Amy I. Berman, DC Bar No. 480541
NATIONAL ACADEMY
OF EDUCATION
500 Fifth Street, NW
Washington, DC 20001
(202) 334-2341
aberman@naeducation.org

Respectfully submitted,

*/s/ Pilar C. Whitaker*
Kameron Johnston*
Pilar C. Whitaker*
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
kjohnston@naacpldf.org
pwhitaker@naacpldf.org

Samuel Spital, DC Bar No. NY0248
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
sspital@naacpldf.org
cburke@naacpldf.org

Kelly Gardner*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
260 Peachtree Street NW, Suite 2300
Atlanta, GA 30303
(332) 282-6613
kgardner@naacpldf.org

*Admitted *pro hac vice*

46