UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION. *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF EDUCATION, *et al.*,<br><br>        Defendants. | Civil Action No. 25-01266 (TNM) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION
<u>TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................5

   I. THE EDUCATION SCIENCES REFORM ACT OF 2002........................................5

   II. THE TEN PROGRAMS ..........................................................................................8

   III. THE CONTRACT ACTIONS AND WHAT HAS HAPPENED SINCE..........................9

   IV. PROCEDURAL HISTORY ....................................................................................12

STANDARD OF REVIEW ..............................................................................................13

ARGUMENT....................................................................................................................15

   I. THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER
JURISDICTION BECAUSE PLAINTIFFS FAILED TO CARRY THEIR EVIDENTIARY
BURDEN OF PROVING ARTICLE III STANDING AS TO EACH CLAIM AND
REQUEST FOR RELIEF. ..............................................................................................15

     A. Plaintiffs Failed to Prove an Injury in Fact to Support Each Claim and Request for
Relief..........................................................................................................................15

       1. The Informational Injury Theory Fails at the First *TransUnion* Requirement: ESRA
Does Not Entitle Plaintiffs to the Datasets They Demand...........................................16

         a. Only One Program Is Named by ESRA, and One Other by the Higher
Education Act; the Department Is Conducting Both. ............................................17

         b. Plaintiffs' Own Brief Describes These Studies as the Means the Department
Chose....................................................................................................................21

       2. The Informational Injury Theory Fails at the Second *TransUnion* Requirement:
Plaintiffs Have Not Proven "Downstream Consequences." .......................................23

       3. The Organizational Standing Theory Fails for the Same Reasons. ........................23

       4. The Associational Standing Theory Also Fails. .....................................................23

     B. Plaintiffs Failed to Prove Traceability as to Each Claim and Request for Relief........24

     C. Plaintiffs Have Not Proven Redressability as to Each Claim and Request for Relief. .25

     D. Defendants Preserve Their Tucker Act Position...........................................................27

   II. EVEN IF ANY PLAINTIFF HAD STANDING, THE APA CLAIMS FAIL. ..................28

     A. The APA Claims Are Barred By Threshold Matters. ....................................................28

     B. The Challenged Decisions Were Not Arbitrary or Capricious. ....................................32

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)……………………………14

*Am. Whitewater v. FERC*, 125 F.4th 1139 (D.C. Cir. 2025) ....................................................13, 24

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ......................................................13

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ..........................14, 32

*Cal. Cattlemen's Ass'n v. United States*, 369 F. Supp. 3d 141 (D.D.C. 2019)........................13, 27

*Camp v. Pitts*, 411 U.S. 138 (1973) ...............................................................................................14

*Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) .............................................................................23

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022)......................27

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)..................................14

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002)..................................................................................22

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)..........................................................15, 30

*Healthy Gulf v. Dep't of the Interior*, 152 F.4th 180 (D.C. Cir. 2025)..........................................24

*Heckler v. Chaney*, 470 U.S. 821 (1985) ..................................................................................28, 30

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015) ...............................................16

*Lawyers Committee for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428 (D.C. Cir. 2021)..............16

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .......................................................................................28, 30

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).................................................................... passim

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ............................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................14, 32

*Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009) .....................................................................29

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...................................................16

*Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984) ........................................30

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026)…4, 26

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .................................................5, 25, 26, 31

*Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42 (D.C. Cir. 2016).....................................15

*Tex. Neighborhood Servs. v. HHS*, 172 F. Supp. 3d 236  (D.D.C. 2016).....................................14

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ............................................................... passim

*Webster v. Doe*, 486 U.S. 592 (1988) ............................................................................................31

**Statutes**

5 U.S.C. § 701 .................................................................................................5, 22, 28, 29

5 U.S.C. § 706 ............................................................................................................ passim

20 U.S.C. § 1094(a)(17) .......................................................................................8, 19, 22

20 U.S.C. § 9541(b) ............................................................................................2, 6, 22, 30

20 U.S.C. § 9574 ........................................................................................................6

20 U.S.C. § 9621(f)(1) ...............................................................................................7, 8

20 U.S.C. § 1015a(i)(4)………………………………………………………passim

20 U.S.C. § 1015a(k)(2) ............................................................................................ passim

20 U.S.C. § 9511 ....................................................................................................... passim

20 U.S.C. § 9512 ....................................................................................................... passim

20 U.S.C. § 9543 ....................................................................................................... passim

20 U.S.C. § 9544 ....................................................................................................... passim

20 U.S.C. § 9573 .........................................................................................................7, 27

20 U.S.C. § 9622 ....................................................................................................... passim

**INTRODUCTION**

This case begins and ends with standing. Plaintiffs have shown that the U.S. Department of Education (the "Department") has not given them everything they want. But they have not shown that the federal statute they rely upon, the Education Sciences Reform Act of 2002 ("ESRA"), entitles them to it. A duty to report statistics on a broad topic is not entitlement to a particular dataset. Plaintiffs' claims under the Administrative Procedure Act ("APA") fail as a matter of law, and summary judgment should be entered in Defendants' favor with the case dismissed for lack of subject matter jurisdiction.

Article III standing has three elements, and Plaintiffs failed to prove each element as to "each claim that they press and for each form of relief that they seek" because standing is "not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs must prove an injury in fact, that the injury is fairly traceable to the agency actions they challenge, and that the injury is "likely" to be "redressed" by relief the Court can lawfully grant. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Court credited Plaintiffs' allegations at the pleading stage, which was a "low bar," but cautioned that the "standing analysis may come out differently at the case's future stages." Mem. Op'n at 2, 15 (ECF No. 40) ("Op'n"). This is because a plaintiff's burden of proof, including the "manner and degree of evidence required," increases with the "successive stages of the litigation." *Lujan*, 504 U.S. at 561. Plaintiffs have failed to carry their evidentiary burden.

Starting with the first element, injury in fact. Plaintiffs are two organizations: the National Academy of Education ("NAE") and the National Council on Measurement in Education ("NCME"). Every standing theory that Plaintiffs advance, including both organizational and associational, rests on a single asserted injury type: an informational injury. *See* Op'n at 16-17.

1

That injury has two requirements: the plaintiff must prove that a statute entitles it to the information at issue, and that the failure to receive that information caused "adverse effects," which the Supreme Court has called "downstream consequences." *TransUnion*, 594 U.S. at 442. Plaintiffs' memorandum in support of their summary judgment motion, ECF No. 54-1 ("Pls.' Mem."), does not cite *TransUnion*, let alone offer evidence that would satisfy both requirements.

The informational injury theory fails at the first step. ESRA established the Institute of Education Sciences ("IES" or the "Institute"), which is part of the Department, 20 U.S.C. § 9511(a), and serves as the Department's research arm. ESRA requires IES to conduct research on certain broad topics, but it does not give Plaintiffs the right to the specific datasets they demand. Plaintiffs challenge the Department's decisions beginning in February 2025 to terminate, descope, or rescope (*i.e.*, to end, narrow, or restructure) contracts that supported ten of IES's statistical programs. Each of the ten is administered by the National Center for Education Statistics ("NCES" or the "Statistics Center"), which is part of IES. *See* 20 U.S.C. §§ 9511(c)(3)(B), 9541(a). From those contract actions Plaintiffs derive an entitlement theory: because ESRA directs NCES to collect and report education statistics on certain broad topics, *see id.* § 9543(a)(1)(B), (E), (L), Plaintiffs argue that ESRA entitles them to the continuation of ten programs in their prior forms and on their prior timetables. Plaintiffs are not entitled to that.

Only one of the ten is a program that ESRA requires by name: the National Assessment of Educational Progress ("NAEP" or the "National Assessment"), *see* 20 U.S.C. § 9622, which IES continues to administer. One other program, the Integrated Postsecondary Education Data System ("IPEDS"), is named in a different federal statute (the Higher Education Act, 20 U.S.C. § 1015a(i)(4)), not ESRA, and the Department continues to administer that program as well. For the rest, ESRA assigns the broad topics that IES must cover, *see* 20 U.S.C. § 9543(a)(1), but leaves

2

IES the discretion to decide how that work gets done.  Section 9512 of ESRA ("Functions") makes this point: "From funds appropriated under section 9584 of this title, the Institute, directly or through grants, contracts, or cooperative agreements, shall" carry out the functions listed in that section. 20 U.S.C. § 9512.  Those introductory words govern every function listed in Section 9512, including the duty to "widely disseminate the findings and results of scientifically valid research in education." *Id.* § 9512(2).  The Department may choose in its discretion to keep the work in-house, which is what the statute means by "directly," or it may use "contracts" or the other listed means.  The choice belongs to the agency.  ESRA thus tells the Department what broad subjects to cover, but it does not promise the public any particular program beyond NAEP.  No entitlement, no informational injury, and "[n]o concrete harm, no standing." *TransUnion*, 594 U.S. at 442.

Plaintiffs' organizational and associational theories do not close the gap.  Their organizational theory (as this Court previously recognized) rests on the same alleged informational injury, *see* Op'n at 16-17, and thus also fails.  Their associational theory rests on twelve member declarations, but none identifies a dataset that ESRA entitles its members to receive, and several of those declarations address programs or agency actions that the First Amended Complaint, ECF No. 31 ("Amended Complaint"), does not even challenge.

Plaintiffs have also failed to establish the second element of Article III standing, traceability, for each claim and request for relief.  Their declarations from members describe alleged disruptions, but much of the alleged harm they describe flows from agency actions that are not challenged in the Amended Complaint.  One declarant's claimed deprivation runs primarily through the National Indian Education Study, which appears nowhere in the Amended Complaint.  Others describe the loss of the What Works Clearinghouse, neither of which any count of the

3

Amended Complaint challenges.  Another describes the loss of EDFacts reporting, which the Amended Complaint never mentions and for which no count claims any entitlement.

Plaintiffs have also failed to establish the third element of Article III standing, redressability.  Plaintiffs ask this Court to "vacate" the contract decisions made beginning in February 2025 on the theory that vacatur supposedly "would restore the Challenged Studies." Pls.' Mem. at 45.  Vacatur under Section 706 of the APA cannot do that because it "functions quite differently from an injunction." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026) (stating that "when a court vacates agency action, it simply holds unlawful and sets aside the action") (cleaned up).  There was no unlawful agency action to set aside, but even were the Court were to find one, setting aside a termination of a contract does not revive the contract or compel a contractor to resume performance.  For the studies whose collection waves did not take place, no order can collect data retroactively.  Plaintiffs' own declarant acknowledges this fact, stating that "[i]f a planned data collection wave is missed, that data is permanently lost."  Barnett Decl. ¶ 8, ECF No. 54-3.  For the programs that continue, the alleged injury is dissatisfaction with the scope and pace of operations, which vacatur also does not remedy.

To the extent Plaintiffs seek an order compelling IES to conduct particular studies on particular schedules, that is seeking to compel agency action.  The Amended Complaint pleads no claim under 5 U.S.C. § 706(1), which is the only APA provision that could authorize such an order, and that relief would be unavailable in any event.  Plaintiffs ask the Court in their summary judgment brief to "order[] Defendants to not only resume the studies, but to do so in a manner that ensures the data meets the highest standards of 'quality, integrity, and accuracy,'" Pls.' Mem. at 35 (quoting 20 U.S.C. § 9511), but an order directing the Department to resume programs that are

4

not legally required and then supervise their quality is precisely the kind of order the Supreme Court has forbidden.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) ("*SUWA*"). Under Section 706(1) of the APA, a court may compel an agency to take a discrete action that is "legally *required*," *id.* at 63 (emphasis in original), but it may not superintend an agency's program at the level required by Plaintiffs because such an order would compel "compliance with broad statutory mandates" and "inject[] the judge into day-to-day agency management." *Id.* at 66-67.

Even assuming that Plaintiffs had standing, which they do not, their claims would still fail. Which studies to support, which contracts to use, and whether to renew those contracts are decisions committed to agency discretion by law, 5 U.S.C. § 701(a)(2), because ESRA supplies no meaningful standard against which to judge them.  In addition, the administrative record does not show an agency that abandoned its statistical mission.  It shows an agency that reviewed its contracts, ended some, narrowed others, and continued, restarted, or re-procured the work that Congress entrusted to its judgment.

The Court should deny Plaintiffs' motion for summary judgment, grant summary judgment for Defendants, and dismiss this case for lack of subject matter jurisdiction or, in the alternative, enter judgment for Defendants on Plaintiffs' claims under 5 U.S.C. § 706(2)(A) because those claims are not reviewable, 5 U.S.C. § 701(a)(2), or otherwise fail on the administrative record.

## BACKGROUND

## I.   THE EDUCATION SCIENCES REFORM ACT OF 2002

ESRA established IES within the Department as its research arm.  *See* 20 U.S.C. § 9511 ("Establishment").  IES's mission is to provide national leadership in expanding fundamental knowledge of education "in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information about" the condition and progress

of education, educational practices, and the effectiveness of federal education programs. *Id.* § 9511(b)(1). NCES is the statistics center within IES. *See id.* §§ 9541-9548.

Congress assigned NCES its duties by subject matter, not by study. NCES "shall collect, report, analyze, and disseminate statistical data related to education," including "full and complete statistics . . . on the condition and progress of education" covering enumerated subjects such as early childhood school readiness, student achievement in the core academic areas, and access to and opportunity for postsecondary education, including financial aid. 20 U.S.C. § 9543(a)(1)(B), (C), (E). That section also directs "acquiring and disseminating data on educational activities and student achievement (such as the Third International Math and Science Study) in the United States compared with foreign nations," *id.* § 9543(a)(6), and "conducting longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7).

Congress addressed how that work would be done in a separate provision, and it left the choice of means to the agency. Section 9512 of ESRA provides: "From funds appropriated under section 9584 of this title, the Institute, directly or through grants, contracts, or cooperative agreements, shall" perform the functions the section lists, including to "widely disseminate the findings and results of scientifically valid research in education." 20 U.S.C. § 9512, (2). Section 9544 ("Performance of duties") speaks in permissive terms as to the NCES, providing that the NCES Commissioner "may award grants, enter into contracts and cooperative agreements, and provide technical assistance," *id.* § 9544(a), and those grants, contracts, and cooperative agreements "may be renewed at the discretion of the Statistics Commissioner[,]" *id.* § 9544(c).

For data that IES collects, Section 9574 of ESRA provides that, "[s]ubject to section 9573 of this title," such data "shall be made available to the public, including through use of the Internet." 20 U.S.C. § 9574. Section 9573 ("Confidentiality") requires that all collection,

maintenance, use, and dissemination of data by IES conform to confidentiality standards the IES Director must "develop and enforce standards designed to protect the confidentiality of persons in the collection, reporting, and publication of data[.]" *Id.* § 9573(c)(1)(A). No person may use individually identifiable information for a non-research purpose, publish data in identifiable form, or "permit anyone other than the individuals authorized by the [IES] Director to examine the individual reports." *Id.* § 9573(c)(2)(A)-(C). Access to data containing individually identifiable information accordingly runs through a restricted-use data license, the authorization this Court has recognized a researcher "must obtain" from the Institute. Op'n at 4 (citing 20 U.S.C. § 9573(c)).

Two programs at issue in this case are required by name. ESRA mentions by name and requires NAEP, providing that the Commissioner for Education Statistics "shall, with the advice of the Assessment Board . . . carry out, through grants, contracts, or cooperative agreements with one or more qualified organizations, or consortia thereof, a National Assessment of Educational Progress." 20 U.S.C. § 9622(a). It sets the schedule, including reading and mathematics in grades 4 and 8 "at least once every 2 years," *id.* § 9622(b)(2)(B). NAEP policy is set by the National Assessment Governing Board, which "shall be independent of the Secretary and the other offices and officers of the Department." 20 U.S.C. § 9621(f)(1).

The Higher Education Act ("HEA"), a different federal statute, names another program at issue in this case: IPEDS. As to IPEDS, the HEA mandates that "[t]he Commissioner for Education Statistics shall continue to update and improve the Integrated Postsecondary Education Data System[.]" 20 U.S.C. § 1015a(i)(4). The HEA also directs a survey of federal student aid recipients "on a regular cycle and not less often than once every four years." *Id.* § 1015a(k)(2).

## II.   THE TEN PROGRAMS

The ten programs at issue can be organized into three types.  *See* Aug. 11, 2026 Decl. of Matthew Soldner, Acting Director for IES ("Soldner Decl.") ¶ 3.  Six are survey-based studies. Four of the six are longitudinal studies that follow cohorts over time: the Early Childhood Longitudinal Study, Kindergarten Class ("ECLS-K"); the High School Longitudinal Study of 2009 ("HSLS:09"); the Baccalaureate and Beyond Longitudinal Study ("B&B"); and the Beginning Postsecondary Students Longitudinal Study ("BPS").  *See id.* ¶¶ 21, 25, 31, 48.  The fifth program, the National Postsecondary Student Aid Study ("NPSAS"), is a cross-sectional study of how students pay for college, and it supplies the sample from which the B&B and BPS cohorts are drawn.  *See id.* ¶¶ 16, 21, 26. The sixth program, the National Household Education Surveys Program ("NHES"), is a household survey program.  *See id.* ¶ 42.

Two programs are assessments.  Soldner Decl. ¶ 3.  NAEP is administered by NCES, with policy set by the independent Assessment Board.  *See* 20 U.S.C. §§ 9621(f)(1), 9622(a); *see also* Soldner Decl. ¶ 5.  The Trends in International Mathematics and Science Study ("TIMSS") is an international assessment led by the International Association for the Evaluation of Educational Achievement on an international schedule.  *Id.* ¶ 55.

Two programs are databases.  Soldner Decl. ¶ 5.  The Common Core of Data ("CCD") is a comprehensive, annual, national database of public elementary and secondary schools and school districts, built from data reported by state education agencies.  *See id.* ¶ 4.  The CCD is also the source from which NAEP's public school sample is drawn.  *See id.* ¶ 5.   IPEDS is a reporting system through which postsecondary institutions report data as a condition of participating in federal student aid programs.  *See id.* ¶ 11; 20 U.S.C. § 1094(a)(17).

### III.   THE CONTRACT ACTIONS AND WHAT HAS HAPPENED SINCE

In February 2025 the Department reviewed its contract portfolio and, beginning on February 10, 2025, terminated or descoped a set of contracts, including contracts that supported the ten programs.  *See* VA000001-09.  This section discusses each program's supporting contracts and their disposition.

**CCD and EDFacts (contract 91990023D0008/91990024F0331).**  This contract, held by AEM Corporation, supports both CCD and EDFacts.  It was terminated on February 10, 2025, *see* VA001516-17, and reinstated on March 3, 2025, *see* VA001518, with a period of performance until September 14, 2029.  Soldner Decl. ¶ 4.  EDFacts activities resumed with the reinstatement. *See id.*  NCES published the 2023-24 CCD preliminary directory files in July 2024, and public school sampling for the 2026 NAEP was completed in April 2025 using the 2023-24 CCD. *Id.* ¶ 6.

**NAEP (support contract modifications).**  Plaintiffs do not allege that any NAEP contract was terminated.   Three support contracts were modified, with the Programs and Operations contract rescoped, *see* VA000992; the Sampling and Weighting contract descoped, *see* VA001243; and the Program Support Management contract descoped, *see* VA001320.   The assessment continues to be administered, with the 2024 grade 12 reading and mathematics and grade 8 science results were released on September 9, 2025, and the 2025 long-term trend results for ages 9 and 13 were released on June 10, 2026.  *See* Soldner Decl. ¶¶ 6-10.

**NPSAS (contracts 91990018C0039, 91990022C0017, 91990026F0051).**  NPSAS:20 was conducted under contract 91990018C0039.  Soldner Decl. ¶ 17.  That contract was terminated on February 10, 2025, and was not reinstated.  *Id.*  The work was largely completed, and remaining activities were addressed in the contract's termination settlement. *See* VA000179-181; Soldner Decl. ¶ 17.  NPSAS:24 was conducted under contract 91990022C0017, terminated on February

10, 2025, rescoped, and reinstated on June 30, 2025, with performance through February 3, 2027. *See* VA000182; Soldner Decl. ¶ 19. On July 1, 2026, the Department awarded contract 91990026F0051 to conduct NPSAS:28, with performance through June 30, 2033. *Id.* ¶ 20.

**BPS.** BPS is conducted through optional tasks under the NPSAS contracts. Soldner Decl. ¶ 21. The first BPS:20 follow-up, BPS:20/22, was conducted in the 2021-22 school year, and NCES released the report before the February 2025 terminations. *Id.* ¶ 22. The associated data were released through the DataLab platform under the settlement of contract 91990018C0039. *Id.* The second BPS:20 follow-up study, BPS:20/25, was not conducted. Data collection for that follow-up had not begun at the time contract 91990018C0039 was terminated, and no current contract provides for it. *Id.* ¶ 23. On August 10, 2026, the Department issued a modification to the NPSAS:28 contract, GS-00F-354CA/91990026F0051/P00001, to collect postsecondary enrollment and federal financial aid data, if available, of BPS:20 participants. *Id.* ¶ 24. As noted elsewhere, ED awarded contract 91990026F0051 on July 1, 2026 to conduct NPSAS:28. That contract includes an optional task to conduct BPS:28/30, which has not been exercised as of the date of this Declaration. *Id.*

**B&B.** B&B is likewise conducted through optional tasks under the NPSAS contracts. Soldner Decl. ¶ 26. The rescoping of the NPSAS:24 contract removed the optional tasks for the first two follow-up studies, B&B:24/25 and B&B:24/28. *Id.* ¶ 28. The third, B&B:24/34, was never included in the contract's scope. *Id.* At the July 1, 2026 NPSAS:28 award, the Department exercised an option reinstating the B&B:24/28 follow-up. *Id.* ¶ 29.

**Postsecondary publications (contract 91990024F0330).** A separate contract supported publications arising from NPSAS, BPS, and B&B, was terminated on February 10, 2025, s*ee* VA003248, and was not reinstated. Soldner Decl. ¶ 30.

10

**HSLS:09 (contract 91990024F0321).**  HSLS:09 follows a cohort of 2009 ninth graders. Soldner Decl. ¶ 31.  Its third follow-up was planned for the summer of 2025, but data collection for that follow-up did not begin.  *Id.*  The supporting contract was terminated on February 10, 2025, *see* VA000396-97, and was not reinstated.  Soldner Decl. ¶¶ 32-34.  The Department approved a termination settlement on May 29, 2025.  *See id.* ¶ 34; VA000409.

**ECLS-K (contract 91990019C0002).**  The kindergarten collection was completed before the contract was terminated on February 10, 2025, *see* Soldner Decl. ¶¶ 49-50, and the first-grade collection scheduled for March 3, 2025 did not take place, *id.* ¶ 51.  Under the termination settlement, the contractor assembled and delivered draft kindergarten data files and documentation by September 30, 2025.  *See* VA000615-VA000622; Soldner Decl. ¶ 52.  On August 7, 2026, the Department reinstated the contract to finalize the kindergarten data files and documentation, with performance through February 6, 2027.  Soldner Decl. ¶ 53.  The Department anticipates releasing a restricted-use file after disclosure risk evaluation, and no public-use file is anticipated. *Id.* ¶ 54.

**NHES (contract 91990021F0343).**  NHES:2023 was collected for NCES by the U.S. Census Bureau, and data collection was completed in August 2023.  Soldner Decl. ¶ 43.  NCES released two First Look reports in October 2024.  *Id.* ¶ 44.  A contract for producing the final data files and documentation was terminated on February 10, 2025, *see* VA000752-53, and was not reinstated.  Soldner Decl. ¶ 46.

**TIMSS    (contracts    91990023C0002,    GS00Q14OADU217/91990021F0001, 91990023D0005/91990024F0348,  91990025C0106).**    The International Association for the Evaluation of Educational Achievement ("IEA") released the TIMSS 2023 results, including the United States results, in December 2024.  Soldner Decl. ¶ 57.  The IEA contract for TIMSS 2023 was terminated on February 10, 2025, and was not reinstated. *Id.* ¶¶ 58-59.  The data-collection

11

contract was terminated the same day and was rescoped and reinstated on September 22, 2025, primarily for TIMSS 2027, with performance through September 30, 2029.  *Id.* ¶ 63.  The international support contract was terminated and its settlement finalized on May 9, 2025. *Id.* ¶¶ 64-66  On September 22, 2025, the Department awarded contract 91990025C0106 to the IEA for the TIMSS 2027 study, covering development, field test, and training phases.  *See* VA002102. Prior to releasing the TIMSS 2023 data files, those files require final quality assurance and the development of appropriate data file documentation.  Soldner Decl. ¶ 67.  Final data files and documentation for the TIMSS 2023 United States data have not been completed.  *Id.*

**IPEDS (contracts 91990022F0021 and 91990023D0005/91990024F0329).**  IPEDS data collection is conducted by RTI under contract 91990022F0021. Soldner Decl. ¶ 15.  That contract has remained in effect continuously since April 15, 2022, with a period of performance through April 14, 2027. Annual IPES data collection has been conducted in each collection cycle since 2022.  *See id.* ¶ 15.  A separate support contract, 91990023D0005/91990024F0329, assisted the collection, and its base period ran to February 12, 2025.  *Id.* ¶ 12.  Option Year 1 was awarded on June 4, 2025, reflecting a rescoped set of activities, and Option Year 2 was fully executed on January 20, 2026, with performance through February 12, 2027. *Id.*  ¶¶ 13-14.

## IV.   PROCEDURAL HISTORY

Plaintiffs filed their First Amended Complaint on July 21, 2025, pleading ten counts.  *See* ECF Nos. 31 & 32. Counts I through X allege that the contract decisions supporting each of the ten programs were arbitrary and capricious under 5 U.S.C. § 706(2)(A).  *See* Pls.' Am. Compl. ¶¶ 137-226 (ECF No. 32).  Count XI alleges that the NAEP-related actions were not in accordance with law.  *See id.* ¶¶ 227-230.  The Court denied Defendants' motion to dismiss on February 25, 2026.  ECF No. 40.  On April 30, 2026, Defendants filed a certified list of the contents of the

Administrative Record, ECF No. 45-1.  On June 2, 2026, Defendants filed a certified list of a supplement to the Administrative Record, ECF No. 49-1.  On July 10, 2026, Plaintiffs filed a Motion for Consideration of Extra-Record Evidence, ECF No. 55, which Defendants will oppose separately.  On the same day, Plaintiffs filed their Motion for Summary Judgment.  ECF No. 54.

## STANDARD OF REVIEW

### I.   STANDING AT THE SUMMMARY JUDGMENT STAGE

Standing must be established at summary judgment, not pleaded. Each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  The burden "grows heavier throughout the litigation." Op'n at 8 (citing *Cal. Cattlemen's Ass'n v. United States*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (McFadden, J.)).

 Article III standing has three elements, and "[t]he party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.  Plaintiffs "must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendant's challenged action and (3) redressability by a favorable decision that is likely as opposed to merely speculative."  *Am. Whitewater v. FERC*, 125 F.4th 1139, 1150 (D.C. Cir. 2025) (citing *Lujan*, 504 U.S. at 560-61). Plaintiffs must prove each element for "each claim that they press and for each form of relief that they seek," because standing is "not dispensed in gross." *TransUnion*, 594 U.S. at 431.  The failure to establish standing means the Court lacks subject matter jurisdiction and the claim must be dismissed.  *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (classifying lack of standing as a defect in subject matter jurisdiction).

## II.    SUMMARY JUDGMENT STANDARD UNDER THE APA

The standard of review for motions for summary judgment under the APA is narrow and deferential to agency action. The question before the court is "'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Tex. Neighborhood Servs. v. U.S. Dep't of Health & Human Servs.*, 172 F. Supp. 3d 236, 242 (D.D.C. 2016) (citation omitted).  On such review, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction," *id.* § 706(2)(C), or "without observance of procedure required by law." *Id.* § 706(2)(D).

The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))**.**

When "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation omitted).  "[J]udicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quotation marks omitted). The "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Where an explanation is inadequate, "the proper course, except in rare circumstances, is to remand

14

to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)**.**

## ARGUMENT

I.   **THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS FAILED TO CARRY THEIR EVIDENTIARY BURDEN OF PROVING ARTICLE III STANDING AS TO EACH CLAIM AND REQUEST FOR RELIEF.**

The Court credited Plaintiffs' allegations at the pleading stage, which was a "low bar," but cautioned that the "standing analysis may come out differently at the case's future stages." Op'n at 2, 15.  This is because a plaintiff must support each element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  *See also Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016) (stating that "a court's determination that a plaintiff has established standing at the motion to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment." (emphasis in original)).  As discussed below, Plaintiffs failed to carry their evidentiary burden at every Article III element.  The case, therefore, should be dismissed for lack of subject matter jurisdiction.

A.   **Plaintiffs Failed to Prove an Injury in Fact to Support Each Claim and Request for Relief.**

Every standing theory that Plaintiffs advance, both organizational and associational, rests on a single asserted injury type: an "informational" injury.  *See* Op'n at 16 ("Plaintiffs base their organizational standing claims on informational injuries they suffered directly.").  It is also the type of injury that Plaintiffs use to support their associational standing theory.  *See* Pls.' Mem. at 22-24, 30-34.  That injury has two requirements: Plaintiffs must prove that a statute entitles them

15

to the specific information, and they must prove that the failure to receive it caused "adverse effects," which the Supreme Court has called "downstream consequences." *TransUnion*, 594 U.S. at 441-42. Plaintiffs have failed to establish either.

**1. The Informational Injury Theory Fails at the First *TransUnion* Requirement: ESRA Does Not Entitle Plaintiffs to the Datasets They Demand.**

Plaintiffs frame the entitlement question as whether they have been deprived of information that, "on [their] interpretation," a statute requires the Government to disclose to them. Pls.' Mem. at 22 (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)). They press further, arguing that a plaintiff satisfies the first element for an informational injury "by espousing a view of the law that entitle[s] it to information." *Id.* at 24 (citing *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 309 (D.D.C.), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017)).

That is not the rule. A court evaluating standing assumes the merits of the plaintiff's legal claim, *see Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), but the plaintiff's reading of a statute must be plausible. *See Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015); *Lawyers Comm. for 9/11 Inquiry, Inc. v. Wray*, 848 F. App'x 428, 429 (D.C. Cir. 2021) ("[A]s with any claimed basis for standing, the plaintiff's reading of a statute for informational standing purposes must at least be plausible.") (citing *Vilsack*, 797 F.3d at 8). Plaintiffs' reading of ESRA is not plausible. The provisions they invoke direct the Department to report statistics on broad topics and leave the Department the discretion to decide how that work gets done. As discussed below, the informational injury theory fails at the first *TransUnion* step: ESRA does not give Plaintiffs the statutory right to the datasets they demand.

### a. Only One Program Is Named by ESRA, and One Other by the Higher Education Act; the Department Is Conducting Both.

Each of the ten programs at issue are administered by NCES. Plaintiffs cite four statutory provisions for the proposition that ESRA "directs NCES to conduct specific studies." Pls.' Mem. at 4. For NAEP, Plaintiffs rely upon 20 U.S.C. § 9622(b)(1). For the CCD, Plaintiffs cite to 20 U.S.C. § 9622(b)(2)(A). For the Trends in International Mathematics and Science Study ("TIMSS"), Plaintiffs cite to 20 U.S.C. § 9543(a)(6). For IPEDS, Plaintiffs cite to 20 U.S.C. § 1015a(i)(4), which is not even part of ESRA. For the remaining six programs, Plaintiffs cite to subsections of 20 U.S.C. § 9543, even though none of the following programs is mentioned by name in Section 9543: the NHES, ECLS-K, HSLS, B&B, BPS, or the NPSAS.

### i. NAEP

ESRA names only one of the ten programs at issue, NAEP, and the text of the statutory provision that established NAEP, 20 U.S.C. § 9622(a), defeats Plaintiffs' NAEP entitlement theory. Section 9622(a) prescribes the mode of performance for NCES to conduct the NAEP, with the NCES Commissioner carrying out NAEP "through grants, contracts, or cooperative agreements with one or more qualified organizations." 20 U.S.C. § 9622(a). The provision names no particular contract and no contractor. What support contracts, grants or cooperative agreements to use is the Department's choice, and Plaintiffs are not statutorily entitled to any particular dataset from any particular contract for the Department to fulfill its obligation of conducting the NAEP.

Moreover, NAEP continues to be administered, with the 2024 grade 12 reading and mathematics and grade 8 science results were released on September 9, 2025, and the 2025 long-term trend results for ages 9 and 13 were released on June 10, 2026. *See* Soldner Decl. ¶¶ 7-9.

17

### ii.   CCD

CCD is not mentioned by name in ESRA.  Plaintiffs rely upon 20 U.S.C. § 9622(b)(2)(A), the provision requiring the NCES Commissioner to "use a random sampling process which is consistent with relevant, widely accepted professional assessment standards and that produces data that are representative on a national and regional basis," *id.* § 9622(b)(2)(A), in fulfilling the "purpose" of "provid[ing], in a timely manner, a fair and accurate measurement of student academic achievement and reporting of trends in such achievement in reading, mathematics, and other subject matter as specified in this section." *Id.* § 9622(b)(1).  That provision requires a sampling process but does not name the CCD or any other source file, and Section 9544(b) commits both sampling and the use of State-reported records to the NCES Commissioner's judgment.  Moreover, the sampling has occurred, with the sample for the 2026 NAEP administration drawn in April 2025 from the 2023-2024 CCD and PSS files.  Soldner Decl. ¶ 6.

### iii.   TIMSS

Plaintiffs rely upon 20 U.S.C. § 9543(a)(6) to argue that TIMSS is statutorily required by ESRA.  It is not.  That subsection directs NCES to "acquir[e] and disseminat[e] data on educational activities and student achievement (*such as* the Third International Math and Science Study) in the United States compared with foreign nations[.]"  20 U.S.C. § 9543(a)(6) (emphasis added).

By its very wording, TIMSS is illustrative ("such as") of how NCES can choose to fulfill its obligation under Section 9543(a)(6); it is not a command to conduct any particular assessment. The subsection sets no cycle, no deadline, and no specific required study.  Moreover, the Department has a TIMSS contract in place for the next study cycle, running through September 30, 2029.  *See* VA002102 (contract 91990025C0106, awarded September 22, 2025).

18

#### iv.   IPEDS

One other program at issue, IPEDS, is required by another statute, but not by ESRA.  The HEA directs the NCES Commissioner to "continue to update and improve" IPEDS, which is a system of interrelated surveys conducted annually.  20 U.S.C. § 1015a(i)(4).  Plaintiffs themselves invoke HEA's provisions, citing 20 U.S.C. § 1015a and § 1094(a)(17), *see* Pls.' Mem. at 4 & 23, but neither section entitles Plaintiffs to a specific dataset.  Section 1015a(i)(4) directs the NCES Commissioner to keep the reporting system current, and the Department has.  Soldner Decl. ¶ 15.

Section 1094(a)(17) provides that participating institutions must complete IPEDS surveys "or any other Federal postsecondary institution data collection effort, as designated by the Secretary [of Education], in a timely manner and to the satisfaction of the Secretary [of Education]." 20 U.S.C. § 1094(a)(17).  Congress thus contemplated the postsecondary collection might take another form, and it made the Secretary of Education the judge of whether the reporting suffices.

There is also no injury in fact because IPEDS data has been collected without interruption under the collection contract in effect since April 2022, which runs through April 2027.  *See* Soldner Decl. ¶ 15.

#### v.   The Remaining Programs

For the remaining six programs, Plaintiffs rely upon subsections of 20 U.S.C. § 9543 ("Duties" of NCES), which assigns broad topics that NCES must "collect, report, analyze, and disseminate" for "statistical data."  *Id.* § 9543(a).  For example, Section 9543(a)(1) directs NCES to collect and disseminate statistics on certain broad topics, including "local early childhood school readiness activities," *id.* § 9543(a)(1)(B); "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students," *id.* § 9543(a)(1)(E); and "access to, and

opportunity for, early childhood education," *id.* § 9543(a)(1)(L).  Section 9543(a)(7) directs NCES to conduct "longitudinal and special data collections necessary to report on the condition and progress of education," *id.* § 9543(a)(7), another broad topic.

While Section 9543(a) assigns broad topics that NCES must cover, ESRA leaves it to IES to decide how the work required in Section 9543(a) gets done.  Section 9512 ("Functions") makes this point: "From funds appropriated . . . the Institute, directly *or* through grants, contracts, or cooperative agreements, shall" carry out the duties listed in that section, including "conduct[ing] and support[ing] scientifically valid research activities" and "widely disseminat[ing] the findings and results" of that research. 20 U.S.C. § 9512(1)-(2) (emphasis added).  IES thus may choose to keep the work in-house, which is what the statute means by "directly," or it may use "contracts" or the other listed means.

Similarly, Section 9544 speaks in permissive terms as to NCES.  The NCES Commissioner "may award grants, enter into contracts and cooperative agreements, and provide technical assistance." 20 U.S.C. § 9544(a).  The NCES Commissioner "may use the statistical method known as sampling (including random sampling)" and "may, as appropriate, use information collected" from States, local educational agencies, and schools.  *Id.* § 9544(b)(1), (2).  Contracts awarded under that section "may be renewed at the discretion of the Statistics Commissioner[.]" *Id.* § 9544(c).

The choice of means belongs to the agency unless ESRA expressly provides otherwise. Section 9622(a) shows what an express command looks like: it names NAEP and requires that the assessment be carried out "through grants, contracts, or cooperative agreements with one or more qualified organizations," leaving no option to keep that work in-house.  Congress wrote no

20

comparable command for any of the other programs at issue.  A statute that requires no specific study entitles no one to the data a specific study would have produced.

> **b.    Plaintiffs' Own Brief Describes These Studies as the Means the Department Chose.**

Even Plaintiffs acknowledge that most of the studies they seek to "restore" are not mentioned by name in ESRA.  Describing what ESRA "expressly directs," Plaintiffs write the Department must "administer NAEP" and must "continue to update and improve" IPEDS.  Pls.' Mem. at 23.  Those are commands to conduct particular programs.  For the rest, Plaintiffs use different language. According to Plaintiffs, NCES collects statistics on postsecondary access and financial aid "through studies like NPSAS;" NCES collects comparative achievement data "through studies like TIMSS;" and NCES conducts longitudinal collections "through studies like NHES, ECLS-K, HSLS, B&B, and BPS."  *Id.*

The operative word is "like."  A duty NCES satisfies through studies "like" NPSAS is not a duty to conduct NPSAS.  Plaintiffs have described the means the Department chose, which is different from entitlement to those specific datasets.  No entitlement, no informational injury, and "[n]o concrete harm, no standing." *TransUnion*, 594 U.S. at 442.

Plaintiffs were not deprived of information at all for most of what they challenge.  For NAEP, TIMSS, IPEDS, CCD, and NPSAS, programs that continue, *see supra* Background, and for the NHES data already collected, Plaintiffs do not claim they were denied data outright. Instead, they claim, in their subjective opinions, that the data is not good enough or did not arrive fast enough.  They say the Department left them "a degraded version of the IPEDS data," Pls.' Mem. at 26, that descoping NPSAS "stripped away the mechanisms previously used to ensure the survey was methodologically sound," *id.* at 25, that the CCD changes deprived them of "a dataset that meets the statutory standard," *id.* at 26, and that a supposedly weakened CCD means the NAEP

21

sample "may no longer meet widely accepted professional standards," *id.* at 27.   Those are complaints about how well and how quickly the Department does work it is still doing.

Plaintiffs invoke two provisions as quality standards, neither of which helps their case. *See* Pls.' Mem. at 3, 25, 27, 30.  ESRA's provisions, 20 U.S.C. §§ 9541(b) and 9511(b)(2) set standards for how NCES conducts its own work.  Section 9541(b) states the mission of the NCES, directing it to collect and analyze information "in a manner that meets the highest methodological standards" and to report "in a timely manner."  20 U.S.C. 9541 § 9541(b)(1)-(2).  Section 9511(b)(2) directs that activities the Institute undertakes "in areas of demonstrated national need" and "supported by Federal funds appropriated to the Institute" conform to "high standards of quality, integrity, and accuracy."  These are directions to NCES about how to do its own work.  They do not tell the public what it is entitled to receive, and they supply no judicially administrable performance level.

Consider IPEDS, where Plaintiffs complain that the Department reduced the support given to the college staff who completed the surveys, so the submissions are less reliable in their opinions. *See* Pls.' Mem. at 26.  But Congress made the sufficiency of those submissions a matter for the Secretary of Education: institutions must complete them "in a timely manner and to the satisfaction of the Secretary [of Education]."  20 U.S.C. § 1094(a)(17).  A statute that sets internal quality standards for an agency as measured by the "satisfaction" of the Department's Secretary does not convert a researcher's dissatisfaction with a dataset into a denial of information within the meaning of *TransUnion*.  *Cf. Drake v. FAA*, 291 F.3d 59, 72 (D.C. Cir. 2002) (statute establishing a subjective standard—"what the agency thinks" about a particular issue—is not subject to review under 5 U.S.C. § 701(a)(2)).

As for NAEP, it continues to be administered, with the 2024 grade 12 reading and mathematics and grade 8 science results were released on September 9, 2025, and the 2025 long-

22

term trend results for ages 9 and 13 were released on June 10, 2026.  *See* Soldner Decl. ¶¶ 7-9.  A program administered with results published deprives no one of information within the meaning of *TransUnion*.

### 2. The Informational Injury Theory Fails at the Second *TransUnion* Requirement: Plaintiffs Have Not Proven "Downstream Consequences."

Even if a statute entitled Plaintiffs to certain information, they would still have to prove that not receiving it produced concrete adverse effects, which the Supreme Court has described as "downstream consequences."  *TransUnion*, 594 U.S. at 442.  Their evidence does not make that showing, and what remains is speculation.  One of Plaintiffs' declarants states that he cannot verify from the available information whether the Department maintained the controls necessary to produce a valid sample for the 2026 NAEP administration, and that any failures "may not be discoverable until the 2026 NAEP results are released in 2027."  Ho Decl. ¶ 22, ECF No. 54-6; *see also* Pls.' Mem. at 28.  That is not the type of "concrete, particularized, and actual or imminent" injury, *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013), required to prove injury in fact at the summary judgment stage.  Plaintiffs' evidence may prove dissatisfaction with ongoing work, but it does not prove the concrete downstream consequences that *TransUnion* requires, so the informational injury theory fails at the second requirement as well.

### 3. The Organizational Standing Theory Fails for the Same Reasons.

Plaintiffs' organizational theory rests upon the same informational injury asserted by the organizations themselves, *see* Op'n at 16-17, and fails for the same reasons.

### 4. The Associational Standing Theory Also Fails.

An association has standing to sue on behalf of its membership only when it shows that "(1) at least one of their members would have standing to sue in their own right, (2) the interests the members seek to protect are germane to their organizations' purposes, and (3) neither the claim

asserted, nor the relief requested requires the members to participate individually in the lawsuit." *Healthy Gulf v. Dep't of the Interior*, 152 F.4th 180, 189 (D.C. Cir. 2025) (citations omitted). Standing is not dispensed in gross, so Plaintiffs also need a member with standing for each separate claim and request for relief. *See TransUnion*, 594 U.S. at 431.

The theory fails at the first element. Plaintiffs' associational theory rests on twelve member declarations, but none identifies a dataset that ESRA entitles its members to receive and which the Amended Complaint challenges. Without statutory entitlement, no member has an informational injury of his or her own. Without a member injured in his or her own right, there is no associational standing.

**B.    Plaintiffs Failed to Prove Traceability as to Each Claim and Request for Relief.**

Plaintiffs challenge ten distinct programs in ten counts of their Amended Complaint. For each count, the alleged injury must be fairly traceable to the actions that count challenges. *See Whitewater,* 125 F.4th at 1150. Plaintiffs' declarations do not line up.

Much of the alleged harm the declarations describe comes from actions that no count of the Amended Complaint even challenges. One declarant's claimed deprivation runs primarily through the National Indian Education Study, which appears nowhere in the Amended Complaint. *See* McCarty Decl. ¶¶ 8-9, ECF No. 54-11. Others describe the loss of the What Works Clearinghouse. *See* Ho Decl. ¶ 24, ECF No. 54-6; Tipton Decl. ¶¶ 21-24, ECF No. 54-5. Declarants also describe the loss of EDFacts reporting. Ho Decl. ¶ 14, ECF No. 54-6; Reardon Decl. ¶¶ 30-31, ECF No. 54-14. No count of the Amended Complaint challenges any of these actions, so any alleged harm tied to them is not fairly traceable to the agency actions that the Amended Complaint challenges.

24

The IPEDS count shows how the declarations and the counts fail to line up.  Plaintiffs identify contract 91990024F0329 as the IPEDS contract and then acknowledge in a footnote that its performance period ended on February 12, 2025, two days after the February 10, 2025 terminations Plaintiffs challenge, and that "it appears from the Administrative Record that the Department simply allowed the contract to lapse."  Pls.' Mem. at 19 n.19.  A contract that expired on its own terms is not an injury traceable to a termination.  Nor can Plaintiffs recast the lapse as unlawful inaction.  The Amended Complaint pleads no claim under 5 U.S.C. § 706(1), and no statute makes renewal a legally required act.  Instead, the NCES Commissioner "may award grants, enter into contracts and cooperative agreements," 20 U.S.C. § 9544(a), and Section 9544(c) provides that such "grants, contracts, and cooperative agreements . . . may be awarded, on a competitive basis, for a period of not more than 5 years, and may be renewed at the discretion of the Statistics Commissioner for an additional period of not more than 5 years."  It does not command renewal.

A court may compel only a discrete action that is "legally *required*."  *SUWA*, 542 U.S. at 63 (emphasis in original).  What Plaintiffs describe for IPEDS thereafter is a June 2025 change in scope that removed a technical review panel and respondent training.  *See* Pls.' Mem. at 26.  That is a complaint about the level of support for a program that continues.  The collection itself never stopped, with the Department collecting IPEDS data without interruption under the collection contract that runs through April 2027.  *See* Soldner Decl. ¶ 15.

**C.    Plaintiffs Have Not Proven Redressability as to Each Claim and Request for Relief.**

Redressability is Article III's third required element.  Plaintiffs ask the Court to "vacate" the contract decisions made beginning in February 2025 on the theory that vacatur supposedly "would restore the Challenged Studies." Pls.' Mem. at 45.  For the studies whose collection waves

25

did not take place, no order can collect data retroactively. For the programs that continue, the alleged injury is dissatisfaction with the scope and pace of operations, which vacatur does not remedy.

Vacatur "functions quite differently from an injunction," and when a court vacates agency action "it simply holds unlawful and sets aside the action." *Mullin*, 174 F.4th at 119. Vacatur here would set the February 2025 decisions aside, but it would not revive the settled contracts. It would not compel any contractor to resume performance of a terminated contract. It would also not recreate a data collection that did not occur. Plaintiffs' own declarant acknowledges this reality: "[i]f a planned data collection wave is missed, that data is permanently lost." Barnett Decl. ¶ 8, ECF No. 54-3. This disposes of redressability for the collection waves that did not take place in ECLS-K, HSLS, B&B, and BPS.

Plaintiffs' quality complaints about ongoing studies fail for the same reason. Declarants state that they can no longer trust the data the Department produces, *see* Tipton Decl. ¶¶ 16-17, ECF No. 54-5; Briggs Decl. ¶¶ 14-17, ECF No. 54-12, but no order of this Court can restore a researcher's confidence in a dataset, and vacatur would not change the data at all.

Plaintiffs also ask the Court to "order[] Defendants to not only resume the studies, but to do so in a manner that ensures the data meets the highest standards of 'quality, integrity, and accuracy.'" Pls.' Mem. at 35 (citing 20 U.S.C. § 9511). That is seeking an order compelling agency action. The Amended Complaint pleads no claim under 5 U.S.C. § 706(1), the only provision that could authorize it. Even if the pleadings were read to reach that far, a court may compel only a discrete action that is "legally *required*," *SUWA*, 542 U.S. at 63 (emphasis in original), and may not order "compliance with broad statutory mandates" in a way that would "inject[] the judge into day-to-day agency management," *id.* at 66-67. Directing the Department

26

to resume particular studies that ESRA does not require, and to superintend their quality, is precisely that.

The redressability failure is dispositive for the collection waves that did not take place and for the quality and timeliness theories, which together account for most of what Plaintiffs claim. For the two datasets that were collected but have not yet been released, the full NHES 2023 data files and the TIMSS 2023 United States data files, the claims fail at the first element for Article III instead: no statute entitles Plaintiffs to those datasets on a schedule of their choosing, and Section 9574 makes public availability expressly "[s]ubject to" Section 9573. That section directs the IES Director to develop and enforce standards protecting the confidentiality of individuals in the collection, reporting, and publication of data, 20 U.S.C. § 9573(c)(1)(A), and limits who may examine individual reports, *id.* § 9573(c)(2)(C).

Plaintiffs have not carried their evidentiary burden to establish each element of Article III standing as to each claim and each request for relief. The Court, therefore, lacks subject matter jurisdiction and should dismiss this action. *See Cal. Cattlemen's*, 369 F. Supp. 3d at 145.

## D.    Defendants Preserve Their Tucker Act Position.

Defendants preserve their position that the Tucker Act channels these claims to the Court of Federal Claims. Whether a claim is "at its essence" contractual turns on the source of the rights asserted and the type of relief sought. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106-07 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982)). The Court rejected that argument at the pleading stage, *see* Op'n at 18, and Defendants do not re-argue it at length here but incorporate the arguments in their motion to dismiss by reference. The summary judgment record supports the position. The actions Plaintiffs challenge

27

are contract terminations, descopes, and reinstatements, and the relief Plaintiffs seek would operate on those contracts.

## II.   EVEN IF ANY PLAINTIFF HAD STANDING, THE APA CLAIMS FAIL.

### A.   The APA Claims Are Barred By Threshold Matters.

#### 1.   The Contract Decisions Are Committed to Agency Discretion By Law.

Standing is dispositive, but if the Court reaches the claims, Defendants are entitled to summary judgment on them.  The contract decisions Plaintiffs challenge are committed to agency discretion by law and are therefore unreviewable under the APA. 5 U.S.C. § 701(a)(2).

The APA precludes judicial review to the extent that "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This applies where the governing statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Certain categories of administrative decisions are "traditionally" treated this way, and the allocation of funds from a lump-sum appropriation is one of them: "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion," and "[a]fter all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).

In *Lincoln v. Vigil,* the Supreme Court considered a challenge to an agency's decision to discontinue a program aiding "handicapped Indian children in the Southwest" in order to "reallocate the Program's resources to a nationwide effort to assist such children" through other means.  508 U.S. at 184. The plaintiffs brought suit arguing that the agency's decision to discontinue the program was arbitrary and capricious.  The Supreme Court held that the agency's

28

decision was "unreviewable under § 701(a)(2)." *Id.* at 193. The Court observed that the program was not required by statute, but rather had been funded from "annual lump-sum appropriations" to the agency. *Id.* at 187. The Court explained that the "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court thus reasoned that "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [the APA] gives the courts no leave to intrude." *Id.* at 193; *see also id.* at 192. The Court accordingly held that the plaintiffs could not compel the agency to continue directing funds to their preferred program.

Applying this authority to the administrative record and ESRA's text, the challenged decisions fall within Section 701(a)(2) and cannot be challenged under the APA.[1]

Start with the statute. ESRA assigns the Department subjects to cover, but three features of the statute commit to the agency's discretion which studies to support, which contracts to use (if any), and whether to renew them. First, Section 9512 allows the agency to choose between performing work itself and contracting it out. *See* 20 U.S.C. § 9512. That provision supplies no standard for reviewing the decision to end one contract, because ending a contract is consistent with every option the statute leaves open to the agency, such as performing the work itself.

Second, the contracting authority for the statistics work is permissive throughout. The NCES Commissioner "may award grants, enter into contracts and cooperative agreements," 20 U.S.C. § 9544(a), "may" use sampling and State-reported records, *id.* § 9544(b), and contracts "may be renewed at the discretion of the Statistics Commissioner," *id.* § 9544(c). Congress did

---

[1]    The D.C. Circuit has observed that the "judicial review provisions of the APA, 5 U.S.C. §§ 701-706, provide a limited cause of action for parties adversely affected by agency action" but do not operate as a jurisdictional bar. *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009).

29

not merely fail to constrain renewal decisions; it expressly assigned them to the NCES Commissioner's discretion. *Cf. Appalachian Power Co. v. E.P.A.*, 135 F.3d 791, 807 (D.C. Cir. 1998) ("when a statute uses the permissive 'may' rather than the mandatory 'shall,' [it] suggests that Congress intends to confer some discretion on the agency"). Compare this to Section 1622 of ESRA, which mandates that the NCES Commissioner "shall" carry out the NAEP "through grants, contracts, or cooperative agreements with one or more qualified organizations, or consortia thereof," 20 U.S.C. 1622(a), and thus does not leave discretion to NCES Commissioner to carry out NAEP through in-house or "direct" work. *Cf. Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C. Cir. 1984) (the use of different language in different parts of the same statute creates a strong inference that different meanings are intended).

Third, IES's undertakings are tied to "areas of demonstrated national need" and to the federal funds "appropriated to the Institute." 20 U.S.C. § 9511(b)(2). Determining which studies serve demonstrated national need, and how to allocate appropriated funds among them, are the agency judgments *Lincoln*, 508 U.S. at 192-93, holds unreviewable. Similarly, determining which contracts to use for those studies, whether to end one support contract and procure another, and whether to renew, 20 U.S.C. §§ 9512, 9544(a), (c), are choices ESRA commits to the agency, and the provisions Plaintiffs invoke supply no meaningful standard for judging them. A court asked to review the February 2025 contract decisions under those provisions would have nothing to measure the decisions against, because every disposition of any given contract, continuation, descope, termination, or re-procurement, is compatible with the duties the provisions impose. That is the definition of "no meaningful standard." *Heckler*, 470 U.S. at 830.

The quality provisions Plaintiffs' declarants invoke make the point even more clearly. Section 9541(b) directs NCES to work "in a manner that meets the highest methodological

30

standards" and to report "in a timely manner." Section 9511(b)(2)(A) directs that IES's activities conform to "high standards of quality, integrity, and accuracy." Those standards are directed to the agency, and they are subjective. Like the statute in *Webster v. Doe*, 486 U.S. 592, 600 (1988), which permitted termination whenever the Director "shall deem such termination necessary or advisable in the interests of the United States," language of this kind "fairly exudes deference" to the agency and "foreclose[s] the application of any meaningful judicial standard of review." *Id.* at 600. A court cannot decide how many quality-review panels, or what sample-support spending "the highest methodological standards" require. The statute gives that judgment to the agency.

Plaintiffs' merits theory depends on the same subjective standards. They contend the descoped surveys are "degraded," that NPSAS lost "the mechanisms previously used to ensure the survey was methodologically sound," and that the NAEP sample "may no longer meet widely accepted professional standards." Pls.' Mem. at 25-27. Those are disputes about degree, resting on competing opinions rather than on any rule of decision a court could draw from the statute.

Framing the claims under § 706(2) does not change the analysis. *SUWA* holds that a court may not use the APA to compel "compliance with broad statutory mandates" or to "inject[] the judge into day-to-day agency management." 542 U.S. at 66-67. The D.C. Circuit has recognized that "[a]lthough the complainants in *Southern Utah* sought to compel agency action allegedly withheld," this reasoning "applies with equal force to claims regarding action taken under § 706(2)." *The Fund for Animals, Inc.*, 460 F.3d at 21 n.9. Plaintiffs' request that the Court measure ten statistical programs against "the highest methodological standards" is programmatic supervision by another name.

This conclusion covers the eight programs that no statute names. For the two named programs, NAEP and IPEDS, the analysis in Argument Part I applies: Sections 9622 and

31

1015a(i)(4) prescribe duties the Department *continues* to perform, which means there was no possible unlawful action to review in the first place.

**B.    The Challenged Decisions Were Not Arbitrary or Capricious.**

Review under Section 706(2)(A) is "narrow," so that a court "may not substitute its own policy judgment for that of the agency" and asks only whether the decision "was reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 426 (2021).

The administrative record shows the process.  On February 10, 2025, the contracting officer was directed to terminate the identified contracts, and the terminations issued that day. VA000001-09.   The dispositions that followed appear in the record and are described in the Background: reinstatement of the CCD/EDFacts contract in March 2025, reinstatement and re-scoping of the TIMSS data collection and a new TIMSS 2027 award, re-procurement of NPSAS with its option tasks, continued IPEDS collection, and the NAEP administration and releases. *See supra* Background.

Plaintiffs' arguments reduce to three: that the Department failed to consider the statutory factors, failed to consider reliance interests, and explained itself inadequately.  *See* Pls.' Mem. at 36-44.   The record answers each.   The February 7, 2025 review was a contract-by-contract examination, circulated with a per-contract action column distinguishing termination from de-scoping from further review, three days before any termination issued.  *See* VA000001-09.  The February 10, 2025 directive stated its criterion on its face.  On that record the agency's path may reasonably be discerned.  *State Farm*, 463 U.S. at 43 (quoting *Bowman*, 419 U.S. at 286).

## CONCLUSION

Based on the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and dismiss this case for lack of subject matter jurisdiction or failure to state a cognizable claim.

Dated: August 11, 2026                    Respectfully submitted,

                                          JEANINE FERRIS PIRRO
                                          United States Attorney

                                          By:  /s/ Brett S. Covington
                                               BRETT S. COVINGTON
                                               D.C. Bar #1003835
                                               Assistant United States Attorney
                                               601 D Street, NW
                                               Washington, DC 20530
                                               (202) 252-0888
                                               Brett.Covington@usdoj.gov

                                          *Attorney for Defendants*

33