**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF EDUCATION and<br>LINDA MCMAHON, *in her official capacity as Secretary of Education*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-1266 (TNM) |

**CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PLAINTIFFS HAVE ESTABLISHED STANDING BASED ON COGNIZABLE INFORMATIONAL INJURIES ........ 2

A. ESRA Requires Defendants to Collect and Disseminate Educational Data, Including Data Related to the Challenged Studies. ........ 3

1. ESRA's disclosure and quality control mandates create an enforceable public right. ........ 3

2. ESRA entitles Plaintiffs to data from the Challenged Studies. ........ 6

3. ESRA entitles Plaintiffs to high-quality data. ........ 9

B. Plaintiffs Continue to Suffer the Downstream Consequences of Defendants' Unlawful Actions. ........ 10

1. Plaintiffs have identified clear informational harms from their inability to access data from the Challenged Studies. ........ 10

2. Defendants descoping of certain studies does not defeat standing. ........ 12

C. Plaintiffs' Informational Harms Support Organizational and Associational Standing. ........ 20

1. Organizational Plaintiffs and Their Members Have Suffered Harm. ........ 20

2. Plaintiffs' Harm Is Traceable to Defendants. ........ 21

3. Plaintiffs' Harm Is Redressable by This Court. ........ 22

II. PLAINTIFFS HAVE DEMONSTRATED THAT DEFENDANTS' CHALLENGED ACTIONS WERE ARBITRARY AND CAPRICIOUS, AND DEFENDANTS CITE NO FACTS OR LAW THAT COMPEL A DIFFERENT CONCLUSION. ........ 24

A. Cancellation of the Challenged Studies Is Not Committed to Agency Discretion. ........ 24

B. Nothing in the Administrative Record Shows the Termination Actions Were the Product of Reasoned Decision-Making. ........ 31

CONCLUSION ........................................................................................................................ 34

## TABLE OF AUTHORITIES

### Cases

**Air All. Hou. v. U.S. Chem. & Safety Hazard Investigation Bd.*,
365 F. Supp. 3d 118 (D.D.C. 2019) ........ 7, 8, 9

*Am. Great Lakes Ports Ass'n v. Zukunft*,
301 F. Supp. 3d 99 (D.D.C. 2018) ........ 23

**Animal Legal Def. Fund, Inc. v. Vilsack*,
111 F.4th 1219 (D.C. Cir. 2024) ........ 19, 20

*Ass'n for Educ. Fin &. Pol'y, Inc. v. McMahon*,
786 F. Supp. 3d 13 (D.D.C. 2025) ........ 3

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
Nos. 1:25-cv-00999 (TNM) & 1:25-cv-01266 (TNM), 2026 WL 523023 (2026) ........ 12

*Bread for the City, Inc. v. U.S. Dep't of Agric.*,
211 F. Supp. 3d 327 (D.D.C. 2016) ........ 4

*Campaign for Accountability v. U.S. Dep't of Just.*,
155 F.4th 724 (D.C. Cir. 2025) ........ 11

*Chesapeake Climate Action Network v. Export-Import Bank of U.S.*,
78 F. Supp. 3d 208 (D.D.C. 2015) ........ 28

*Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*,
791 F. Supp. 3d 29 (D.D.C. 2025) ........ 23

*Citizens for Resp. & Ethics in Wash.*,
No. 22-cv-3281 (CRC), 2023 WL 6141887 (D.D.C. Sept. 20, 2023) ........ 11

**Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*,
137 F.4th 932 (9th Cir. 2025) ........ 30, 31

**Cody v. Cox*,
509 F.3d 606 (D.C. Cir. 2007) ........ 28, 29

*Ctr. for Biological Diversity v. E.P.A.*,
722 F.3d 401 (D.C. Cir. 2013) ........ 10

**Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........ 28

*Doe v. Daversa Partners*,
No. 20-cv-3759, 2021 WL 736734 (D.D.C. Feb. 25, 2021) ........ 5

*Drs. for Am. v. Off. of Pers. Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) ........ 12, 34

**Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........ 2

**Environ. Def. Fund v. EPA*,
922 F.3d 446 (D.C. Cir. 2019) ........ 19

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ........ 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 21

*Johnson v. Panetta*,
953 F. Supp. 2d 244 (D.D.C. 2013) ........ 33

*Kone v. D.C.*,
808 F. Supp. 2d 80 (D.D.C. 2011) ........ 13

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ........ 28

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........ 30

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 11

**Mach Mining, LLC v. Equal Emp. Opportunity Comm'n*,
575 U.S. 480 (2015) ........ 25

**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
463 U.S. 29 (1983) ........ 33, 34

**NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
496 F. Supp. 3d 116 (D.D.C. 2020) ........ 28, 29

*Nader v. Fed. Election Comm'n*,
725 F.3d 226 (D.C. Cir. 2013) ........ 3

*Nat. Res. Def. Council v. Regan*,
67 F.4th 397 (D.C. Cir. 2023) ........ 5

*Oceana, Inc. v. Pritzker*,
24 F. Supp. 3d 49 (D.D.C. 2014) ........ 31

**People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2014) ........ 8

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ........ 29

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ........ 5

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ........ 33

**Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) ........ 25, 30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 11

*U.S. v. Am. Trucking Ass'ns*,
310 U.S. 534 (1940) ........ 6

*United States v. TDC Mgmt. Corp.*,
827 F.3d 1127 (D.C. Cir. 2016) ........ 32

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017) ........ 2

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........ 5

**Statutes**

20 U.S.C. § 1015a(i) ........ 9

20 U.S.C. § 1015a(i)(4) ........ 9, 26

20 U.S.C. § 9511(b)(2)(A) ........ 4, 26, 27

20 U.S.C. § 9541(b) ........ 4, 5, 9, 16, 18, 20, 25, 26, 28

20 U.S.C. § 9543(a) ........ 3, 4, 26

20 U.S.C. § 9574 ........ 5

20 U.S.C. § 9622(b)(1) ........ 4

20 U.S.C. § 9622(b)(2) ........ 13, 15, 26

5 U.S.C. § 701(a)(2) ........ 25

5 U.S.C. § 706(2)(A)........................................................................................................ 23

**Other Authorities**

*About the LTT Assessment*, Nation's Rep. Card,
https://www.nationsreportcard.gov/ltt/2025/?age=9 (last visited Aug. 27, 2026) .................. 14

S. Rep. No. 107-337 (2002) ........................................................................................... 6

## INTRODUCTION

In February 2025, the Department of Education ("the Department"), which houses the Institute for Education Sciences ("IES"), violated its statutory obligation to collect, maintain, analyze, and disseminate high-quality educational data in breathtaking fashion. The Department cancelled hundreds of contracts and, with them, critical research initiatives responsible for a range of educational data that the Education Sciences Reform Act ("ESRA") requires the Department to make public. Plaintiffs, the National Academy of Education and the National Council on Measurement in Education (collectively "Plaintiffs"), and their members, brought this action under the Administrative Procedure Act ("APA") to challenge the Department's termination of ten research studies ("Challenged Studies").

In support of their claim for summary judgment, Plaintiffs have identified scores of statutory provisions entitling them to data from the Challenged Studies, highlighted the myriad ways they and their members have suffered informational harm as a result of Defendants' actions, and demonstrated that Defendants' termination of the Challenged Studies was not the result of reasoned decisionmaking. Defendants do not persuasively rebut that showing.

Defendants' arguments begin with a flawed premise: that ESRA does not actually entitle Plaintiffs to data from the Challenged Studies. But ESRA plainly and unambiguously requires Defendants to disclose the data Plaintiffs seek, and Defendants' attempts to show that Plaintiffs suffer no injury—either because the studies have been reinstated or because there was never a duty to conduct them in the first place—are unavailing.

Defendants' merits arguments are equally unpersuasive. Defendants recycle the claim, already considered and rejected by this Court once, that the APA's exception for decisions committed to agency discretion by law forecloses judicial review of Plaintiffs' claims. Defendants,

however, point to nothing in the Administrative Record that warrants this Court reaching a different conclusion. Defendants' efforts to rebut Plaintiffs' arbitrary and capricious claim fare even worse. Defendants devote less than a page of their brief to this merits claim, and their arguments are so perfunctory that they invite waiver. For these reasons, Defendants have not carried their burden on summary judgment, and this court should deny Defendants' cross-motion for summary judgment and grant summary judgment in Plaintiffs' favor.

## ARGUMENT

### I. PLAINTIFFS HAVE ESTABLISHED STANDING BASED ON COGNIZABLE INFORMATIONAL INJURIES.

Plaintiffs have demonstrated standing based on the informational injuries they suffered when Defendants terminated the Challenged Studies. A plaintiff incurs an informational injury when "agency action cuts him off from 'information which must be publicly disclosed pursuant to a statute.'" W*aterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998)). To establish a "'sufficiently concrete and particularized informational injury,' the plaintiff must show that '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (citations omitted). For the reasons set forth in their opening brief and outlined below, Plaintiffs meet this standard. *See* Pl. Mot. Summ J. at 21–34, ECF No. 54-1.

### A. ESRA Requires Defendants to Collect and Disseminate Educational Data, Including Data Related to the Challenged Studies.

Properly interpreted, ESRA entitles Plaintiffs—along with the rest of the public—to data from the Challenged Studies. Although Defendants claim that this "reading of ESRA is not plausible," Def. Opp'n at 16, ECF No. 59-1, their argument falls flat.

As demonstrated below, the very purpose of ESRA is to facilitate public disclosure of educational data and information. The statute explicitly enumerates the subject matter areas the Department's data collection and dissemination must cover, as well as the standards that collection and dissemination must meet. These unambiguous disclosure obligations—which include data from the Challenged Studies and various quality control standards—entitle Plaintiffs to the information at issue[1] and adequately support their standing. *See Nader v. Fed. Election Comm'n*, 725 F.3d 226, 229 (D.C. Cir. 2013) ("If the statute grants a plaintiff a concrete interest in the information sought. . . [the plaintiff will] be able to assert an injury in fact."). Any other reading ignores ESRA's statutory text and conflicts with basic principles of statutory construction.

#### *1. ESRA's disclosure and quality control mandates create an enforceable public right.*

ESRA unambiguously provides that the Department, through the National Center for Education Statistics ("NCES"), "*shall* collect, report, analyze, and *disseminate* statistical data related to education in the United States and in other nations . . . ." 20 U.S.C. § 9543(a) (emphasis added). Beyond this broad directive that the Department collect and disseminate educational data, ESRA explicitly identifies the subject matter that the Department's collection and dissemination must cover. The Department must administer a "National Assessment of Educational Progress"

[1] Indeed, this Court has already found as much. *See* Mem. Op. at 12, ECF No. 40. (acknowledging, at the pleadings stage, that "Plaintiffs have [plausibly] alleged the Department owed and deprived them of 'information'" pursuant to ESRA); *see also Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 19 (D.D.C. 2025) (McFadden, J.) (finding that ESRA "statutorily require[s IES] to make its research and data publicly available" and "by design" makes the public beneficiaries of its mandate).

("NAEP") that measures "student academic achievement and reporting of trends in such achievement in reading, mathematics" and other subjects. 20 U.S.C. § 9622(b)(1). It must also collect and disseminate, among other things: "full and complete statistics . . . on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels in the United States," including postsecondary education and financial aid; data showing U.S. student achievement compared to that of other nations; and information gathered from "longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(1), (7). In undertaking this work, the Department "*shall*. . . ensure that [its] activities . . . conform to high standards of quality, integrity, and accuracy." 20 U.S.C. § 9511(b)(2)(A) (emphasis added); *see also* 20 U.S.C. § 9541(b)(1) (noting that "the mission of the Statistics Center shall be . . . to collect and analyze education information and statistics in a manner that meets the highest methodological standards").

These statutory provisions create an enforceable public right to data conforming to ESRA's mandates. Although Defendants argue otherwise and interpret the above provisions as nothing more than broad directives that "leave the Department the discretion to decide how [its] work gets done," Def. Opp'n at 16, ECF No. 59-1, that reading disregards important context. It also "ignore[s] the statute's structure, distort[s] its clear meaning, and ultimately lead[s] to a tortured reading." *Bread for the City, Inc. v. U.S. Dep't of Agric.*, 211 F. Supp. 3d 327, 333 (D.D.C. 2016). Under a proper reading of ESRA's public disclosure mandates, Defendants have unlawfully deprived Plaintiffs of the information at issue here. This Court should reject the absurd reading of the statute that Defendants now offer to justify their actions.

In interpreting a statute's mandate, a court must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the "language is unambiguous and 'the statutory scheme is coherent and consistent[,]'" the inquiry ends. *Id.* (citations omitted); *see also Doe v. Daversa Partners*, No. 20-cv-3759, 2021 WL 736734, at *4 n.6 (D.D.C. Feb. 25, 2021) ("[T]he unambiguous text of [a] statute is binding."). This is such a case. There is nothing ambiguous about ESRA's provisions providing that the Department "shall" collect, analyze, and publicly disclose educational data, or that those activities "shall" be conducted in accordance with standards that ensure high data quality and integrity. These provisions plainly deny the Department discretion to choose whether to collect and disseminate the educational data outlined in the statute or whether that data adheres to the quality standards the statute sets. *See Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023) ("It is well established that '[t]he word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.'") (citations omitted).

Moreover, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Here, that scheme never veers from the command that the Department publish, report, and disseminate educational data from each of the subject areas ESRA enumerates. ESRA repeats the requirement of public disclosure throughout, leaving no question that the Department bears a Congressionally mandated duty to provide the public with educational data. *See* 20 U.S.C. § 9541(b) ("The *mission* of the Statistics Center shall be . . . to *report* education information and statistics in a timely manner" and "to collect, analyze, and *report* education information and statistics in a manner that . . . is relevant and useful to practitioners, researchers, policymakers, and the public.") (emphasis added); 20 U.S.C. § 9574 ("[D]ata collected . . . in carrying out the

priorities and mission of the Institute[] *shall be made available to the public*.") (emphasis added); 20 U.S.C. § 9512 (detailing that five of IES's six functions relate to broad public disclosure and promotion of the public's understanding and use of educational research). Read in context of the overall statutory scheme, public disclosure of educational data is not incidental to ESRA, but rather its core.

This interpretation is consistent with ESRA's legislative purpose. *See U.S. v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940) ("In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress."). Congress made its intent to promote public disclosure of educational data clear both in the text of the statute and in ESRA's legislative history. For example, Congress explicitly acknowledged the public-serving purpose of ESRA, noting that activities conducted under the statute must "make customer service a priority[,]" including by "disseminating information in a timely manner and in user-friendly formats[,] . . . establishing and measuring performance for quality purposes[,] . . . [and] making information available to the public in an expeditious fashion." S. Rep. No. 107-337, at *34 (2002). Additionally, in requiring both NCES and the Statistics Commissioner to issue "*regular* and special statistical reports" on selected topics, Congress emphasized its intent to provide a consistent flow of information to the public. *Id*. at *3, *28 (emphasis added). This legislative history only underscores what the statute already makes clear: Congress enacted ESRA to secure the public's access to important educational data, which it has charged the Department with collecting and disseminating.

***2. ESRA entitles Plaintiffs to data from the Challenged Studies.***

Plaintiffs identify numerous statutory provisions entitling them to data from the Challenged Studies. *See supra* Section I.A.1; Pl. Mot. Summ. J. at 23, ECF No. 54-1. Defendants, however, argue that those provisions do not entitle Plaintiffs to any data other than NAEP and IPEDS

because the studies are not "mentioned by name in ESRA." Def. Opp'n at 21, ECF No. 59-1. Defendants are wrong.

Defendants point to nothing in ESRA suggesting that their duty to collect data covering the subjects the statute enumerates is discretionary. ESRA need not specify the exact manner in which information must be collected in order to create an entitlement to that data. It is sufficient that ESRA "entitles the public to 'reports' and other information" on particular subject matters. *Air All. Hou. v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 126 (D.D.C. 2019) (citation omitted).

For years, the Department has satisfied its statutory obligation to disclose data covering the subject matters identified in ESRA by administering the Challenged Studies. These studies may be the "means the Department chose." Def. Opp'n at 21, ECF No. 59-1. But having chosen those means, the Department cannot invoke purely theoretical defenses to justify its failure to meet its statutory obligations in that way. Glaringly absent from Defendants' brief is any discussion of how the Department *is* fulfilling its statutory mandate to disseminate data on the subjects outlined in ESRA, if *not* through the Challenged Studies. The Record does not support a finding that the Department is conducting any new studies or other alternatives to the Challenged Studies that meet the statutory obligations Defendants have abandoned. Nor do Defendants make any such claim. Under these circumstances, Plaintiffs' interpretation of ESRA as creating an entitlement to data from the Challenged Studies is sound.

Case law is consistent with this conclusion. Courts have held that plaintiffs are entitled to information where the connection between the information requested and the statutory disclosure requirement is far more attenuated than the one here. In *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture* ("*PETA*"), for example, the D.C. Circuit found that

even though the statute at issue only required the USDA to conduct "investigations or inspections *as [it] deem[ed] necessary*," the agency's failure to conduct these investigations "deprived [plaintiff] of key information that it relies on to educate the public." 797 F.3d 1087, 1090, 1094 (D.C. Cir. 2014). As a result of that deprivation, plaintiff sufficiently alleged an injury. *Id.* at 1094–95 (D.C. Cir. 2014).

Likewise, in *Air Alliance Houston v. U.S. Chemical and Safety Hazard Investigation Board*, the court rejected the argument that "a plaintiff can show informational standing only when the public-disclosure law at issue requires an agency take affirmative steps as to the manner and means of making information available." 365 F. Supp. 3d at 124. There, Congress directed the Chemical and Safety Hazard Investigation Board ("CSB") to promulgate certain reporting requirements concerning accidental chemical releases, which CSB still had not done more than twenty years after the statute was enacted. *Id.* at 121. The statute also required that CSB make public "any records, reports or information obtained by the Board." *Id.* at 124. The plaintiffs claimed CSB's failure to promulgate these rules caused them to suffer an informational injury "because they [could not] access information that [a] statute mandates the agency collect and then make available." *Id.* Like Defendants in this case, CSB argued the statute "neither require[s] direct disclosure nor obligates the Board to take any specific steps to disclose information, or establish any specific mechanism by which the public can access the information." *Id.* (internal quotations omitted). The court rejected this "excessively narrow view of informational standing," *id.* at 125, and found "the CSB [was] denying the public, and these particular [p]laintiffs, the very information that the act contemplates would be publicly available." *Id.* at 126.

This Court should similarly reject Defendants' excessively narrow views of standing. Defendants are under a clear statutory duty to produce each of the Challenged Studies and any lack

of statutory specificity does not undermine that mandate. *See Air All. Hou.*, 365 F. Supp. 3d at 125 (examining *PETA* and noting that "[i]f the denial of voluntarily produced information can result in a sufficiently concrete injury in fact, then surely Plaintiffs' claimed denial of information that, by statute, the [agency] must produce qualifies as well.").

**3. *ESRA entitles Plaintiffs to high-quality data.***

Plaintiffs have also identified statutory provisions within ESRA that entitle them to data meeting specific quality standards. *See supra* at Section I.A.1; Pl. Mot. Summ J. at 23, ECF No. 54-1. These quality control mandates are not, as Defendants contend, simply "directions to NCES about how to do its own work." Def. Opp'n at 22, ECF No. 59-1. The directives requiring the Department to conduct its work "in a manner that meets the highest methodological standards" and to report data "in a timely manner," 20 U.S.C. § 9541(b)(1)–(2), play an integral role in effectuating the mission that ESRA establishes for NCES: "collect[ing], analyz[ing], and report[ing] education information and statistics in a manner that . . . is relevant and useful to practitioners, researchers, policymakers, and the public."[2] 20 U.S.C. § 9541(b)(3)(B). For researchers, in particular, the relevance and usefulness of data depends on the quality assurances that accompany it. *See, e.g.*, Ho Decl. ¶¶ 17–21, ECF No. 54-6, Ex. D; Lee Decl. ¶ 12, ECF No. 54-7, Ex. E.; Patz Decl. ¶¶ 9, 18–20, ECF No. 54-8, Ex. F.; McCarty Decl. ¶¶ 15–19, ECF No. 54-11, Ex. I.; Briggs Decl. ¶¶ 14–19, ECF No. 54-12, Ex. J; Dynarski Decl. ¶¶ 17–18, 20, 22, 23, ECF No. 54-4, Ex. B.

[2] No different conclusion is warranted for IPEDS. The Department's obligation to "continue to update and improve [IPEDS]" explicitly includes the obligation to improve "the reporting of information by institutions and the timeliness of the data collected." 20 U.S.C. § 1015a(i)(4). Those mandates appear in a subsection of the relevant statute entitled "Consumer Data." *See* 20 U.S.C. § 1015a(i). That subsection identifies certain IPEDS data that must be made public and thus constrains the Department with the public in mind. *Id.*

Interpreting ESRA as requiring the Department to collect and disclose data meeting the highest methodological standards but denying the public a corresponding right to receive compliant data would render ESRA's quality control provisions a nullity. Such a reading is legally unsound. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411 (D.C. Cir. 2013) ("[A] statute should not be construed to produce an absurd result."). The only reading of ESRA's quality control provisions that gives effect to the statute's legislative purpose is that the Department must timely provide high-quality data to the public. Accordingly, Defendants' assertion that ESRA's quality control mandates "do not tell the public what it is entitled to receive[]" must fail.[3] Def. Opp'n at 22, ECF No. 59-1.

**B. Plaintiffs Continue to Suffer the Downstream Consequences of Defendants' Unlawful Actions.**

***1. Plaintiffs have identified clear informational harms from their inability to access data from the Challenged Studies.***

As set forth more fully in their opening brief, and contrary to Defendants' claim, Def. Opp'n at 27, ECF No. 59-1, Plaintiffs have identified numerous downstream consequences resulting from Defendants' termination, interruption, and material alteration of the Challenged Studies. These consequences include concrete and particularized harms to Plaintiffs and their members arising from their inability to conduct research that data from the Challenged Studies previously made possible. *See, e.g.*, Pl. Mot. Summ. J. at 28–35.

[3] Defendants make a related argument that ESRA's quality control mandates "supply no judicially administrable performance level." Def. Opp'n at 22, ECF No. 59-1. Plaintiffs address this argument, which is similarly unavailing, in Section II.A *infra*.

Defendants' reliance on *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021),[4] to rebut Plaintiffs' showing of harm is misplaced. In that case, the Court considered claims that TransUnion failed to provide pertinent information with plaintiffs' credit files, including a summary of plaintiffs' rights under the applicable statute. *Id*. at 440. TransUnion provided plaintiffs information in two separate mailings. The first mailing included the summary of rights, but the second one did not. *Id*. The Court rejected the argument that the dual mailings and omission of the summary of rights from the second mailing constituted a cognizable informational injury. *Id*. at 441. It reasoned that plaintiffs "did not allege that they failed to receive any required information[, t]hey argued only that they received it *in the wrong format*." *Id*. Because plaintiffs had not identified any "downstream consequences" from the omission of the summary of rights from the second mailing, they could not establish standing. *Id*. at 442.

Unlike in *TransUnion*, Plaintiffs here suffer the exact harm that ESRA's mandates aim to avoid. Because the federal education data that ESRA mandates has not been publicly disclosed, Plaintiffs cannot conduct their research. There is no dispute that this harm constitutes a cognizable informational injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992) ("It is clear that the person who observes or works with a particular [subject] threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist."); *Ass'n for Educ. Fin.*

[4]Additionally, as the D.C. Circuit recently recognized, "the Supreme Court specifically distinguished *TransUnion* from cases that 'involve[ ] denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information[.]'" *Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 735 (D.C. Cir. 2025) (quoting *TransUnion*, 594 U.S. at 441). When a statute—like ESRA—entitles the public to disclosure, demonstrating that the "denial [of required disclosures] harms [a plaintiff's] ability to carry out its core programmatic activities" suffices to establish standing. *Id*. at 735. (internal quotation marks omitted). *See also* Citizens *for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, No. 22-cv-3281 (CRC), 2023 WL 6141887, at * 6 (D.D.C. Sep. 20, 2023) (noting, in the context of an informational injury stemming from a public disclosure statute, *TransUnion*'s mandate that a plaintiff identify the downstream consequences of an injury is "encapsulate[d by an]. . . analysis. . . assessing whether [a plaintiff's] failure to receive the requested disclosures would harm its ability to advance its organizational mission.") Here, Plaintiffs' denial of statutorily mandated information harms their core activities – conducting accurate and reliable research.

*& Pol'y, Inc. v. McMahon*, Nos. 1:25-cv-00999 (TNM) & 1:25-cv-01266 (TNM), 2026 WL 523023, at *6 (2026) ("Unable to complete research and craft education policy without the Department's dissemination of data, Plaintiffs 'suffer[ ]' from these deprivations." (quoting *Akins*, 524 U.S. at 21)); *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 133–34 (D.D.C. 2025) (finding that removal of information from CDC website was a cognizable injury for doctor members of the plaintiff organization, as these "removals . . . inhibit[ed] the doctors' daily operations and forced them to spend their time and efforts elsewhere.") (internal quotation marks omitted).

***2. Defendants descoping of certain studies does not defeat standing.***

Defendants' reinstatement of contracts related to five of the Challenged Studies does not defeat Plaintiffs' standing. Those contracts discontinue important processes necessary to ensure data validity and, in doing so, deprive Plaintiffs of data meeting the quality standards outlined in ESRA. Defendants dismiss the harms Plaintiffs suffer as a result of this deprivation as mere "complaints about how well and how quickly the Department does work it is still doing." Def. Opp'n at 22, ECF No. 59-1. But this position fundamentally misunderstands what ESRA requires (namely that the Department maintain high quality standards and disclose data in a timely fashion), what the evidence in the record shows about the Department's data quality practices, and the injury Plaintiffs have suffered on account of those practices.

The Administrative Record here consists almost entirely of terminated and descoped contracts. Defendants ignore nearly every aspect of the contracts that reinstate the five studies other than the fact they exist. As the terms of those contracts confirm, the reinstated studies eliminate important data protections. Curiously, although Defendants submit a third declaration of Acting Commissioner Matthew Soldner explaining the status of each study, even he does not contend that the reinstated studies meet ESRA's high-quality standards. Nor does he address the

specific tasks the Department eliminated through descoping or the dramatic reductions in contract value documented in the Record. By failing to engage with any of these specific facts, Defendants effectively concede that the mechanisms assuring high data quality no longer exist for the reinstated studies. *See Kone v. D.C.*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded.") (citation omitted). Further, although Defendants point to evidence of "ongoing work" for some studies, that evidence shows only that the most recent NAEP and CCD owe their existence to data collected long before the Termination Directive was issued. These facts are insufficient to defeat Plaintiffs' standing.

i. <u>Each of the Reinstated Studies Lack the Quality Controls that ESRA Requires</u>

**NAEP**. However the Department chooses to carry out NAEP, the results must meet the statutory standard of validity and reliability that Congress imposed through ESRA. *See* 20 U.S.C. § 9622(b)(2). Defendants' arguments that the contracts used to carry out NAEP are "the Department's choice" and that "Plaintiffs are not statutorily entitled to any particular dataset from any particular contract," Def. Opp'n at 17, ECF No. 59-1, therefore miss the point entirely. Plaintiffs do not argue that the Department must use any particular contractor or any specific contract to fulfill its NAEP obligations. Indeed, none of the ten coalition contractors involved in carrying out NAEP produce individual datasets. The "successful administration of NAEP" is a multi-faceted undertaking requiring extensive coordination between teams and individual contractors. The Record shows there were three "teams," comprised of 10 individual contractors working in a coalition, responsible for the various tasks necessary to conduct NAEP. *See* VA001077–80. For example, the Design and Coordination team, comprised of three separate contracts, "support[s] the overall design of NAEP and coordination among contractors across the

Coalition and requires real-time, close coordination across team contractors." VA001079. The Assessment Content team "ensure[s] the successful and efficient development of the instruments for undertaking NAEP, including the scoring of student responses." *Id*. The two contractors comprising the Data Collection team "must work hand-in-glove for successful administration of NAEP in the field." *Id*. And there are five other non-coalition contracts that "also support NAEP." VA001279. The Administrative Record includes only two of three contracts comprising the Design and Coordination team (the Programs and Operations and Sampling and Weighting Contracts), as well as a standalone Program Support Management contract. The Department significantly reduced the value of all of these contracts. Pl. Mot. Summ. J. at 17–18, ECF No. 54-1. This partial record raises more questions about Defendants' compliance with its statutory obligations than it answers. But it confirms Defendants' departure—without explanation—from what NCES had previously deemed to be the best practices in carrying out ESRA's statutory mandate.

Defendants point to the release of the 2026 NAEP results as proof that the assessment continues. Def. Opp'n at 17, 22–23, ECF No. 59-1 However, Acting Commissioner Soldner states in his August 2026 declaration that "[p]ublic school sampling for the 2026 NAEP was completed in April 2025 using data from the 2023-24 CCD" and that all of the most recent NAEP assessments were conducted in 2024 or during the 2024-2025 school year.[5] August 11, 2026 Decl. of Matthew Soldner ("Aug. Soldner Decl.") ¶¶ 6–9, ECF No. 59-2. The claims at issue here concern Defendants' failure to conduct and release statutorily mandated data *after* the Department issued the February 10, 2025 Termination Directive, not assessments conducted beforehand. Releasing results using data collected prior to the Termination Directive is not the same as collecting and

[5] The NAEP Long-Term Trend assessment for 9-year-olds was conducted between January and March 2025 (thus concluding one month after the Termination Directive was issued). The NAEP Long-Term Trend assessment for 13-year-olds was conducted between October and December of 2024. *See About the LTT Assessment*, Nation's Rep. Card, https://www.nationsreportcard.gov/ltt/2025/?age=9 (last visited Aug. 27, 2026).

producing ongoing data that meet ESRA's methodological standards. Defendants do not explain how this practice satisfies its statutory obligations. Further, despite asserting that NAEP is ongoing Defendants do not address the $29,745,237.88 reduction to the Programs and Operations contract, VA001018–19, the two additional rounds of descoping applied to the Sampling and Weighting contract, VA001228–42; VA001243–49, or the redactions that make it impossible to determine what specific tasks were eliminated from the Program Support Management contract. VA001320–28. Acting Commissioner Soldner, who has now produced three declarations in this case, also makes no representation about the future of NAEP—a glaring omission.

**CCD**. In conducting NAEP, Department must "use a random sampling process which is consistent with relevant, widely accepted professional assessment standards and that produces data that are representative on a national and regional basis." 20 U.S.C. § 9622(b)(2)(A). As discussed, ESRA's failure to identify CCD by name does not relieve the Department of its statutory obligation to use the type of random sampling process that ESRA specifies. Although Defendants argue that "sampling and the use of State-reported records" is within "the NCES Commissioner's judgment," Def. Opp'n at 18, ECF No. 59-1, they provide no information showing what judgment the Commissioner has exercised regarding sampling and state-reported records. Despite submitting a declaration in support of Defendants' motion for summary judgment, Acting Commissioner Soldner also says nothing of CCD beyond the fact that the contract reinstating it was executed on March 3, 2025 and runs through September 14, 2029. Aug. Soldner Decl. ¶ 4, ECF No. 59-2. This information does not respond to, much less refute, Plaintiffs' showing that the CCD was reinstated without any data quality processes at all. Pl. Mot. Summ. J. at 26–27, ECF No. 54-1. Nor does it address CCD's ~42% reduction in contract value. VA001518–19. On this record, Defendants have done nothing to mitigate the fact that "CCD data files are not delivered as a high-quality product,

resulting in a loss of confidence among data users." VA001603. Although Acting Commissioner Soldner states the 2023-2024 CCD preliminary directory files were published in July 2024, Aug. Soldner Decl. ¶ 10, ECF No. 59-2, data collected and released prior to February 2025 is irrelevant to Plaintiffs' claims. Defendants say nothing about whether CCD data produced going forward will meet ESRA's statutory standards. The Department's silence suggests the data will not.

**TIMSS**. As explained in Plaintiffs' opening brief, Defendants terminated the quality control contract required to finalize and approve the TIMSS 2023 U.S. national data files for public release. VA000003 at line 27; VA003241–42. Acting Commissioner Soldner confirms that "[f]inal data files and documentation for the TIMSS 2023 United States data have not been completed." Aug. Soldner Decl. ¶ 67, ECF No. 59-2. While Defendants point to a new TIMSS 2027 contract as evidence that U.S. participation in TIMSS is ongoing, Def. Opp'n at 18, ECF No. 59-1, they do not address the ongoing harm occasioned by their failure to disclose all 2023 data. A future contract for TIMSS 2027 does not cure the failure to release 2023 data the Department has already collected. Nor should Defendants' failure be excused. A duty to collect and timely disseminate data, *see* 20 U.S.C. § 9541(b)(2), is not satisfied by collecting data and then failing to release it.

**IPEDS**. Defendants correctly identify that 20 U.S.C. § 1015a(i)(4) directs the Department, through NCES, to "continue to update and improve" IPEDS, but they are silent as to how the Department will do so in light of the cuts apparent in the Administrative Record. Although Defendants assert that IPEDS data collection has continued without interruption under the collection contract in effect since April 2022, Def. Opp'n at 19, ECF No. 59-1, they do not acknowledge or explain the descoped IPEDS contract's elimination of the Technical Review Panel, removal of respondent training and dissemination activities, and discontinuation of conference outreach. *Id*. This failure is fatal. Collecting data and collecting data that meets ESRA's standards

are not the same thing. Defendants' elimination of the Technical Review Panel, which previously provided independent expert review of plans for improvement to IPEDS data collection and products, is inconsistent with a mandate to continuously improve the system. Pl. Mot. Summ. J. at 19–20. Moreover, as Professor Dynarski explains, the quality of IPEDS data depends on surveys being completed correctly, and the elimination of respondent training and support undermines the quality of what colleges submit. Dynarski Decl. ¶¶ 15, 17, ECF No. 54-1, Ex. B. Neither Defendants' brief, nor Acting Commissioner Soldner's declaration dispute these facts.

**NPSAS**. In arguing that NPSAS:24 was reinstated and that a new NPSAS:28 contract has been awarded, Def. Opp'n at 9–10, ECF No. 59-1, Defendants wholly ignore what the reinstated NPSAS:24 contract makes clear: the Department eliminated the study's mini technical review meetings, VA000203, its First Look reports, VA000214, and all optional tasks covering longitudinal follow-up studies. VA000191; VA000194–97. The Department acknowledges in the reinstated contract, with lettering highlighted in bold, that "all [of the] tasks in th[e] contract as originally awarded were necessary for the efficient implementation and fulfillment of NCES's statutory requirements." VA000188–89. Given this acknowledgment, Defendants cannot argue that the elimination of these tasks is harmless.

Defendants' assertions about NPSAS:28 also fail to cure Plaintiffs' harm. Defendants offer nothing more than a "Fixed Price Payment Schedule" detailing how much a vendor will be paid for completing future work. Aug. Soldner Decl. Ex. G., ECF No. 59-2. Ex. G. They provide no Performance Work Statement, as they did for earlier iterations of NPSAS. *See, e.g.*, VA000188–316. Without that information, neither Plaintiffs nor this Court can assess what work the Department has committed to performing, what tasks are included or excluded, or whether the contract as awarded will produce data meeting ESRA's statutory standards. A payment schedule

establishes only that money has been obligated, not that the statutory obligation to collect and disseminate full and complete statistics on postsecondary education and financial aid will be fulfilled.

ii. <u>By Reinstating Studies Without Adequate Quality Controls, Defendants Fail to Meet ESRA's Quality Control Standards and Compound Plaintiffs' Harm</u>

Defendants' failure to disclosure accurate and reliable data is no less harmful than failing to disclose data at all. A researcher who receives data she cannot trust has been deprived of the information Congress requires just as surely as the researcher who receives nothing. *See* 20 U.S.C. § 9541(b)(3)(B) (requiring that information disseminated be "relevant and useful to . . . researchers"). Defendants' argument that any harm flowing from its removal of data quality mechanisms is speculative is unavailing. Defendants do not dispute that the removal of data quality mechanisms impedes their ability to provide high-quality data to the public. They instead argue that the public is not actually entitled to receive data that meets "high standards of quality, integrity, and accuracy." Def. Opp'n at 22, ECF No. 59-1. For the reasons explained, this interpretation of ESRA is inconsistent with the statute's text and purpose. *See supra* at Section I.A.1. Moreover, Defendants cannot have it both ways. If the Department bears no obligation to ensure the accuracy of the data it disseminates, then the risk that inaccurate data will reach Plaintiffs is not speculative—it is the Department's own stated position.

Even setting aside that fatal admission, in analogous cases the D.C. Circuit has squarely rejected the argument that such injuries are speculative. For example, in *Environmental Defense Fund v. Environmental Protection Agency*, the D.C. Circuit found that defects in "indispensable procedural step[s]" related to an agency's discharge of a statutory disclosure mandate adequately supported standing: "[a]ll that is necessary for standing is for [the plaintiff] to show that the procedural step was connected to the substantive result." 922 F.3d 446, 453 (D.C. Cir. 2019)

(citation modified). *Environmental Defense Fund* involved a provision of the Toxic Substances Control Act. *Id*. at 450. The Act directed the EPA to require any manufacturer of a chemical substance claiming that a chemical identity should remain confidential to provide certain statutorily required information to substantiate the claim. *Id*. at 450–452. However, the EPA did not require manufacturers to explicitly answer a question the Act deemed necessary to substantiate a confidentiality request. *Id*. The D.C. Circuit rejected the EPA's argument that the plaintiff lacked standing because it was "merely speculative" that the agency's inclusion of the omitted question would have led the EPA to disapprove a confidentiality claim. *Id*. at 453. Instead, the court held that a plaintiff asserting an informational injury "need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." *Id.* Demonstrating that the omitted procedural step is "connected to the substantive result" suffices for purposes of standing. *Id*. (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)). Just as "[i]nforming the confidentiality decision is the raison d'être of the substantiation questions," *id*., ensuring the federally mandated validity and reliability of educational data subject to disclosure is the raison d'être of the quality control mechanisms the Department eliminated. And it is undisputed that the removal of those mechanisms is "connected to the substantive result"—here, data of diminished quality.

The D.C. Circuit reached a similar conclusion in *Animal Legal Defense Fund, Inc. v. Vilsack*, 111 F.4th 1219 (D.C. Cir. 2024). There, the court held that a plaintiff had established a concrete injury arising from the Department of Agriculture's policy of not reviewing the imagery on poultry-product labels for accuracy despite its statutory authority to do so. *Id.* at 1223. The plaintiff alleged that certain poultry packaging inaccurately reflected the birds' living conditions, and that the challenged policy prevented her from making informed purchasing decisions. *Id*. at

1229. The D.C. Circuit acknowledged that the "'information deficit' created by [the Department's] policy . . . is the sort of 'downstream consequence[ ]' that can establish Article III standing." *Id.* (internal citations omitted).[6] The same is true here. The Department's elimination of quality control mechanisms creates precisely the same kind of "informational deficit" that results in downstream consequences for the researchers and organizations who depend on the Department's data to do their work. In this case, however, ESRA not only authorizes Defendants to ensure that their data meets standards of high quality, it compels them to do so.

### C. Plaintiffs' Informational Harms Support Organizational and Associational Standing.

#### *1. Organizational Plaintiffs and Their Members Have Suffered Harm.*

The declarations of Plaintiffs' members and its organizational leaders make clear that Plaintiffs have suffered informational harms arising from all of the Challenged Studies.[7] *See* Barnett Decl. ¶¶ 6–8, 10–29 (ECLS & NHES), ECF No. 54-3, Ex. A; Bastedo Decl. ¶¶ 7, 9–22 (HSLS), ECF No. 54-12, Ex. K; Briggs Decl. ¶¶ 6–19 (NAEP), ECF No. 54-12, Ex. J; Dynarski Decl. ¶¶ 9–13 (NPSAS), ECF No. 54-4, Ex. B; Ho Decl. ¶¶ 10–14, 16–23 (CCD & NAEP), ECF No. 54-6, Ex. D; Johnson Decl. ¶¶ 10–12 (CCD & NAEP), ECF No. 54-9, Ex. G; Lee Decl. ¶¶ 6, 8–13 (NAEP), ECF No. 54-7, Ex. E; McCarty Decl. ¶¶ 7–10, 15 (NAEP), ECF No. 54-11, Ex. I; Patz Decl. ¶¶ 10–17, 21–23 (TIMSS, ECLS, ECLS-K, IPEDS, CCD, NAEP), ECF No. 54-8, Ex. F; Reardon Decl. ¶¶ 12–14, 21–24, 26–32 (ECLS-K), ECF No. 54-14, Ex. L; Tipton Decl. ¶¶ 7–

[6] Although the court ultimately found that the plaintiff had not demonstrated an ongoing and imminent harm because her awareness that the poultry label was misleading rendered any future purchase a self-inflicted injury, that fact is readily distinguishable. *Animal Legal Def. Fund*, 111 F.4th at 1230–1231. Unlike a consumer who can simply choose not to repurchase a mislabeled product, Plaintiffs here have no comparable alternatives. ESRA's express purpose is to ensure that educational data is "relevant and useful to practitioners, researchers, policymakers, and the public," 20 U.S.C. § 9541(b)(3)(B), and the federally mandated datasets at issue are the only nationally representative sources of this information. Plaintiffs cannot opt out of relying on them; they either receive data that meets the statutory standard or they do not.

[7] The NPSAS study incorporates component datasets B&B and BPS. Pl. Mot. Summ. J. at 12.

17 (CCD & IPEDS), ECF No. 54-5, Ex. C; Worrell Decl. ¶¶ 8–14 (NAEP), ECF No. 54-10, Ex. H. Defendants offer nothing to rebut this showing. They argue only that none of Plaintiffs' declarations "identifies a dataset that ESRA entitles [Plaintiffs'] members to receive and which the Amended Complaint challenges." Def. Opp'n at 24, ECF No. 59-1. For reasons already discussed, *supra* at Section I.A.2, the argument that there is no "statutory entitlement" to any of the Challenged Studies is meritless and cannot defeat Plaintiffs' showing of associational standing.[8]

Defendants also assert that Plaintiffs' organizational standing theory fails, but its argument on this point is indecipherable. To the extent Defendants contend that Plaintiffs lack organizational standing because they can point to no informational harm flowing from termination of the Challenged Studies, the declarations submitted by Plaintiffs' organizational leaders prove that argument false. Those declarations, like the member declarations, identify informational harm tied to the Challenged Studies. *See* Lee Decl. ¶¶ 4–6, 8–13 (NAEP), ECF No. 54-7, Ex. E; Patz Decl. ¶¶ 10–17, 21–23 (TIMSS, ECLS, ECLS-K, IPEDS, CCD, NAEP), ECF No. 54-8, Ex. F. On this record, Defendants' challenges to Plaintiffs' theories of associational and organizational standing fail.

### 2. *Plaintiffs' Harm Is Traceable to Defendants.*

The harms Plaintiffs detail in this case are traceable to Defendants. As this Court has correctly observed, "Plaintiffs' theory is that *the Department* stopped the programs that previously produced the data to which Plaintiffs are entitled" and "[a]s a result, *the Department* curbed Plaintiffs' research and policy abilities." Mem. Op. at 13, ECF No. 40. Although the Administrative Record and sworn testimony of Plaintiffs and their members confirm that theory, Defendants

[8] Notably, Defendants do not dispute, Def. Opp'n at 23–24, ECF No. 59-1, that Plaintiffs' members have proven both that "the interests [they] seek[] to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

misleadingly argue that "[m]uch of the alleged harm [Plaintiffs] describe comes from actions that no count of the Amended Complaint even challenges." Def. Opp'n at 24, ECF No. 59-1. This is a red herring. Plaintiffs' declarations identify harm relating to all of the Challenged Studies. *See supra* Section I.B.1, I.C.1; Pl. Mot. Summ. J. at 28–34, ECF No. 54-1. That harm is no less valid because Plaintiffs and their members discuss other IES studies that may provide relevant context for the full extent of their injuries. The only relevant question for this Court is whether Plaintiffs' evidence substantiates the cognizable harms alleged in their complaint and ties those harms to Defendants' challenged actions. The Record compels this Court to answer that question in the affirmative. For these reasons, Plaintiffs have established that the harm they suffer from cancellation of the Challenged Studies is directly traceable to Defendants.

***3. Plaintiffs' Harm Is Redressable by This Court.***

Consistent with this Court's prior conclusion that it "can redress Plaintiffs' injuries by declaring that canceling the studies was arbitrary and capricious and ordering Defendants to resume the studies," Mem. Op. at 13, ECF No. 40, Plaintiffs satisfy the requirement of redressability. Although Defendants argue that vacatur cannot restore the longitudinal studies, compel contractors to resume performance, or recreate data collections that did not occur, Def. Opp'n at 25–26, ECF No. 59-1, their argument misunderstands both the relief Plaintiffs seek and the scope of this Court's remedial authority.

Plaintiffs do not ask this Court to order a specific contractor to resume performance of a terminated contract or to retroactively collect data that was not gathered.[9] Rather, Plaintiffs request that this Court declare Defendants' termination of the Challenged Studies unlawful, vacate the

[9] Although Plaintiffs do not seek to reinstate any particular contract, the Department's own conduct demonstrates that reinstatement is not the impossibility Defendants claim. The Administrative Record demonstrates that the Department has both the authority and the willingness to restore terminated contracts when it finds it suitable to do so.

Department's decision to terminate those studies, and order the Department to resume fulfilling its statutory obligations under ESRA. *See, e.g.*, Pl. Mot. Summ. J. at 2, 35–36, 45, ECF No. 54-1; First Am. Compl. ¶¶ 231–41, ECF No. 31. That vacatur of the termination decisions would not revive settled contracts does not defeat redressability. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103 (D.D.C. 2018) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect") (citation omitted), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 92 (D.D.C. 2007) (acknowledging "the fact that vacatur preserves the status quo"). Throughout this litigation, Plaintiffs have consistently maintained that the Department retains discretion to determine how to resume its unfulfilled statutory obligations. The Department may procure the work through new contracts, perform the work internally, or use any other means ESRA permits. What it may not do is continue to ignore its statutory mandate.

Vacating the Department's unlawful decisions and ordering the Department to meet the congressionally imposed obligations left unfulfilled by those decisions is precisely the kind of relief that the APA authorizes and that this Court has authority to grant. *See* 5 U.S.C. § 706(2)(A); *see also, e.g.*, *Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 61 (D.D.C. 2025), *appeal docketed*, No. 25-5267 (D.C. Cir. July 23, 2025) (awarding summary judgment with respect to plaintiffs' APA claims challenging the removal of information contained in a public-apportionments database, vacating and setting aside the unlawful removal, and permanently enjoining the government from removing the database and the apportionment information required to be disclosed by statute). More importantly, it is relief that will adequately redress the harm caused by Defendants' termination of the studies.

For the reinstated studies, redressability is even clearer. Vacating the Department's decision to eliminate the quality control mechanisms at issue and enjoining Defendants from disclosing data that does not meet ESRA's quality standards would restore the status quo and directly redress Plaintiffs' informational injury. Defendants' argument that no court order can restore a researcher's confidence in a dataset misses the point. Def. Opp'n at 26, ECF No. 59-1. Plaintiffs do not ask the Court to restore confidence in the abstract. Instead, they request that the Court restore the status quo, including the panels, data quality checks, and peer review processes that are critical components of the Department's ability to ensure the studies at issue meet ESRA's quality control mandates. *See, e.g.*, Pl. Mot. Summ. J. at 13–20, ECF No. 54-1. Taking this step would allow the Department to produce the compliant data Plaintiffs are entitled to receive, which is precisely what redressability requires.

In addition to vacating Defendants' unlawful decisions and requiring the Department to resume the Challenged Studies and its adherence to relevant quality assurance standards, this Court may retain jurisdiction to monitor compliance and ensure the Department fulfills its statutory obligations going forward. Given the Department's demonstrated willingness to terminate and descope critical research programs without notice or explanation, retaining jurisdiction would appropriately guard against recurrence and ensure that any remedial order is meaningfully enforced.

## II. PLAINTIFFS HAVE DEMONSTRATED THAT DEFENDANTS' CHALLENGED ACTIONS WERE ARBITRARY AND CAPRICIOUS, AND DEFENDANTS CITE NO FACTS OR LAW THAT COMPEL A DIFFERENT CONCLUSION.

### A. Cancellation of the Challenged Studies Is Not Committed to Agency Discretion.

In their effort to avoid liability for the Department's arbitrary and capricious termination of the Challenged Studies, Defendants assert that "[t]he contract decisions Plaintiffs challenge are

committed to agency discretion by law and therefore unreviewable under the APA." Def. Opp'n at 28, ECF No. 59-1 (citing 5 U.S.C. § 701(a)(2)). This argument is no more persuasive now than when this Court considered and rejected the committed-to-agency-discretion exception at the motion-to-dismiss stage. *See* Mem. Op. at 22–23, ECF No. 40. Indeed, Defendants cite nothing in the Record that compels this Court to reach a different conclusion.

Courts recognize an exception to judicial review under the APA for actions committed to agency discretion. *See* 5 U.S.C. § 701(a)(2). As this Court has already explained, however, "courts *presume* they may review claims under the APA . . . [and] read exceptions to that presumption 'quite narrowly.'" Mem. Op. at 22, ECF No. 40. (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)); *see also Mach Mining, LLC v. Equal Emp. Opportunity Comm'n*, 575 U.S. 480, 489 (2015) (noting that there is a "strong presumption favoring judicial review of administrative action" (citation modified)). This narrow reading of the exceptions to judicial review is controlling here. Accordingly, the Court may recognize Defendants' claimed exception only if: 1) the law provides no meaningful standard by which to judge agency action, or 2) the challenged action is the type that courts have typically viewed as committed to agency discretion. *See, e.g.*, *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (explaining that § 701(a) "imposes two related, but distinct, barriers to judicial review").

Neither of these circumstances applies. Plaintiffs have identified scores of statutory provisions, embodied in ESRA, that provide standards by which the Department's termination of the Challenged Studies may be measured. Those provisions require the Department to collect and analyze education data "in a manner that meets the highest methodological standards," 20 U.S.C. § 9541(b)(1), and to disseminate such data in a "timely," "objective" manner that "is relevant and

useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b)(2)–(3); *see also* 20 U.S.C. § 9511(b)(2)(A) (requiring that IES's research activities "conform to high standards of quality, integrity, and accuracy"). ESRA further requires the Department to: (1) administer the National Assessment of Educational Progress ("NAEP"), which must be conducted using widely accepted professional standards to produce "valid and reliable" results on student achievement at the national and regional level, 20 U.S.C. § 9622(b)(2); (2) collect and disseminate "full and complete statistics" on postsecondary education and financial aid through studies like NPSAS, 20 U.S.C. § 9543(a)(1)(E); (3) collect and disseminate data comparing U.S. student achievement with that of other nations, 20 U.S.C. § 9543(a)(6); and (4) "conduct[] longitudinal and special data collections necessary to report on the condition and progress of education," 20 U.S.C. § 9543(a)(7). The Department is also required to "continue to update and improve" IPEDS, 20 U.S.C. § 1015a(i)(4).[10]

Defendants' emphasis on the Department's discretion to determine "which studies to support, which contracts to use (if any), and whether to renew them" tells only half the story. Def. Opp'n at 29, ECF No. 59-1. While the Department may have discretion to make *some* decisions regarding the data and information that ESRA requires it to collect and disseminate, the statutory scheme plainly provides detailed guidelines for how that discretion must be used. Those guidelines constitute the standard by which the Department's actions should be judged. Nowhere do the guidelines afford the Department discretion to arbitrarily ignore ESRA's mandates regarding the types of studies the Department must conduct, the subject areas the studies must cover, or the quality standards the studies must meet. Yet that is precisely what the Department did in terminating the Challenged Studies. *See* Pl. Mot. Summ. J. at 5–19, 41–45, ECF No. 54-1.

---

[10] While this provision is not formally a part of ESRA, it nevertheless establishes a statutory mandate that binds the Department, through NCES.

For the terminated longitudinal studies, in particular, Defendants argue that the Department has discretion to determine how to carry out its statutory duties and is not required to use any particular contractor or study. Although Defendants specifically assert that the Department may choose to "keep the work in-house," Def. Opp'n at 20, ECF No. 59-1, they do not show or even suggest the Department has *actually* carried out the work in this manner.[11] Nor could they. The record makes clear that because the Department is not conducting any longitudinal studies, it is not performing its statutory obligations in this respect at all.[12] *See* Aug. Soldner Decl. ¶¶ 23–24, 28–29, 40, 45, 54, ECF No. 59-2; Dep. of Matthew Soldner 131:19–22, ECF No. 54-2.

Defendants' efforts to show that ESRA commits the quality of its mandated data to agency discretion similarly fail. ESRA's quality control provisions are not so subjective that they lack an administrable standard for judging the Department's actions. Contrary to phrases and terms like "shall deem necessary" or "advisable," which rely on the subjective discretion and judgment of the underlying actor, ESRA's requirement that the Department's research activities adhere to "high standards of quality, integrity, and accuracy," 20 U.S.C § 9511(b)(2)(A), and "meet[] the highest methodological standards," 20 U.S.C. § 9541(b)(1), provides a judicially reviewable standard for

[11] It is unlikely that Defendants could make such a showing, as Mr. Soldner testified that 90% of IES's staff was eliminated through a reduction in force ("RIF"), whittling NCES's prior workforce of approximately 110 employees down to just three employees after the RIF. Soldner Dep. 151:15–17, 161:3–6, 170:10–13, ECF No. 54-2. Mr. Soldner conceded that NCES could not carry out its critical functions in the long term with just three employees. *Id.* at 192:22–193:12 Even before the RIF, IES relied largely on contractors to fulfill its statutory obligations because "the volume of work led by IES staff substantially exceed[ed] its ability to hire that number of individuals." *Id.* at 61:16–62:10.

[12] Defendants omit from their brief any reference to Acting Commissioner Soldner's declaration, which confirms the longitudinal studies are inactive and that relevant collections have been missed. He notes, in particular, that the BPS:20/25 was not conducted and no current contract provides for it. Aug. Soldner Decl. ¶ 23, ECF No. 59-2. Acting Commissioner Soldner further admits that several follow-up studies necessary to carry out the B&B longitudinal study were not conducted and that the collection window for the B&B:24/25 has passed. *Id.* ¶¶ 28–29. Follow-up for the HSLS:09 also did not occur, and "[n]o follow-up collection for the HS&B:22 cohort has been conducted." *Id.* ¶ 40. Although there is potential for some of these studies to be conducted alongside NPSAS:28 as late as 2029, that contract option "has not been exercised." *Id.* ¶ 24. Additionally, Acting Commissioner Solder confirms that "[f]inal data files and documentation for NHES:2023 have not been completed." *Id.* ¶ 45. Although the Department reinstated the contract to complete the ECLS-K on August 7, 2026, there is no date certain by which the Department will release a restricted use version of the data and "[a] public-use version of the ECLS-K data is not anticipated." *Id.* ¶ 54. Despite Acting Commissioner Soldner's assertion to the contrary, there is no ECLS-K contract attached to his declaration.

judging the Department's conduct. *See Cody v. Cox*, 509 F.3d 606, 608 (D.C. Cir. 2007) (concluding that a statutory mandate requiring provision of health care services in a "high-quality" manner was judicially enforceable); *see also NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 132 (D.D.C. 2020) (summarizing cases in which the D.C. Circuit has found meaningful and judicially reviewable standards "even in 'permissive and indeterminate language.'" (citation omitted)).

Courts are not inexperienced in assessing compliance with methodological standards. They routinely do so in evaluating expert opinion testimony. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999) (affirming trial court's conclusion that the methodology employed by an expert was unreliable); *Chesapeake Climate Action Network v. Export-Import Bank of U.S.*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) ("Rule [702] requires trial courts to assume a 'gatekeeping role,' ensuring that the methodology underlying an expert's testimony is valid and the expert's conclusions are based on "good grounds." (citation omitted)). Indeed, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court expressed "confiden[ce] that federal judges possess the capacity" to conduct "a preliminary assessment of whether the reasoning or methodology underlying [proffered expert] testimony is scientifically valid." 509 U.S. 579, 592–93 (1993). For purposes of that assessment, which is required to properly apply Federal Rule of Evidence 702, the Court identified several pertinent considerations, including—among other things—the presence or absence of peer review and "the existence and maintenance of standards controlling the technique's operation." *Id.* at 593–94. These considerations mirror those implicated by elimination of the Department's quality control mechanisms for certain reinstated studies.

Courts have rejected arguments similar to the one Defendants press here. In *Cody v. Cox*, the D.C. Circuit found that a statute's mandate that the Armed Forces Retirement Home "shall

provide for the overall health care needs of residents in a high-quality and cost-effective manner" qualified the agency's otherwise "broad discretion in administering care." 509 F.3d at 608, 610. The court concluded that the "'high quality' mandate ha[d] force" throughout the statute, and it rejected claims that it could not review compliance with the mandate because compliance fell within the scope of decisions "committed to agency discretion by law." *Id.* at 609, 611; *see also Barr*, 496 F. Supp. 3d at 132 (collecting additional cases finding meaningful and judicially reviewable standards in similar circumstances).

Enforcing ESRA's quality control standards would not, as Defendants argue, amount to programmatic supervision for ten statistical programs. Plaintiffs challenge specific decisions that prevent a subset of the Challenged Studies from meeting the quality standards set by ESRA. As this Court has previously ruled, Plaintiffs "seek 'incremental correction'" of those "'specific erroneous decisions,' not 'large-scale alterations in day-to-day agency operations.'" Mem. Op. at 21, ECF No. 40 (quoting *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 25 (D.D.C. 2025)); *see supra* Section I.C.3 (seeking restoration of discontinued Technical Review Panels, data quality checks, and peer review). Under these circumstances, the Department's actions are not insulated from judicial review. *See Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.").

Defendants make a final attempt to escape this conclusion by likening this case to *Lincoln v. Vigil*, 508 U.S. 182 (1993). But this analogy fails, just as it did when Defendants moved to dismiss. *See* Mem. Op. at 22–23, ECF No. 40 (rejecting Defendants' reliance on *Lincoln* as a

"theory" that "barely gets . . . off the ground"). Unlike in *Lincoln*, Plaintiffs do not challenge the Department's allocation of funds from lump-sum appropriations but instead its failure to continue conducting and disseminating certain statutorily mandated research. Defendants' emphasis on the Department's discretion to determine *how* it conducts a study misreads Plaintiffs' claims and ignores this Court's prior rulings. *See, e.g.*, Pl. Opp'n Mot. Dismiss at 13, ECF No. 33; Pl. Mot. Summ. J. at 20, 36, ECF 54-1; Mem. Op. at 18, ECF No. 40 ("[T]his dispute concerns statutory constraints, not contracts.").

The question before this Court is whether the Department has discharged its statutory obligations with respect to the Challenged Studies. It is immaterial whether the Department discharges that obligation using contracts or its own personnel. *See* Mem. Op. at 18, ECF No. 40. Likewise, the Department may determine how to allocate its financial resources across the studies it supports. But, as *Lincoln* makes clear, "an agency is not free simply to disregard statutory responsibilities." 508 U.S. at 193; *see also Shawnee Tribe*, 984 F.3d at 100 (explaining that there is no presumption of non-reviewability where "Congress has circumscribed agency discretion to allocate resources by putting restrictions in the operative statute" (citation modified)); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 137 F.4th 932, 940 (9th Cir. 2025) ("Where Congress establishes a mandatory program, in the sense that Congress directs (rather than merely authorizes) the agency to conduct certain activities, the rule in *Lincoln* has no application." (citation modified)). As discussed, that is precisely what occurred here.

In short, ESRA limits the Department's discretion by imposing on it a detailed scheme of affirmative obligations. These statutory provisions "stand in stark contrast with those at issue in *Lincoln*, where no statute or regulation even mentioned the Program that was cancelled, let alone required that the Executive carry out the program." *Cmty. Legal Servs.*, 137 F.4th at 941 (citation

modified); *see also id.* at 936, 940, 943 (upholding preliminary injunction preventing agency from withdrawing funding for "a program that is *required* by statute"). This Court should therefore reject Defendants' claim that their challenged actions are unreviewable on account of the committed-to-agency-discretion exception.

### B. Nothing in the Administrative Record Shows the Termination Actions Were the Product of Reasoned Decision-Making.

For the reasons explained in Plaintiffs' opening brief, Defendants' termination of the Challenged Studies was arbitrary and capricious. *See* Pl. Mot. Summ. J. at 41–45, ECF No. 54-1. Nothing in Defendants' opposition alters that conclusion.

Defendants do not contest Plaintiffs' showing that the termination of the Challenged Studies constitutes discrete and final agency action. *See id.* at 37–40. Any such arguments are therefore waived. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) ("[F]ailure to raise arguments or theories in [a] motion for summary judgment results in waiver of those arguments."). The only remaining merits issue is whether the Department's termination was arbitrary and capricious. Confronted with Plaintiffs' detailed explanation of the numerous reasons this Court should answer that question in the affirmative, Defendants offer little more than *ipse dixit*.

Defendants concede that their challenged actions must be "reasonable and reasonably explained" to survive Plaintiffs' APA challenge. Def. Opp'n at 32 (internal quotation marks omitted), ECF No. 59-1. But their summary judgment brief contains just three sentences purporting to explain how the Department meets that standard and why this Court should not credit Plaintiffs' arguments that "the Department failed to consider the statutory factors, failed to consider reliance interests, and explained itself inadequately." *Id.* None persuades.

First, Defendants contend that "[t]he February 7, 2025 review was a contract-by-contract examination, circulated with a per-contract action column distinguishing termination from descoping from further review, three days before any termination issued." *Id.* at 32. This argument is so conclusory and underdeveloped that it should be deemed forfeited. *See United States v. TDC Mgmt. Corp.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016) (finding an argument "forfeit[ed] because [the party] does not further develop it (or even mention it again) after [a] 'single, conclusory statement'" (quoting *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008)). But even if the argument is not forfeited, the spreadsheet reflecting the review Defendants describe does not explain Defendants' decisionmaking with respect to the underlying contracts. The spreadsheet leaves unanswered critical questions about the reasons for the Department's termination of the contracts, the justification for the unprecedented change in course that the terminations represent, the factors the Department considered in reaching its decision to terminate (including any reliance interests), and how the Department's cancellation of the contracts would affect its ability to meet ESRA's statutory mandate. Moreover, in many instances the spreadsheet's "per-contract action" conflicts with its description of the Department's corresponding statutory requirements. *See* Pl. Mot. Summ. J. at 43, ECF No. 54-1 (noting that "in numerous cases, the Department canceled contracts that—by the Department's own assessment—supported "Statutory, Mandated, or Critical" research"). For these reasons, Defendants' bald citation to the February 7, 2025 review cannot controvert Plaintiffs' arguments demonstrating the Department's lack of reasoned decisionmaking. *See id.* at 41–45.

Defendants next assert that because "[t]he February 10, 2025 directive stated its criterion on its face[,] . . . the agency's path may reasonably be discerned" from that record. Def. Opp'n at 32, ECF No. 59-1. This argument, too, is so perfunctory and undeveloped that the Court should

deem it waived. *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments . . . are deemed waived.") "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). Defendants have an "obligation to spell out [their] arguments squarely and distinctly, or else forever hold [their] peace." *Id.* (citation modified). They have failed to do so.

Even if Defendants had spelled out their argument, the lack of substance in the February 10, 2025 Termination Directive dooms their claim. The Directive reads, in relevant part: "Please move out on terminating the contracts in the attachment. The expectation is that these will be terminated today. I recommend starting with those with the highest dollar value of implied savings." VA000001. The Directive does not offer a reasoned explanation of the decision to terminate the hundreds of contracts to which it applies. Nor does it shed light on whether or how the Department considered the statutory obligations or reliance interests implicated by the studies to which those contracts relate. The contents of the Directive are thus woefully insufficient to establish that "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also id.* at 48 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner.").

While Defendants suggest that this Court can reasonably discern the basis for the Department's decision from the Record despite the Department's failure to articulate a reasoned basis, their argument lacks merit. A court confronted with a "sparse administrative record" cannot reasonably discern the basis for agency decisionmaking where "[t]he agenc[y's] decisions 'leave[]

too many key questions unanswered to satisfy the APA.'" *Drs. for Am*, 793 F. Supp. 3d at 145 (citation omitted). By Defendants' own account, the record from which this Court should reasonably discern the basis for the Department's decision to terminate the Challenged Studies consists of nothing more than a three-line email directing cancellation and suggesting that cancellations with the highest implied savings be terminated first. Because that email "leaves too many key questions unanswered," it cannot support the Court's discernment of a reasoned basis that the Department itself failed to adequately articulate. *Id.*

Because Plaintiffs have demonstrated that the Department's decision to terminate the Challenged Studies "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [and rests on] an explanation . . . that runs counter to the evidence before the agency," the decision was arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## CONCLUSION

For the foregoing reasons, this Court should award summary judgment in favor of Plaintiffs.

Dated: August 28, 2026

Respectfully submitted,

/s/ Amy I. Berman
Amy I. Berman, DC Bar No. 480541
NATIONAL ACADEMY
OF EDUCATION
500 Fifth Street, NW
Washington, DC 20001
(202) 334-2341
aberman@naeducation.org

/s/ Pilar Whitaker
Pilar Whitaker*
Chloe Miller*
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
kjohnston@naacpldf.org
pwhitaker@naacpldf.org

Samuel Spital, DC Bar No. NY0248
Colin Burke*
NAACP LEGAL DEFENSE &

EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
sspital@naacpldf.org
cburke@naacpldf.org

Kelly Gardner*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
260 Peachtree Street NW, Suite 2300
Atlanta, GA 30303
(332) 282-6613
kgardner@naacpldf.org

*Admitted *pro hac vice*