UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ACADEMY OF EDUCATION and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity as Secretary of Education,<br><br>Defendants. | Civil Action No. 25-1266 (TNM) |

**DEFENDANTS' REPLY IN SUPPORT**
**OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 5

I. Plaintiffs Have Not Carried Their Burden of Demonstrating Standing. ........................................ 5

A. No Statute Entitles Plaintiffs to Seven of the Ten Studies, and the Three Studies Congress Prescribes Have Continued to Be Administered. ........................................ 5

1. The Provisions on Which Plaintiffs Rely Require Statistics on Broad Subjects, Not Specific Studies. ........................................ 5

1. The Three Studies That Congress Prescribes Continue, and the Record Does Not Support Plaintiffs' Account of the Others. ........................................ 10

(a) The Studies That Continue ........................................ 10

(b) The Collection Waves That Did Not Take Place ........................................ 15

B. Plaintiffs Have Not Demonstrated Their Alleged Injuries Are Redressable by Relief the Court May Order. ........................................ 15

C. Plaintiffs' Organizational, Associational, and Traceability Arguments Do Not Establish Standing. ........................................ 20

II. Nothing in Plaintiffs' Opposition Rescues Their Claims on the Merits. ........................................ 20

A. No Statute Prescribes the Seven Studies, So the Court May Not Order the Department to Resume Them. ........................................ 21

B. The Record Shows That the Department's Decisions Were Not Arbitrary or Capricious. 23

C. Any Relief Should Be Limited to Setting Aside the Action Found Unlawful. ........................................ 25

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*AFL-CIO v. Chao*,
496 F. Supp. 2d 76 (D.D.C. 2007) ........ 17
*Air All. Houston v. U.S. Chem. Safety & Hazard Investigation Bd.*,
365 F. Supp. 3d 118 (D.D.C. 2019) ........ 9, 10
*Am. Great Lakes Ports Ass'n v. Zukunft*,
301 F. Supp. 3d 99 (D.D.C. 2018) ........ 17
*Am. Whitewater v. FERC*,
125 F.4th 1139 (D.C. Cir. 2025) ........ 20
*Bean v. Perdue*,
316 F. Supp. 3d 220 (D.D.C. 2018) ........ 4
*Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*,
369 F. Supp. 3d 141 (D.D.C. 2019) ........ 16
*Cody v. Cox*,
509 F.3d 606 (D.C. Cir. 2007) ........ 22
*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ........ 9
*Ethical Treatment of Animal*s v. *USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ........ 8, 9
*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 9
*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ........ 25
*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........ 5
*Fryshman v. U.S. Comm'n for the Pres. of Am.'s Heritage Abroad*,
422 F. Supp. 3d 1 (D.D.C. 2019) ........ 18
*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) ........ 3, 19, 21
*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 22
*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
751 F.3d 629 (D.C. Cir. 2014) ........ 19, 21
*ITServe All., Inc. v. Dep't of Homeland Sec.*,
590 F. Supp. 3d 27 (D.D.C. 2022) ........ 10
*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........ 22
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 5

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........................................ 25
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 24
*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ........................................ 15
*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................ passim
*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ........................................ 16
*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ........................................ 22
*Russello v. United States*,
464 U.S. 16 (1983) ........................................ 7
*Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) ........................................ 16
*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................ 5, 16

Statutes

5 U.S.C. § 701(a)(2) ........................................ 20, 22
5 U.S.C. § 706(1) ........................................ 3, 10
20 U.S.C. § 1015a(i)(4) ........................................ 11
20 U.S.C. § 1015a(k)(1) ........................................ 11
20 U.S.C. § 1094(a)(17) ........................................ 11
20 U.S.C. § 9512 ........................................ 7, 22, 24
20 U.S.C. § 9541(b)(1) ........................................ 4, 12, 14, 19
20 U.S.C. § 9543(a) ........................................ 1
20 U.S.C. § 9543(a)(1) ........................................ 6
20 U.S.C. § 9543(a)(1)(E) ........................................ 21
20 U.S.C. § 9543(a)(7) ........................................ 15, 18
20 U.S.C. § 9544(a) ........................................ 2, 6, 22
20 U.S.C. § 9574 ........................................ 7
20 U.S.C. § 9622 ........................................ 20, 23
20 U.S.C. § 9622(b)(2)(A) ........................................ 12
20 U.S.C. §§ 9573(c)(2)(B) ........................................ 14
20 U.S.C. §§ 9622(a) ........................................ 1, 6, 10, 23
28 U.S.C. § 1491(a)(1) ........................................ 21
42 U.S.C. § 7412(r)(6)(Q) ........................................ 10
U.S.C. § 9574 ........................................ 7

## INTRODUCTION

The question in this case is whether a statutory duty to report statistics on a list of broad subjects is a duty to conduct the specific studies relied upon by Plaintiffs. It is not. The Education Sciences Reform Act ("ESRA") provides that the National Center for Education Statistics ("NCES") "shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations," including by "conducting longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a), (a)(7). Those provisions describe broad subjects, but they identify no particular study. Congress prescribes three of the ten studies at issue by statute. It prescribes two by name, the National Assessment of Educational Progress ("NAEP") and the Integrated Postsecondary Education Data System ("IPEDS"). 20 U.S.C. §§ 9622(a), 1015a(i)(4). It prescribes the third by description: a survey of "recipients of Federal student financial aid" conducted "not less often than once every four years." *Id.* § 1015a(k)(1)–(2). NCES conducts that survey as the National Postsecondary Student Aid Study ("NPSAS"). The Department continues to administer all three. For the other seven studies[1] which Plaintiffs ask the Court to order the Department to "resume," Am. Compl. ¶¶ 232–241 (ECF No. 31), Congress specified subjects and left the choice of which studies to conduct to NCES. No statute prescribes any of the seven studies "with the clarity necessary to support judicial action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004) ("*SUWA*").

Plaintiffs' opposition confirms this point. They claim informational standing on the theory that ESRA entitles them to data from each of the ten studies they challenge. Pls.' Opp'n at 8

---

[1] The seven are the Common Core of Data ("CCD"); the Trends in International Mathematics and Science Study ("TIMSS"); the National Household Education Surveys Program ("NHES"); the Early Childhood Longitudinal Study, Kindergarten Class of 2023–24 ("ECLS-K"); the Beginning Postsecondary Students Longitudinal Study ("BPS"); the Baccalaureate and Beyond Longitudinal Study ("B&B"); and the High School Longitudinal Study of 2009 ("HSLS:09").

(ECF No. 64). But they now acknowledge, without distinguishing among the ten, that the studies "may be the 'means the Department chose'" to meet its statutory obligations, *id.* at 7; that the Department "retains discretion to determine how" to meet its obligations and may use "new contracts," its own staff, or "any other means ESRA permits," *id.* at 23; and that "the Department may determine how to allocate its financial resources across the studies it supports," *id.* at 30. A statute that leaves the Department with discretion to choose which studies to conduct does not entitle anyone to a specific study. ESRA's text confirms that discretion. The Statistics Commissioner "may award grants, enter into contracts and cooperative agreements," "may use the statistical method known as sampling," and may renew contracts "at the discretion of the Statistics Commissioner." 20 U.S.C. § 9544(a), (b)(1), (c). The so-called public-availability provision, on which Plaintiffs rely, applies only "[s]ubject to section 9573 of this title," *id.* § 9574, which bars "any publication whereby the data furnished by any particular person . . . can be identified," *id.* § 9573(c)(2)(B). So even that provision has limits, and such limits are why the Department evaluates a data file for disclosure risk before releasing it. Defendants addressed both provisions in their opening memorandum. Defs.' Mem. at 18–21, 27 (ECF No. 59-1). Plaintiffs' opposition does not mention either provision.

Nor does Plaintiffs' opposition address *SUWA*, which forecloses the relief Plaintiffs seek. In the Amended Complaint, Plaintiffs ask the Court to order the Department to "resume" the ten studies. Am. Compl. ¶¶ 232–241. The statute in *SUWA* directed the agency to manage wilderness study areas "so as not to impair the suitability of such areas for preservation as wilderness," and the plaintiffs asked for an order compelling the agency to comply. 542 U.S. at 59-61, 65-66. The Supreme Court held that the statute was "mandatory as to the object to be achieved" but left the agency "a great deal of discretion in deciding how to achieve it." *Id.* at 66. The statute did not

mandate the specific step the plaintiffs sought, the total exclusion of off-road vehicles, "with the clarity necessary to support judicial action." *Id.* It follows that a court may not "enter general orders compelling compliance with broad statutory mandates." *Id.* *SUWA* arose under 5 U.S.C. § 706(1), and the Amended Complaint invokes only § 706(2), but that makes no difference because *SUWA*'s "reasoning applies with equal force to claims regarding action taken under § 706(2)." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 n.9 (D.C. Cir. 2006); Defs.' Mem. at 31. ESRA's mandate shares the key feature of the statute in *SUWA*. It uses "shall" to set a goal, and it leaves the agency with the choices on how to meet that goal. Apart from the three studies Congress prescribes by statute, no statute specifies which studies NCES must conduct.

What Plaintiffs' opposition adds are requests for relief that go beyond the Amended Complaint and would run afoul of *SUWA*. In their Amended Complaint, Plaintiffs ask the Court to "[e]njoin Defendants from hindering the collection, maintenance, analysis, and dissemination of" the ten studies, and to "order Defendants to resume" each "study." *See* Am. Compl. ¶¶ 232–241. In their opposition, Plaintiffs now ask the Court to order the Department "to resume fulfilling its statutory obligations under ESRA," which is another way of asking the Court to order compliance with a broad statutory mandate. Pls.' Opp'n at 23. They also ask the Court to enjoin the Department from "disclosing data that does not meet ESRA's quality standards," to restore "the panels, data quality checks, and peer review processes" that earlier contracts included, and to "retain jurisdiction to monitor compliance and ensure the Department fulfills its statutory obligations going forward." *Id.* at 23–24. A court may compel an agency to take an action that is discrete and legally required, but it may not take on "day-to-day agency management." *SUWA*, 542 U.S. at 66–67. In accepting Plaintiffs' allegations at the motion-to-dismiss stage, the Court understood the Amended Complaint to seek "incremental correction" of "specific erroneous

decisions." Mem. Op. at 21 (ECF No. 40) ("Mem. Op."). Plaintiffs' request that the Court monitor the Department's compliance with ESRA going forward is a different kind of relief. To the extent these new requests for relief go beyond the Amended Complaint, they are impermissible attempts to amend the complaint through summary judgment briefing. *See Bean v. Perdue*, 316 F. Supp. 3d 220, 226 (D.D.C. 2018) ("[I]t is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing.").

Plaintiffs also rely on a provision about the quality of NCES's work. Section 9541(b)(1) states that NCES's mission is "to collect and analyze education information and statistics in a manner that meets the highest methodological standards." 20 U.S.C. § 9541(b)(1). That provision sets the standard NCES's work must meet, but it does not prescribe *which studies* NCES must conduct. For these reasons, among others, Plaintiffs have failed to demonstrate informational standing at the summary judgment stage, and the case should be dismissed for lack of subject-matter jurisdiction.

Even if the Court were to reach the merits of Plaintiffs' claims under the Administrative Procedure Act ("APA"), those claims fail. The administrative record shows that the challenged decisions were not arbitrary or capricious. It contains more than the "three-line email," Pls.' Opp'n at 34, on which Plaintiffs rest. It contains a contract-by-contract review dated three days before any termination. And if the Court were to find the explanation for any decision inadequate, the remedy would be to set that decision aside, not to order the Department to conduct specific studies. The Court should deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion for summary judgment, and dismiss the case for lack of subject-matter jurisdiction.

## ARGUMENT

### I. Plaintiffs Have Not Carried Their Burden of Demonstrating Standing.

Now at summary judgment, Plaintiffs must support each element of standing with evidence, for each claim and each form of relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). This Court cautioned that the standing analysis may come out differently on a developed record, which is now before the Court. Mem. Op. at 15-16. Defendants begin with statutory entitlement, where Plaintiffs' own statements are most telling.

#### A. No Statute Entitles Plaintiffs to Seven of the Ten Studies, and the Three Studies Congress Prescribes Have Continued to Be Administered.

##### 1. The Provisions on Which Plaintiffs Rely Require Statistics on Broad Subjects, Not Specific Studies.

The Amended Complaint does not ask the Court to order the Department to report statistics on any subject listed in ESRA. It asks the Court to order the Department to "resume" each "study." Am. Compl. ¶¶ 232–241.

Informational standing requires a statute that, on a plausible reading, requires disclosure of the information the plaintiff alleges it was denied. Mem. Op. at 9; *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); Defs.' Mem. at 16. Plaintiffs emphasize that the Court credited their reading of ESRA on the motion to dismiss. *See* Pls.' Opp'n at 3 n.1. The Court did so on allegations taken as true from Plaintiffs' Amended Complaint, and "for now." Mem. Op. at 10. Plaintiffs continue to ignore this distinction. The question at summary judgment is whether, under a plausible reading of ESRA, a statutory duty to report statistics on a list of broad subjects is a duty to conduct the specific studies relied upon by Plaintiffs. For most of what Plaintiffs seek, it is not. And the three studies Congress prescribes by statute continue, so Plaintiffs have not been

deprived of them. Plaintiffs' objections to those three studies concern quality-control measures that earlier contracts included and that no statute requires. *See infra* Part I.A.2.

The provisions of ESRA on which Plaintiffs rely are mandatory as to the *subjects* NCES must cover, but they do not specify which studies NCES must conduct on a subject, with what sample, or how often. Section 9543(a)(1) calls for "collecting, acquiring, compiling (where appropriate, on a State-by-State basis), and disseminating full and complete statistics (disaggregated by the population characteristics described in paragraph (3)) on the condition and progress of education, at the preschool, elementary, secondary, postsecondary, and adult levels in the United States," including data on subjects such as "State and local early childhood school readiness activities" and "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students." 20 U.S.C. § 9543(a)(1), (a)(1)(B), (a)(1)(E). These topics are unquestionably broad. Section 9543(a)(7) calls for "conducting longitudinal and special data collections necessary to report on the condition and progress of education." Each provision states a subject. None prescribes a study or a cohort, and § 9543(a)(7) leaves what is "necessary" for NCES to determine. Section 9544 provides that, in carrying out those duties, the Statistics Commissioner "may use the statistical method known as sampling" and "may, as appropriate, use information collected" from States and other sources, and that NCES contracts "may be renewed at the discretion of the Statistics Commissioner." *Id.* § 9544(b)(1)–(2), (c).

In that respect, these provisions resemble the statute the Supreme Court considered in *SUWA*, which was "mandatory as to the object to be achieved" but left the agency "a great deal of discretion in deciding how to achieve it." 542 U.S. at 66. Congress knows how to prescribe a specific study on a specific schedule. It prescribed the National Assessment by name, "at least once every 2 years, in grades 4 and 8 in reading and mathematics." 20 U.S.C. § 9622(a), (b)(2)(B).

It prescribed the student-aid survey by description: a survey of "recipients of Federal student financial aid" "not less often than once every four years." *Id.* § 1015a(k)(1)–(2). A statute can thus prescribe a study without naming it, by specifying who is surveyed and how often. Those are discrete requirements, and the Department has kept to both schedules. *See infra* Part I.A.2. Congress wrote nothing comparable for the other studies Plaintiffs ask the Court to "resume." ESRA specifies no cohort and no schedule for any of them. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

Neither of the two provisions Plaintiffs cite for a public right of access supports the entitlement to the studies they seek. The first is 20 U.S.C. § 9574, which Plaintiffs quote as providing that data "shall be made available to the public." Pls.' Opp'n at 5–6. That provision reads, in relevant part: "Subject to section 9573 of this title, data collected by the Institute . . . shall be made available to the public, including through use of the Internet." 20 U.S.C. § 9574. By its clear terms, that provision reaches only "data collected." It mentions nothing about what data must be collected, and it applies "[s]ubject to" § 9573, which bars "any publication whereby the data furnished by any particular person . . . can be identified." *Id.* § 9573(c)(2)(B). The second provision cited by Plaintiffs is 20 U.S.C. § 9512, which directs the Institute of Education Sciences ("IES" or "the Institute") to "widely disseminate the findings and results of scientifically valid research in education." *Id.* § 9512(2); *see* Pls.' Opp'n at 6. That provision concerns the "findings and results" of research; it prescribes no specific study.

Plaintiffs respond that the studies "may be the 'means the Department chose,'" but that, "having chosen those means, the Department cannot invoke purely theoretical defenses to justify

its failure to meet its statutory obligations in that way." Pls.' Opp'n at 7. That response confirms that the studies are means of carrying out the statute, not requirements of it. Plaintiffs do not hold their position consistently, either. On page 7 of their opposition, Plaintiffs acknowledge the studies are "means the Department chose." On page 23, Plaintiffs acknowledge the Department "may procure the work through new contracts, perform the work internally, or use any other means ESRA permits," and on page 30, Plaintiffs recognize "the Department may determine how to allocate its financial resources across the studies it supports." Those three statements are correct. But on page 8, Plaintiffs argue the Department is "under a clear statutory duty to produce each of the Challenged Studies." That statement cannot be squared with the other three. Apart from the three studies Congress prescribes by statute, which the Department continues to administer, Plaintiffs have no entitlement to any specific study in this case. A duty to report statistics on a broad topic is not an entitlement to a specific study.

Plaintiffs rely on *People for the Ethical Treatment of Animals v. USDA* ("*PETA*"), 797 F.3d 1087 (D.C. Cir. 2015), *see* Pls.' Opp'n at 7–8, but *PETA* does not support their theory of informational standing for two reasons. First, *PETA* did not hold that any statute entitled the plaintiff to information. The plaintiff there "assert[ed] 'organizational standing' only." 797 F.3d at 1093. Under the organizational standing doctrine, the court asked whether the agency's inaction "injured the [organization's] interest" and whether the organization "used its resources to counteract that harm." *Id.* at 1094. The D.C. Circuit found both were adequately alleged "at the dismissal stage": the agency's failure to apply the Animal Welfare Act to birds left the organization without a complaint process and without the inspection reports it used to educate the public, and the organization had spent its own money in response. *Id.* at 1094–97. The court did not ask whether any statute required the agency to produce those reports.

The type of organizational standing recognized in *PETA*, which rests on harm to an organization's own activities and the resources it spends in response, is not available to Plaintiffs. This Court has recognized that Plaintiffs "base their organizational standing claims on informational injuries they suffered directly," and that resource expenditures "have little to do with Plaintiffs' theory of injury." Mem. Op. at 16–17. The Supreme Court has also since narrowed the organizational theory on which *PETA* rested, recognizing an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). The D.C. Circuit has since explained the limits of *PETA* in a case where it rejected organizational standing. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025). As the D.C. Circuit explained, *PETA* turned on the fact that the agency's inaction in *PETA* "shifted to the plaintiff organization the burden" of investigating and responding to complaints. *Id.* The organization in *Center for Biological Diversity* lacked standing when it alleged that the agency's inaction "deprived [it] of information" that "would have otherwise been disclosed," because it identified "no harm to its own activities apart from its advocacy." *Id.*

Second, the plaintiff in *PETA* lost on the merits for the reason Defendants press here. "Having won the standing battle, PETA nonetheless loses the war." 797 F.3d at 1097. The D.C. Circuit applied *SUWA* and held that the plaintiff could not compel the agency to act, because "nothing in the [Animal Welfare Act] requires the USDA to apply the general animal welfare standards to birds . . . before it has promulgated more appropriate bird-specific regulations." *Id.*

at 1098 (emphasis omitted). The D.C. Circuit could not conclude that the agency had "failed to take action it was 'required to take.'" *Id.* at 1099 (quoting *SUWA*, 542 U.S. at 64).[2]

**1. The Three Studies That Congress Prescribes Continue, and the Record Does Not Support Plaintiffs' Account of the Others.**

**(a) *The Studies That Continue***

Defendants have submitted a supplemental declaration with this reply to bring the facts current.[3] *See* Supp. Decl. of Matthew Soldner, Oct. 6, 2026 ("Supp. Soldner Decl."); *see also* Decl. of Matthew Soldner, Aug. 11, 2026 (ECF No. 59-2) ("Soldner Decl."). Those facts bear on subject-matter jurisdiction. Start with the three studies Congress prescribes by statute, where each continues.

<u>NAEP</u>. Congress prescribes the National Assessment, 20 U.S.C. § 9622(a), and the Department administers it. The 2026 assessment was administered from January 26 through March 20, 2026, in mathematics and reading at grades 4 and 8 and in civics and U.S. history at

---

[2] Plaintiffs also cite a district court decision, *Air Alliance Houston v. U.S. Chemical Safety & Hazard Investigation Board*, 365 F. Supp. 3d 118 (D.D.C. 2019). Pls.' Opp'n at 8–9. That case involved two specific statutory commands. One directed the agency to "establish by regulation requirements binding on persons for reporting accidental releases into the ambient air," and the agency did not dispute that the statute required it to do so. *Id.* at 120–21 (quoting 42 U.S.C. § 7412(r)(6)(C)(iii)). The other provided that "any records, reports or information obtained by the Board shall be available to . . . the public." *Id.* at 124 (quoting 42 U.S.C. § 7412(r)(6)(Q)). The plaintiffs filed suit under 5 U.S.C. § 706(1), and the court ordered that the regulation be issued because the directive to adopt the regulation, in its view, was "a discrete act that the [agency] is required to take." *Id.* at 131–32.

[3] Defendants submit the supplemental declaration for the limited purpose of addressing current factual circumstances bearing on Plaintiffs' Article III standing, including whether the relief Plaintiffs seek would redress their asserted injuries. The declaration does not supplement the administrative record, supply additional reasons for the challenged agency actions, or raise a new legal argument. Rather, it provides additional evidence concerning redressability, an issue Defendants raised in their cross-motion and that Plaintiffs addressed in opposing that motion. *See ITServe All., Inc. v. Dep't of Homeland Sec.*, 590 F. Supp. 3d 27, 35–36 (D.D.C. 2022) (McFadden, J.) (considering a declaration submitted during cross-motion summary-judgment briefing because it was "not a new argument," but instead "more evidence for standing," an issue already raised), *aff'd*, 71 F.4th 1028 (D.C. Cir. 2023).

grade 8. Supp. Soldner Decl. ¶ 5. The contracts under which the assessment is administered remained in effect as of October 5, 2026. *Id.* That answers Plaintiffs' objections that Defendants' evidence concerns "data collected prior to the Termination Directive" and that the declarations make "no representation about the future of NAEP." Pls.' Opp'n at 14–15. Plaintiffs' concern about the sample for the 2026 assessment is based on speculation. Their declarant could not identify which CCD file the Department used to draw that sample, or when, and he acknowledged that any problem "may not become apparent until the 2026 NAEP results are released in 2027." Ho Decl. ¶¶ 20–22, ECF No. 54-6. The record answers his question: the public-school sample was drawn in April 2025 from the 2023–24 CCD. Soldner Decl. ¶ 6. Plaintiffs respond that those data predate the challenged actions. Pls.' Opp'n at 14. The sample for the 2026 assessment was drawn from data collected before the February 2025 actions, so those actions could not have affected it.

<u>IPEDS</u>. IPEDS has continued without interruption. The 2025–26 collection was completed under a contract in place since April 2022, and the 2026–27 collection opened on September 16, 2026, under a successor contract. Supp. Soldner Decl. ¶ 8; *see* Defs.' Mem. at 19. Plaintiffs do not dispute that IPEDS has continued. *See* Pls.' Opp'n at 16. Their objection concerns support for institutions that submit data, but Congress made the adequacy of institutions' IPEDS submissions a matter for "the satisfaction of the Secretary [of the Department]." 20 U.S.C. § 1094(a)(17). Plaintiffs do not mention that provision. They rely instead on 20 U.S.C. § 1015a(i)(4), which directs the Commissioner to "continue to update and improve" IPEDS, "including the reporting of information by institutions and the timeliness of the data collected." Pls.' Opp'n at 9 n.2, 26. That provision presupposes that IPEDS continues, and it does.

<u>NPSAS</u>. The Higher Education Act prescribes a survey of "recipients of Federal student financial aid" and provides that it be conducted "not less often than once every four years."

20 U.S.C. § 1015a(k)(1)–(2). NCES conducts that survey as NPSAS. Data collection for NPSAS:24 is complete, and NPSAS:28 has been awarded. Supp. Soldner Decl. ¶¶ 4, 6. Plaintiffs object that Defendants attached only a "Fixed Price Payment Schedule" for NPSAS:28. Pls.' Opp'n at 17. The award is now before the Court as Exhibit A to Mr. Soldner's supplemental declaration. Supp. Soldner Decl. ¶ 4. Modification No. P00001 to that award, which added the collection of administrative records for the BPS:20 cohort, was already in the record. ECF No. 59-2 at 52–70.

CCD. Plaintiffs rely upon 20 U.S.C. § 9622(b)(2)(A), *see* Pls.' Opp'n at 15, which requires a random sampling process for NAEP, but that provision does not mention CCD. Section 9544(b) leaves sampling methods and the use of State-reported records to the Statistics Commissioner. *See* Defs.' Mem. at 18, 20. Plaintiffs do not address that provision.

For the studies that continue, Plaintiffs' main objection appears to be that the current contracts omit quality-control measures that earlier contracts included, such as a technical review panel, training for survey respondents, and a First Look report. Pls.' Opp'n at 13–18. Plaintiffs argue that ESRA entitles them to data of a particular quality, and that the Department denies them information when it produces data without the measures that earlier contracts included. *Id.* at 9–10, 18. Plaintiffs rely on two provisions for this proposition. Section 9541(b)(1) states that NCES's mission is "to collect and analyze education information and statistics in a manner that meets the highest methodological standards." 20 U.S.C. § 9541(b)(1). Section 9511(b)(2)(A) directs the Institute to ensure that its activities "conform to high standards of quality, integrity, and accuracy." *Id.* § 9511(b)(2)(A). Defendants do not dispute either provision. Each sets a standard for the quality of the Department's work. Neither tells the Department which studies to conduct, and neither requires a technical review panel, respondent training, or a First Look report.

The two documents from the administrative record that Plaintiffs quote do not change the analysis. One is the June 30, 2025 modification that reinstated the NPSAS:24 contract, which states that "all [of the] tasks in th[e] contract as originally awarded were necessary for the efficient implementation and fulfillment of NCES's statutory requirements." VA000188–89; *see* Pls.' Opp'n at 17. The other is a page in the file for the reinstated CCD contract that identifies, as a risk, that "CCD data files are not delivered as a high-quality product." VA001603; *see* Pls.' Opp'n at 15–16. Neither is a statute, and neither makes contract work a statutory entitlement of the public.

Plaintiffs rely on *Environmental Defense Fund v. EPA* for the proposition that a plaintiff asserting an informational injury "need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." Pls.' Opp'n at 19 (quoting 922 F.3d 446, 453 (D.C. Cir. 2019)). They argue that removing the quality-control measures is "connected to the substantive result," which they describe as "data of diminished quality." *Id.* But that does not relieve Plaintiffs of the need to identify a statutory entitlement in the first place. In that case, the Toxic Substances Control Act required EPA to publish an inventory of chemicals. 922 F.3d at 450. A company could ask EPA to keep a chemical's identity confidential, but the Act required the company to substantiate that request, including by showing that the identity was not "readily discoverable through reverse engineering." *Id.* at 450–51, 453. EPA's rule eliminated the questions that had required companies to make that showing. *Id.* at 453. The D.C. Circuit referred to this as "a quintessential claim of informational standing." *Id.* at 452. On the plaintiff's reading, the Act "requires disclosure to it (and the public at large) of chemical identities that the [challenged rule] will keep secret." *Id.* The omitted questions were "an indispensable procedural step in the agency's confidentiality determination," that is, in deciding whether information would be disclosed at all. *Id.* at 453. Here, by contrast, the quality-control measures that Plaintiffs say are

missing, such as a technical review panel and a First Look report, do not decide whether any data is disclosed. Plaintiffs describe the "substantive result" of removing those measures as "data of diminished quality," Pls.' Opp'n at 19, and that is a complaint about quality, not a denial of information.

TIMSS 2023, NHES:2023, and the ECLS-K kindergarten file. That leaves the data that was collected, but has not been released in full. Plaintiffs maintain that a duty to disseminate "is not satisfied by collecting data and then failing to release it." Pls.' Opp'n at 16. But the provisions on which they rely set no date for the release of any file. Section 9574 provides that data the Department has collected "shall be made available to the public," and it applies "[s]ubject to section 9573," which bars any publication from which an individual could be identified. 20 U.S.C. §§ 9573(c)(2)(B), 9574. Section 9541(b)(2) describes NCES's mission as reporting statistics "in a timely manner." *Id.* § 9541(b)(2). Neither provision sets a date. Plaintiffs therefore have not shown that a statute requires the Department to have released these files by now. For ECLS-K, IES intends to release "the restricted-use data file and associated documentation" "following completion of disclosure-risk evaluation," and the contract under which those products are being developed runs through February 6, 2027. Supp. Soldner Decl. ¶ 7 & Ex. B. For TIMSS 2023 and NHES:2023, the final files and documentation have not been completed. Soldner Decl. ¶¶ 45, 67. The United States' participation in TIMSS continues under the contract for TIMSS 2027. Defs.' Mem. at 18.

### (b) *The Collection Waves That Did Not Take Place*

Plaintiffs' fallback is that the Department "is not conducting any longitudinal studies" and so "is not performing its statutory obligations in this respect at all." Pls.' Opp'n at 27.[4] This assertion is wrong on the facts, or at least Plaintiffs are relying on outdated information, as detailed below.

<u>BPS, B&B, HSLS:09, and the ECLS-K first-grade round</u>. The Department is conducting longitudinal work. NPSAS:28 was awarded on July 1, 2026, and the award includes a follow-up of the B&B:24 cohort. Soldner Decl. ¶¶ 20, 29; Supp. Soldner Decl. ¶ 4 & Ex. A. Modification No. P00001 to that contract, dated August 10, 2026, added the collection of administrative records for the BPS:20 cohort, and that work started the same day. Soldner Decl. ¶ 24 & Ex. G, ECF No. 59-2 at 52–70; Supp. Soldner Decl. ¶ 10. Defendants have been equally plain about what did not happen: the BPS:20/25 and B&B:24/25 collection waves, the third follow-up of HSLS:09, and the first-grade round of ECLS-K did not take place. Soldner Decl. ¶¶ 23, 28, 31–34, 50–54; Supp. Soldner Decl. ¶ 9; Defs.' Mem. at 10–11. Those collection waves are what Plaintiffs' claims about these four studies boil down to. But the provision on longitudinal work calls for "longitudinal and special data collections necessary to report on the condition and progress of education," 20 U.S.C. § 9543(a)(7), and it prescribes no specific wave of any specific study. *See supra* Part I.A.1.

### B. Plaintiffs Have Not Demonstrated Their Alleged Injuries Are Redressable by Relief the Court May Order.

Redressability is measured against relief the Court can award. When the only relief that would redress an injury is relief a court cannot grant, the plaintiff lacks standing. *Newdow v.*

---

4 Plaintiffs support this assertion in part with deposition testimony taken in another case. Pls.' Opp'n at 27 & n.11. Their motion asking the Court to consider that testimony is pending, ECF No. 55, and Defendants have opposed it.

*Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (no standing where the only relief that would redress the injury "is unavailable"). Vacatur would not supply the data from collection waves that did not take place, and it would add nothing for the studies whose contracts have been reinstated. The type of order Plaintiffs would need for redressability, one compelling the Department to resume studies, is not available for the seven studies that no statute prescribes. The three studies Congress does prescribe continue, as explained above, and so cannot establish redressability. Without a redressable injury, the Court lacks subject-matter jurisdiction over the corresponding claims. *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019).

Plaintiffs' theory of redressability rests on one sentence from the Court's opinion on the motion to dismiss. Pls.' Opp'n at 22. There, the Court stated that it could redress Plaintiffs' injuries by "declar[ing]" that canceling the studies was "arbitrary and capricious" and ordering "Defendants to resume the stud[ies]." Mem. Op. at 13 (quoting Am. Compl. at 44–45). The Court was quoting the relief requested in the complaints, and its next sentence reads: "This allegedly available relief satisfies redressability for now." *Id.* (citing *Severino v. Biden*, 71 F.4th 1038, 1043 (D.C. Cir. 2023)). That ruling, like *Severino* itself, came on the pleadings. *Severino* explains that a plausible allegation is enough at that stage, "even though greater specificity as to the availability of relief might be required at later stages in the litigation." 71 F.4th at 1043. Plaintiffs continue to ignore this distinction. At summary judgment, Plaintiffs must establish redressability with evidence, as to each claim and each request for relief. *TransUnion*, 594 U.S. at 431. They have not, because an order that the Department "resume the stud[ies]" is not available under the APA.

Start with vacatur. Plaintiffs ask the Court to "vacate the Department's decision to terminate those studies." Pls.' Opp'n at 22–23. Vacatur sets agency action aside and "does not

'enjoin' or 'restrain' anyone." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026), *petition for cert. filed*, No. 26-239 (U.S. Aug. 24, 2026); Defs.' Mem. at 4, 26. Plaintiffs agree about what vacatur would not do here. They "do not ask this Court to order a specific contractor to resume performance of a terminated contract or to retroactively collect data that was not gathered," and they accept that vacatur "would not revive settled contracts." Pls.' Opp'n at 22–23. Their own declarant avers that when a collection wave does not take place, "that data is permanently lost." Barnett Decl. ¶ 8, ECF No. 54-3; Defs.' Mem. at 26. The periods planned for those collections have passed. Supp. Soldner Decl. ¶ 9. The three court decisions Plaintiffs cite for the proposition that vacatur is the appropriate remedy do not suggest that vacatur would supply the studies here. Pls.' Opp'n at 23. Two of the cases concerned agency rules, and vacating a rule restores the rule that preceded it. *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103 (D.D.C. 2018); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 92 (D.D.C. 2007). The third, which is now on appeal, enforced an appropriations statute that required OMB to post specific apportionment documents on a public website, and the court set aside OMB's removal of documents that already existed. *See* Pls.' Opp'n at 23 (describing *Citizens for Resp. & Ethics in Wash. v. OMB*, 791 F. Supp. 3d 29, 61 (D.D.C. 2025), *appeal filed*, No. 25-5267 (D.C. Cir. July 23, 2025)). Here, there is no earlier rule to restore. Apart from the three studies Congress prescribes by statute, no statute prescribes the studies at issue, and vacatur cannot supply data from collection waves that never took place.

Nor would vacatur add anything for the studies under contract today. Data collection for NPSAS:24 is complete, and its final data products are in development under the contract reinstated on June 30, 2025. Soldner Decl. ¶ 19; Supp. Soldner Decl. ¶ 6. The ECLS-K kindergarten data products are in development under the contract reinstated on August 7, 2026. Soldner Decl. ¶ 53;

Supp. Soldner Decl. ¶ 7. The terminations of those two contracts have been superseded, and setting them aside would change nothing.

Vacatur would not supply what they seek, so Plaintiffs now ask for more. The Amended Complaint asked the Court to order the Department to "resume" each "study." Am. Compl. ¶¶ 232–241. Plaintiffs' opposition attempts to recast that request as an order that the Department "resume fulfilling its statutory obligations under ESRA," by whatever means the Department selects. Pls.' Opp'n at 23. Neither order is available on this record. A court may compel an agency to act only where the agency has failed to take a discrete action that it is legally required to take. *SUWA*, 542 U.S. at 63-64. The Amended Complaint pleads no claim under § 706(1). Apart from the three studies Congress prescribes by statute, which continue, no statute prescribes the studies Plaintiffs ask the Court to order the Department to "resume," so resuming them is not an action the Department is legally required to take. Four of them, BPS, B&B, HSLS:09, and ECLS-K, are longitudinal studies. The provision that addresses longitudinal work calls for "conducting longitudinal and special data collections necessary to report on the condition and progress of education." 20 U.S.C. § 9543(a)(7). That provision names no study. It does not require the Department to resume BPS, B&B, HSLS:09, ECLS-K, or any other specific study "with the clarity necessary to support judicial action." *SUWA*, 542 U.S. at 66. Plaintiffs acknowledge as much: "the Department retains discretion to determine how" to proceed, and it "may procure the work through new contracts, perform the work internally, or use any other means ESRA permits." Pls.' Opp'n at 23.

An order that the Department "resume fulfilling its statutory obligations under ESRA," Pls.' Opp'n at 23, is the type of order the plaintiffs sought in *SUWA*: "a general order compelling compliance with that mandate, without suggesting any particular manner of compliance."

542 U.S. at 66. The Supreme Court held that the APA does not authorize such an order. *Id.* at 66–67. Courts have applied *SUWA*'s reasoning to other statutes that use the word "shall" to impose "a mandatory, general duty" without specifying how the agency must meet its duty. *See Fryshman v. U.S. Comm'n for the Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1, 10–11 (D.D.C. 2019) (concluding that the plaintiffs identified no discrete action the agency was required to take, because "[t]he mere presence of the word 'shall' does not conversely mean a court can *a fortiori* compel an agency to act."). These limits apply even though Plaintiffs bring their claims under Section 706(2) of the APA. *Fund for Animals*, 460 F.3d at 21 n.9; Defs.' Mem. at 31. The distinction "between acting and failing to act" is "irrelevant under the APA," because "[a] court's authority to remedy either type of error depends entirely on the underlying statutory obligation of the agency." *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014). In that case, the district court set aside an unlawful agency notice and remanded without directing the agency to issue a replacement, and the D.C. Circuit affirmed: "Absent a statutory duty to promulgate a new rule, a court cannot order it." *Id.*

Plaintiffs also ask the Court to enjoin the Department from "disclosing data that does not meet ESRA's quality standards," to restore "the panels, data quality checks, and peer review processes," and to "retain jurisdiction to monitor compliance." Pls.' Opp'n at 24. None of these requests appears in the Amended Complaint. *See* Am. Compl. ¶¶ 232–241. The first would withhold data from Plaintiffs who claim injury from not receiving data, and it would require the Court to decide what "the highest methodological standards" demand of each release. 20 U.S.C. § 9541(b)(1). The second would require the Court to decide which review panels, quality checks, and review processes each study must include, although no statute prescribes the specific panels, checks, or processes that earlier contracts included. The third is the supervision that *SUWA* rules

out: it would make it "the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." 542 U.S. at 66–67.

### C. Plaintiffs' Organizational, Associational, and Traceability Arguments Do Not Establish Standing.

Plaintiffs' organizational theory is a claim of informational injury, Mem. Op. at 16–17, and their associational theory rests on the same claim for their members. Both fail for the same reasons.

No member declaration identifies a study that a statute prescribes and that the Department has stopped conducting. Nor does any identify data that the Department has collected and that a statute requires it to have released by now. *See* Defs.' Mem. at 23–24. The declarations that address NAEP and IPEDS describe studies that continue.

Traceability fails for a related reason. Much of the alleged harm that Plaintiffs' declarants describe comes from programs that no count of the Amended Complaint challenges. Defs.' Mem. at 24. Plaintiffs respond only that the unchallenged programs "may provide relevant context." Pls.' Opp'n at 22. "Context" does not establish Article III standing. Each claim requires an injury traceable to the action that claim challenges. *Am. Whitewater v. FERC*, 125 F.4th 1139, 1150 (D.C. Cir. 2025). Plaintiffs also do not respond to Defendants' showing that the IPEDS support contract ended on its own terms rather than by termination. Defs.' Mem. at 25.

## II. Nothing in Plaintiffs' Opposition Rescues Their Claims on the Merits.

Plaintiffs' opposition confirms that "[t]he only remaining merits issue is whether the Department's termination was arbitrary and capricious." Pls.' Opp'n at 31. Plaintiffs have not defended Count XI, which alleges that the Department acted contrary to 20 U.S.C. § 9622, and Defendants are entitled to judgment on that count.

### A. No Statute Prescribes the Seven Studies, So the Court May Not Order the Department to Resume Them.

Plaintiffs argue that the Department's decisions are not "committed to agency discretion by law" and thus their APA claims are not precluded on that basis. 5 U.S.C. § 701(a)(2); Pls.' Opp'n at 25–30. Defendants do not concede the point, but the Court need not resolve it, because *SUWA* does not rest on that exception to APA review. It rests on the limits the APA places on when relief can be ordered: a court may order an agency to act only where the agency has failed to take "a discrete agency action that it is required to take." 542 U.S. at 64 (emphasis omitted); *see also Long-Distance*, 751 F.3d at 634; *supra* Part I.B. So even assuming, *arguendo*, that the challenged decisions are reviewable, the dispositive question is whether any statute prescribes the specific studies that Plaintiffs ask the Court to order be resumed.

Plaintiffs state they do not challenge how the Department allocates its funds and instead challenge the Department's "failure to continue conducting and disseminating certain statutorily mandated research." Pls.' Opp'n at 30. They add that it is "immaterial" whether the Department meets its obligations "using contracts or its own personnel," *id.*, and that the Court has stated this dispute "concerns statutory constraints, not contracts," Mem. Op. at 18. On that framing, the question is whether a statute prescribes the studies at issue.[5] Apart from the three studies Congress prescribes by statute, which continue, no statute does, and Plaintiffs' own statements confirm it. Plaintiffs acknowledge that the studies are "means the Department chose," that the Department may use "any other means ESRA permits," and that it "may determine how to allocate its financial

[5] Defendants preserve their position that Plaintiffs' claims are in essence contract claims that belong in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See* Defs.' Mem. at 27; Mem. Op. at 17–18.

resources across the studies it supports." Pls.' Opp'n at 7, 23, 30. A choice that ESRA leaves to the Department is not an action the Department is "required to take." *SUWA*, 542 U.S. at 64.

Plaintiffs argue that "the statutory scheme plainly provides detailed guidelines for how that discretion must be used." Pls.' Opp'n at 26. But the provisions they list identify the subjects NCES must cover and describe its mission. *Id.* at 25–26. Take the provision Plaintiffs cite for postsecondary data: it calls for data on "access to, and opportunity for, postsecondary education, including data on financial aid to postsecondary students." 20 U.S.C. § 9543(a)(1)(E). Plaintiffs describe that provision as calling for data "through studies like NPSAS." Pls.' Opp'n at 26. That provision does not state that: it names no study, and it does not prescribe BPS, B&B, or any other specific study "with the clarity necessary to support judicial action." *SUWA*, 542 U.S. at 66. Where Congress wanted a specific postsecondary study, it prescribed one: the student-aid survey in § 1015a(k). For the seven studies that no statute prescribes, the choice of studies is the Department's. The Institute may act "directly or through grants, contracts, or cooperative agreements." 20 U.S.C. § 9512. The Statistics Commissioner "may" award contracts, use sampling, and use State-reported records, and may renew contracts "at the discretion of the Statistics Commissioner." *Id.* § 9544. ESRA directs the Department to report statistics on listed subjects. Apart from the three studies Congress prescribes by statute, no statute directs which studies the Department must conduct.

Defendants also preserve their position that, apart from the three studies Congress prescribes by statute, the choice of which studies to conduct is committed to agency discretion by law. 5 U.S.C. § 701(a)(2). The Court addressed that position on the pleadings and invited Defendants to develop it "at summary judgment with the benefit of the administrative record." Mem. Op. at 23. ESRA's reporting duties bind the Department, but ESRA supplies no standard

for deciding which studies will fulfill those duties, by what means, and at what cost. *See Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Plaintiffs' authorities ask whether a statute gives any guidance about how discretion is to be exercised. Pls.' Opp'n at 28–29 (citing *Cody v. Cox*, 509 F.3d 606, 610–11 (D.C. Cir. 2007), and *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985)). Even assuming, *arguendo*, that § 9541(b)(1)'s direction that NCES work "in a manner that meets the highest methodological standards" supplies a standard for the quality of work, it supplies none for deciding *which studies* NCES must conduct.

**B. The Record Shows That the Department's Decisions Were Not Arbitrary or Capricious.**

Plaintiffs contend that Defendants have forfeited their argument that the February 7, 2025 contract-by-contract review shows the challenged decisions were not arbitrary or capricious, because Defendants stated it briefly. Pls.' Opp'n at 32–33. Defendants previously raised the argument, identified the record documents on which it rests, and stated the governing standard, which is sufficient to present the issue for the Court's consideration. Defs.' Mem. at 32. Defendants provide further details here in response to Plaintiffs' opposition.

Plaintiffs argue the administrative record "consists of nothing more than a three-line email." Pls.' Opp'n at 34. It does not. The certified record contains two documents dated before any termination. The first is a contract-by-contract review dated February 7, 2025. EDAERA_AR_00003–16.[6] For each contract it records a category, such as "Statutory, Mandated,

[6] Defendants' opening memorandum cited the February 7, 2025 review at VA000001–09. Defs.' Mem. at 32. That range is the February 10, 2025 directive and its attachment; the February 7, 2025 review is at EDAERA_AR_00003–16. The memorandum's two references to "Section 1622" at page 30 should read 20 U.S.C. § 9622(a), and its citation of the Amended Complaint at page 12 should read ECF No. 31. Mr. Soldner's supplemental declaration included with this reply also corrects and supplements the contract exhibits to the August 11, 2026 declaration by Mr. Soldner. *See* Supp. Soldner Decl. ¶¶ 3–4, 7.

or Critical" or "Non-Critical," and a recommended action. *Id.* Its notes identify the statutory basis for the work where there is one. For the core NAEP contracts, for example, the notes cite 20 U.S.C. § 9622, the recommended action is review for reduced scope, and those contracts were not terminated. EDAERA_AR_00005–07. The second is the February 10, 2025 directive, which attached a list showing each contract's value, the amount obligated, and its "implied savings," and which recommended "starting with those with the highest dollar value of implied savings." VA000001–09.

The question under *State Farm* is whether the agency's path "may reasonably be discerned" from the record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). The record answers it: before any termination, it contains a document that sorts each contract by whether its work was statutory, mandated, or critical and recommends an action for each, and a directive that states the criterion on which to proceed. The record also shows what followed, contract by contract: the work was reinstated, modified, settled for delivery of what had been completed, or awarded anew. *See, e.g.*, VA000182 (NPSAS:24 reinstatement); VA001518 (CCD reinstatement); VA000615–22 (ECLS-K settlement and delivery of kindergarten data); VA002102 (TIMSS 2027 contract).

Plaintiffs' main response is that the Department terminated contracts that the internal review had labeled "Statutory, Mandated, or Critical." Pls.' Opp'n at 32. That label does not show that any statute required those contracts. The label covered work that was statutory, or mandated, or critical, so a contract could bear that label because the work was critical even if no statute required it. Further, the label described contracts, not the subjects that ESRA requires the Department to cover. The review shows that, before any termination, the Department examined each contract and recorded the purpose of its work. That is consideration of the kind Plaintiffs

argue was missing. Pls.' Opp'n at 32–33. On reliance, Plaintiffs identify no commitment by the Department to continue any study on any schedule, and the ECLS-K settlement, for example, provided for delivery of the kindergarten data. VA000618. On cost, ESRA conditions the Institute's work on "funds appropriated," 20 U.S.C. § 9512, and Plaintiffs agree the Department may allocate its resources "across the studies it supports," Pls.' Opp'n at 30.

### C. Any Relief Should Be Limited to Setting Aside the Action Found Unlawful.

If the Court reaches the merits and finds the explanation for a particular decision inadequate, the remedy should be to set that decision aside and remand it to the Department, in which case the Department would provide additional consideration and explanation. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); Defs.' Mem. at 15. For the reasons in Parts I.B and II.A, the Court should not go further and order the Department to resume specific studies, to restore earlier quality-control measures, or to submit to continued monitoring by the Court. An injunction beyond vacatur would also require its own showing. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

## CONCLUSION

For these reasons, the Court should dismiss the case for lack of subject-matter jurisdiction or, alternatively, deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: October 6, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: <u>*/s/ Brett S. Covington*</u>
BRETT S. COVINGTON
D.C. Bar #1003835
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-0888
Brett.Covington@usdoj.gov

*Attorney for Defendants*